**IN THE UNITED STATES
COURT OF APPEALS FOR
THE FIFTH CIRCUIT**

U.S. COURT OF APPEALS
RECEIVED
**Jan 19, 2023**
FIFTH CIRCUIT

| | |
|---|---|
| CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY, TEXAS CAMPAIGN FOR THE ENVIRONMENT, TURTLE ISLAND RESTORATION NETWORK, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY, | Case No. _____ |
| Petitioners, | |
| v. | |
| UNITED STATES DEPARTMENT OF TRANSPORATION; PETE BUTTIGIEG, in his official capacity as Secretary of the U.S. Department of Transportation; UNITED STATES MARITIME ADMINISTRATION, an agency of the U.S. Department of Transportation; ANN PHILLIPS, in her official capacity as Administrator of the U.S. Maritime Administration; UNITED STATES COAST GUARD, an agency of the U.S. Department of Homeland Security; LINDA FAGAN, in her official capacity as Commandant of the U.S. Coast Guard | |
| Respondents. | |

## PETITION FOR REVIEW

Pursuant to Administrative Procedure Act, 5 U.S.C. § 702, Deepwater Port

Act, 33 U.S.C. § 1516, Federal Rule of Appellate Procedure 15(a), and Circuit Rule

1

15, CITIZENS FOR CLEAN AIR & WATER IN BRAZORIA COUNTY, TEXAS CAMPAIGN FOR THE ENVIRONMENT, TURTLE ISLAND RESTORATION NETWORK, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY (hereafter "COMMUNITY PETITIONERS"), petition this Court for review of the United States Maritime Administration's ("MARAD") Record of Decision, dated November 21, 2022, for the licensing of the Sea Port Oil Terminal ("the Project"), and the underlying Final Environmental Impact Statement for the Project issued by MARAD and the United States Coast Guard ("USCG") on July 29, 2022. In accordance with local Rule 15.1(b), a copy of the Record of Decision is attached hereto as Exhibit A. The Final Environmental Impact Statement is incorporated by the Record of Decision and is part of the administrative record that will be filed in this case.

In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, parties that may have participated in the underlying procedure have been served with a copy of this Petition. The Certificate of Service to these parties is attached as Exhibit B. Pursuant to Federal Rule of Appellate Procedure 15(c), attached hereto as Exhibit C is a list of Respondents specifically identifying the Respondents' names and addresses.

Dated: January 19, 2023                    Respectfully submitted,

**/s/ Devorah Ancel**
Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
1650 38th St., Ste. 102W
Boulder, CO 80301
Telephone: (303) 449-5595
Fax: (303) 449-6520
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

**/s/ Amy Dinn**
Amy Catherine Dinn (TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext. 1118
adinn@lonestarlegal.org

*Counsel for Petitioner*
*Citizens for Clean Air & Clean Water in*
*Brazoria County*

**/s/ Erin Gaines**
Erin Gaines (TX24093462)
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org

*Counsel for Petitioner*
*Texas Campaign for the Environment*

3

**/s/ Lauren Parker**

Lauren Parker (DC1670885)
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202)-868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner*
*Center for Biological Diversity*

# Exhibit A

# DEPARTMENT OF TRANSPORTATION
# UNITED STATES OF AMERICA



# RECORD OF DECISION ON
# THE DEEPWATER PORT LICENSE APPLICATION
# OF
# SPOT TERMINAL SERVICES LLC

**Washington, D.C.**
**November 21, 2022**
**Expires on November 21, 2027**

**DEPARTMENT OF TRANSPORTATION**
**UNITED STATES OF AMERICA**

**RECORD OF DECISION ON**
**THE DEEPWATER PORT LICENSE APPLICATION**
**OF**
**SPOT TERMINAL SERVICES LLC**

**Washington, D.C.**

**TABLE OF CONTENTS**

TABLE OF CONTENTS............................................... 2

LIST OF ACRONYMS................................................ 4

I.      INTRODUCTION ............................................ 6

I.1. Deepwater Port Applicant.................................. 9

I.2. Project Description....................................... 9

I.2.1 Onshore Components....................................... 9

I.2.2 Offshore Components..................................... 12

I.2.3 Project Construction and Commissioning.................. 14

I.3. SPOT Terminal Services LLC's Corporate Structure........ 16

I.4. SPOT Deepwater Port Application Review Process.......... 17

I.5. National Environmental Policy Act Review Process........ 18

II.     DECISION .............................................. 27

III.    DECISION-MAKING PROCESS ............................... 29

III.1. The Deepwater Port Act................................ 29

III.2. Regulations........................................... 31

III.3. Facts................................................. 31

III.4. Environmental Protection Agency (USEPA) Approval...... 35

III.5. Section 7 Consultation................................ 37

III.6. Cultural Resources and Section 106  Consultation...... 38

III.7. The FEIS.............................................. 39

III.8. Adjacent Coastal State (ACS) Approval................. 40

IV.     POLICY DETERMINATIONS ................................. 41

V.      CRITERIA FOR ISSUANCE ................................. 41

V.1.   Financial Responsibility ............................... 42

V.1.1 General Obligations.................................... 42

V.1.2 Oil Spill Liability.................................... 44

V.1.3 Ownership, Construction, and Operation.................. 45

V.1.4 Removal Requirements................................... 47

V.2.   Compliance with Applicable Laws, Regulations, and License Conditions.......................................... 48

V.3. National Interest....................................... 50

V.4.   Navigation, Safety, and Use of the High Seas ........... 52

V.4.1 Navigation Safety...................................... 55

V.5.   Protecting and Enhancing the Environment ............... 58

V.5.1 Best Available Technologies, Safety and Control........ 59

V.5.2 Vapor Combustion Systems............................... 60

V.5.3 Agency and Public Involvement.......................... 60

V.5.4 Alternatives.......................................... 66

V.5.5 Conditions............................................ 68

V.6.   Advice of the Administrator of USEPA ................... 84

V.7. Consultations with the Secretaries of State, Defense, and Army................................................... 85

V.8. Approval of Adjacent Coastal State Governor............. 86

V.9. Coastal Zone Management Act............................. 87

VI.    CONCLUSIONS ........................................... 89

VII.   Appendix I. Endangered Species Act – Section 7 Consultation Final Biological Opinion

**LIST OF ACRONYMS**

| Acronym | Definition |
| --- | --- |
| ACS | Adjacent Coastal State |
| APE | Area of Potential Effect |
| The Applicant | SPOT Terminal Services LLC |
| ATBA | Area-to-be-Avoided |
| B/d | Barrels per day |
| BA | Biological Assessment |
| BAT | Best Available Technology |
| BBL | Barrels |
| BMPs | Best Management Practices |
| BOEM | Bureau of Ocean Energy Management |
| BSEE | Bureau of Safety and Environmental Enforcement |
| CAA | Clean Air Act |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| COFR | Certificate of Financial Responsibility |
| COVID-19 | Coronavirus Disease 2019 |
| CWA | Clean Water Act |
| CZMA | Coastal Zone Management Act of 1972 |
| DOI | U.S. Department of Interior |
| DOT | U.S. Department of Transportation |
| DWPA | Deepwater Port Act of 1974, as amended |
| EBR | Eastern Black Rail |
| ECHO | Enterprise Crude Houston Terminal |
| EEZ | Exclusive Economic Zone |
| EFH | Essential Fish Habitat |
| EIS | Environmental Impact Statement |
| EJ | Environmental Justice |
| EPD | Enterprise Products Partners L.P. |
| EPO | Enterprise Products Operating, LLC |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| GHG | Greenhouse Gases |
| GLO | The Texas General Land Office |
| GoM | Gulf of Mexico |
| HIPPS | High Integrity Pressure Protection System |
| IMO | International Maritime Organization |
| JD | Jurisdictional Determination |
| LACT | Lease Automatic Custody Transfer Unit |
| LEP | Limited English Proficient |
| License | Deepwater Port License |
| M$^3$ | Cubic meters |
| MARAD | Maritime Administration |

4

| | |
|---|---|
| MLVs | Mainline valves |
| MMPA | Marine Mammal Protection Act |
| NAA | No-Anchoring-Area |
| NEPA | National Environmental Policy Act of 1969 |
| NGO | Non-Governmental Organization |
| NMFS | National Marine Fisheries Service |
| NOx | Nitrogen Oxides |
| NOAA | National Oceanic and Atmospheric Administration |
| NOAA Fisheries | National Marine Fisheries Service |
| NPDES | National Pollutant Discharge Elimination System |
| OCS | Outer Continental Shelf |
| OPA 90 | Oil Pollution Act of 1990 |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PLEM | Pipeline End Manifold |
| PMMP | Prevention, Monitoring, and Mitigation Plan |
| PRM Plan | Permittee-Responsible Mitigation Plan |
| The Project | SPOT Terminal Deepwater Port or The Port |
| PSI | Pounds per Square Inch |
| Secretary | Secretary of U.S. Department of Transportation |
| SHPO | State Historic Preservation Office |
| SIP | State Implementation Plan |
| SPM | Single Point Mooring |
| SPOT | SPOT Terminal Services LLC |
| STEO | Short-Term Energy Outlook |
| TCEQ | Texas Commission on Environmental Quality |
| THC | Texas Historical Commission |
| TIRN | Turtle Island Restoration Network |
| TNAP | Temporary Noise Attenuation Piles |
| TPWD | Texas Parks and Wildlife Department |
| UDP | Unanticipated Discoveries Plan |
| UNCLOS | United Nations Convention on the Law of the Sea |
| U.S.C. | United States Code |
| USACE | U.S. Army Corps of Engineers |
| USCG | U.S. Coast Guard |
| USDHS | U.S. Department of Homeland Security |
| USEIA | U.S. Energy Information Administration |
| USEPA | U.S. Environmental Protection Agency |
| USFWS | U.S. Fish and Wildlife Service |
| VLCC | Very Large Crude Carriers |
| VOCs | Volatile Organic Compounds |

I.    **INTRODUCTION**[1]

This Record of Decision is for the SPOT Terminal Services LLC (SPOT or Applicant) application to own, construct, operate, and eventually decommission a deepwater port. This Record of Decision is not a license under the Deepwater Port Act of 1974 (DWPA), as amended and it does not authorize SPOT to own, construct, operate, or decommission a deepwater port. SPOT must comply with state and Federal permitting, mitigation, and related requirements outlined in this Record of Decision before a License can be issued and SPOT can begin construction of the proposed deepwater port.

The DWPA, as amended[2] declares it to be the intent of Congress to "...authorize and regulate the location, ownership, construction, and operation of deepwater ports

---

[1] The SPOT application related public comments, and official actions may be viewed on the Federal Government's Docket Management System (Docket) at http://www.regulations.gov by entering the official docket number for SPOT, MARAD-2019-0011.

[2] In September 1984, the DWPA was amended by Public Law No. 98-419, Deepwater Port Act Amendments of 1984, to define an "application" as any application submitted under the DWPA for a license for the ownership, construction, and operation of a deepwater port. Also, the 1984 amendment of the DWPA granted the Secretary of Transportation (Secretary) the authority to issue, amend, transfer, or reinstate a license (if consistent with the findings made at the time the said license was issued). The amendment directed that a license issued under the DWPA shall remain in effect until revoked by the Secretary or surrendered by the licensee. In October 1996, the DWPA was amended by Public Law No. 104-324, Deepwater Port Modernization Act, to promote the use of deepwater ports to transport Outer Continental Shelf (OCS) oil by reducing unnecessary and duplicative regulatory requirements, and promote innovation, flexibility and efficiency in the preparation and processing of a license by providing a streamlined regulatory approach utilizing provisions in an operations manual rather than specific license conditions or regulations. In addition to the streamlining process, the Secretary delegated responsibilities for processing licenses to the U.S. Coast Guard (USCG) and Maritime Administration (MARAD). The DWPA was later amended in January 2002, by Public Law No. 107-295, the Maritime Transportation Security Act of 2002, which, at Section 106, amended the DWPA to cover the importation, transportation, and production of natural gas. The DWPA was later amended by Public Law No. 109-241, the Coast Guard and Maritime Transportation Act of 2006, to address crew nationalities, vessel flag registries, and other requirements. The DWPA was subsequently amended in 2012 by Public Law No.112-213, the Coast Guard and Maritime Transportation Act of 2012, by modifying the definition of deepwater port to include transportation of oil or natural gas from a State. The DWPA was most recently amended by Public Law No. 113-281, the Howard Coble Coast Guard Authorization Act of 2014, providing technical amendments to 33 U.S.C. § 1503(i) concerning crew nationalities and vessel registries for natural gas export facilities. The DWPA is codified at 33 United States Code (U.S.C.) §§ 1501 through 1524, and citations in this document are either to sections of the DWPA or, whenever possible, to corresponding sections of the U.S.C. or to the Code of Federal Regulations (CFR).

in waters beyond the territorial limits of the United States."[3]  The term deepwater port includes offshore structures other than vessels used as terminals to transport, store, or further handle oil or natural gas to or from any State.[4]

Under the DWPA, persons seeking a license to own, construct, and operate a deepwater port must submit a detailed application to the Secretary of the U.S. Department of Transportation (USDOT) (hereinafter, the Secretary).  The Secretary has delegated to the Maritime Administration (MARAD) "the authority to issue, transfer, amend, or reinstate a license for the construction and operation of a deepwater port" as provided for in the DWPA.[5] By a 1997 delegation, the Secretary delegated the authority to process license applications to MARAD and the United States Coast Guard (USCG) in coordination with each other.[6] The Secretary has delegated to the Pipeline and Hazardous Materials Safety Administration (PHMSA) the authority to establish, enforce, and review regulations concerning the safe construction, operation, or maintenance of pipelines on Federal lands and the Outer Continental Shelf (OCS) (33 U.S.C. § 1520).[7]

In response to the 1973 oil embargo and resulting higher domestic gasoline prices, Congress passed the Energy Policy and Conservation Act of 1975, which prohibited the export

---

[3] 33 U.S.C. § 1501(a)(1).

[4] The term "deepwater port" is defined at 33 U.S.C. § 1502(9) to include only fixed or floating structures located beyond State seaward boundaries and deepwater port components located seaward of the high-water mark.  The Port, however, discussed herein, has onshore components *and* offshore components.  As such, the general term, "deepwater port," used herein shall have the statutory meaning referenced above.

[5] Vol. 77, Federal Register, No. 160, Friday, August 17, 2012, pp. 49964-49990 (77 FR 49964); 49 C.F.R. § 1.93(h).

[6] Vol. 62, Federal Register, No. 48, Wednesday, March 12, 1997, pp. 11382-11382 (62 FR 11382). The USCG has the additional statutory responsibility to approve an operations manual for a deepwater port. 33 U.S.C. § 1503(e)(1).  The USCG retained the statutory authority and its delegated authorities upon its transfer to USDHS (Department of Homeland Security Delegation Number: 0170, Sec. 2. (75), March 3, 2003; Public Law. 107-296, Section 888).

[7] Vol. 62, Federal Register, No. 48, Wednesday, March 12, 1997, pp. 11382-11383 (62 FR 11382).

of crude oil produced in the United States (U.S.), subject to a few statutory exceptions related to national security and national policy matters.[8]  The ban on exports was designed to ensure adequate domestic supplies of crude oil were maintained within the United States.  Although, crude exports were prohibited during this period, refined petroleum types manufactured in the U.S. were permitted to be sold abroad, which resulted in a thriving export trade. Subsequently, in December 2015, the Consolidated Appropriations Act of 2016, Section 101(a) of Division O, Title I, repealed the 1975 crude export ban.  After the repeal, U.S. producers began exporting crude oil overseas.[9]

In recent years, U.S. crude oil production has steadily increased as a result of the technological advancements in exploration and production methods and increased global demand.[10]   While a portion of the crude oil produced by the U.S. is refined for domestic use, the U.S. Energy Information Administration (USEIA) projects that the U.S. will be a net petroleum exporter from 2024 to 2050.[11] High export levels are driven by less consumption of liquid fuels in the U.S. as well as the production of crude oil grades that cannot be processed economically by U.S. refineries.[12]   Along with the lifting of the crude oil export ban in 2015, these developments have increased interest in the development of offshore deepwater ports for exporting U.S.-produced crude oil.[13]

---

[8] 42 U.S.C. § 6212. Repealed.

[9] Pub. L. 114-113, div. O, title I, § 101(a).

[10] See USEIA, U.S. Crude Oil Exports Reached Record Levels in 2020 and Remain High in 2021, July 20, 2021, https://www.eia.gov/todayinenergy/detail.php?id=48776#, accessed November 17, 2022.

[11] USEIA, Annual Energy Outlook 2021 Narrative, February 3, 2021, at 27-29, https://www.eia.gov/outlooks/aeo/pdf/AEO_Narrative_2021.pdf.

[12] Id.

[13] See USEIA, U.S. Crude Oil Exports Reached Record Levels in 2020 and Remain High in 2021, July 20, 2021, https://www.eia.gov/todayinenergy/detail.php?id=48776#, accessed November 17, 2022 ("U.S. crude oil infrastructure has expanded significantly since 2015 to facilitate crude oil exports from onshore production. Ports on the Texas Gulf Coast, particularly Corpus Christi and Houston, have led the expansion, allowing more oil to be exported from the Permian Basin and Eagle Ford Basin.").

## I.1. Deepwater Port Applicant

On January 31, 2019, SPOT, a wholly owned subsidiary of Enterprise Products Operating LLC (hereinafter referred to as EPO or direct parent), organized and existing under the laws of the State of Texas, submitted to MARAD and the USCG an application for a license under the DWPA - to own, construct, and operate (License) the SPOT Terminal Deepwater Port (hereinafter referred to as the Port or the Project) for the transportation of domestically produced crude oil for export to the global market.[14]

## I.2. Project Description

The Port will have both onshore and offshore components.[15] The onshore components will support the Port's operation and will be located in both Brazoria and Harris counties, Texas.

### I.2.1 Onshore Components

The onshore storage and supply components of the Project will include modifications to the existing Enterprise Crude Houston (ECHO) Terminal located in Harris County, Texas, including the installation of a pump and meter station within the facility's existing operating boundary, construction of Oyster Creek Terminal located in Brazoria County, Texas, and installation of buried onshore pipelines and ancillary facilities, which are described in more detail below.

The existing ECHO Terminal is located approximately four miles northeast of Pearland, Texas, near the intersection of Interstate 45 and State Highway 8 (also known as Beltway 8 and the Sam Houston Tollway). Specific modifications of the ECHO Terminal will include: (1) installation of four 10,000-horsepower electric motor-driven mainline centrifugal pumps that will operate in series to pump crude oil at or up to the maximum operating pressure of 1,480

---

[14] Vol. 84, Federal Register, No. 42, Monday, March 4, 2019, pp. 7413-7415 (84 FR 7413).

[15] A detailed description of the Port components can be found in the SPOT Deepwater Port License application, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-0001.

pounds per square inch gauge (psig); (2) installation of four 2,500-horsepower electric motor-driven vertical booster pumps that will move crude oil from their respective manifolds and related storage tanks through a measurement skid prior to delivery to the mainline pumps; and (3) installation of one measurement skid that will hold helical turbine metering equipment, which will meter crude oil exiting the ECHO Terminal and destined for the Oyster Creek Terminal.

The existing ECHO Terminal will connect to the Oyster Creek Terminal by a new 36-inch diameter pipeline, which will be identified as the ECHO to Oyster Creek Pipeline, upon completion of its construction.[16]  The ECHO to Oyster Creek Pipeline will extend 50.1 miles in length and cross both Harris and Brazoria Counties, with portions of the pipeline collocated with existing utility rights-of-way for the 36-inch Enterprise Rancho Pipeline, the 36-inch Enterprise Seaway Pipeline, and the CenterPoint Energy Transmission Line.

Six 0.1-acre mainline valve (MLV) sites will be constructed approximately ten miles apart along the ECHO to Oyster Creek Pipeline.  A connection from the existing Rancho II Pipeline to the ECHO to Oyster Creek Pipeline will be installed at the MLV 2 site.  This connection will include a measurement skid and will be identified as the Rancho II Junction.  A pig launcher will be installed at the beginning milepost of the ECHO to Oyster Creek Pipeline within the operating fence line of the ECHO Terminal.  A pig receiver will be installed at the ending milepost of the pipeline within the fence line of the Oyster Creek Terminal.[17]

---

[16] The proposed "ECHO to Oyster Creek Pipeline" will be constructed to connect the existing ECHO Terminal in Harris County, Texas, to the newly constructed Oyster Creek Terminal located in Brazoria County, Texas. Onshore construction and installation associated with Project construction and operations can be found in Chapter 2.2.1.2 of The Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032

[17] A "pig" is an internal tool that can be used to clean and dry a pipeline and to inspect the pipeline for damage or corrosion.  The purpose of the pig launchers and receivers is to allow for inspection and cleaning without having to shut down the pipeline. Onshore construction and installation associated with Port can be found in Chapter 2.2.1.2 of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

The Oyster Creek Terminal will be constructed approximately
2.5 miles northeast of Lake Jackson, Texas, and four miles
southeast of Angleton, Texas, on Farm to Market Road 523 in
Brazoria County.  The Oyster Creek Terminal site will cover
approximately 140.1 acres and include: (1) installation of
seven aboveground crude oil storage tanks, each with a
capacity of 685,000 barrels (bbl) (600,000 bbl of working
storage) for a total onshore storage capacity of
approximately 4.8 million bbl (4.2 million bbl working
storage of crude oil); (2) installation of four measurement
skids with helical turbine metering equipment to measure
the inbound ECHO to Oyster Creek Pipeline, one future
inbound pipeline system, and one each for the outbound
Oyster Creek to Shore 36-inch pipelines; (3) installation
of four 900-horsepower electric motor-driven vertical
booster pumps that will move crude oil from the storage
tanks through the measurement skids; and (4) installation
of six 9,000 horsepower electric motor-driven centrifugal
pumps downstream of the booster pumps to move crude oil
from the measurement skids to the Oyster Creek to Shore
Pipelines.[18]  The vertical booster pumps and the centrifugal
pumps will work in parallel to move crude oil at a flow
rate of up to 42,500 barrels per hour per pipeline (or
combined flow rate of up to 85,000 barrels per hour for the
two pipelines), but will be capable of varying speeds to
adjust flow rates.

Additional onshore facilities will include an electrical
substation, electrical services, and office and warehouse
buildings, which will be constructed to support the
operation of the Oyster Creek Terminal.  Two permanent
vapor combustion units and one portable vapor combustion
unit will be installed to prevent vapors generated in the
storage tanks from being uncontrollably emitted.  The vapor
combustors can eliminate more than 99 percent of volatile
organic compounds (VOCs) that would otherwise be emitted

---

[18] The proposed "Oyster Creek to Shore Pipelines" will be constructed from the Oyster
Creek Terminal located in Brazoria County, Texas to the shoreline of Brazoria County,
Texas.  A discussion of the Oyster Creek Terminal and Oyster Creek to Shore Pipelines
can be found in Chapters 2.2.1.3 and 2.2.1.4 of the Final Environmental Impact
Statement, available for viewing at the Federal Docket Management System:
http://www.regulations.gov under docket number MARAD-2019-0011-5032.

during tank filling, maintenance, or inspection activities. A firewater pond and a foam system will be constructed within the Oyster Creek Terminal for fire control.

Two collocated 36-inch diameter pipelines, identified as the Oyster Creek to Shore Pipelines, will be constructed from the Oyster Creek Terminal to the shoreline of Brazoria County, Texas. These pipelines will be approximately 12.2 miles long and traverse south-southeast from the Oyster Creek Terminal to the shoreline, where they will transition to subsea pipelines from the shoreline to the Port. Four 0.1-acre MLV sites will be constructed along the Oyster Creek to Shore Pipelines, one at mile post 5.4 and one at mile post 12.2 (for each pipeline). The Oyster Creek to Shore Pipelines will have pig launchers and receivers within the Oyster Creek Terminal, allowing continuous pigging from the Oyster Creek Terminal to the Port platform and back.

The Applicant will use trenching or the horizontal directional drilling (HDD) construction method to bury the onshore pipeline segments. HDD construction will be used at 28 locations onshore to install pipeline segments to avoid sensitive and/or protected areas/resources. The locations include 13 roads or unspecified landowner parcels, 1 road with an adjacent waterbody, and 14 wetland or waterbody features.[19]

In response to public comments on the proposed Project, the location of the shoreline mainline valve (MLV) was relocated from the south side to the north side of Bluewater Highway (approximately 80 meters [262 feet] farther inland) to minimize visual impacts along the beach during construction at Surfside Beach.[20]

### I.2.2 Offshore Components

The offshore components of the Port will originate at the shoreline crossing in the town of Surfside Beach, Brazoria

---

[19] A description of HDD crossings is included in Chapter 2.2 of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

[20] The Oyster Creek to shore pipelines is described in Chapter 2.2.1.4 of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

County, Texas, where the collocated onshore Oyster Creek to
Shoreline Pipelines will tie into two 36-inch diameter
subsea pipelines to deliver crude oil to the Port.  The
subsea pipelines will be approximately 40.8 nautical miles
long and transect the Outer Continental Shelf (OCS)
Galveston Protraction Area Lease Blocks 280, 304, 303, 314,
330, 329, 347, 348, 360, 359, 382, 392, 421, 426, and 463.
The pipelines would be bi-directional for the purposes of
maintenance, pigging, changing of crude oil grades, or
evacuating the pipeline with water.

The Port will be located in Federal waters within the OCS
Galveston Protraction Area (Gulf of Mexico [GoM]) Lease
Block 463, approximately 27.2 to 30.8 nautical miles off
the coast of Brazoria County, in water depths of
approximately 115 feet.  The Port will consist of one fixed
offshore platform that will include: (1) a laydown deck
with a crane laydown area; (2) a main deck with a lease
automatic custody transfer (LACT) unit, prover loop, living
quarters, electrical and instrument building, and other
ancillary equipment; (3) a cellular deck with departing pig
launchers and receivers, generators, and vapor combustion
units; and (4) a sump deck with shut-down valves and an
open drain sump.

Crude oil will arrive at the Port from the 36-inch subsea
pipelines and enter the LACT unit to measure the crude oil
being transferred to the VLCCs or other crude oil carriers.
A High Integrity Pressure Protection System (HIPPS) will be
installed following the LACT unit and between the subsea
crude oil pipelines and loading hoses.  Crude oil will then
move through 30-inch diameter crude oil loading pipelines
to pipeline end manifolds (PLEMs) that will be installed on
the seafloor.  Two PLEMs will serve the crude oil loading
pipelines, and two PLEMS will serve the vapor recovery
pipelines.  Pig launchers and receivers will be installed
along the 30-inch loading pipelines and the 16-inch
incoming vapor recovery pipelines.  The vapor recovery
pipelines will extend from the PLEMs into a vapor
combustion system on the platform that will eliminate 95
percent or more of VOC emissions generated from the VLCCs
or other crude oil carriers.

Two single-point mooring (SPM) buoys will be installed to
moor a maximum of two VLCCs or other crude oil carriers
concurrently.  The SPMs are floating buoys anchored in
approximately 115 feet of water, 0.66 nautical miles from

the Port platform and within the same OCS Galveston Area
Lease Block 463.  Each SPM buoy will connect to the PLEMs
via two 24-inch diameter underwater buoy crude oil hoses
and a 24-inch diameter vapor recovery hose.  Once crude oil
reaches the SPM buoys, it will be loaded on the VLCCs or
other crude oil carriers via two 24-inch diameter floating
crude oil hoses.  Each SPM buoy will also have one 24-inch
vapor recovery hose approximately 1,000 feet long connected
to the moored VLCC or other crude oil carrier.  The
configuration of the Port will allow for concurrent mooring
of two VLCCs or other crude oil carriers with capacities
between 120,000 and 320,000 deadweight tonnage for loading
up to 365 days per year.

Service vessels, including tugboats, supply vessels, and
crew boats, will be required to assist with the operation
of the Port.  Three mooring points for these service
vessels will be anchored to the sea floor on the southwest
corner of Galveston Area Lease Block 463.  Additionally, an
anchorage area in Galveston Area Lease Block A-59 has been
proposed to allow for the VLCCs or other crude oil carriers
to stage near the Port in the event a vessel is not able to
navigate directly to the SPM buoys or if they must
disconnect from the SPM buoys for safety reasons.

### I.2.3 Project Construction and Commissioning

According to the Applicant, construction of the proposed
Port will begin in the second quarter of 2023, but only if
a License is issued and all License conditions are met.
Onshore construction is expected to begin in the second
quarter of 2023 and be completed in the fourth quarter of
2024. The Applicant anticipates that commissioning of the
Port will occur in the third and fourth quarters of 2025.
The Applicant anticipates that the first exports of crude
oil would commence in December 2025, contingent upon the
company's ability to obtain all required State and Federal
permits and satisfy all License conditions. The onshore and
offshore components of the Port will have short-term
impacts during construction and long-term impacts during
operation and decommissioning.  Details regarding the
Federal environmental evaluation of the Port's short and
long-term impacts on the environment during construction,
operation, and decommissioning are summarized in Section
V.5 – *Protecting and Enhancing the Environment* of this

Record of Decision and in the SPOT Final Environmental
Impact Statement (FEIS).[21]

The modifications to the ECHO Terminal will take
approximately 9.5 months. Construction of the Oyster Creek
Terminal will take approximately 20 months. An additional 2
to 2.5 months of cleanup and restoration will be required
for these onshore components.

Most of the offshore components will be fabricated onshore
prior to installation offshore.  The Applicant states that
offshore component fabrication will occur at multiple
existing fabrication businesses, most within the Gulf Coast
region, including some that may be within the Project's
socioeconomic study area.[22]  Fabrication of the platform
equipment will take approximately 12 to 14 months.
Fabrication of the jacket and piles, which includes the
structure supporting the Port deck, will take 6 to 8
months.  The deck fabrication, outfitting, and pre-
commissioning will take 12 to 14 months.

Once the offshore components are fabricated, transportation
of the equipment and construction of the platform offshore
will take approximately five weeks.  Construction of the
subsea pipelines, SPM buoys, PLEMs, interconnecting
pipelines, and floating hoses will take approximately 22
months.  Once construction is complete, the final
commission and startup for the offshore components of the
Project will take approximately six weeks. All Port
components will be designed, constructed, and operated in
accordance with applicable codes and standards and will
have an expected operating life of approximately 30 years.

The Applicant advises that construction and installation
will support as many as 1,400 temporary jobs, including up
to 1,100 temporary jobs during the second year of
construction.  Further, it is estimated that the
Applicant's workforce will peak at 260 offshore workers and

---

[21] The SPOT Final Environmental Impact Statement can be viewed at
https://www.regulations.gov/ under the document number MARAD-2019-0011-5032.

[22] Offshore construction and installation associated with Port construction and
operations can be found in Chapter 2.2.6 of the Final Environmental Impact Statement,
available for viewing at the Federal Docket Management System:
http://www.regulations.gov under docket number MARAD-2019-0011-5032.

840 onshore workers, during construction.  Project operations will generate 62 permanent jobs. It is estimated that 34 workers will operate onshore facilities and 28 workers will operate the offshore facilities over the 30-year life of the Project.[23]  The Applicant estimates that 85 percent of the workforce will be hired from existing labor pools in Texas and Louisiana, given these states' mature oil and gas industries.  Harris County has a civilian labor force exceeding 2.2 million people. Construction represents the third largest labor sector in Brazoria County.  Therefore, the Applicant states that a significant percentage of workers will be hired from within the Project area.[24]  Additionally, the Applicant states that the contractors for Project construction will purchase supplies and services from local businesses that could reasonably be expected to benefit from increased employment and income in the socioeconomic area of impact.[25]

### I.3. SPOT Terminal Services LLC's Corporate Structure

SPOT, organized and existing under the laws of the State of Texas, was established to own, construct, and operate the proposed Port.  SPOT is a wholly owned subsidiary of EPO.  EPO is the wholly owned operating subsidiary of Enterprise Products Partners L.P.(EPD).  EPD is a publicly traded Delaware limited partnership and a leading North American provider of midstream energy services to producers and consumers of natural gas, natural gas liquids, crude oil, petrochemicals, and refined petroleum products.  EPD conducts substantially all their business operations through EPO and its consolidated subsidiaries.

---

[23] Employment and Income impacts from Operation of the Project can be found in Chapter 3.14.5.2 of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

[24] SPOT Deepwater Port License Application, Volume IIa, Section 8, available for viewing at the Federal Docket Management System: http://www.regulations.gov, docket number MARAD-2019-0011-0001.

[25] Socioeconomic Impacts associated with Project construction and operations can be found in Chapter 3.14 of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

SPOT and its parent companies, EPO and EPD, will execute
safety protocols, environmental stewardship, and social
responsibility while supporting the development of domestic
reserves and fostering energy security for the U.S.  SPOT,
its financiers, and team of industry experts must provide
the necessary financial, management, and technical support
to own, construct, operate, and decommission the Port.

Based on the information and representations provided by
SPOT, including its December 12, 2018, Affidavit of U.S.
Citizenship, MARAD has determined that SPOT is a citizen of
the United States within the meaning of 33 U.S.C. §
1502(4).  Accordingly, SPOT has met the citizenship
requirements necessary to receive a License under 33 U.S.C.
§ 1503(g).

### I.4. SPOT Deepwater Port Application Review Process

On January 31, 2019, the Applicant submitted to MARAD and
the USCG an application for a License under the DWPA to
own, construct, and operate the Port for the export of
domestically produced crude oil to the global market.[26] On
February 22, 2019, the SPOT deepwater port license
application was deemed complete by MARAD, USCG, and other
Federal cooperating agencies.[27]  On March 4, 2019, MARAD
published a Notice of Application in the *Federal Register*
summarizing the Application and Project design.  The
*Federal Register* Notice of Application was posted to the
Federal Docket for the SPOT Project at Docket No. MARAD-
2019-0011.[28]

Pursuant to 33 U.S.C. § 1508(a)(1), the State of Texas was
designated as the Adjacent Coastal State (ACS) for the
Project because Texas will be directly connected by
pipeline to the Port.  No other state will be directly
connected by pipeline to the Port or located within fifteen
nautical miles of the proposed Port. Moreover, no other

---

[26] Federal Docket Management System, http://www.regulations.gov,
https://www.regulations.gov/document/MARAD-2019-0011.

[27] Federal Docket Management System, http://www.regulations.gov,
https://www.regulations.gov/document/MARAD-2019-0011-5025.

[28] Vol. 84, Federal Register, No. 42, Monday, March 4, 2019, pp. 7413-7415 (84 FR
7413).

state petitioned MARAD for ACS status.  As such, Texas is
the only designated ACS for the Project.  Sections
1503(c)(8) and 1508(b)(1) of Title 33 provide that the
Secretary may not issue a License without the approval of
the Governor of the ACS who must approve, approve with
conditions, or deny the application within 45 days of the
final public hearing on the proposed deepwater port license
application. If the Governor fails to transmit his
decision, an approval is conclusively presumed under the
DWPA.[29]

By letter dated February 26, 2019, MARAD notified the
Governor of Texas of the Application and 45-day period
during which the Governor could exercise his authority
under the DWPA to approve, approve with conditions, or deny
the Application.[30,31]

On August 3, 2022, MARAD issued a second letter to the
Governor of Texas informing him of the availability of the
SPOT FEIS, the date of the final public hearing, and the
45-day period during which he could exercise his authority
to approve, approve with conditions, or deny the
Application. The 45-day ACS Governor's decision period
ended on October 7, 2022.  The Governor of Texas provided
approval of the proposed SPOT project dated August 31,
2022, with no conditions, within the 45-day period
following the final public hearing.[32]

### I.5. National Environmental Policy Act Review Process

In addition to the statutory requirements stipulated under
the DWPA, the Project required review under the National
Environmental Policy Act (NEPA).  NEPA requires Federal
agencies to consider the environmental impacts of a
proposed action (and reasonable alternatives), which may
significantly affect the quality of the natural and human
environment, into their decision-making process.

---

[29] 33 U.S.C. §§ 1503 (c)(8) and 1508(b)(1).

[30] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1204.

[31] 33 U.S.C. § 1508(b)(1), (c)(8).

[32] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-7880.

The purpose of the NEPA review is to provide an environmental analysis sufficient to support the Maritime Administrator's licensing decision; to facilitate a determination of whether the Applicant has demonstrated that the proposed Project would be located, constructed, operated, and decommissioned using the best available technology necessary to prevent or minimize adverse impacts on the environment; and to encourage and facilitate involvement by the public and interested agencies in the environmental review process.

The environmental review process, required by NEPA and the DWPA, began on March 7, 2019, with the publication in the *Federal Register* of a Notice of Intent (NOI) to prepare an environmental impact statement (EIS) and receive public comments regarding the scope of the proposed action and its potential environmental impacts.[33]  As stated, under procedures set forth in the DWPA, MARAD had 240 days from the date of the Notice of Application[34] to hold one or more public meetings in the ACS.[35]  During the scoping process, MARAD and the USCG conducted an informational open house and public scoping meeting on March 20, 2019, in Lake Jackson, Texas, to receive public comments and information on issues to be addressed in the EIS.  Three local residents commented at the March 20, 2019, public scoping meeting.  The comments included: concerns regarding environmental impacts on Galveston Bay seafood production and ship lightering; concerns regarding the number of active deepwater port license applications under consideration by MARAD and USCG; concerns regarding impacts to Tribal nations, native flowers and plants; and concerns regarding hurricane and other extreme weather events and the potential impacts on the Port and ultimately, southern Brazoria County.[36]

---

[33] Vol. 84, Federal Register, No. 45, Thursday, March 7, 2019, pp. 8401-8404 (84 FR 8401).

[34] Vol. 84, Federal Register, No.42, Monday, March 4, 2019, pp. 7413-7415 (84 FR 7413).

[35] 33 U.S.C. § 1504(g).

[36] The Public Scoping Meeting Report is available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-0019.

In addition to the public comments received at the March 20, 2019, public scoping meeting, written comments were submitted to the Federal Docket Management System at *www.regulations.gov/docket/MARAD-2019-0011*. Generally, these comments expressed concerns with the scoping period timeline, evaluation of an alternative pipeline route through Manvel, Texas, and the potential for adverse environmental impacts on protected species resulting from upstream oil and gas activities in the Gulf of Mexico. The transcripts of the March 20, 2019, public scoping meeting and its Public Scoping Meeting Report, which includes a summary of the oral and written public comments, are available on the Federal Docket at *www.regulations.gov/docket/MARAD-2019-0011*.[37]

Following the close of the public scoping meeting comment period, the regulatory timeline for processing the application was suspended three times to obtain additional information from the Applicant that was needed to sufficiently develop the required environmental document.

The regulatory timeline was initially suspended on May 31, 2019, to receive additional information regarding the ichthyoplankton and underwater acoustic analysis for several aspects of the Port's design and operations.[38] MARAD and USCG received responses from the Applicant to all information requests and the information submitted was deemed sufficient to continue the environmental review. As such, MARAD and USCG restarted the regulatory clock on October 23, 2019.[39]

The regulatory timeline was suspended a second time on November 21, 2019, to receive additional information required for development of the USCG's Risk Assessment Report.[40] On February 5, 2020, MARAD and USCG restarted the regulatory clock as all requested information from the

---

[37] The Public Scoping Meeting Report that includes the Public Scoping Meeting Transcripts (Appendix D) is available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-0019.

[38] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0018.

[39] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0026.

[40] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1219.

Applicant had been received and was deemed sufficient to continue the environmental review.[41]

The regulatory clock was suspended a third time on June 4, 2020, to receive information from the Applicant regarding changes to the Project's proposed pipeline route and the potentially affected landowners.[42]  The necessary information was received on November 25, 2020, and the regulatory clock was restarted.[43]

On February 7, 2020, MARAD published a *Federal Register* Notice of Availability announcing the publication of the SPOT Draft Environmental Impact Statement (DEIS), and the agencies' plans to host a DEIS public meeting.[44] Publication of the Notice of Availability began a 45-day comment period during which the public could submit formal comments concerning the SPOT DEIS.  On February 26, 2020, MARAD and USCG held an informational open house and DEIS public meeting in Lake Jackson, Texas to receive comments from Federal and State agency representatives, tribal leaders, elected officials, and other members of the general public regarding the scope and content of the DEIS.[45]  During the DEIS meeting, MARAD and USCG received a total of 16 oral comments from various members of the public representing local residents, Non-Governmental Organizations (NGOs), and a local tribal representative. The February 26, 2020, DEIS public meeting transcript is available on the Federal Docket.[46]

In addition to receiving oral comments at the February 26, 2020, DEIS public meeting, MARAD and USCG provided a 45-day public comment period for which the public could submit written comments on the Federal Docket for the SPOT DEIS. This public comment period initially ended on March 23,

---

[41] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0035.

[42] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1181.

[43] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1188.

[44] Vol. 85, Federal Register, No. 26, Friday, February 7, 2020, pp. 7381-7383 (85 FR 7381).

[45] Id.

[46] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1192.

2020; however, due to the COVID-19 public health emergency[47], the 45-day DEIS public comment period was extended to May 31, 2020.[48]  To continue compliance with national health and safety protocols due to COVID-19, MARAD decided to conduct all future public meetings in a virtual platform.

In response to the DEIS public comment period, MARAD and USCG received approximately 37,408 comments on the DEIS. From the public comments received, MARAD and USCG determined that 6,581 were substantive comments.  All substantive comments were considered and responded to in Appendix C1 of the Final Environmental Impact Statement (FEIS).[49]  Generally, the public comments expressed concerns regarding impacts from crude oil spills; information regarding the economic benefits and national interest of the Project; impacts to terrestrial, aquatic, and marine wildlife, including the Kemp's Ridley Sea Turtle; and impacts to the coastal environment and communities.  Other substantive comments received from Federal and State agencies included: recommendations for MARAD and USCG to perform more meaningful engagement with impacted minority and low-income communities; recommendations to require the Applicant to obtain updated applicable permits; requests for clarification from the Applicant regarding compensatory mitigation; recommendations to require the Applicant to develop and implement a Discharge Prevention and Response Plan; requests for clarification regarding the Purpose and Need of the Project; and recommendations to ensure that the agencies comply with NEPA requirements and other relevant environmental laws and regulations.

Based on comments received on the DEIS, MARAD determined that public notification and opportunities for comment did not include sufficient outreach and notification to Limited English Proficient (LEP) persons.  As such, on October 29,

---

[47] Vol. 85, Federal Register, No. 85, Wednesday, March 18, 2020, pp. 15337-15338 (85 FR 15337).

[48] Vol. 85, Federal Register, No. 85, Friday, May 1, 2020, pp. 25507-25508(85 FR 25507).

[49] See Appendices C1-C3 of the FEIS for a more detailed discussion of the evaluation and resolution of public comments received during the environmental review process. Appendices C1-C3 are available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

2021, MARAD published a *Federal Register* Notice of Availability announcing the SPOT Supplemental Draft EIS (SDEIS) for a 45-day public review and comment period.  The Notice of Availability also advised the public of the SDEIS virtual public meeting, held on November 16, 2021.[50]  The SDEIS was prepared and published to ensure meaningful engagement of identified LEP persons located in the affected area of the Project in the environmental review process.  The SDEIS also presented MARAD's and USCG's evaluation of the Applicant's proposed pipeline route changes and the affected landowners and responded to comments received on the DEIS.

Prior to the publication of the SDEIS, on October 8, 2021, MARAD published a Draft General Conformity Determination in the *Federal Register* for a 30-day public review and comment.[51]  The Draft General Conformity Determination was prepared to ensure that the air emissions associated with the Project conform with the Texas State Implementation Plan (SIP).  The Project's onshore construction workspaces would be located within the Houston-Galveston-Brazoria (HGB) ozone nonattainment area, which extends nine nautical miles offshore over state waters.  In the Draft General Conformity Determination, MARAD concluded that the Project would comply with the Texas SIP requirements.[52]  MARAD submitted its General Conformity Determination to the Texas Commission on Environmental Quality (TCEQ) and the USEPA, and the TCEQ concurred with MARAD's determination.

As part of the SDEIS and Draft General Conformity Determination public outreach effort, MARAD and USCG undertook the following actions to ensure full and proper engagement:

1. Identified through the USEPA's EJSCREEN 80 census block groups within the project area of impacts that

---

[50] Vol. 86, Federal Register, No. 207, Friday, October 29, 2021, pp. 60093-60095 (86 FR 60093).

[51] Vol. 86, Federal Register, No. 193, Friday, October 8, 2021, pp. 56349-56350 (86 FR 56349); see also, Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1247.

[52] See Appendix V of the FEIS for the General Conformity evaluation of construction and operation emissions from the proposed action, available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

include thousands of Spanish and Vietnamese speaking LEP persons.

2. Mailed flyers, translated in English, Spanish, and Vietnamese, to residences located within 0.25 miles of the proposed SPOT pipeline route.[53]

3. Published announcements in English, Spanish, and Vietnamese in the local newspapers, libraries, community centers, and on social media.

4. Provided live interpretation services in English, Spanish, and Vietnamese during the SDEIS public meeting.

5. Provided Spanish[54] and Vietnamese[55] translations of the Executive Summary of the SDEIS and other related documents below, which were made available on the Federal Docket Management System for the SPOT Project. These documents included:

   i. SDEIS Public Meeting transcripts (specifically, the opening comments and all non-English comments made during the public meeting);

   ii. Online resources, such as the Project DWP Website and other Project materials;

   iii. Public Meeting Online Registration process for participation in the SDEIS public meetings; and

   iv. Draft General Conformity Determination.[56]

On November 16, 2021, MARAD and USCG held a public meeting to receive comments on the SDEIS. A total of 20 oral

---

[53] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1267.

[54] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5033.

[55] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5034.

[56] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1247. The Spanish translation of the Draft General Conformity Determination is available at http://www.regulations.gov, MARAD-2019-0011-1249. The Vietnamese translation of the Draft General Conformity Determination is available at http://www.regulations.gov, MARAD-2019-0011-1250.

comments were provided by local area residents, and NGOs.[57] In addition to providing oral comments at the SDEIS public meeting, the public submitted written comments during the SDEIS 45-day public comment period, which ended on December 13, 2021.  The public also provided comments on the Draft General Conformity Determination.  The comment period for the Draft General Conformity Determination closed on November 7, 2021.  In total, approximately 50,857 public comments were received on the SDEIS and Draft General Conformity Determination.  From the comments received, MARAD and USCG determined that 1,024 were substantive comments.  All substantive comments were considered and responded to in Appendix C2-C3 of the Final Environmental Impact Statement (FEIS).[58]  Overall, the SDEIS public comments expressed concern regarding the following: impacts to endangered species, including sea turtles and rare birds, such as the Kemps Ridley Sea Turtle and the Eastern Black Rail (EBR); impacts to Brazoria County residents, including the Surfside Beach residential community and three national wildlife refuge areas; adverse impacts to human health resulting from VOC emissions during Port operations; impacts on water systems resulting from oil spills; cumulative impacts of industrial infrastructure development and pollution generated by the Port and existing facilities in the area of impact; the need to conduct adequate environmental justice analysis regarding compounding social and environmental costs of existing and new onshore and offshore oil and gas facilities; consistency with national policy goals and national interest; safety concerns regarding the distance between the proposed Port platform and SPM buoys; the potential for a loaded VLCC/platform strike during adverse weather conditions; and consideration of an alternate pipeline route to bypass the City of Surfside Beach.[59]

---

[57] The transcript of the November 16, 2021, SDEIS public meeting is available on the Federal Docket at https://www.regulations.gov/document/MARAD-2019-0011-5028.

[58] See Appendices C1-C3 of the FEIS for a more detailed discussion of the evaluation and resolution of public comments received during the environmental review process. Appendices C1-C3 are available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

[59] Id.

In addition to the above cited comments, MARAD and USCG received other substantive comments on the SDEIS from Federal and State agencies as well as NGOs.  These entities included, but are not limited to, the USEPA, TCEQ, the Sierra Club[60], Sierra Club Texas, Citizens for Clean Air and Clean Water[61], Earthjustice and others.

The Notice of Availability of the SPOT FEIS, Notice of a Virtual Final Public Hearing, and Request for Comments was published in the *Federal Register* on July 29, 2022.[62] Concurrent with the issuance of the FEIS, MARAD published a Notice of Availability of the Project's Final General Conformity Determination in the *Federal Register*.[63] MARAD and the USCG held the virtual final hearing on August 23, 2022.  Transcripts of the final hearing are available on the Federal Docket.[64]  MARAD received 14,072 submissions on the FEIS.  Of the 14,072 submissions, over 800 were identified as possible unique, substantive comments.  All substantive comments were considered by MARAD.  Additional mitigation measures have been added as conditions to this Record of Decision.  Additional details regarding the environmental review process for the application are discussed later in this Record of Decision.

This Record of Decision sets forth MARAD's decision on the application submitted by SPOT.  The statute requires that this decision be made within 90 days after the last public hearing, which was held on August 23, 2022.[65]

In reaching this decision, a broad range of expert advice and information from other Federal agencies, the ACS, and the public must be evaluated and considered.  Moreover, the

---

[60] Sierra Club https://www.regulations.gov/comment/MARAD-2019-0011-5005

[61] Citizens for Clean Air and Clean Water (via Lone Star Legal Aid) https://www.regulations.gov/comment/MARAD-2019-0011-4999.

[62] Vol. 87, Federal Register, No. 145, Friday, July 29, 2022, pp. 45849 - 45851 (87 FR 45849).).

[63] Vol. 87, Federal Register, No. 145, Friday, July 29, 2022, pp. 45847 - 45849 (87 FR 45847); see also, Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5031.

[64] Federal Docket Management System, MARAD-2019-0011-7886.

[65] 33 U.S.C. § 1504(i)(4).

DWPA requires specific findings be made that seek to protect, promote, and, in some cases, reconcile national priorities on energy, the environment, the economy, and freedom of navigation on the high seas.

## II.  DECISION

For the reasons set forth in this document, SPOT Terminal Services, LLC's Application for a License under the DWPA has been approved. This Record of Decision is not a License. SPOT must comply with state and Federal permitting, mitigation, and related requirements outlined in this Record of Decision before a License can be issued. This approval is subject to conditions designed to protect and advance the national interest, ensure adequate demonstration of financial capability to construct, operate and decommission the Port, and make certain that the Port will be constructed and operated using best available technology (BAT) to prevent or minimize adverse impacts to the marine environment.  Several of the conditions are self-evident: the need for an operation manual, the need to submit further technical information and detailed drawings concerning the construction of the Port, and the need to obtain all required Federal and State permits, as well as other conditions that are the natural product of the application process.  The precise conditions, including conditions required by the cooperating Federal and State agencies will be set forth in the License upon issuance.

The USEPA, National Marine Fisheries Service (NMFS), U.S. Army Corps of Engineers (USACE), U.S. Fish and Wildlife Service (USFWS), Texas Park and Wildlife Department (TPWD), Texas General Land Office (Texas GLO), TCEQ, and other Federal and State agencies have made sound and constructive recommendations to preserve the marine and coastal environments in which this Port will be located and operate.

MARAD considered the specific concerns expressed by members of the local Lake Jackson and Surfside Beach coastal communities regarding the proposed Port, its pipeline route, and the potential impact the facility and its components may have on local resources.  Also, MARAD thoroughly evaluated the SPOT application, the FEIS, and other related supporting documentation and considered the purpose and need of the Project, whether it meets the nation's interest, the effects of potential oil spills,

increased air pollution, GHG emissions, and other impacts that may adversely affect threatened and endangered species, local water systems, local fishing communities, EJ communities, and LEP persons.

MARAD has worked extensively with the USCG, the Applicant, and other Federal and State agencies to conduct a comprehensive environmental and cultural resources evaluation of the potential impacts of the Port.  The agencies have directed the SPOT team to continue to collaborate with the State of Texas and the local coastal communities to develop a comprehensive plan to avoid and mitigate impacts from the construction, operation, and eventual decommissioning of the proposed Project through the conditions imposed with this Record of Decision.   The substantive comments provided by residents of the local communities, elected officials, NGOs, and Federal and State agencies such as the USEPA, NMFS, USACE, TPWD, TCEQ, Texas GLO, and the other participating agencies, as well as the Governor of Texas, were considered and addressed during the application and environmental review process.  All substantive public comments on the DEIS, SDEIS, and FEIS are available on the Federal Docket.  Substantive comments and concerns have been incorporated through the conditions, as outlined in Section V.5 – *Protecting and Enhancing the Environment* of this Record of Decision.[66] Moreover, specific environmental conditions, mitigation measures, and other requirements recommended by the participating agencies will also be addressed in further detail within the official License upon its issuance.

MARAD has accepted recommendations provided by the cooperating Federal, State, and local agencies. Conditions are discussed in Section V. 5 – Protecting and Enhancing the Environment of this document and will be incorporated in the License upon its issuance.  Additionally, MARAD recommended to the USCG that such conditions and other appropriate requirements be addressed in the Operations Manual that will govern the operation of the Port.

In approving this application, and by delegation of the Secretary, MARAD is relying on broad authority under the DWPA to impose such conditions as are necessary to carry

---

[66] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032

out the applicable provisions of the DWPA.[67]  These
conditions create special obligations with which the
Applicant must agree to comply.  For this reason, SPOT may
decide not to accept the License upon its issuance and not
undertake the project.

Finally, it is important to recognize that the USCG and
other cooperating agencies were instrumental in developing
the environmental and marine navigation aspects of this
Record of Decision, among many other valuable services
rendered throughout the application and environmental
review process. MARAD expresses appreciation for this
efficient and collaborative effort.

## III. DECISION-MAKING PROCESS

In reaching this decision, MARAD followed the procedures
prescribed by the DWPA, which are designed to ensure full
exposure to a broad range of relevant information and
expertise.  Also, this decision can only be fully
understood if it is placed within the context of the
statutory framework of the DWPA.

### III.1. The Deepwater Port Act

The DWPA authorizes the Secretary to consider License
applications for deepwater ports by:

    i.   Providing that no person may engage in the
ownership, construction, or operation of a
deepwater port except in accordance with a
License issued pursuant to the DWPA (33 U.S.C. §
1503(a));

    ii.  Confirming that the applicant is a citizen of the
United States (33 U.S.C. § 1503(g));

    iii. Prohibiting the transportation or transfer of any
oil or natural gas between a deepwater port and
the United States unless such port is licensed
under the DWPA (33 U.S.C. § 1503(a));

---

[67] 33 U.S.C. § 1503(e)(1).

iv.    Authorizing the Secretary of Transportation to issue, amend, transfer, and reinstate Licenses for the ownership, construction, and operation of deepwater ports (33 U.S.C. § 1503(b) and (f));

v.    Allowing such Licenses to be effective unless suspended, revoked, or surrendered (33 U.S.C. § 1503(h));

vi.    Setting forth prerequisites, conditions, application procedures, regulations, and criteria for the issuance of Licenses for deepwater ports (33 U.S.C. § 1504(a) and (b));

vii.    Requiring public notice and hearings before Licenses are issued (33 U.S.C. § 1504(g));

viii.    Allowing ACSs to set reasonable fees for the use of deepwater ports (33 U.S.C. § 1504(h)(2));

ix.    Setting forth criteria for determining what is an ACS (33 U.S.C. § 1502(1) and 33 U.S.C. § 1508);

x.    Requiring the Secretary to prescribe procedures governing the environmental and navigational effect of such ports (33 U.S.C. § 1509);

xi.    Permitting the Secretary to suspend or revoke Licenses for noncompliance with the DWPA (33 U.S.C. § 1503(h));

xii.    Declaring that the laws of the United States and the nearest ACS, as applicable, shall apply to such ports (33 U.S.C. § 1518);

xiii.    Requiring the Secretary to issue regulations as necessary to assure the safe construction and operation of pipelines on the Outer Continental Shelf (33 U.S.C. § 1504(a) and 33 U.S.C. § 1520);

xiv.    Establishing civil and criminal penalties for violations of the DWPA (33 U.S.C. § 1514(b)(3));

xv.    Requiring that communications and documents transferred between Federal officials and any person concerning such ports are available to the public (33 U.S.C. § 1513);

30

xvi.    Allowing civil actions for equitable relief for violations of the DWPA (33 U.S.C. § 1514(c)); and

xvii.    Prohibiting issuance of a License unless the ACS to which the port is to be connected by pipeline has developed, or is making reasonable progress toward developing, an approved coastal zone management program pursuant to the Coastal Zone Management Act of 1972 (CZMA) (33 U.S.C. § 1503(c)(9)).

## III.2. Regulations

This application has been processed, and this decision is made in conformance with regulations promulgated under the DWPA of 1974, as amended.  The regulations appear in the Code of Federal Regulations at 33 C.F.R. Parts 148, 149, and 150.[68]

In addition, it is important to note MARAD's authority to enforce the provisions of the DWPA and the terms and conditions of a License under the law once it is issued. Failure of the applicant to comply with any applicable rule, regulation, restriction, or condition imposed by the License may result in suspension or termination of the License pursuant to 33 U.S.C. § 1511.

The License, if issued subsequent to this Record of Decision, along with any required assurances, will be in a form and substance satisfactory to MARAD, reflecting the terms, criteria, and conditions set forth in this Record of Decision.

## III.3. Facts

On January 31, 2019, SPOT submitted to MARAD and USCG an application for a License to own, construct, and operate, the Port.[69]  As mentioned above, the proposed Port will be

---

[68] Vol. 71, Federal Register, No. 189, Friday, September 29, 2006, pp. 57643-57694 (71 FR 57643).

[69] Vol. 84, Federal Register, No. 42, Monday, March 4, 2019, pp. 7413-7415 (84 FR 7413).

located in U.S. Federal waters approximately 27.2 to 30.8 nautical miles off the coast of Brazoria County, Texas, in water depths of approximately 115 feet.

On February 22, 2019, the application was deemed complete by MARAD and USCG.[70]  On March 4, 2019, a Notice of Application was published in the *Federal Register*, summarizing the application, project design and designating the State of Texas as the ACS, in accordance with 33 U.S.C. § 1508(a)(1).[71]  The application, including the Applicant's environmental report and other related documents were posted to the Federal Docket Management System for the SPOT Project.[72]

The environmental review process, required by NEPA and the DWPA, began on March 7, 2019, with the publication of a Notice of Intent in the *Federal Register* to prepare an EIS, hold a public scoping meeting, and receive public comments regarding the Port and its potential environmental impacts.[73]  During this process, MARAD and the USCG conducted a public scoping meeting in Lake Jackson, Texas, on March 20, 2019, to receive public comments and discuss issues to be addressed in the DEIS.

Following the close of the public scoping meeting comment period on April 8, 2019, the regulatory timeline for processing the application was suspended three times to obtain additional information that was needed from the Applicant to sufficiently develop the required environmental documents.

The regulatory timeline was initially suspended on May 31, 2019, to obtain information from the Applicant regarding the ichthyoplankton and underwater acoustic analysis of the Port's design and operations.[74]  MARAD and USCG received

---

[70] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5025.

[71] Vol. 84, Federal Register, No. 42, Monday, March 4, 2019, pp. 7413-7415 (84 FR 7413).

[72] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0001.

[73] Vol. 84, Federal Register, No. 45, Thursday, March 7, 2019, pp. 8401-8404 (84 FR 8401).

[74] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0018.

responses from the Applicant to all information requests and the information submitted was deemed sufficient to continue the environmental review.  Thereafter, the regulatory clock was restarted on October 23, 2019.[75]

The regulatory clock was suspended a second time on November 21, 2019,[76] to address information requests related to a VLCC ship strike potential scenario identified in the Phase-I Hazard Identification Workshop that was held on October 15, 2019, in Houston, Texas.[77]  The VLCC ship strike scenario required additional oil spill and fate trajectory modeling necessary to complete the Risk Assessment Report, which was separate from but incorporated into the DEIS. MARAD and USCG received and reviewed the finalized report for Phase-I of the Risk Assessment, and the regulatory clock was restarted on February 5, 2020.[78]  On April 5, 2021, risk rankings for onshore and offshore Port hazard scenarios and associated mitigation strategies were identified to incorporate into the Phase-II Risk Assessment Final Report.  The Phase-II Risk Assessment and its report was completed on May 26, 2022.[79,80]

The DEIS was issued on February 7, 2020,[81] and an informational open house and DEIS public meeting were held on February 26, 2020, in Lake Jackson, Texas, to receive comments from agency representatives, tribal representatives, elected officials, and the public on the

---

[75] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0026.

[76] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1219.

[77] See Appendix H of the FEIS, Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

[78] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0035.

[79] See Appendix H of FEIS, Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

[80] Information regarding Threats from a Crude Oil Spill can be found in Chapter 4.4 of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

[81] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0036.

scope and content of the DEIS.[82]  The DEIS public comment
period initially ended on March 23, 2020, but due to the
nationwide impacts of the COVID-19 public health emergency,
the DEIS public comment period was extended to May 31,
2020.[83]

The regulatory clock was suspended a third time on June 4,
2020, to provide time for the Applicant to address
information requests pertaining to changes in the Project
description, specifically the proposed pipeline route and
affected landowners.[84]  The necessary information was
received on November 25, 2020, and the regulatory clock was
restarted.[85]

To ensure full and meaningful participation by LEP persons
in the environmental review process, MARAD elected to issue
an SDEIS, as well as open a 45-day public comment period
and host a virtual public meeting.  The corresponding
Notice of Availability of the SDEIS, Notice of Public
Meeting, and Request for Comments was published in the
*Federal Register* on October 29, 2021.[86]  The SDEIS public
comment period ended on December 13, 2021.  Additionally,
on October 8, 2021, the Draft General Conformity
Determination was published in the *Federal Register* for a
30-day public comment period.[87]  The comment period on the
Draft General Conformity Determination closed on November
7, 2021.

MARAD and USCG worked in collaboration with the cooperating
Federal and State agencies to complete development of the
SPOT Final EIS (FEIS).  On July 29, 2022, MARAD and USCG

---

[82] Vol. 85, Federal Register, No. 26, Friday, February 7, 2020, pp. 7381-7383 (85 FR
7381).

[83] Vol. 85, Federal Register, No. 85, Friday, May 1, 2020, pp. 25507-25508 (85 FR
25507).

[84] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1181.

[85] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1188.

[86] Vol. 86, Federal Register, No. 207, Friday, October 29, 2021, pp. 60093-60095 (86 FR
60093).

[87] Vol. 86, Federal Register, No. 193, Friday, October 8, 2021, pp. 56349-56350 (86 FR
56349); see also, Federal Docket Management System, http://www.regulations.gov, MARAD-
2019-0011-1247.

published a Notice of Availability of the FEIS, Notice of
Final Public Hearing, and Request for Comments in the
*Federal Register*.[88] Concurrent with the FEIS, MARAD
published a Notice of Availability of the Final General
Conformity Determination in the *Federal Register*.[89] MARAD
and the USCG held a virtual Final Hearing on August 23,
2022. MARAD received 14,072 submissions on the FEIS. Of
the 14,072 submissions, over 800 were identified as
possible unique, substantive comments. All substantive
comments were considered by MARAD. Additional mitigation
measures have been added as conditions to this Record of
Decision. Additional details regarding the environmental
review process and relevant conditions of approval of the
SPOT application are summarized under Section V.5 –
*Protecting and Enhancing the Environment* of this Record of
Decision.

### III.4. Environmental Protection Agency (USEPA) Approval

Section 4(c)(6) of the DWPA [33 U.S.C. § 1503(c)(6)]
provides that the License may be issued if the Secretary
has not been informed within 45 days following the last
public hearing on a proposed License for a designated
application area, by the Administrator of the USEPA that
the deepwater port will not conform with all applicable
provisions of the Clean Air Act (CAA), as amended [42
U.S.C. 7401 et seq.], the Federal Water Pollution Control
Act, as amended [33 U.S.C. 1251 et. seq], or the Marine
Protection, Research and Sanctuaries Act, as amended [16
U.S.C. 1431 et seq., 1447 et seq.; 33 U.S.C. 1401 et seq.,
2801 et seq.].

In its letter to MARAD dated October 7, 2022, USEPA, Region
6 recommended approval of the DWP License for SPOT pursuant
to its authority under the Clean Air Act (CAA), the Clean
Water Act (CWA), and the Marine Protection, Research and
Sanctuaries Act.[90]

---

[88] Vol. 87, Federal Register, No. 145, Friday, July 29, 2022, pp. 45849 - 45851 (87 FR
45849).

[89] Vol. 87, Federal Register, No. 145, Friday, July 29, 2022, pp. 45847 - 45849 (87 FR
45847); see also, Federal Docket Management System, http://www.regulations.gov, MARAD-
2019-0011-5031.

[90] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-7870.

Prior to its approval, USEPA's initial comments on the proposed SPOT project, dated March 20, 2020, requested that consultation with the recognized tribal organizations be completed and that USCG and MARAD perform meaningful engagement with the impacted minority and low-income communities.  MARAD and the USCG consulted with Federally recognized tribes and considered the recommendations of local Tribal representatives as part of the public outreach effort.  As described above, MARAD and USCG conducted additional outreach to impacted EJ communities and LEP persons.  Such actions involved distributing trilingual notifications and acquiring certified interpreters for the Supplemental DEIS and Final EIS public meetings.

On March 20, 2020, the USEPA also recommended via letter that documentation be provided to clarify that compensatory mitigation may be required for temporal losses of wetlands, not just for conversion losses and permanent wetland impacts since the typical threshold for activities to be considered temporary is less than 12 months.[91]  For those areas where no mitigation is required for temporary impacts, USEPA recommended that monitoring and performance standards (i.e., for vegetative cover and invasive species) be included to ensure those areas are restored to pre-construction conditions.  The Applicant provided a Compensatory Mitigation Plan that clarifies the Applicant's plan to purchase mitigation bank credits from USACE-approved mitigation banks to offset the unavoidable functional loss of wetlands.[92]

In its October 7, 2022, approval letter, USEPA also recommended that more emphasis is needed to ensure that EJ and climate change considerations are included in the project for the protection of overburdened communities.  Moreover, USEPA recommended that MARAD incorporate mitigation measures that would prevent, to the extent practicable, the collocation of deepwater port projects to avoid additive and synergistic disproportionate adverse

---

[91] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1254.

[92] The Conceptual Wetland Mitigation Plan (Appendix P of the FEIS) is available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

impacts to minority and low-income populations/communities. USEPA also recommended that continued public outreach for the Project take place, indicating how the pipelines and terminals from the Project will impact populations within 2 miles of the project components.  Specifically, USEPA recommended that the continued outreach disclose projected impacts to health and safety, air quality, recreation, and noise.  Conditions addressing USEPA's recommendations are included in Section V.5 – *Protecting and Enhancing the Environment* of this Record of Decision.

### III.5. Section 7 Consultation

Section 7 of the ESA (16 U.S.C. § 1536) requires federal agencies to consult with USFWS and/or NMFS when any action an agency carries out, funds, or authorizes may affect either a species listed as threatened or endangered under the ESA, or any critical habitat designated for such species.

Section 7 informal consultation with the USFWS was completed. The USFWS' concurrence on the Effects Determination was provided to MARAD and USCG, by letter dated September 29, 2021.[93]  Pursuant to the consultation with USFWS, the Applicant has a continuing obligation to employ the best available technology and use the agreed upon best management practices (BMPs) as conservation measures, as listed and described in the FEIS, Appendices M and N.

Formal ESA Section 7 consultation between MARAD and NMFS was completed on November 9, 2022, with the issuance of a Final Biological Opinion.[94]  The Applicant proposes to establish noise attenuation controls during its offshore construction.  Furthermore, the Applicant also proposes establishing bubble curtains that would attenuate the pile driving noise effects on species that are protected under both the Marine Mammal Protection Act (MMPA) and the Endangered Species Act (ESA). Also, NMFS requires that SPOT

---

[93] USFWS, Concurrence on addendum to Biological Assessment, September 29, 2021, is available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1251.

[94] The National Marine Fisheries Service Final Biological Opinion is available for viewing at https://www.regulations.gov/document/MARAD-2019-0011-7887, as well as Appendix I of this Record of Decision.

provide annual reports to NMFS SERO PRD associated with
inadvertent spills or releases of oil resulting from, or in
any way related to, the operation of the Port.

## III.6. Cultural Resources and Section 106 Consultation

The National Historic Preservation Act (NHPA) and its
implementing regulations (36 CFR Part 800) represent the
principal Federally mandated process for assessing the
effects of Federal undertakings on cultural resources. The
lead Federal agency for a Federal undertaking performs this
assessment through the NHPA Section 106 review process. The
purpose of the NHPA Section 106 review is to require
Federal agencies to take into account the effects of their
undertakings on historic properties and cultural resources.

Chapter 3.9 of the FEIS discusses the Project's impacts on
onshore and offshore cultural resources. The chapter
includes a definition of cultural resources based on
applicable Federal laws, Executive Orders, and state law; a
discussion of existing threats to onshore and offshore
cultural resources; a description of the existing
conditions for onshore and offshore cultural resources; an
assessment of Project impacts on cultural resources and
proposed mitigations; and conclusions and recommendations.

MARAD consulted with the Texas Historical Commission (THC)
on potential impacts to cultural resources.  Additionally,
prior to submitting its application, the Applicant sent
information letters to 24 Indian tribes (22 Federally
recognized tribes and 2 state recognized tribes) with
ancestral, cultural, and/or historic connections to
southeast Texas.

On May 1, 2019, after the submission of the application,
MARAD and the USCG sent letters to 30 Indian tribes (of
which 28 are Federally recognized and 2 are state
recognized) with ancestral, cultural, and/or historic
connections to southeast Texas to initiate consultations as
part of the NHPA Section 106 review for the Project.  A
list of the Indian tribes contacted by the Applicant,
MARAD, and USCG is contained in table 3.9-2 in the FEIS.
MARAD and the USCG received responses from the Tribal
Historical Preservation Offices (THPOs) of five tribes:

- The Choctaw Nation replied that the region around the Project is outside their area of historic interest;
- The Comanche Nation of Oklahoma stated that they had reviewed the Comanche Nation site files for recorded prehistoric and historic archaeological properties within the Project area and did not find any recorded properties;
- The Coushatta Tribe of Louisiana replied that the Project would not result in any negative impacts on archaeological, historic, or cultural resources of the Coushatta people and that the tribe did not wish to consult further on the Project; however, if inadvertent discoveries are made during the course of the Project the tribe expects to be contacted immediately and reserves the right to consult with MARAD and the USCG at that time;
- The Delaware Nation replied that Brazoria County, Texas is outside their area of concern; and
- The Quapaw Tribe of Oklahoma THPO replied that the Project is outside the tribe's area of interest, and they defer any comment to other interested tribal nations.[95]

On September 17, 2019, THC concurred with MARAD and USCG that the Project would not impact historic properties.[96] The BMPs that the Applicant will employ to minimize impacts on cultural resources that would likely result from construction and operation of the onshore and offshore components of the Project are identified below.

### III.7. The FEIS

MARAD determined that the FEIS for the Project meets the statutory requirements of NEPA and the DWPA. The FEIS evaluated the direct, indirect, and cumulative impacts of the proposed Port that is subject to MARAD's Federal action, which is the licensing of the construction, operation, and decommissioning of the Port. In addition,

---

[95] A discussion of cultural resources can be found in Chapter 3.9 of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

[96] A copy of THC's concurrence is included in Appendix D of the Final Environmental Impact Statement, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

reasonably foreseeable connected actions were analyzed in the FEIS as required under NEPA, such as the Federal actions of cooperating agencies, including but not limited to USACE (for permit authorization under Section 404 of the Clean Water Act [CWA]), USEPA (for permit authorization under the CWA and Clean Air Act [CAA]), USFWS and NMFS (for Section 7 Endangered Species Act [ESA] consultation), and Texas GLO (for Coastal Zone Management Act [CZMA] consistency determination) in coordination with Section 404 permit authorization from USACE.  Federal and State agency comments were addressed in the FEIS, and many are included as conditions of this Record of Decision, described in Section V.5 – *Protecting and Enhancing the Environment.* The precise conditions required by the cooperating Federal and State agencies will be set forth in the License upon issuance.

### III.8. Adjacent Coastal State (ACS) Approval

As discussed herein and under Section 4(c)(8) of the DWPA [33 U.S.C. § 1503(c)(8)], a condition for issuance of a License is contingent on the approval(s) of the Governor of the "Adjacent Coastal State or States."

The State of Texas was designated as the ACS for the Project.[97]  ACS designation entitles such State to certain rights and privileges, including effective veto power over a deepwater port license application by the Governor of any designated ACS.  Under 33 U.S.C. § 1508(b)(1):

> If the Governor fails to transmit his approval or disapproval to the Secretary not later than 45 days after the last public hearing on applications for a particular application area, such approval shall be conclusively presumed.

As such, for the subject Application review process, the 45-day time limit ended on October 7, 2022. The Governor of Texas provided approval of the proposed SPOT project dated August 31, 2022, with no conditions, within the 45-day period following the final public hearing.[98]

---

[97] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-0036, Volume I Appendix B, Initial Notification Letters, pp. 11-12.

[98] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-7862.

IV.  **POLICY DETERMINATIONS**

The following sections will address whether the applicant has or will meet the statutory criteria for issuance of a License.  Section 4(c) of the DWPA (33 U.S.C. § 1503(c)) provides nine conditions for the issuance of a License. Section V – Criteria for Issuance of this Record of Decision discusses these conditions in detail.

In general, the determination regarding whether the nine conditions are met requires the evaluation of the financial, technical, and management capability of the applicant and its owners to ensure that, if a License is granted, the Licensee is able to comply with all applicable laws, the DWPA's criteria, regulations, and License conditions to meet any contingent liabilities, and to fulfill its obligation to construct, operate, and decommission the Port in a timely and efficient manner.

Consequently, if SPOT becomes a Licensee, it takes on a special obligation to conform to the conditions of the License.  MARAD must be confident of SPOT's ability to meet such License conditions.

In making these statutory determinations, the task has been complicated by the fact that some of the values involved can be described and quantified with precision, while others, equally important to their advocates, are more qualitative.  It would be a plain error, however, to ignore a value simply because it cannot be reduced to numbers, and therefore MARAD's reasons and findings for each of these requirements are set forth in the following sections, drawing upon the substantial record.

Accordingly, MARAD's specific determinations on each of the nine statutory criteria are set forth below.

V.  **CRITERIA FOR ISSUANCE**

Section 4(c) of the DWPA [33 U.S.C. § 1503(c)] requires the Secretary to make nine findings or determinations prior to issuing a deepwater port License.  When issued, the License will reflect the terms, conditions, and other requirements discussed in this Record of Decision and the License and will be in a form and substance satisfactory to MARAD. Additional construction, operating, and decommissioning

41

conditions will be included in the License upon its
issuance.  Each of the nine factors are addressed herein in
the order they appear in section 4(c) of the DWPA.

### V.1. Financial Responsibility

Section 4(c)(1) of the DWPA, [33 U.S.C. § 1503(c)(1)],
requires the determination that the "applicant" or in this
case, SPOT, "is financially responsible and will meet the
requirements of Section 1016 [33 U.S.C. § 2716] of the Oil
Pollution Act of 1990" (OPA 90).  Financial Responsibility
requirements are promulgated by regulation at 33 CFR §
138.230.  Determination of financial responsibility is
based upon the following three factors:

   i.   The Applicant must demonstrate the ability to meet
        the OPA 90 requirements either through financial
        ability, insurance coverage, or a USCG
        determination that the deepwater port is not a
        facility under OPA 90;

   ii.  The Applicant must be financially able to own,
        construct and operate the proposed Port; and

   iii. The Applicant must meet all bonding requirements or
        provide other assurances that the Port and its
        components will be removed upon revocation or
        termination of the License.

### V.1.1 General Obligations

In granting the first deepwater port License, the Secretary
at the time provided insights into the general obligations
of the Licensee that are still valid today.  In the 1976
Louisiana Offshore Oil Port (LOOP) decision, the Secretary
wrote:

     Perhaps the most important requirement for
     financial responsibility arises out of the
     obligations which flow from the rights and
     privileges under the license.  We cannot grant a

> license without recognition of the importance of
> the licensee going forward with the project.[99]

MARAD agrees with this assessment and must be reasonably
assured that the Applicant, its parent, guarantor, and its
affiliates have the financial resources and wherewithal
required to complete the full life cycle of the project.

As presented, the Applicant's proposed Project plan
includes the ownership, construction, operation, and
eventual decommissioning of one fixed offshore platform
that will connect to two single point mooring buoys that
will transfer crude oil to VLCCs for export. The Port will
be located in Federal waters within the OCS in lease blocks
463 and A-59, 27.2 to 30.8 nautical miles off Brazoria
County, Texas. The Port will be supplied with oil from an
onshore transmission network and will transport the oil to
the VLCCs via two 36-inch diameter 40.8 nautical mile-long
crude oil pipelines.

The Applicant advises that it will generate revenues by
using assets that are part of the deepwater port and
onshore appurtenant facilities that receive and export
crude oil.  The Applicant owns or has access to several
crude oil pipelines from multiple sources that will supply
the proposed port and VLCCs at a rate of 85,000 barrels per
hour.

Full construction and start-up of the Port will require
significant investment by the Applicant and its parent
affiliates.  The total onshore and offshore Project
construction costs, including capitalized interest, for the
entire Project will require approximately $1.75 billion,
with additional decommissioning costs that are currently
estimated at $176.9 million. Execution of the full Project
plan, including the timeframe for full build-out of the
Port, is estimated to take approximately 23 months after
the Applicant has obtained all required State and Federal
permits and secured and executed all financial commitments
and commercial agreements with its anticipated partners.

---

[99] The Secretary's Record of Decision on the Deepwater Port License Application of LOOP
Inc. (Dec. 17, 1976), p. 14.

The financial responsibility determination addressed herein shall apply to the Applicant's financial capability to meet the maximum oil spill liability requirements of OPA 90, obtain sufficient financing for the construction and operation of the Port, and satisfy requirements for the full removal (decommissioning) of the Port, including the deepwater port pipeline.  The results of this analysis are addressed herein.

### V.1.2 Oil Spill Liability

Under section 4(c)(1) of the DWPA [33 U.S.C. § 1503(c)(1)], "[t]he Secretary may issue a license…if he determines that the applicant is financially responsible and will meet the requirements of section 2716 of this title [33 U.S.C. § 2716 - Financial Responsibility]."  MARAD is responsible for ensuring that the required parties provide evidence of financial responsibility sufficient to meet the maximum amount of liability prescribed by OPA 90.  The USCG is charged with administering and enforcing applicable requirements of OPA 90, including issuing a Certificate of Financial Responsibility (COFR).

As currently designed, the Port will maintain and transport substantial amounts of crude oil for export to nations abroad.  33 U.S.C. § 2716 requires deepwater port operators who maintain any amount of oil or other substances covered under OPA 90 to secure sufficient liability coverage for the maximum amount required by OPA 90. In this case, the maximum liability coverage required for the Port is currently assessed at $672,514,900.

Accordingly, MARAD evaluated and assessed the financial proposal of the Applicant and its plan to obtain the maximum required oil spill liability coverage of $672,514,900 to satisfy the requirements of 33 U.S.C. § 2716.  This review included an in-depth assessment of the financial resources and technical expertise of the Applicant, its parent, guarantor, and affiliates.  An evaluation was conducted of the financial and operating performance of the guarantor proposed to provide oil spill liability coverage for the Port.  The Applicant's direct parent, Enterprise Products Operating LLC (EPO), has provided a written Draft OPA 90 Guarantee Agreement in the amount of $672,514,900 to demonstrate financial responsibility for the full liability amount for the Port.

The Applicant is a Texas limited liability company established to construct, own, and operate the proposed Port.  The company is comprised of a team of energy professionals with expertise developing domestic and international oil and gas projects within the global energy sector.  The Applicant's parent, EPO, is the wholly owned operating subsidiary of Enterprise Products Partners Limited Partnership (EPD).  EPD is a publicly traded Delaware limited partnership that is listed on the New York Stock Exchange under the ticker symbol EPD. EPD was formed in April 1998 to own and operate certain natural gas liquids (NGL) related businesses.  EPD serves as a leading North American provider of midstream energy services to producers and consumers of natural gas, natural gas liquids, crude oil, petrochemicals, and refined products. Since the establishment of SPOT, the company has been marginally capitalized and will need to rely heavily upon the financial support and resources of its parent, guarantor, and other related investors.

Based upon the results of this analysis, it is hereby concluded that the Applicant, through the support of its parent and financial guarantor and affiliates, will possess sufficient resources to meet the requirements of 33 U.S.C. § 2716.

Prior to issuance of the License and commencement of construction, the Applicant will be required to provide MARAD and USCG with final documented evidence, such as an executed Final OPA 90 Guarantee Agreement, in a form acceptable to MARAD, which validates that the Applicant has secured the maximum oil spill liability coverage of $672,514,900.  Any request made by the Applicant for a reduction in the OPA 90 liability amount for deepwater ports must be requested from the USCG and will be subject to all applicable regulatory and administrative procedure requirements.  The VLCCs and all other vessels that call on the Port must maintain separate vessel COFRs to comply with OPA 90.

### V.1.3 Ownership, Construction, and Operation

As provided in section 4(c)(1) of the DWPA, [33 U.S.C. § 1503(c)(1)], the Applicant must demonstrate, prior to License issuance, the financial ability to own, construct and operate the proposed Port.  Similar to the OPA 90 requirements, MARAD must have reasonable assurance that

this statutory requirement for the construction and operation of the Port will be met, and such evidence will be provided in a satisfactory form in advance of License issuance.

To validate this requirement, MARAD conducted an extensive and comprehensive evaluation of the financial resources, operating performance, and overall wherewithal of the Applicant, its parent, guarantor, and affiliates proposed to finance and/or support the construction and operation of the Port.  The Applicant has proposed to secure Project financing from its parent, EPO, for the total costs of construction and operation of the Port.

As referenced above, EPO is a wholly owned subsidiary of EPD, which is a well-experienced midstream energy asset network with extensive experience linking producers of natural gas, natural gas liquids, and crude oil from some of the largest supply basins in the United States and Canada. EPD demonstrates extensive expertise in transporting crude oil.  In 2020, the company moved over 2,166 MBPD of oil from the United States to foreign markets.  It is anticipated that this level of expertise will benefit the Applicant's ability to successfully manage and operate the Port.  The Port will use the pipeline infrastructure that EPD has an ownership interest in to supply the proposed offshore terminal. EPD will provide its subsidiary, EPO, with the necessary financial resources to meet its guarantee obligations to finance the total construction and operation costs of the Port.  To demonstrate financial responsibility and support of its plan, the Applicant provided MARAD with suitable evidence of a Draft Construction and Operating Costs Guarantee Agreement, which will be executed by EPO prior to License issuance.

Based upon the detailed analysis and assessment of the Applicant's financial proposal, the Draft Construction, and Operating Costs Guarantee Agreement, and other preliminary evidence of financial support, it is concluded that the Applicant, through the direct and indirect support of its financiers, has sufficiently demonstrated its ability to own, construct and operate the proposed Port.  Therefore, for purposes of this Record of Decision, the Applicant hereby meets the construction and operational financial responsibility requirements of the DWPA, subject to the full satisfaction of the following conditions:

1. Prior to issuance of the License, the Applicant must execute a Final Construction and Operating Costs Guarantee; or

2. As an alternative, the Applicant may provide draft financing agreements by other credit-worthy financial entities for MARAD's review and acceptance prior to the final execution of the agreements. Upon satisfaction of this requirement, MARAD will confirm the determination of financial responsibility for the application.

### V.1.4 Removal Requirements

Section 4(e)(3) of the DWPA [33 U.S.C. § 1503(e)(3)] requires the Applicant to furnish, prior to issuance of the License, a bond, or other assurance(s) demonstrating that all components of the Port will be removed at the termination or revocation of the License. The Applicant's financial plan provides an estimate of costs for full removal of the Port in the estimated amount of $176.9 million. These costs include full removal of the Port, the pipelines, and other related offshore Port components.

To demonstrate financial responsibility for the removal of the Port, the Applicant provided a Draft Decommissioning Guarantee Agreement to be executed by the Applicant's parent, EPO, prior to License issuance. As detailed above, an analysis of the Applicant's parent and proposed guarantor, EPO, and its indirect parent EPD, was conducted. Each entity's financial resources, operating performances, and credit ratings were evaluated and assessed. The long-term financial wherewithal and operating performance of EPO and EPD were considered and deemed acceptable for purposes of the financial responsibility determination for decommissioning the Port. EPO, through its corporate affiliation to EPD, will provide the Applicant with sufficient financial, management, and technical support to satisfy the applicable decommissioning requirements of the DWPA.

Prior to issuance of the License, MARAD will require an executed final guarantee agreement in an acceptable form and substance, as set forth in the Draft Decommissioning Guarantee Agreement provided by the Applicant during the application review process.

47

Alternatively, the Applicant may arrange and complete necessary financing agreements from another credit-worthy source(s) of investment grade quality.  Evidence of such financing agreements must be provided in an acceptable form and substance, including all supporting financial documentation, such as annual financial statements, guarantee agreements, and other relevant agreements.

Once all decommissioning requirements and all other conditions outlined in this Record of Decision are met, MARAD will issue a License to SPOT.  On an annual basis, following License issuance, MARAD will prepare an adjustment of the total estimated amount of $176.9 million of the executed Final Decommissioning Guarantee Agreement. This adjustment will be determined and applied in accordance with the inflationary percentage rate of the Consumer Price Index for All Consumers (CPI-U), established and published annually by the U.S. Bureau of Labor Statistics.

Since financial analysis will become obsolete over time, SPOT must provide audited annual financial statements or other financial evidence to confirm its continued financial capability and wherewithal and the financial standing of its guarantor and affiliate(s) to perform under the proposed guarantee agreements discussed above.

A five (5) year time limit is hereby required for SPOT to meet the above financial responsibility conditions and begin construction of the proposed Port after the issuance of the License.

## V.2. Compliance with Applicable Laws, Regulations, and License Conditions

Section 4(c)(2) of the DWPA [33 U.S.C. § 1503(c)(2)] requires a finding "…that the applicant *can and will comply* with applicable laws, regulations, and License conditions" (emphasis added).

The proposed Port involves the construction and operation of both onshore and offshore industrial components.  As evidenced by the number of cooperating agencies involved in processing SPOT's application, several of which also have a responsibility to issue permits, approvals, and authorizations, SPOT's ability to comply with all

applicable Federal and State laws, regulations, and License
conditions is critical.

SPOT and its affiliated entities, including EPO and EPD
(hereinafter, Enterprise) have over 54 years of experience
in the midstream industry. SPOT and its affiliates'
managerial, technical, and practical expertise in operating
midstream crude oil assets, including pipelines, subject to
Federal and State regulation is evidence that the Applicant
both understands the legal requirements for constructing
and operating the Port and the adverse ramifications that
may result from failure to comply with all applicable laws,
regulations, and License conditions (including, suspension
or revocation of its operating License).[100]

As a condition of receiving a license, SPOT must agree in
writing that: (1) SPOT will make no substantial change from
the plans, operational systems and methods, procedures, and
safeguards set forth in the License before receiving, in
writing, any Federal, State, or local authorizations
required by law, regulation, or License condition as a
result of the proposed changes; and (2) SPOT will comply
with all conditions prescribed in its License (see section
4(e)(2) of the DWPA ((33 U.S.C. § 1503(e)(2)).  This
agreement must be provided to MARAD by SPOT no later than
90 days before a License can be issued.  Similar
assurances, by the parent or affiliate companies (as
applicable) for those License conditions, which they alone
can satisfy, must also be provided a minimum of 90 days
before a License can be issued.  Further, the License will
provide that neither the License nor any ownership interest
in the Licensee may be transferred without the written
approval of the Maritime Administrator.  Additionally, the
License will require SPOT to maintain and comply with all
applicable Federal and State permits, approvals, and
authorizations throughout the life of the Project,
including the BMPs and mitigation measures listed in
Appendices M and N of the FEIS.  Those BMPs and mitigation
measures address:

---

[100] SPOT Deepwater Port License Application, Volume I, Section 1.2, available for
viewing at the Federal Docket Management System: http://www.regulations.gov, docket
number MARAD-2019-0011-0001.

    i.   Minimizing erosion, soil degradation, and runoff;

   ii.   Implementation of spill and contamination response plans;

  iii.   Maintaining and restoring wetland and waterbody integrity and ecosystems, as directed in the conditions;

   iv.   Ensuring safety and protection of wildlife and its habits near or on the construction site including:

        a.   Daily monitoring efforts;
        b.   Hiring at least one designated on-site Environmental Inspector;
        c.   Environmental training for all construction employees; and
        d.   Implementing NOAA, USFWS, USEPA, and NMFS best practices and conditions

    v.   Reducing and mitigating noise, light, and other pollution from construction sites; and other conditions that will apply to this approval and will be specified in the License.

MARAD has determined that 33 U.S.C. § 1503(c)(2) will be satisfied upon execution of the agreements described above.

### V.3. National Interest

Section 4(c)(3) of the DWPA requires that issuing a deepwater port license be "in the national interest" and consistent with other policy goals and objectives, including energy sufficiency and environmental quality. In reaching its national interest determination, MARAD has considered a broad range of factors including the following:

    i.   The offshore location of the Port is expected to move vessel traffic away from more congested safety fairways and navigation areas near and approaching Galveston and Houston by reducing the need for inland port loading and tanker trips to and from Galveston and Houston for ship-to-ship transfers. As a result, the offshore location of the proposed Port is expected to reduce the likelihood and consequences of VLCC and other vessel collisions.

ii.   Operation of the Port is expected to reduce the number of ship-to-ship transfers of crude oil and lessen emissions associated with conventional crude oil loading and reverse lightering, including GHG, VOC, and HAPs emissions.

iii.  Operation of the Port is not expected to impact oil prices in the U.S. because the major drivers of oil price movements, such as global oil demand, wars and civil unrest, technological innovation, and government policy are minimally influenced by U.S. exporter decisions and largely independent of U.S. exports.[101]

iv.   The Port will add to the Nation's infrastructure resilience as a state-of-the-art alternative to existing shoreside terminals and ship-to-ship loading. Of the roughly 13.8 million bpd in crude oil export capacity in the GoM, 1.2 million bpd is provided by the sole existing deepwater port crude export facility, LOOP.[102]  Additional deepwater port capacity could allow for a greater proportion of U.S. crude oil export volumes, roughly 3 million bpd in 2021, to be handled by a deepwater port as opposed to shoreside terminals and ship-to-ship loading.[103]  This capacity may benefit U.S. allies subject to crude oil disruptions due to natural disasters or man-made events and could reduce environmental impacts associated with shoreside loading.

v.    Construction of the Port will positively impact the employment levels in Texas.  Construction and installation will support as many as 1,400 temporary jobs, including up to 1,000 temporary jobs at a time during the 2-year construction period.[104]  The Port

---

[101] See FEIS at 5-7, Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

[102] See FEIS at 5.2.1, http://www.regulations.gov, MARAD-2019-0011-5032.

[103] Id. at Table 5.3.7-1.

[104] Socioeconomic Impacts associated with Project construction and operations can be found in Chapter 3.14 of the FEIS, available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

operations will generate 62 permanent jobs.[105] Harris
County has a civilian labor force exceeding 2.2
million people while Brazoria County's third largest
labor force is in construction.[106] Hence, it is
projected that a significant percentage of workers
will be hired from within the Project area.[107]

In light of the Project's benefits to local and national
economic growth and the Nation's infrastructure resilience,
its minimal impact on the availability and cost of crude
oil in the U.S. domestic market, and environmental and
safety profile compared to current transportation methods
for crude oil export, as well as the Applicant's experience
in operating pipelines and marine terminals, MARAD has
determined that the approval of SPOT's application is in
the national interest and consistent with other policy
goals and objectives, including energy sufficiency and
environmental quality, subject to the mitigation conditions
outlined below.

**V.4. Navigation, Safety, and Use of the High Seas**

Section 4(c)(4) of the DWPA (33 U.S.C. § 1503(c)(4))
requires a finding that "…a deepwater port will not
unreasonably interfere with international navigation or
other reasonable uses of the high seas, as defined by
treaty, convention or customary international law."

As a declaration of policy, Congress stated in section 2(b)
of the Act (33 U.S.C. § 1501(b)) "…that nothing in the Act
shall be construed to affect the legal status of the high
seas, the super adjacent airspace, or the seabed and
subsoil, including the Continental Shelf."

---

[105] Id.

[106] SPOT Deepwater Port License Application, Volume IIa, at 8-23, available for viewing
at the Federal Docket Management System: http://www.regulations.gov, docket number
MARAD-2019-0011-0001.

[107] Id.

The United Nations Convention on the Law of the Sea
(UNCLOS)[108] Article 60 grants coastal States the exclusive
right to construct, authorize and regulate installations
and structures in its Exclusive Economic Zone (EEZ),
including deepwater ports.[109]  Also, the freedom of all
nations to make reasonable use of waters beyond their
territorial boundaries is recognized by the 1958
International Convention on the High Seas, which defines
the term "high seas" to mean all parts of the sea that are
not included in the territorial sea or in the internal
waters of a state.[110]

---

[108] Even though the United States is not a party to UNCLOS, as a matter of policy, the
United States complies with most of its provisions as customary international law.
United States Oceans Policy, Statement by the President, 19 Weekly Compilation of
Presidential Documents 384 (March 10, 1983).

* * *

Today I am announcing three decisions to promote and protect the oceans interests of
the United States in a manner consistent with those fair and balanced results in the
Convention and international law.

First, the United States is prepared to accept and act in accordance with the balance
of interests relating to traditional uses of the oceans—such as navigation and
overflight.  In this respect, the United States will recognize the rights of other
states in the waters off their coasts, as reflected in the Convention, so long as the
rights and freedoms of the United States and others under international law are
recognized by such coastal states.

Second, the United States will exercise and assert its navigation and overflight
rights and freedoms on a worldwide basis in a manner that is consistent with the
balance of interests reflected in the convention.  The United States will not,
however, acquiesce in unilateral acts of other states designed to restrict the rights
and freedoms of the international community in navigation and overflight and other
related high seas uses.
* * *

[109] Title 33 U.S.C. section 1518 precedes the entry into force of UNCLOS article 60.
It also precedes the designation of the Exclusive Economic Zone of the United States,
which grants us certain rights and jurisdiction under customary international law, as
stated in UNCLOS Part V.  While Article 60(7) indicates that a deepwater port does not
have the status of an island, has no territorial sea of its own, and its presence does
not affect the delimitation of the territorial sea, the exclusive economic zone or the
continental shelf, the United States interprets Article 12 to mean that any roadstead
located outside the territorial sea and used for the loading or unloading of ships is
included in the territorial sea.  See letter dated January 12, 2005, from Margaret F.
Hayes, Acting Deputy Assistant Secretary for Oceans and Fisheries, United States
Department of State, Bureau of Oceans and International Environmental and Scientific
Affairs to Rear Admiral Thomas H. Gilmour, United States Coast Guard.

[110] Prior to UNCLOS coming into force, a rule of reason was applied.  For example,
whether use of the high seas by a deepwater port is reasonable could be determined by
examining, among other things, the extent to which deepwater port facilities do not

Prior to the U.S. adopting the UNCLOS concept of the EEZ, under the DWPA, a distinction was made between foreign flag vessels using deepwater ports and those only navigating in the vicinity of the ports.  At that time, for vessels calling at deepwater ports, the U.S. exercised the right and authority as the licensing state to condition the use of the ports on compliance with reasonable regulations, including acceptance of the general jurisdiction of the United States.[111]  If such conditions were not accepted by a foreign state, use of the deepwater port must be denied to vessels registered in or flying the flag of that state.[112]

The DWPA addresses the issue of vessels calling at deepwater ports with respect to extended U.S. jurisdiction as follows:

> The DWPA at 33 U.S.C. § 1518(a)(3) requires the Secretary of State to notify the government of each foreign state having vessels under its authority or flying its flag that may call at a deepwater port, that the United States intends to exercise jurisdiction over such vessels.  The notification must indicate that, absent the foreign State's objection, its vessels will be subject to U.S. jurisdiction whenever calling at the proposed Port or in an established safety zone (not greater than 500 meters) and using or interfering with the use of the deepwater port.  Further, Section 1518(c)(2) states that entry by a vessel into the port is prohibited unless the flag state does not object to the exercise of U.S.

---

unreasonably interfere with the high seas freedoms of other nations, including the freedoms of navigation, fishing, laying submarine cables and pipelines, and overflight.  In fact, a properly located deepwater port could enhance navigation and safety by reducing the chances of vessel collision and pollution of the marine environment in heavily congested areas.  Thus, under the reasonable uses test, one would propose to exercise the international right of the United States to make a permissible use of the high seas in a cautious and restrained manner.  The use by foreign nations of the same ocean area can be accommodated if they reasonably respect the rights and interests of the United States.  The amount of controversy would be decreased where the deepwater port, although in international waters, had close proximity to our shores, suggesting that there was little danger of interference with actual use of the high seas by other nations.

[111] 33 U.S.C. § 1518(c).

[112] Id.

> jurisdiction or a bilateral agreement between the flag
> State of the vessel and the United States permitting
> the exercise of jurisdiction is in force.[113]

Thus, any ship calling at a deepwater port in our EEZ would
be subject to U.S. jurisdiction as if it were in the
territorial sea.  As the proposed Port will be in the EEZ,
this principle applies here.  Any ship flying the flag of a
party to UNCLOS would be subject to Articles 12 and 60 and
would be bound to the same jurisdictional principles of 33
U.S.C. § 1518, thus obviating the need for further
bilateral agreements.  However, if a ship flying the flag
of a non-party to UNCLOS were to call at the deepwater
port, the State Department would only object to such calls
if the non-party flag State had filed an objection with the
United States.[114]

### V.4.1 Navigation Safety

In accordance with section 10(d) of the Act (33 U.S.C. §
1509(d)), a zone of appropriate size around and including
the deepwater port for the purpose of navigational safety
must be established (safety zone).  In such a zone, no
installations, structures or uses will be permitted that
are incompatible with the operation of the deepwater port.
The required safety zone may be supplemented by
establishment of other offshore routing measures including
no anchoring areas (NAAs) and areas to be avoided (ATBAs).
Safety zones will be the minimum size necessary to ensure
safety, but, pursuant to customary international law, will
not exceed 500 meters in radius around the primary
components of the Port.

In accordance with 33 C.F.R. § 150.915(a), deepwater port
safety zones are developed and designated through
rulemaking.  As has occurred with other licensed deepwater
ports, prior to establishment of the required safety
zone(s), the USCG will publish in the *Federal Register* a
notice that affords prior public notice and comment, unless
there is a good cause to expedite the process to protect
life and property.

---

[113] January 12, 2005, letter from Margaret F. Hayes, op. cit.

[114] Id.

The Department of State has previously commented on establishment of offshore safety zones and routing measures.[115]  Under international law, navigation safety zones are governed by three principal sources: UNCLOS, specifically Articles 22, 60 and 211; the International Convention on the Safety of Life at Sea, 1974, Annex, Chapter V, primarily Regulation V/10; and the General Provisions on Ships' Routing, adopted by the International Maritime Organization (IMO) pursuant to Assembly Resolution A.572 (14), as amended.[116]  The Convention on the Continental Shelf of 1958 also provides for the construction and operation of continental shelf installations and the coastal States' establishment of safety zones, which may extend to a distance of 500 meters around such installations.[117]  Outside the 500-meter safety zone, uniform international rules to ensure navigational safety around the deepwater port can best be achieved by seeking appropriate ships' routing measures through the IMO.

Enforceable safety zones will be established around the Port, which will have a radius of 500 meters extending out from the perimeter of the platform structure, and around each SPM buoy, which will likely extend 500 meters from the buoy itself.  In addition to the safety zones around the deepwater port and SPM buoys, the USCG will also establish a safety zone for the support vessel mooring areas.  Based on the size of a typical oil tanker and deepwater port

---

[115] January 12, 2005, letter from Margaret F. Hayes, op. cit.

[116] Id.

[117] Convention on the Continental Shelf, 15 U.S.T. 471 (1958), Article 5 provides in part:

> 2. Subject to the provisions of paragraphs 1 and 6 of this article, the coastal State is entitled to construct and maintain or operate on the continental shelf installations and other devices necessary for its exploration and the exploitation of its natural resources, and to establish safety zones around such installations and devices and to take in those zones measures necessary for their protection. 3. The safety zones referred to in paragraph 2 of this article may extend to a distance of 500 meters around the installations and other devices which have been erected, measured from each point of their outer edge. Ships of all nationalities must respect these safety zones. 4. Such installations and devices, though under the jurisdiction of the coastal State, do not possess the status of islands. They have no territorial sea of their own, and their presence does not affect the delimitation of the territorial sea of the coastal State.

support vessels, as well as the Applicant's proposed
mooring design, SPOT has proposed three circular Safety
Zones that would extend in all directions 250 meters beyond
a point measured from the stern of a VLCC as it
weathervanes in a complete circle around the SPM buoys.[118]
The actual dimensions of each safety zone would be set
forth in regulations promulgated at 33 C.F.R. Part 150,
Subpart J (§§ 150.900-150.940).

In addition to the Safety Zones, SPOT has proposed the
establishment of a continuous 500-meter ATBA and designated
NAA beyond the zones for the platform and SPM buoys, to
further reduce vessel traffic around the Port and SPM
buoys, allow moored vessels to move with the currents as
necessary and to navigate to and from the SPM buoys, and to
prevent damage or entanglement of the SPM buoy anchor
system and pipelines.

As discussed in 33 C.F.R. § 150.915(c), NAAs and ATBAs are
established by the IMO.  In accordance with past practice,
the USCG, in coordination with the Department of State,
will prepare and submit to the IMO for adoption of a
proposal to establish the NAAs/ATBAs.  If adopted, the
NAAs/ATBAs will be implemented by the IMO and published in
the appropriate IMO Circular.  The USCG will undertake
preparation and publication of a *Federal Register* notice
that sets forth the geographic boundaries of all the
offshore routing measures adopted by the IMO.  In
accordance with 33 C.F.R. § 150.905(c), compliance with the
requirements of a Safety Zone is mandatory, whereas an NAA
and ATBA are recommendatory routing measures.  This
comports with advice given by the Department of State.[119]

The Applicant has also proposed an anchorage area in
Galveston Area Lease Block A-59, adjacent to the southeast
corner of Galveston Area Lease Block 463 (which will
contain the Port and SPM buoys).  The proposed dedicated
anchorage area could be used by VLCCs or other crude oil
carriers to wait for access to the SPM buoys, or to stand

---

[118] With the length of each VLCC and the SPM mooring structure added to the proposed 500-meter Safety Zone area, each of the three Safety Zones would have a radius of approximately 916 meters (3,005 feet).

[119] January 12, 2005, letter from Margaret F. Hayes, op. cit.

by if they must temporarily disconnect from the SPM buoy. The proposed anchorage area would be 3 square miles and would not contain any Project infrastructure.

Following issuance of this Record of Decision, and prior to commencing Port operations, the Coast Guard will coordinate with the Applicant and appropriate stakeholders to determine if the proposed routing measures properly address matters including, but not limited to: Port and vessel operational hazards and risks; vessel traffic characteristics, volumes, and trends; and other maritime operations and facilities in the vicinity of the Port.

In addition to these safety measures, the Coast Guard Captain of the Port has authority to introduce additional vessel movement controls within the safety zone to enhance the safety of ship movements to and from the deepwater port.

Moreover, prior to commencement of construction activities, the Operations Manual, which SPOT is required by law and regulation to develop for USCG's review and approval and maintain throughout the operational life of the Port, will specify vessel operating procedures for oil carriers calling at the deepwater port.[120]

Based on the above, the Port will not unreasonably interfere with international navigation or other reasonable uses of the high seas, as defined by treaty, convention, or customary international law.

**V.5. Protecting and Enhancing the Environment**

Section 4(c)(5) of the DWPA (33 U.S.C. § 1503(c)(5) requires the Secretary to determine, in accordance with environmental review criteria established pursuant to 33 U.S.C. § 1505, "…that the applicant has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment."

---

[120] The USCG has the statutory responsibility to approve an operations manual for a deepwater port. 33 U.S.C. § 1503(e)(1).

As proposed, the Port will contain a minimal offshore footprint that will consist of one fixed offshore platform, two SPM buoys (each with two PLEMs per buoy), and floating crude oil and vapor recovery hoses.  This configuration will allow the SPM buoys to move as needed within defined limits based on wind, waves, current, and VLCC or other crude oil carrier conditions. Each vessel calling on the Port will enter the U.S. EEZ from international waters, transit to a shipping fairway, and then exit the shipping fairway to approach the Port.

### V.5.1 Best Available Technologies, Safety and Control

As a condition of this Record of Decision, the Applicant will enact certain BMPs listed in Appendices M and N of the FEIS that will minimize the effects on resources throughout the Port's construction, operation, and decommissioning. The Applicant will install portions of the onshore pipeline adjacent to existing petroleum infrastructure and commercial rights-of-way, and to employ boring and horizontal directional drilling methods for installing portions of the onshore pipelines.  These measures will be undertaken to minimize impacts on wetlands, water quality, sensitive habitats, and beach areas that experience commercial and recreational use.

The Port will contain state-of-the-art processes, best available technologies and controls that provide enhanced safety.  The independently operating process safety and control features will include autonomous shutdown valves, a HIPPS, a fire and gas detection system, an emergency shutdown and safety control system, and a process control system. These systems protect the offshore platform from overpressure, detect explosive vapors and fire, perform emergency and safety shutdowns of the equipment, and perform platform process control.[121]

The HIPPS will detect high-pressure conditions and close isolation valves to protect downstream facilities. The HIPPS will operate independently from the rest of the Port's process shutdown system.  The Port will also operate autonomously when the crude oil loading pipeline shutdown

---

[121] SPOT Deepwater Port License Application, available for viewing at the Federal Docket Management System: http://www.regulations.gov, docket number MARAD-2019-0011-0001.

valves do not activate in time to prevent overpressure or other release events.

The life-support and life-saving equipment for the Port will include the emergency generator and power system, the communications tower, a 24-person enclosed motor-propelled survival craft (TEMPSC), firewater system, helideck, and other miscellaneous life saving devices. The Applicant will be required to ensure the rescue boat maintained at the Port meets the related requirements of 33 CFR 149.314.

### V.5.2 Vapor Combustion Systems

The Applicant will install two permanent and one portable vapor combustion units at the proposed Oyster Creek Terminal.  It is expected that the vapor combustion units at the Oyster Creek Terminal will eliminate more than 99 percent of VOCs that could potentially be emitted during tank filling, maintenance, or other inspection activities. Additionally, the storage tanks at the proposed Oyster Creek Terminal incorporate a floating roof, which is used as an emissions control device.

The Applicant will install a vapor combustion system on the Port platform to destroy the VOC vapors that will be displaced during the loading of the VLCCs or other crude oil carriers.  Moreover, it is expected that the vapor combustion system will eliminate approximately 95 percent or more of the VOCs to be emitted during the loading process.

The platform will also contain a sewage treatment system that will treat the brown and black water produced.  After the treatment process is completed, treated water will be discharged from the platform.  The Applicant will be required to ensure that the sewage treatment system meets the USCG and International Maritime Organization (IMO) Marine Environment Protection Committee 159 (55) certified Type II standards.

### V.5.3 Agency and Public Involvement

In analyzing the Applicant's proposal to construct and operate the Port for the export of crude oil, the USEPA, NOAA, NMFS, USACE, PHMSA, BOEM, BSEE, USFWS, and other Federal, State, and local agencies served as cooperating agencies and/or provided information and recommendations

that were evaluated and considered. MARAD has accepted recommendations of cooperating Federal, State, and local agencies that will become part of the License upon issuance.  These recommendations and other substantive feedback received from the cooperating agencies, including responses to the agencies, can be found in Appendix D of the FEIS.[122]

MARAD received 88,215 public comments on the SPOT DEIS, Draft General Conformity Determination, and SDEIS from Federal and State agencies, NGOs, and other members of the surrounding communities.  Of the public comments received, MARAD and USCG determined that there were over 7,600 substantive comments. The complete list of substantive public comments received on the DEIS, Draft General Conformity Determination, and SDEIS, and the agencies' responses to the comments, are provided in Appendices C1-C3 of the FEIS.[123]

Summaries of substantive agency and public comments received are described below:

  i. **USEPA** recommended that compensatory mitigation be required for temporal wetland losses that will exceed impacts for a period of 12 months.  For the project areas where no mitigation is required for temporary impacts, USEPA recommended that monitoring and performance standards be included to ensure those areas are restored to pre-construction conditions.  In response, the Applicant provided monitoring and performance standards as BMPs and a Compensatory Mitigation Plan that clarifies the Applicant's plan to purchase mitigation bank credits from USACE's approved mitigation banks.  It is anticipated that this effort

---

[122] See Appendix D of the FEIS for agency correspondence during the environmental review process. Appendix D is available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

[123] See Appendices C1-C3 of the FEIS for a more detailed discussion of the evaluation and resolution of public comments received during the environmental review process. Appendices C1-C3 are available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

will offset any unavoidable functional loss of
wetlands.[124]

USEPA also recommended that:

a.  The FEIS include updated information on climate
    change and a more expansive discussion on GHG
    emissions. Specifically, USEPA requested that the
    FEIS: 1) discuss more recent global climate change
    data, and 2) address the full lifecycle of the
    Project's operational and estimated upstream and
    downstream GHG emissions in the context of
    national and state GHG emissions goals and
    reduction targets.  MARAD and USCG worked with
    USEPA to develop the methodology for analysis of
    GHG emissions upstream and downstream of the
    proposed Project used in the FEIS.  A discussion
    of the broad relationship between GHG emissions
    and climate change, evaluated during the
    environmental review, is included in Chapters
    3.3.2, 3.12.2, 3.12.6, and 5.3.7.3 of the FEIS.

b.  The EPA inquired about the Project's effects on
    subsistence fishing. MARAD and USCG determined
    that there was no subsistence fishing data within
    the State of Texas that could be used to
    quantitatively determine an impact or duration of
    impact.  MARAD acknowledged that low-income
    communities that rely on local fishing for food,
    could be impacted during the project construction
    and during operations, in the event of an oil
    spill. As part of the environmental review
    process, MARAD, USCG, and other relevant
    cooperating agencies, including DOI, evaluated the
    Project's impacts on local recreational and
    commercial fisheries, and included the related
    analyses in Chapters 3.10.4.1, 3.10.4.2, 3.15.4.3
    and Chapter 5.3.10 of the FEIS.[125]

---

[124] The Compensatory Wetland Mitigation Plan (Appendix P of the FEIS) is available for
viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-
2019-0011-5032.

[125] See the FEIS for a more detailed discussion of the subsistence fishing. The FEIS is
available for viewing at the Federal Docket Management System:
http://www.regulations.gov under docket number MARAD-2019-0011-5032.

ii. **USACE** recommended that clarification and incorporation of an expanded set of geographical alternatives be considered during the agencies' review of the Purpose and Need of the Project. USACE also requested that the Applicant be required to implement a rigorous Compensatory Mitigation Plan, resulting from the impacts of the Project. Additional geographical alternatives were examined, considered and included in Chapter 2, Alternatives of the FEIS. The Applicant provided a Compensatory Wetland Mitigation Plan[126] that clarifies the Applicant's intent to purchase mitigation bank credits from USACE-approved mitigation banks. As of the date of this Record of Decision, the Compensatory Wetland Mitigation Plan has not been approved by USACE, and that approval will be a condition of this Record of Decision and future License, if issued.

iii. **USFWS** provided informal consultation on the Biological Assessment (BA) and concurrence on the Effects Determination for ESA-listed species on April 23, 2020.[127] The eastern black rail (EBR) was listed as a Federally threatened species at the end of October 2020,[128] and the final rule became effective on November 9, 2020, after the issuance of the DEIS. This listing triggered a reexamination of habitats that were proposed to be crossed during the Project's onshore construction activities. The USFWS, USCG, and MARAD conducted this reexamination prior to the development of the SDEIS. Consultation with the USFWS led the Applicant to develop survey protocols, methods, and BMPs that will avoid and minimize disturbance of the newly listed species during SPOT's construction of the Project. The Project's onshore construction activities are not likely to adversely

---

[126] See Appendix P of the FEIS for the Compensatory Mitigation Plan. Appendix P is available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

[127] MARAD and the USCG received concurrence from the U.S. Fish and Wildlife Service on Thursday, April 23, 2020, available for viewing at the Federal Docket Management System, http://www.regulations.gov, under docket number MARAD-2019-0011-1231.

[128] Vol. 85, Federal Register, No. 196, Thursday, October 8, 2020, pp. 63764 – 63803(85 FR 63764).

affect the EBR.  The USFWS concurred with this
determination on September 29, 2021.[129]

iv. **NMFS** recommended that the Applicant undertake an
expanded cumulative effects analysis to assist in
describing the Project's cumulative impact with other
local projects. NMFS also requested that a more
detailed analysis of construction noise effects and
noise abatement related to pile driving and anchor
handling noise be included in the environmental
review.

Information regarding NMFS ESA Section 7 formal
consultation with MARAD and USCG on the Project is
addressed in the Final Biological Opinion, which
concludes that all listed species within NMFS'
jurisdiction are not likely to be adversely affected
by the Project unless a major oil spill occurs in the
Project area. It provides reasonable and prudent
measures the Applicant must comply with during the
Project's construction, operation and decommissioning
and specific conditions concerning underwater noise
and oil spill monitoring and reporting.  The
conditions are described in greater detail below.

The Final Biological Opinion's not likely to adversely
affect conclusion includes potential impacts to the
Rice's whale. [130]  The primary shipping routes to be
followed by the vessels utilizing the Project do not
overlap with the core distribution area, where Rice's
whales have been consistently located in the
northeastern Gulf of Mexico along the continental
shelf between roughly 300-1300 FT (100-400m) depth.

The Rice's whale's occurrence outside of the known
core distribution area appears to be quite rare and
the Port will be anchored in the western Gulf in

---

[129] Letter of Concurrence from USFWS on the BA Addendum, Federal Docket Management
System, http://www.regulations.gov, MARAD-2019-0011-1251.

[130] Potential impacts to Threatened, Endangered, or Candidate Species are included in
Chapter 3.7 of the Final Environmental Impact Statement, available for viewing at the
Federal Docket Management System: http://www.regulations.gov under docket number
MARAD-2019-0011-5032.

approximately 115 feet of water.[131] Recent models based on sightings coupled with passive acoustic monitoring predict suitable Rice's whale habitat throughout the Gulf, including outside of their core distribution area.  Based on recent passive acoustic monitoring data, there is the potential for Rice's whales to occur in the western Gulf offshore from the proposed Port, in water depths approximately ranging between 300-1300 FT (100-400m).[132]

Given that the Port-related vessel traffic is not expected to transverse through the species' core distribution area, the likelihood of a project-related vessel strike of a Rice's whale is considerably lower than NMFS estimated for sperm whales.  Based on the foregoing and the fact that all crude oil carrier captains associated with the Project must comply with the NMFS-issued Vessel Strike Avoidance Measures, which include collision avoidance measures to reduce the potential for vessel strikes with ESA-listed species, a project-related vessel strike involving Rice's whale is unlikely to occur.[133]

v. **The Texas General Land Office (Texas GLO)** recommended that the Applicant be required to develop and implement a Discharge Prevention and Response Plan for the facility and obtain certification for a large facility classification (TX Admin Code 19.12).  Texas GLO also advised that the Applicant will be required to comply with certain easement requirements for projects developed on state-owned submerged lands (TX Code of Natural Resources 51.291).

Further, Texas GLO, and TPWD provided recommendations concerning the length of construction impacts on

---

[131] A detailed description of the proposed Project is included in Chapter 2.2 of the Final Environmental Impact Statement available for viewing at the Federal Docket Management System: http://www.regulations.gov under docket number MARAD-2019-0011-5032.

[132] NMFS, Final Biological Opinion, p. 54.  The National Marine Fisheries Service Final Biological Opinion is available for viewing at https://www.regulations.gov/document/MARAD-2019-0011-7887, as well as Appendix I of this Record of Decision.
[133] NMFS estimated that the proposed Project's 1,138 annual vessel transits would have an average of .00236 sperm whale strikes per year, which equates to 1 sperm Whale every 424 years. Id., p. 53-54.

sensitive habitats and the need for the Applicant to establish wetlands restoration and monitoring.

vi. **Texas Commission on Environmental Quality (TCEQ)** indicated that if the proposed action were modified in any way that would increase construction and/or operations air emissions from what was determined to generally conform to the State Implementation Plan (SIP), then a re-evaluation would be required consistent with 40 C.F.R. 93.157.

vii. **Non-Governmental Organizations (NGOs)** including the Sierra Club and Citizens for Clean Air and Clean Water, expressed concerns regarding the Port's consistency with national policy goals and the national interest, as well as additional inquiries regarding upstream and downstream GHG emissions, induced production of crude oil, and the relationship to the social cost of carbon.

As part of the environmental review, MARAD and USCG ensured that the FEIS included an analysis of the Project's GHG emissions and the upstream and downstream GHG production estimates associated with the amount of oil that could be transported through the proposed Project, a discussion on the broad relationship between GHG emissions and climate change, and a discussion of the possible induced production of crude oil. DOT and MARAD have determined the Project will have only a marginal effect on upstream production and a minimal contribution to downstream consumption. In addition, the FEIS also provides the agencies' supporting analysis and calculations regarding the social cost of carbon for the Project. Based on these analyses, although the GHG emissions associated with the upstream production and downstream end use of the crude oil to be exported from the Project may represent a significant amount of GHG emissions (see Table 5.3.7-2 of the FEIS) these emissions largely already occur as part of the U.S. crude oil supply chain. Therefore, the Project itself is likely to have minimal effect on the current GHG emissions associated with the overall U.S. crude oil supply chain.

**V.5.4 Alternatives**

The DWPA requires compliance with NEPA.  To identify the
environmentally preferable alternative, a reasonable range
of alternatives to the proposed action were examined.  The
alternatives are described in Chapters 2.3-2.10 of the
FEIS.  Alternatives considered include the no action
alternative, system alternatives, and alternatives for
elements of the project construction, operation, and
decommissioning including: port design, onshore and
offshore pipeline route locations, onshore terminal
locations, alternative deepwater port anchorages and
designs, mooring systems, anchoring methods, VOC control
technologies, construction methods, offshore port and
pipeline decommissioning alternatives, and other Project
related alternatives.  The potential environmental
consequences for the proposed action and alternatives are
evaluated under each resource area outlined in Chapter 3 of
the FEIS.[134]  Cumulative impacts of alternatives are
addressed throughout Chapter 5.3 of the FEIS.

In order to assure that all possible care is taken to
protect the environment, the Applicant will maintain a
continuing obligation to employ BATs and use BMPs and
conservation measures as listed and described in the FEIS,
Appendices M and N, which the Applicant has committed to
incorporate into their proposed action.[135]  These include
measures that require the Applicant to apply best practices
during construction spill responses, wetland and waterbody
protection, soil stabilization, revegetation, air
emissions, industrial and wastewater discharges, avoidance
of adverse effects on historical and archaeological sites,
and during project decommissioning.  The License will be
subject to the conditions listed below as well as
additional conditions consistent with Appendices M and N of
the FEIS and this Record of Decision, all of which will be
set forth in precise detail in the License.

---

[134] See Chapter 3 of the FEIS for evaluation of environmental consequences from the
proposed action and alternatives under each resource area. Chapter 3 is available for
viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-
2019-0011-5032.

[135] See Appendices M and N of the Final EIS for listing of the Best Management
Practices (BMPs) that SPOT has agreed to incorporate into the construction, operation
and decommissioning of the Port as a result of Federal, State and local agency
comments received during the environmental review process. Appendices M and N are
available for viewing at the Federal Docket Management System,
http://www.regulations.gov, MARAD-2019-0011-5032.

### V.5.5 Conditions

All applicable Federal, State, and local authorizations and permits must be obtained for the Port's construction, operation, and decommissioning.  The Applicant will comply with all applicable authorizations, permits, and License requirements, including monitoring and mitigation requirements.  Any additional requirements and conditions will be explained in detail in the License or under the relevant permit authorizations upon issuance.  The Applicant shall provide copies of all final permits and authorizations to MARAD and the USCG.

The Applicant shall comply with the following conditions:

    i.   <u>Clean Air Act, as amended (CAA)</u>. The Applicant shall comply, at a minimum, with the following conditions relating to the CAA:

        a.   The Applicant shall obtain a Title V Operating Permit and a Prevention of Significant Deterioration (PSD) Air Permit from the USEPA and comply with the terms and conditions of such permits.

        b.   The Applicant shall obtain, from the Texas Commission on Environmental Quality, Air Quality Division, in coordination with USEPA, the following air permits:  1) a New Source Review (NSR)permit for the Oyster Creek Terminal as an Oil and Gas Handling and Production Facility, and 2) an Air Permit-by-Rule (PBR) for the ECHO Terminal. The onshore components of the proposed Project require a minor emission source permit.

        c.   The Applicant shall reevaluate the emissions from the project if the proposed action is modified in any way that would increase construction emissions and/or operations emissions from what was determined in the Final General Conformity Determination, issued on July 29, 2022, which required that the Port conform to the Texas State Implementation Plan (SIP).

The Final General Conformity Determination is included in the FEIS Appendix V.[136]

d. As a condition of the License, the Applicant shall provide ongoing construction and operation progress reports, which will allow MARAD to track the progress of the activities subject to the General Conformity Determination, as outlined in 40 CFR § 93.157.

ii. <u>Federal Water Pollution Control Act, as amended (Clean Water Act (CWA))</u>. The Applicant shall comply, at a minimum, with the following conditions relating to the CWA:

a. The Applicant shall obtain a USEPA National Pollutant Discharge Elimination System (NPDES) permit for regulated discharges of wastewater for the Port and stormwater associated with industrial activities for the Port's onshore facilities.  The Applicant shall obtain a TCEQ Construction General Permit (CGP) for stormwater discharges from construction activities for onshore facilities.

b. The Applicant shall obtain a Texas Railroad Commission (TRRC) Section 401 Water Quality Certification, in conjunction with the USACE Section 404 permit, and provide the Certification to USEPA.

c. The Applicant shall, to the extent required, obtain permits under Section 10 of the Rivers and Harbors Act (RHA) and a Section 404 Permit and Section 408 authorization administered by USACE.

d. The Applicant shall complete and supply an USACE-approved Compensatory Wetland Mitigation

---

[136] See Appendix V of the FEIS for the General Conformity evaluation of construction and operation emissions from the proposed action, available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

Plan to the USCG and MARAD prior to initiation of Project construction.

e.   In response to recommendations by USEPA, the Applicant shall develop a plan for the restoration of impacted wetlands from the construction of the Project and submit the plan to MARAD and USEPA for review prior to the issuance of a license. The restoration plan shall focus on replanting, restoring, and returning impacted wetlands to their pre-impacted state.  MARAD shall have final approval authority of the restoration plan.

iii.   <u>Endangered Species Act of 1973 (ESA)</u>. MARAD and the USCG have developed a BA for the SPOT Project to be used for consultation required under the ESA and requested concurrence from the USFWS and NMFS with the findings of effect for Federally listed species. MARAD and the USCG entered formal consultation with NMFS on April 8, 2021.

Informal consultation with the USFWS required under Section 7 of the ESA was completed. The USFWS' concurrence on the Effects Determination was provided to MARAD and USCG, by letter dated September 29, 2021.[137]   As stated above, the Applicant has a continuing obligation to employ the best available technology and use the agreed upon BMPs and conservation measures, as listed and described in the FEIS, Appendices M and N.

Formal ESA Section 7 consultation between MARAD and NMFS was completed on November 9, 2022, with the issuance of a Final Biological Opinion.  As a condition of the License, the Applicant must comply with all mitigation measures and requirements contained in the Endangered Species Act - Section 7 Consultation Final Biological Opinion.  Some of these measures are described below and are listed in

---

[137] USFWS, Concurrence on addendum to Biological Assessment, September 29, 2021, is available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-1251.

further detail in Appendix I of this Record of Decision.[138]

Pursuant to 50 CFR 402.16, ESA consultation must be reinitiated if:

   a.   The amount or extent of the take specified in the incidental take statement is exceeded;

   b.   New information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

   c.   The identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the Final Biological Opinion or written letter of concurrence; or

   d.   A new species is listed or critical habitat designated that may be affected by the identified action.

If the Applicant wishes to make changes to the proposed construction, operation, or decommissioning of the Port after issuance of the License, the Applicant must first notify MARAD and the USCG of any proposed Port changes and their potential effects.  MARAD and the USCG will evaluate the proposed changes to see if they warrant re-initiation of ESA Section 7 consultations with the NMFS and USFWS.

If issued a License, the Applicant shall at a minimum comply with the below listed conditions relating to the ESA, and as identified in the FEIS. All ESA related conditions will be explained in more detail within the License upon issuance:

---

[138] The National Marine Fisheries Service Final Biological Opinion is available for viewing at https://www.regulations.gov/document/MARAD-2019-0011-7887, as well as Appendix I of this Record of Decision.

a.  The Applicant shall consult with NMFS to determine if any changes in Port construction, operation, and/or decommissioning activities require Incidental Take or Harassment Authorizations under the Marine Mammal Protection Act (MMPA). If required, the Applicant shall obtain such authorization and submit the authorization to MARAD and the USCG prior to commencement of construction or decommissioning activities.

b.  The Applicant shall implement NMFS' Protected Species Construction Conditions (2021), to reduce the risk of adverse effects on ESA species by requiring all construction workers to watch for ESA-listed species during all construction activities.[139]

c.  The Applicant shall immediately cease operation of any in-water moving equipment if a protected species is seen within a 150-ft radius of the equipment. Activities will not resume until the protected species has departed the Project area of its own volition.

d.  The Applicant shall ensure that all construction vessels comply with NOAA's NMFS Southeast Region's Protected Species Construction Conditions (NMFS 2021) to reduce the risk of a vessel strike during Port construction.

e.  The Applicant shall ensure adherence to procedures described in NOAA Fisheries Guidelines for Vessel Strike Avoidance Measures[140] for all vessels that the Applicant

_____

[139] The National Marine Fisheries Service Final Biological Opinion is available for viewing at https://www.regulations.gov/document/MARAD-2019-0011-7887, as well as Appendix I of this Record of Decision.

[140] NOAA, SPOT will implement the procedures described in the NOAA Fisheries Guidelines for Vessel Strike Avoidance Measures, revised 2021. https://media.fisheries.noaa.gov/2021-06/Vessel_Strike_Avoidance_Measures.pdf

operates.  These guidelines will also be provided to the operators of VLCCs that are not owned or operated by the Applicant.

f.  The Applicant shall implement mitigations and BMPs[141] related to pile driving noise generation that include:  clearing of the surrounding waters by a Protected Species Observer (PSO); implementing a "soft start" procedure to pile driving and a "shut down" of pile driving activity, if ESA-listed species are observed approaching or within the area of acoustic effects that can cause injury; applying a bubble curtain system to all pile driving activity; and ensuring a PSO monitors the Zone of Influence (ZOI) for the entirety of the in-water activity and afterward.  All marine mammal and ESA-listed species sightings must be fully documented.

g.  The Applicant shall monitor and document any inadvertent spills or releases of oil resulting from, or in any way related to, the operation of the Port. The Applicant shall provide annual reports to NMFS Southeast Regional Office (SERO), which include details of any such spills or releases and any remediation or mitigation measures that were taken in response to those spills or releases. NMFS will track these annual reports and calculate total spill amounts, on a 5-year basis, to determine if the project is exceeding the level of oil spill impacts anticipated and analyzed in the Final Biological Opinion.[142] Reports shall reference

---

[141]  See Appendices M and N of the Final EIS for listing of the Best Management Practices (BMPs) and mitigation measures that SPOT has agreed to incorporate into the construction, operation and decommissioning of the Port, as a result of Federal, State and local agency comments received during the environmental review process. Appendices N and M is available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

[142]  The National Marine Fisheries Service Final Biological Opinion is available for viewing at https://www.regulations.gov/document/MARAD-2019-0011-7887, as well as Appendix I of this Record of Decision.

the NMFS Environmental Consultation Organizer (ECO) tracking number for this consultation (SERO-2020-00075) and shall be submitted to the following email address: nmfs.ser.esa.consultations@noaa.gov.

h.    The Applicant must develop a comprehensive hydroacoustic monitoring plan based on procedures described in CalTrans' Technical Guidance for the Assessment of Hydroacoustic Effects of Pile Driving on Fish – Appendix II Procedures for Measuring Pile Driving Sound(October 2020), as recommended by NMFS in the Endangered Species Act - Section 7 Consultation Final Biological Opinion (Appendix I to this Record of Decision) The Applicant must submit its hydroacoustic monitoring plan to NMFS SERO for approval prior to commencement of pile driving activities.  The Applicant must submit a detailed report of the final monitoring results to NMFS SERO upon completion of the pile driving activities. Reports shall reference the NMFS ECO tracking number for this consultation (SERO-2020-00075) and shall be submitted to the following email address: nmfs.ser.esa.consultations@noaa.gov.

i.    The Applicant must prepare a Prevention, Monitoring, and Mitigation Plan (PMMP) for MARAD review and approval.  The MARAD approved PMMP, with concurrence from appropriate resource agencies, shall be incorporated as an Annex to the Deepwater Port Operations Manual. Compliance with an approved PMMP will be made a condition of the License.

Additionally, the Applicant will collectively work with Federal, State, and local agencies, as appropriate, to develop the PMMP.  The PMMP will be regulatory and performance-based and will include the periodic evaluation of effectiveness to identify environmental protection improvements in the Port's operating area. The PMMP must:

1.  Establish a single consolidated prevention, monitoring, and mitigation plan of the environmental impacts, which may result from the construction and operation of the Port.  The Plan must be satisfactory to all relevant Federal and State agencies.

2.  Address regulatory requirements and requirements of permits, approvals, and authorizations; project-specific requirements; Best Management Practices; and any other commitments made by the Applicant included in the Application and Final EIS, including the Best Management Practices, which are outlined in Appendices M and N of the FEIS.

3.  Provide Port personnel with the necessary information, training, procedures, and equipment to implement the PMMP's requirements and integrate them into all Port operations.

iv.  <u>Outer Continental Shelf (OCS) Activities</u>. The Applicant must comply, at a minimum, with the following conditions relating to activities on the OCS:

a.  The Applicant shall secure the necessary rights to utilize the OCS, including pipeline rights-of-way, in consultation with BOEM.

b.  The Applicant shall work with BOEM to obtain the initial Fair Market Rental Value assessment for the submerged lands required for the Port's construction, operation, and decommissioning. After BOEM makes the initial assessment, the Applicant will pay to MARAD the annual payments for the Fair Market Rental Value and pipeline right-of-way assessments, which will be calculated and collected by MARAD on an annual basis until the Port is decommissioned.

c.   The Applicant shall follow all applicable BOEM and BSEE Notices to Lessees and Operators concerning impacts on OCS areas.

d.   Prior to decommissioning, the Applicant will be required to provide demonstration of site clearance under BOEM regulations (30 C.F.R. Part 250, Subpart Q; Sections 1740—1743 for platforms and other facilities and Sections 1750—1754 for pipelines).  BOEM regulations provide the following methods to verify adequate site clearance: trawling with a shrimp-style net, using high-frequency sonar (at least 500 kHz), using divers, and using Remotely Operated Vehicles.

v.   <u>Deepwater Port Operations Manual</u>.  Prior to the commencement of construction activities, the Applicant shall prepare, submit to the USCG for review and approval, and maintain throughout the operational life of the Port a Deepwater Port Operations Manual that conforms to the requirements set forth at 33 C.F.R. Part 150.

vi.   <u>Additional USCG Requirements.</u> The Applicant must meet the requirements of 33 C.F.R. Part 149 governing design, planning, reviewing, fabrication, installation, inspection, maintenance, and equipment requirements.  These include but are not limited to those requirements contained within 33 C.F.R § 149.625, which requires that component design must meet a recognized industry standard and be appropriate for the protection of human life from death or serious injury, both on the deepwater port and on vessels calling on or servicing the deepwater port, and for the protection of the environment. The Applicant must also comply with 33 C.F.R. Part 150 governing operations, navigation measures, and oversight of the Port.  The U.S. Coast Guard Navigation and Vessel Inspection Circular (NVIC) No. 03-05 Guidance for Oversight of Post-Licensing Activities Associated with Development of Deepwater

Ports provides useful reference information
regarding these requirements.

vii.  <u>Self-Enforced Precautionary Requirement.</u>  The
Applicant must designate a self-enforced
precautionary area around each service vessel
mooring point to allow the vessels to turn or move
as necessary.  This requirement is in accordance
with the World Association for Waterborne Transport
Infrastructure guidelines.  Each mooring point will
have a secondary precautionary area of a prescribed
distance to minimize risk of collision and meet the
U.S. Department of Defense (UFC 4-150-06) Unified
Facilities Criteria.

viii.  <u>Requirements for Discharge of Operational Wastes.</u>
The Applicant must ensure that all deepwater port-
related activities shall comply with Federal
regulations to control the discharge of operational
wastes, such as bilge and ballast waters, trash,
debris, and sanitary and domestic waste generated
from the vessels and platform associated with the
proposed Port.

ix.  <u>Inspections and Monitoring</u>.  The Applicant shall
allow authorized representatives from MARAD and the
USCG access to inspect the Port at any time to
ensure that the Port is being operated in conformity
with the License and other applicable regulatory
requirements.  To the extent required, the Applicant
shall allow authorized representatives of USEPA and
other authorized Federal and State agencies to
verify and enforce License requirements.

x.  <u>Safety, Security, and Risk Mitigation</u>.  The
Applicant has committed to, and shall work with,
local and headquarters USCG units and applicable
local stakeholders to ensure the implementation of
the required safety and security risk mitigation
measures identified during the Risk Assessment.  The
measures are intended to reduce the risk of, and
consequences associated with, a crude oil release
caused by either accidental or intentional events.
The risk mitigation measures aim to minimize spill

impacts on high consequence areas and vessel traffic in commercially navigable waterways and nearest shipping fairways, such as the Freeport Harbor Safety Fairway.  Safety, security, and risk mitigation will be incorporated into the applicable USCG requirements of the Facility Security Plan, Facility Response Plan, Port Operations Manual, and addressed in ships' routing measures, including Safety Zones, NAAs, and an ATBA.

The Applicant shall address simultaneous operations protocols relating to communications, identification, safety, and security to ensure coordination between the Port and other vessels. These protocols are intended to manage risks through controlled access and operational restrictions.

xi.    Avoidance of Geologic Hazards and Hazardous Materials.  Before the commencement of any marine construction authorized under the License, the Applicant shall update the geophysical and geotechnical survey originally conducted as part of the Application for both the onshore and offshore Port facilities.  The surveys aim to avoid any significant debris that may adversely affect construction activities and identify cultural areas of significance and/or significant geologic hazards. Geologic hazards may include but are not limited to seismicity, slope stability, flooding and storm surge, competency of bedrock, and subsidence or settlement.  The Licensee shall make the results of such surveys known to appropriate personnel in BOEM, USACE, USEPA, and USCG.

xii.   Protection of Cultural/Archeological Resources. The Applicant shall develop and implement an Unanticipated Discoveries Plan (UDP).  The UDP will address procedures if previously unidentified cultural or underwater archaeological resources, and/or human remains are discovered during the construction of the Port's onshore, inshore, and offshore components.  If buried cultural or archaeological resources and/or human remains are encountered during construction, all work must cease

in the immediate area.  If the human remains are
determined to be Native American or of unknown
cultural affiliation, the remains will be left in
place and protected from any form of disturbance
until a plan for their protection or removal can be
developed.  The offshore portion of the UDP shall be
reviewed by the Texas Historical Commission (THC),
BOEM, MARAD, and USCG.  The onshore portion of UDP
shall be reviewed by THC, THPOs, MARAD, and USCG.
In the event of a cultural or archaeological
resource and/or human remains discovery, the
Applicant shall follow the UDP and comply with
applicable BOEM and NHPA regulations.

xiii.    Continued Public Outreach. The Applicant must
continue to conduct public outreach to the impacted
communities in the project vicinity and provide
specific information/fact sheets as to how the
pipelines and terminals will impact those
communities.  Additionally, the Applicant must
maintain the Project website, located at
https://www.spotnepaprocess.com/, so that the public
remains informed of the environmental review
process.  The website shall include translated
information for impacted LEP persons within the
Project area.  The Applicant must prepare an EJ and
LEP outreach and engagement plan (Engagement Plan)
prior to construction of any component of the
proposed DWP project.  The Engagement Plan shall
identify methods of public outreach, including but
not limited to developing a website and toll-free
hotline where the public can report and ask
questions during the construction phase of the
project; identifying potentially impacted EJ
communities and LEP persons; providing public
notices and conducting monthly public meetings; and
other public outreach actions designed to
meaningfully engage with EJ communities and LEP
persons, including translation and interpretation
accommodations. The Applicant must submit monthly
reports to MARAD during construction identifying any
EJ or LEP related issues encountered during the
reporting period.  The Engagement Plan will be
submitted to MARAD and USEPA prior to the issuance

of the License. MARAD will have final approval of
the Engagement Plan.  The Applicant's public
outreach and information must be performed/prepared
consistent with the approved Engagement Plan.

xiv.  <u>Viewshed Mitigation Plan</u>.  The FEIS identifies a
potentially disproportionate impact to surrounding
communities, including EJ communities, within 1 mile
of the Oyster Creek Terminal in regard to the
viewshed of the Project.  The Applicant must prepare
and provide a Viewshed Mitigation Plan to avoid or
minimize potential visual impacts associated with
the Oyster Creek Terminal.  The Applicant shall
coordinate with TPWD to include the use of native
species in the Viewshed Mitigation Plan.  The
Viewshed Mitigation Plan must be submitted to and
approved by MARAD prior to commencement of
construction and operations.

xv.  <u>Coastal Zone Consistency Determination</u>.  The
Applicant shall receive a Texas GLO coastal zone
consistency determination prior to the issuance of
the License.

xvi.  <u>Port and Pipeline Construction</u>.  The Applicant shall
minimize underwater noise transmission by the use of
a bubble curtain system and use of pile-driving soft
start ramp-up procedures.  Prior to the initiation
of construction activities, including pile driving
operations, the surrounding waters will be cleared
by a certified Protected Species Observer.  Best
available offshore construction practices using the
most efficient and effective construction equipment
and methods available must be used to minimize the
duration of construction activities.  The Applicant
will notify MARAD headquarters and the local USCG
unit in writing at least thirty (30) days prior to
commencement of any marine construction authorized
by the License.

xvii.  <u>Pipeline and Hazardous Materials Safety
Administration (PHMSA) Office of Pipeline Safety
Requirements</u>.  The Applicant shall ensure the

pipeline(s) are designed, constructed, installed, tested, inspected, operated, and maintained according to applicable Federal Pipeline Safety Regulations as defined in 49 U.S.C. §§ 601 and 603 and 49 C.F.R. Parts 190-199 in coordination with the PHMSA Office of Pipeline Safety.  These regulations concern the safe construction, operation, or maintenance of pipelines on Federal lands and the OCS.  The Applicant will develop a contingency plan, in coordination with PHMSA and USEPA, for the local impacted communities that describe plans in case of accidents such as explosion, pipeline failure/fires, and/or other health and safety matters.  The contingency plan must be submitted and approved before the commencement of construction of the Project.

xviii.    Volatile Organic Compounds (VOCs) Control.  The USEPA and members of the public raised concerns regarding impacts to human health from the Project's air emissions.  To address these health concerns the Applicant has committed to installing three vapor combustion units at the proposed Oyster Creek Terminal and a vapor combustion system at the Port. These systems will eliminate the VOCs emitted from the project by 99 percent and 95 percent, respectively.  In addition to the installation of onshore and offshore vapor combustion units/systems, the Applicant shall conduct the following measures to mitigate the potential impacts from VOC emissions:

a.    Prior to construction and operation, conduct a baseline monitoring test of the vapor combustion units/system.

b.    Conduct performance testing of the vapor combustion units/system on a quarterly basis to ensure the efficacy of the units/system.  The results of the performance testing must be submitted to MARAD within 30 days of receipt of testing results.

81

    c.   Conduct visual inspections of the vapor combustion units/system on a weekly basis to ensure the units/system are in proper working order.

    d.   Develop a monitoring plan for the Oyster Creek Terminal, in coordination with USEPA and TCEQ, that will monitor the VOC concentrations at locations sufficient to characterize the facility and local VOC concentrations. The monitoring plan shall be submitted to MARAD for review and approval prior to issuance of the License.  Monitoring results shall be provided to MARAD and included in the continued public outreach described in Condition xiii.

    e.   Maintain records of the conducted performance tests.

If the VOC Control systems/units do not eliminate the VOCs consistent with the emission elimination projections in the FEIS and this Record of Decision, then the Applicant shall report any deficiencies to MARAD within 30 days of receipt of testing results. The Applicant shall implement remedial measures approved by MARAD to reduce emissions to levels analyzed in the FEIS.  Failure to comply with these requirements may result in suspension or termination of the License pursuant to 33 U.S.C. § 1511.

xix.   <u>Decommissioning</u>.  The Applicant shall conduct all decommissioning activities in accordance with approved plans required by the Maritime Administrator.  Decommissioning plans shall comply with applicable and appropriate regulations and guidelines at the time of decommissioning.  A financial guarantee agreement or other suitable evidence of financing must be provided to ensure the Applicant has sufficient financial resources to decommission all components of the Port in a manner acceptable to the Maritime Administrator. Annual financial statements must be submitted to MARAD to demonstrate continued financial capability to fund

the full costs of decommissioning the Port, including removal of Port structures and associated facilities.

Review and approval of removal activities by MARAD, USCG, PHMSA, BSEE, BOEM, Texas GLO, USEPA and other agencies as appropriate, must occur prior to the start of decommissioning.  Approval of the decommissioning plan may require preparing a supplemental NEPA document.  All required Federal, State, and local permits, approvals, and authorizations must be applied for and received prior to commencement of any decommissioning activity. Other conditions related to decommissioning requirements will be set forth in the License.

xx.    Changes to the Deepwater Port.  In the event that the Applicant proposes to make any substantive changes to the construction and/or operation of the Port from that which is specifically authorized in this Record of Decision and/or in a License, the Applicant shall submit to MARAD and USCG, an Environmental Impact Assessment (Assessment) that details the proposed changes and evaluates its probable environmental consequences, adverse or beneficial.  The Assessment shall be appropriate to the nature of the proposed changes and of a level of detail and depth of analysis to enable the USCG and MARAD to prepare the appropriate NEPA document, if necessary.

MARAD, in consultation with other agencies as appropriate, will decide what level of further environmental review, if any, will be necessary.  To the extent the substantive changes require the preparation of a supplemental environmental impact statement or other supplemental NEPA analysis, the Applicant shall reimburse the Government for all costs associated with the preparation thereof.

Substantive changes include but are not limited to:

a.    Changes in purpose, technology, mechanical systems or infrastructure, and operations that

83

will have any significant effect on the
environment and/or are not consistent with the
project, as described in the Port's original
application, as amended, or as analyzed in the
FEIS;

b.    Any change that would require significant
modifications to the Deepwater Port Operations
Manual that are inconsistent with the
requirements of the License;

c.    Any change in pipeline routing or installation
methods for which the environmental impacts
were not analyzed in the FEIS or that is not
consistent with the analysis in the FEIS; and

d.    Any change that would require significant
modifications to the Port's original
application, as amended, or as analyzed in the
Final EIS.

In the event substantive changes are proposed, the
Applicant must do the following: 1) provide a list
of all Federal, State, or local permits which may be
affected by the proposed change and include the
permit number (if applicable), the current status,
and the date of expiration; 2) apply for new or
amended permits as required; and 3) provide MARAD
and the USCG with information sufficient for the re-
initiation of consultation under the ESA, Magnuson-
Stevens Fishery Conservation and Management Act, the
Marine Mammal Protection Act, the National Historic
Preservation Act, the National Marine Sanctuaries
Act, the Texas Deepwater Port Procedures Act or
other applicable laws.  All required new and/or
amended permits, approvals, and authorizations must
be received prior to the commencement of
construction or operation activities related to the
substantive change.

**V.6. Advice of the Administrator of USEPA**

Section 4(c)(6) of the DWPA (33 U.S.C. § 1503(c)(6))
provides that the License may be issued if the Secretary

has not been informed within 45 days following the last public hearing on a proposed License for a designated application area, by the Administrator of the USEPA that the deepwater will not conform with all applicable provisions of the CAA, as amended, the CWA, as amended, or the Marine Protection, Research, and Sanctuaries Act, as amended.

On October 7, 2022, MARAD was informed by the USEPA, Region 6, that it recommends approval of the DWP License for SPOT pursuant to its authority under the Clean Air Act (CAA), the Clean Water Act (CWA), and the Marine Protection, Research and Sanctuaries Act. EPA also recommended that additional emphasis is needed to ensure that environmental justice and climate change considerations are included in the project for the protection of overburdened communities.[143]

## V.7. Consultations with the Secretaries of State, Defense, and Army

Pursuant to the requirement of Section 4(c)(7) of the DWPA (33 U.S.C. § 1503(c)(7)), the Departments of State, Defense, and Army have been consulted to determine their views on the adequacy of the application, and the effect of the deepwater port on programs within their respective jurisdictions.

The Department of Defense did not provide comments on the proposed SPOT project.

By letter dated October 25, 2022, the Department of State advised that its review of the License application was complete and found "that the issuance of a License will have no adverse effect on the programs within the Department's jurisdiction."[144]

By letter dated September 16, 2022, the U.S. Army Corps of Engineers advised that the SPOT Project will have no

---

[143]  Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-7870.

[144]  Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-7869.

adverse effect on programs within the Galveston District.
Moreover, all appropriate accesses, authorizations, and
rights-of-way on the Corps Federal project areas must be
procured from the Corps prior to impacting any of these
federally owned/operated lands.[145]

As discussed under Section V.5 – *Protecting and Enhancing
the Environment* of this Record of Decision, USACE
provided substantive comments during the environmental
review process.  Specifically, USACE recommended that
clarification and incorporation of an expanded set of
geographical alternatives be considered and addressed in
the Project's Purpose and Need section of the EIS.
Additional geographical alternatives were examined,
considered, and included in Chapter 2, Alternatives of
the FEIS.

Also, during the environmental review, USACE requested
that a rigorous Compensatory Mitigation Plan be
established by the Applicant to mitigate impacts to
wetlands.  In response, the Applicant provided a
Compensatory Mitigation Plan that clarified its plan to
purchase mitigation bank credits from USACE-approved
mitigation banks to offset the unavoidable functional
loss of wetlands.  Prior to construction, the Applicant
must provide MARAD and USCG a USACE-approved Compensatory
Mitigation Plan.

### V.8. Approval of Adjacent Coastal State Governors

Section 4(c)(8) of the DWPA (33 U.S.C. § 1503(c)(8))
conditions the issuance of a License on the approval(s)
of the Governor(s) of the "Adjacent Coastal State or
States" (ACS).  ACS status confers Project approval,
disapproval, and approval with conditions authority to
States if they meet certain criteria.  33 U.S.C. §
1508(a)(1) of the DWPA provides that the Secretary must:

> Designate as an 'Adjacent Coastal State' any
> coastal State which (A) would be directly

---

[145]  Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-
7871.

connected by pipeline to a deepwater port as
proposed in an application, or (B) would be
located within 15 miles of any such proposed
deepwater port.

In addition, 33 U.S.C. § 1508(a)(2) provides:

> The Secretary shall, upon request of a State,
> and after having received the recommendations
> of the Administrator of the National Oceanic
> and Atmospheric Administration, designate such
> State as an "Adjacent Coastal State" if he
> determines that there is a risk of damage to
> the coastal environment of such State equal to
> or greater than the risk posed to a State
> directly connected by pipeline to the proposed
> deepwater port.

The Governor of any State designated by the Secretary as
an ACS can prevent the issuance of a deepwater port
license by timely notification to the Secretary of his or
her disapproval.

The State of Texas was designated as the ACS for the
Project.  Section 9(b)(1) of the DWPA (33 U.S.C. §
1508(b)(1)) states: "if the Governor fails to transmit
his approval or disapproval to the Secretary not later
than 45 days after the last public hearing on
applications for a particular application area, such
approval shall be conclusively presumed."[146]   The
Governor of Texas provided approval of the proposed SPOT
project with no conditions on August 31, 2022, within the
45-day period following the final public hearing.[147]

## V.9. Coastal Zone Management Act

Section 4(c)(9) of the DWPA (33 U.S.C. § 1503(c)(9))
authorizes the issuance of a License if the State or
States adjacent to the proposed deepwater port are making
reasonable progress toward developing an approved coastal

---

[146]  The final public hearing for the SPOT deepwater port License application was held
on August 23, 2022.

[147]  Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-
7862.

zone management program.  Section 9(c) of the DWPA (33 U.S.C. § 1508(c)) provides that a State is considered to be making such progress if it is receiving a planning grant pursuant to Section 305 of the CZMA.  The Texas Coastal Coordination Act of 1991 established a comprehensive coastal resource management program in Texas. The program gives Texas the authority to review proposed Federal actions and activities that are located or may affect the land and water resources in the Texas Coastal Zone through a Federal consistency review process.

All of the Project's onshore storage and supply components will be located within the Texas Coastal Zone Management Area administered by the Texas GLO. Concurrent with requirements of the DWPA, the Applicant submitted a draft application to the USACE under Section 404 of the CWA in December 2018. The Applicant filed a final application with the USACE on March 15, 2019. The application contains a consistency review form for the onshore components of the proposed Project. The Applicant provided a revised consistency review form to the Texas GLO on October 24, 2019, and the Texas GLO issued its conditional concurrence following its consistency review, which was completed on June 21, 2021.[148]

The Applicant must ensure that the Section 404 permit from the USACE, the Section 401 Water Quality Certification from the TRRC, and the Texas GLO consistency determination are received prior to Project construction.

Consistent with the Texas Coastal Coordination Act, as described above, the Texas Beach Access and Dune Protection Program requires any development within 1,000 feet of mean high tide to obtain approval from the Texas GLO).[149] Additionally, a Dune Protection Permit is required from the Village of Surfside Beach for any

---

[148]  See Appendix G of the Final EIS for the conditional concurrence letter received during the Federal Consistency determination and environmental review process. Appendix G is available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.
[149] See Chapter 6-2 of the Final EIS, available at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032

alteration (in elevation or vegetation) of nearby sand dunes from mean high tide landward for a distance of 1,000 feet.[150]  The Applicant shall comply with all conditions set forth in the CZMA consistency certifications.  Additional information regarding CZMA requirements is outlined in Appendix D, Agency Correspondence, of the FEIS.

## VI.  CONCLUSIONS

For the reasons set forth above, MARAD has reached the following conclusions:

1. The Applicant has provided the necessary documentation, guarantees, and assurances to confirm it has or has access to the required financial capital to construct, operate, and decommission the Port.  Also, the Applicant, through the support of its guarantor, has the financial resources to meet the maximum limit of liability requirements for deepwater ports as established by the Oil Pollution Act of 1990 and as amended by regulation at 33 C.F.R. § 138.230(c).

2. The Applicant brings together a team of offshore energy (facility and pipeline) development engineers, managers, and financial backers with experience to implement the project.  The Applicant's team has been informed of and understands the statutory and regulatory framework under which the construction and operation of the Port are governed.  Thus, it is expected that the Applicant will comply with all applicable laws, regulations, and License conditions, and understands the adverse ramifications of noncompliance.

3. The construction and operation of the Port is in the national interest because the Project will benefit employment, economic growth, and U.S. energy infrastructure resilience and security. The Port will provide a reliable source of crude oil to U.S. allies in the event of market disruption and have a minimal impact

---

[150] Id.

on the availability and cost of crude oil in the U.S. domestic market.  Construction and operation of an offshore export terminal and the installation of a vapor combustion system at the DWP will reduce the number of ship-to-ship transfers of crude oil and lessen emissions from conventional crude oil loading, thus providing a more efficient, less impactful crude oil transport facility within the offshore waters of the United States.

4. The Port will not interfere with international navigation or other reasonable uses of the high seas.  The requirement to establish safety zones and other regulated navigational areas, the Port's location 27.2 to 30.8 nautical miles offshore and outside of the Freeport Harbor Safety Fairway, and its proximity to other OCS activities is such that the Port will not affect other vessel traffic operating in the Gulf of Mexico.

5. The Project will be constructed and operated using the best available technology.  Operating safety and control features of the Project will include autonomous shutdown valves, HIPPs, fire and gas detection, emergency shutdown and safety controls, and process control systems.

The Applicant will install three vapor combustion units, two permanent and one portable, at the proposed Oyster Creek Terminal to eliminate VOC vapors emitted during storage tank filling, maintenance, and inspection activities.  The vapor combustion units would be capable of eliminating more than 99 percent of the VOCs. Additionally, the storage tanks at the proposed Oyster Creek Terminal incorporate a floating roof, which is used as an emissions control device.

The Applicant will also install a vapor combustion system at the DWP to collect and eliminate the VOC vapors displaced during the loading of the VLCCs or other crude oil carriers at the DWP. The vapor combustion system will eliminate 95% or more of the VOCs to be emitted during the loading process.  The conditions provided above will require monitoring of the vapor combustion system to ensure effectiveness as projected. These measures, described above, are considered the best available technology for this Port.

Moreover, the environmental impact analysis requirements
of NEPA have been satisfied.  The FEIS was prepared as
part of a transparent and publicly inclusive
administrative process, which included extensive public
comment on the Application, DEIS, Supplemental DEIS, and
FEIS, as well as the inclusion of a comprehensive
Federal, State, local, and tribal consultation process.

In consideration of the information and analysis included
in the FEIS and the comprehensive review performed by
MARAD and USCG with input from cooperating agencies,
MARAD concludes that the construction and operation of
the Port, as specifically detailed in Chapter 2.2 of the
FEIS, is the environmentally preferable alternative for
this Project and proposed technologies to be used by the
Applicant for constructing, operating, and
decommissioning the proposed Port, are the best available
technologies under Section 4(c)(5),(33 U.S.C. §
1503(c)(5))to minimize or prevent adverse impact on the
marine environment from this Project.

Additionally, based on the information provided within
the FEIS, Chapter 3.8.5.2, MARAD concludes that the
location of the proposed Oyster Creek Terminal, which is
located within the 100-year floodplain, is the only
practicable alternative in accordance with Executive
Order 11988, *Floodplain Management*, and DOT Order 5650.2,
*Floodplain Management and Protection*. Any other location
would require additional pumping units, and thus, provoke
additional environmental impacts.  The design of the
terminal would be based on the latest standards and
local, state, and federal requirements and would follow
Brazoria County minimum design requirements by elevating
all buildings, above-ground piping, and above-ground
equipment with electrical components by 2 feet above the
base flood elevation of 13 feet above mean sea level.

In accordance with Executive Order 11990, *Protection of
Wetlands*, and DOT Order 5660.1A, *Preservation of the
Nation's Wetlands*, MARAD concludes that no practicable
alternative avoiding a wetland exists for this Project.
The Applicant provided a Compensatory Mitigation Plan
that clarifies the Applicant's plan to purchase

mitigation bank credits from USACE-approved mitigation
banks to offset the unavoidable functional loss of
wetlands.  The Applicant has further committed to install
portions of the onshore pipeline adjacent to existing
petroleum infrastructure and commercial rights-of-way,
and to employ boring and horizontal directional drilling
methods for installing portions of the onshore pipelines.
These measures will be undertaken to minimize impacts on
sensitive and/or protected areas/resources, including
wetlands.  Additionally, this Record of Decision requires
the Applicant to develop a wetland restoration plan to
replant, restore and return impacted wetlands to their
pre-impact state.

As the License to construct and operate the Port is
prepared, detailed conditions will be included to address
the results, assessments, BMPs, and operating conditions
listed in the FEIS.  The License will include specific
conditions that respond to the requests and
recommendations submitted by agencies and members of the
public.  Compliance with the requirements imposed by
other Federal and State agency permits (such as USEPA
permits issued under the authority of the CWA and CAA)
will be included as conditions of the License.  Further,
the NEPA process undertaken by MARAD, USCG, and
cooperating agencies included ESA consultation with the
USFWS and NMFS.  The results of those consultations are
briefly addressed in this Record of Decision. Any related
conditions and requirements specified by the cooperating
agencies will be incorporated into the License upon its
issuance.

6. The USEPA Region 6 recommended approval of the Project
   and informed MARAD by letter that the Port will conform
   to all applicable provisions of the Clean Air Act, the
   Clean Water Act, and the Marine Protection, Research and
   Sanctuaries Act.

7. MARAD has consulted with the Secretaries of State,
   Defense, and the Army. The Department of State has
   advised that the Project will have no adverse impact on
   programs within its jurisdiction or significant adverse
   impacts on U.S. foreign policy regarding global and
   regional fisheries agreements, international agreements

for the prevention of pollution, or international agreements regarding oceanographic research and study.[151] USACE has advised that the Project will have no adverse effect on USACE projects within the Galveston District.[152] DOD did not provide comment on the Application. MARAD, therefore, concludes that the Port will have no impact on DOD programs.

8. The Adjacent Coastal State Governor of Texas provided approval with no conditions of the Port's License for construction and operation in a letter dated August 31, 2022.

9. The State of Texas has an approved Coastal Zone Management Program.  The Texas GLO issued its conditional concurrence following its consistency review on June 21, 2021.[153]  The Texas GLO consistency determination must be received before the issuance of the License.

The conditions in the Record of Decision are directed to ensure the Port is located, constructed, and operated in an environmentally sound manner that will help to minimize environmental damage caused by the accidental release of crude oil resulting from offshore or onshore operations, transshipment, or harbor collision.

MARAD finds that the construction and operation of the Port is in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency, environmental quality, and energy security. MARAD also finds that the SPOT application meets all requirements of the DWPA.  Based on these findings, the SPOT Terminal Services LLC, application to construct and operate a deepwater port 27.2 to 30.8 nautical miles offshore of Freeport, Texas, is hereby approved. This approval expires November 21, 2027.

---

[151] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-7869.

[152] Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-7871.
[153] See Appendix G of the FEIS for the conditional concurrence letter received during the Federal Consistency determination and environmental review process.  Appendix G is available for viewing at the Federal Docket Management System, http://www.regulations.gov, MARAD-2019-0011-5032.

This Record of Decision is not a license under the DWPA, and it does not authorize SPOT to own, construct, operate, or decommission a deepwater port. SPOT must comply with state and Federal permitting, mitigation, and related requirements outlined in this Record of Decision before a License may be issued and SPOT can begin construction of the proposed deepwater port.

Dated: November 21, 2022

_____

Rear Admiral Ann C. Phillips (USN, Ret.)
Maritime Administrator
Washington, D.C.

# Exhibit B

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that a true copy of this Petition for Review was served via U.S. Mail on each of the parties that may have participated in the underlying procedure:

SPOT Terminal Services LLC
1100 Louisiana Street, Suite 1000
Houston, Texas 77002

Enterprise Products Partners L.P
1100 Louisiana Street, 10th Floor
Houston, Texas 77002

Enterprise Products OLPGP, Inc
1100 Louisiana Street, 10th Floor
Houston, Texas 77002

Dan Duncan LLC
1100 Louisiana Street, Suite 1000
Houston, Texas 77002

Enterprise Products Operating LLC
1100 Louisiana Street, Suite 1000
Houston, Texas 77002

Enterprise Products Holdings LLC
1100 Louisiana Street, Suite 1000
Houston, Texas 77002

Enterprise Products Company and its
privately held affiliates
1100 Louisiana Street, Suite 1000
Houston, Texas 77002

This 19th day of January, 2023.

/s/ **Devorah Ancel**
Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
1650 38th St., Ste. 102W
Boulder, CO 80301
Telephone: (303) 449-5595
Fax: (303) 449-6520
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

**/s/ Amy Dinn**

Amy Catherine Dinn (TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext. 1118
adinn@lonestarlegal.org

*Counsel for Petitioner*
*Citizens for Clean Air & Clean Water in*
*Brazoria County*

**/s/ Erin Gaines**

Erin Gaines (TX24093462)
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org

*Counsel for Petitioner*
*Texas Campaign for the Environment*

**/s/ Lauren Parker**

Lauren Parker (DC1670885)
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202)-868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner*
*Center for Biological Diversity*

# Exhibit C

## LIST OF RESPONDENTS

Pursuant to Federal Rule of Appellate Procedure 15(c), Petitioners hereby provide a list of Respondents, specifically identifying the Respondents' names and the addresses where Respondents may be served with copies of the Petition for Review.

United States Department of
Transportation
1200 New Jersey Ave., SE
Washington, DC 20590

United States Maritime
Administration
1200 New Jersey Ave., SE
Washington, DC 20590

Hon. Pete Buttigieg
Secretary
U.S. Department of Transportation
1200 New Jersey Ave., SE
Washington, DC 20590

Rear Admiral Ann Phillips
Administrator
U.S. Maritime Administration
1200 New Jersey Ave., SE
Washington, DC 20590

United States Coast Guard
245 Murray Lane, SW
Washington, DC 20528-0075

Admiral Linda Fagan
Commandant
U.S. Coast Guard
245 Murray Lane, SW
Washington, DC 20528-0075

Rear Admiral Richard V. Timme
Commander
8th Coast Guard District
500 Poydras Street
New Orleans, LA 70130

Respectfully Submitted,

/s/ **Devorah Ancel**
Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
1650 38th St., Ste. 102W
Boulder, CO 80301

Telephone: (303) 449-5595
Fax: (303) 449-6520
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

**/s/ Amy Dinn**
Amy Catherine Dinn (TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext. 1118
adinn@lonestarlegal.org

*Counsel for Petitioner*
*Citizens for Clean Air & Clean Water in*
*Brazoria County*

**/s/ Erin Gaines**
Erin Gaines (TX24093462)
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org

*Counsel for Petitioner*
*Texas Campaign for the Environment*

**/s/ Lauren Parker**
Lauren Parker (DC1670885)
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202)-868-1008

lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner*
*Center for Biological Diversity*