No. 23-60027

—————————————————

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

—————————————————

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY;
TEXAS CAMPAIGN FOR THE ENVIRONMENT; CENTER FOR BIOLOGICAL
DIVERSITY; TURTLE ISLAND RESTORATION NETWORK; SIERRA CLUB,

*Petitioners*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; PETE BUTTIGIEG,
IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF
TRANSPORTATION; UNITED STATES COAST GUARD, AN AGENCY OF THE
U.S. DEPARTMENT OF HOMELAND SECURITY; RICHARD V. TIMME;
UNITED STATES MARITIME ADMINISTRATION, AN AGENCY OF THE U.S.
DEPARTMENT OF TRANSPORTATION; ANN PHILLIPS, IN HER OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE U.S. MARITIME
ADMINISTRATION; LINDA L. FAGAN, IN HER OFFICIAL CAPACITY AS
COMMANDANT OF THE U.S. COAST GUARD,

*Respondents*

On Petition for Review from Maritime Administration,

MARAD-2019-0011

### INITIAL BRIEF OF PETITIONERS

SUBMITTED BY:

Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org
*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

Erin Gaines (TX24093462)
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org
*Counsel for Petitioner*
*Texas Campaign for the Environment*

Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
adinn@lonestarlegal.org
*Counsel for Petitioner*
*Citizens for Clean Air and Water in*
*Brazoria County*

Lauren Parker (DC1670885)
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org
*Counsel for Petitioner*
*Center for Biological Diversity*

Submitted on: May 10, 2023

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Respondents: | Counsel for Respondents: |
| --- | --- |
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Brian Toth of U.S. Department of Justice Washington, DC |
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Paul Geier of U.S. Department of Transportation Washington, DC |
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Ann Phillips of U.S. Department of Transportation Washington, DC |
| Linda Fagan, Commandant, U.S. Coast Guard | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| Linda Fagan, Commandant, U.S. Coast Guard | Brian Toth of U.S. Department of Justice Washington, DC |
| Linda Fagan, Commandant, U.S. Coast Guard | Linda Fagan of U.S. Coast Guard Washington, DC |
| Linda Fagan, Commandant, U.S. Coast Guard | Melissa Bert of Judge Advocate General Washington, DC |
| Ann Phillips, Administrator, U.S. Maritime Administration | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| Ann Phillips, Administrator, U.S. Maritime Administration | Brian Toth of U.S. Department of Justice Washington, DC |
| Ann Phillips, Administrator, U.S. Maritime Administration | Paul Geier of U.S. Department of Transportation Washington, DC |
| Ann Phillips, Administrator, U.S. Maritime Administration | Ann Phillips of U.S. Department of Transportation Washington, DC |
| Richard Timme, Eighth District Commander, U.S. Coast Guard | Richard Timme of U.S. Coast Guard New Orleans, LA |

| United States Coast Guard | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
|---|---|
| United States Coast Guard | Brian Toth of U.S. Department of Justice Washington, DC |
| United States Coast Guard | Linda Fagan of U.S. Coast Guard Washington, DC |
| United States Coast Guard | Melissa Bert of Judge Advocate General Washington, DC |
| United States Department of Transportation | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| United States Department of Transportation | Brian Toth of U.S. Department of Justice Washington, DC |
| United States Department of Transportation | Paul Geier of U.S. Department of Transportation Washington, DC |
| United States Department of Transportation | Ann Phillips of U.S. Department of Transportation Washington, DC |
| United States Maritime Administration | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| United States Maritime Administration | Brian Toth of U.S. Department of Justice Washington, DC |
| United States Maritime Administration | Paul Geier of U.S. Department of Transportation Washington, DC |
| United States Maritime Administration | Ann Phillips of U.S. Department of Transportation Washington, DC |

| Petitioners: | Counsel for Petitioners: |
|---|---|
| Center for Biological Diversity | Jason Rylander of Center for Biological Diversity Washington, DC |
| Center for Biological Diversity | Lauren Parker of Center for Biological Diversity Washington, DC |
| Citizens for Clean Air & Clean Water in Brazoria County | Amy Dinn of Lone Star Legal Aid Houston, TX |
| Sierra Club | Rebecca McCreary of Sierra Club Boulder, CO |
| Sierra Club | Devorah Ancel of Sierra Club Austin, TX |

| Texas Campaign for the Environment | Michael Brown of Earthjustice New Orleans, LA |
| Texas Campaign for the Environment | Erin Gaines of Earthjustice Houston, TX |
| Turtle Island Restoration Network | Rebecca McCreary of Sierra Club Boulder, CO |
| Turtle Island Restoration Network | Devorah Ancel of Sierra Club Austin, TX |

| **Intervenors:** | **Counsel for Intervenors:** |
|---|---|
| Enterprise Products Operating, L.L.C. | Catherine Stetson of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | James Banks of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | Joanne Rotondi of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | Catherine Stetson of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | James Banks of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | Joanne Rotondi of Hogan Lovells US, L.L.P. Washington, DC |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|
| Enbridge Inc. or its affiliate[1] | |

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org

*Counsel for Petitioners*

---

[1] Petitioners make this disclosure to comply with their duty to the court under Fifth Circuit Rule 28.2.1(a), and in light of both Enterprise Products Partners L.P.'s and Enbridge, Inc.'s public statements, including in filings to the Securities and Exchange Commission (SEC). *See* Press Release, Enterprise Products Partners, L.P., "Enterprise and Enbridge Sign LOI to Jointly Develop Deepwater Terminal" (Dec. 9, 2019), https://www.businesswire.com/news/home/20191209005188/en/Enterprise-and-Enbridge-Sign-Letter-of-Intent-to-Jointly-Develop-Deepwater-Terminal; Enbridge, Inc., Annual Report (Form 10-K), 72 (Feb. 11, 2022), https://www.sec.gov/Archives/edgar/data/895728/000089572822000011/enb-20211231.htm [hereinafter: "Enbridge 10-K"]; Enterprise Products Partners, L.P., Annual Report (Form 10-K), 16 (Feb. 28, 2022), https://www.sec.gov/Archives/edgar/data/1061219/000106121922000008/form10k.htm; Enbridge, Inc., Current Report (Form 8-K, Ex. 99.1), 5 (May 5, 2023), https://www.sec.gov/Archives/edgar/data/895728/000089572823000015/ei-ex991newsreleasexdocume.htm; *see also* ROA.00098607, ROA.00098635-36, 00055128, (financial press articles describing relationship).

Specifically, these show that affiliates of Enbridge, Inc. and Enterprise Products Partners L.P. executed a letter of intent to "jointly develop and market SPOT," as well as to finalize an equity participation right for Enbridge, Inc. in the SPOT project, "subject to SPOT receiving [the] deepwater port license" that is the subject of this petition for review. *See, e.g.*, Enbridge 10-K at 72. Counsel for Petitioners have conferred with counsel for Intervenors Enterprise Products Operating LLC and SPOT Terminal Services LLC about this relationship but have been unable to come to a mutual understanding.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Local Rule 28.2.3, Petitioners Citizens for Clean Air & Clean Water in Brazoria County; Texas Campaign for the Environment; Center for Biological Diversity; Turtle Island Restoration Network; and Sierra Club (hereafter "Petitioners") respectfully request that the Court hold oral argument in this case. At issue is whether the U.S. Department of Transportation ("DOT") violated the National Environmental Policy Act ("NEPA") and Deepwater Port Act ("DWPA") when it issued the Record of Decision ("ROD") to license the construction and operation of the Sea Port Oil Terminal ("SPOT") deepwater port. SPOT is a two-million barrel-per-day crude oil export terminal that would operate for thirty years. Petitioners respectfully submit that oral argument would assist the Court with the complex legal issues and the voluminous administrative record in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ........................................... vii

TABLE OF CONTENTS ...................................................................................... viii

TABLE OF AUTHORITIES .................................................................................. xi

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE ISSUES.............................................................................2

STATEMENT OF THE CASE.................................................................................4

I.      Statement of Facts ........................................................................................4

      A.  Expansion of Crude Oil Exports and the Sea Port Oil Terminal ..............4

      B.  SPOT's Immeasurable Harm to Gulf of Mexico Ecosystems, Communities, and the Climate.................................................................5

      C.  MARAD's Review of SPOT's Deepwater Port License Application .......8

II.     Legal Background.........................................................................................9

      A.  Deepwater Port Act .................................................................................9

      B.  National Environmental Policy Act .......................................................11

SUMMARY OF THE ARGUMENT ....................................................................13

STANDARD OF REVIEW ...................................................................................19

ARGUMENT .........................................................................................20

I.     Petitioners Have Standing ...........................................................20

II.    SPOT's FEIS Grossly Underestimates the Project's Irreversible Impacts ....24

       A. The EIS Fails to Take a Hard Look at the Project's Significant Risks and
          Impacts to the Environment and Communities...........................................24

          1.     The Flawed Oil Spill Risk and Impact Analysis................................24

                 i.     The FEIS Fails to Assess Spills Likely to Occur Throughout
                        SPOT's Lifetime ...........................................................25

                 ii.    MARAD Failed to Consider Impacts on Species and Habitat
                        from "Most Likely" Spills ...........................................27

                 iii.   The EIS Fails to Assess Impacts of a "Worst Case" Discharge..30

          2.     SPOT Presents Extinction-Level Risk to Protected Gulf Species from
                 a Range of Unevaluated Project Threats.............................................32

                 i.     The EIS did not Accurately Consider the Rice's Whale's Range,
                        which Precluded Understanding of SPOT's True Impacts .........33

                 ii.    The FEIS Omits Analysis of Cumulative Effects on Protected
                        Species ...........................................................36

          3.     MARAD Violated NEPA by Failing to Take a Hard Look at SPOT's
                 Ozone Pollution...................................................................38

      i.    The FEIS Fails to Evaluate SPOT's Ozone Impacts in a Region with Existing Unhealthy Air Quality...........................................38

      ii.   MARAD Failed to Consider the Cumulative Impact of SPOT's Ozone Pollution Combined with Pollution from Nearby Projects...........................................................................41

  B. MARAD's Alternatives Analysis is Flawed............................................42

    1.    The Alternatives Analysis Unlawfully Excludes Consideration of a Reduced-Capacity Option ...................................................................43

    2.    The FEIS's Flawed Evaluation of the No Action Alternative...........47

III.   MARAD'S Licensing Decision Violated Deepwater Port Act Mandates .....53

  A. MARAD Failed to Meet Explicit Statutory Timelines for Licensing Review...................................................................................................53

  B. MARAD Failed to Determine Whether Allowing SPOT's Massive New Export Capacity Would Advance "Energy Sufficiency".........................57

CONCLUSION ..................................................................................................60

CERTIFICATE OF SERVICE .............................................................................62

CERTIFICATE OF COMPLIANCE....................................................................63

CERTIFICATE OF ELECTRONIC COMPLIANCE...........................................64

# TABLE OF AUTHORITIES

**Cases**

*Am. Rivers & Ala. Rivers Alliance v. FERC,*
  895 F.3d 32 (D.C. Cir. 2018).................................................................29

*Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers,*
  894 F.3d 692 (5th Cir. 2018) ..............................................................19

*Center for Biological Diversity v. U.S. Dep't of Interior ("CBD"),*
  623 F.3d 633 (9th Cir. 2010) ......................................................... 51, 52

*Coliseum Square Ass'n, Inc. v. Jackson,*
  465 F.3d 215 (Sept. 18, 2006) ............................................................11

*Ctr. for Biological Diversity v. Bernhardt,*
  982 F.3d 723 (9th Cir. 2020) ........................................... 16, 46, 48, 50

*Dakota Access, LLC v. Standing Rock Sioux Tribe,*
  142 S. Ct. 1187 (2022) .......................................................................32

*Del. Riverkeeper Network v. FERC,*
  753 F.3d 1304 (D.C. Cir. 2014)..................................................... 43, 46

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ...........................................................................11

*Dine Citizens Against Ruining Our Env't v. Haaland,*
  59 F.4th 1016 (10th Cir. 2023) ..................................................... 39, 41

*Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army,*
  492 F.2d 1123 (5th Cir. 1974) ................................. 16, 42, 43, 44, 47

*Found. on Econ. Trends v. Heckler,*
  756 F.2d 143 (D.C. Cir. 1985)............................................................12

*Friends of Back Bay v. U.S. Army Corps of Eng'rs,*
681 F.3d 581 (4th Cir. 2012) ...............................................52

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ................................................... 20, 21

*Friends of Yosemite Valley v. Kempthorne,*
520 F.3d 1024 (9th Cir. 2008) ............................................48

*Fritiofson v. Alexander,*
772 F.2d 1225 (5th Cir. 1985) ................................... 36, 37, 42

*Gulf Restoration Network v. U.S. Dep't of Transp.,*
452 F.3d 362 (5th Cir. 2006) ................................. 2, 3, 10, 12, 14, 24, 36, 41, 58

*Harris v. United States,*
19 F.3d 1090 (5th Cir. 1994) ...............................................19

*Hunt v. Wash. Apple Advert. Comm'n,*
432 U.S. 333 (1977) ..........................................................20

*League of Wilderness Def. v. U.S. Forest Serv.,*
689 F.3d 1060 (9th Cir. 2012) ............................................43

*Marsh v. Oregon Nat. Res. Council,*
490 U.S. 360 (1989). .........................................................33

*Mex. Gulf Fishing Co. v. U.S. Dep't of Commerce,*
60 F.4th 956 (5th Cir. 2023) ...............................................58

*Mid States Coal. For Progressive v. Surface Transp. Bd.,*
345 F.3d 520 (8th Cir. 2003) ..............................................50

*Miss. River Basin All. v. Westphal,*
230 F.3d 170 (5th Cir. 2000) ..............................................43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................ 19, 35, 41

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.,*
  677 F.3d 596 (4th Cir. 2012) ....................................................... 17, 48

*Nat. Res. Def. Council v. Hodel,*
  865 F.2d 288 (D.C. Cir. 1988) ............................................................53

*Nat. Res. Def. Council, Inc. v. Callaway,*
  524 F.2d 79 (2d Cir. 1975) ........................................................... 44, 47

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) ............................................................12

*Nevada v. Dep't of Energy,*
  457 F.3d 78 (D.C. Cir. 2006) ............................................................52

*New Mexico ex rel. Richardson v. Bureau of Land Management,*
  565 F.3d 683 (10th Circuit 2009) .........................................................44

*O'Reilly v. U.S. Army Corps of Engineers,*
  477 F.3d 225 (5th Cir. 2007) ....................................................... 27, 36

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
  402 F.3d 846 (9th Cir. 2005) ............................................................30

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 33 (1989) ....................................................................11

*Sabine River Auth. V. U.S. Dep't of Interior,*
  951 F.2d 669 (5th Cir. 1992) ............................................................36

*Save Our Cmty. v. E.P.A.,*
  971 F.2d 1155 (5th Cir. 1992) ...........................................................24

*Sierra Club v. FERC,*
   867 F.3d 1357, 1367 (D.C. Cir. 2017) ........................................................... 2, 12

*Sierra Club v. FERC,*
   827 F.3d 36 (D.C. Cir. 2016) ........................................................ 13, 47

*Sierra Club v. Glickman,*
   67 F.3d 90 (5th Cir. 1995) .................................................................19

*Sierra Club v. Sigler,*
   695 F.2d 957 (5th Cir. 1983) ...................................................... 30, 32

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   985 F.3d (D.C. Cir. 2021) ................................................................32

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.,*
   207 F.3d 789 (5th Cir. 2000) ...........................................................20

*Texas Off. of Pub. Util. Couns. v. F.C.C.,*
   183 F.3d 393 (5th Cir. 1999) ...........................................................19

*UAW v. Brock,*
   477 U.S. 274 (1986) .......................................................................20

*Union Neighbors United, Inc. v. Jewell,*
   831 F.3d 564 (D.C. Cir. 2016) .........................................................44

*United States v. Ameren Mo.,*
   421 F. Supp. 3d 729 (E.D. Mo. 2019) .............................................40

*Vieux Carre Prop. Owners Residents, & Assocs., Inc. v. Pierce,*
   719 F.2d 1272 (5th Cir. 1983) .........................................................36

*Western Watersheds Project v. Abbey,*
   719 F.3d 1035 (9th Cir. 2013) ............................................... 16, 44, 45

xiv

*Westlands Water Dist. v. U.S. Dep't of Interior,*
  376 F.3d 853 (9th Cir. 2004) .................................................................45

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
  139 S. Ct. 361 (2018) ...........................................................................58

*WildEarth Guardians v. Bureau of Land Management,*
  870 F.3d 1222, 122 (10th Cir. 2017) .......................................... 51, 52


**Statutes**

33 U.S.C. § 1501 ................................................................................. 9, 58

33 U.S.C. § 1503 ....................................... 3, 10, 11, 17, 44, 54, 57, 58, 60

33 U.S.C. § 1504 ........................................ 3, 10, 17, 29, 53, 54, 55, 56, 57

33 U.S.C. § 1505 ................................................... 3, 10, 11, 17, 53, 57

33 U.S.C. § 1516 .......................................................................................1

42 U.S.C. § 4321 .....................................................................................11

42 U.S.C. § 4331 .....................................................................................11

42 U.S.C. § 4332 ................................................................ 12, 29, 36, 42

5 U.S.C. § 500 ........................................................................................19

5 U.S.C. § 706 ................................................................................. 19, 57

**Regulations**

33 C.F.R. § 148.105 ........................................................................... 53, 57

33 C.F.R. § 148.107 ........................................................ 10, 53, 54, 56, 57

33 C.F.R. § 148.276 .................................................... 10, 53, 54, 55, 56

33 C.F.R. § 148.283 ...................................................... 10, 53, 56, 57

40 C.F.R. § 1500.1 ........................................................ 11, 13, 30, 37

40 C.F.R. § 1502.1 .......................................................................13

40 C.F.R. § 1502.14 ........................... 3, 10, 13, 16, 42, 43, 47, 48, 52

40 C.F.R. § 1502.16 ...................................................... 13, 15, 24, 39, 41

40 C.F.R. § 1502.22 ...................................................... 13, 14, 27, 30

40 C.F.R. § 1502.24 ...................................................... 12, 30, 37, 41

40 C.F.R. § 1502.5 .......................................................................29

40 C.F.R. § 1502.9 .......................................................................35

40 C.F.R. § 1508.7 ...................................................... 13, 15, 36, 39

40 C.F.R. § 1508.8 ...................................................... 13, 15, 24, 36, 39

**Federal Register Notices**

62 Fed. Reg. 11,382 (Mar. 12, 1997).........................................................8

CEQ, Interim Guidance on Consideration of Greenhouse Gases and Climate
    Change, 88 Fed. Reg. 1,196 (Jan. 9, 2023) ...........................................51

CEQ, Memo. to Agencies: Forty Most Asked Questions Concerning CEQ's NEPA
    Regs., 46 Fed. Reg. 18,026 (Mar. 1981) ................................................................44

Deepwater Port License Application: SPOT Terminal Services LLC (SPOT),
    84 Fed. Reg. 8,401 (Mar. 7, 2019) ........................................................................11

EPA, Determinations of Attainment by the Attainment Date, Extensions of the
    Attainment Date, and Reclassification of Areas Classified as Serious for the
    2008 Ozone National Ambient Air Quality Standards,
    87 Fed. Reg. 60,926 (Oct. 7, 2022) ................................................................ 5, 39

Organization and Delegation of Powers and Duties, Update of Secretarial
    Delegations,
    68 Fed. Reg. 36,496 (June 18, 2003) ..................................................................1, 9

Update to the Regulations Implementing the Procedural Provisions of the National
    Environmental Policy Act,
    85 Fed. Reg 43,304 (July 16, 2020) .....................................................................10

## Other Authorities

DWPA of 1974, Pub. Law No. 93-627 (1975) .........................................................58

H.R. Res. 22, 118th Cong. (Jan. 12, 2023) .............................................................58

Mandelkar et al., NEPA Law and Litig. § 10:33 (2d ed. 2022) ..............................48

S. Rep. No. 93-1217, at 5-6 (1974) ...........................................................................9

S. Rep. No. 93-217 (1974) ................................................................................ 54, 55

The Continuing Appropriations Act, 2016, Pub. L. No. 114-53, Div. O, Title I, §
    101 ............................................................................................................................9

# JURISDICTIONAL STATEMENT

Petitioners seek review of the Department of Transportation's ("DOT") decision to license the Sea Port Oil Terminal ("SPOT") deepwater port, issued under the Deepwater Port Act of 1974, 33 U.S.C. Chapter 29 ("DWPA").[2] This Court has original jurisdiction over this case pursuant to Section 1516 of the DWPA. The case seeks review of a decision to issue a deepwater port license within the Gulf of Mexico, and the nearest adjacent coastal state to the project is Texas, which is within the jurisdiction of this Court. 33 U.S.C. § 1516.

Petitioners are "aggrieved by the Secretary's decision" because it adversely affects them, and Petitioners participated in the administrative proceedings before the Secretary. 33 U.S.C. § 1516; ROA.00208553.

---

[2] The Secretary of Transportation delegated to the Maritime Administration authority to issue licenses for construction and operation of deepwater ports as provided for in the DWPA of 1974. 68 Fed. Reg. 36,496 (June 18, 2003).

# STATEMENT OF THE ISSUES

1) Whether the licensing decision, by DOT's Maritime Administration ("MARAD"), authorizing the construction and thirty-year operation of SPOT's two-million barrel-per-day deepwater crude export facility, violates the National Environmental Policy Act ("NEPA")[3] because it failed to take the requisite "'hard look' at the environmental consequences of its actions," *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 367 (5th Cir. 2006); *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) by:

   a. omitting analysis of a range of probable oil spill sizes likely to occur, as well as a consequential worst-case discharge occurrence during the Project's lifetime;

   b. failing to analyze direct and cumulative impacts of oil spills from SPOT, and other projects, on species and habitat, including consideration of new information revealing heightened impacts on the critically endangered Rice's whale;

   c. failing to analyze the direct, indirect, and cumulative impacts of SPOT's ozone pollution on the region's severely impaired air quality.

---

[3] MARAD's NEPA review was conducted in accordance with regulations effective prior to September 13, 2020. ROA.00023353. Citations to Council on Environmental Quality ("CEQ") regulations in this brief refer to the regulations in effect before September 14, 2020.

2) Whether the licensing decision violated NEPA's requirement to analyze a range of reasonable alternatives, 40 C.F.R. § 1502.14, including a smaller-capacity project alternative, and the true impacts of taking "no-action."

3) Whether MARAD's nearly four-year licensing review violated the DWPA by exceeding the statutorily-mandated 356-day application review timeline. *See* 33 U.S.C. §§ 1504, 1505.

4) Whether the licensing decision's failure to examine "energy sufficiency" violated the DWPA duty to "determine" if SPOT would be "good for" the national interest in "energy sufficiency." *See Gulf Restoration Network*, 452 F.3d at 373; 33 U.S.C. § 1503(c)(3).

# STATEMENT OF THE CASE

## I.    Statement of Facts

### A. Expansion of Crude Oil Exports and the Sea Port Oil Terminal

The Sea Port Oil Terminal ("SPOT" or "the Project") would be the largest crude export facility ever built in U.S. waters.[4] Proposed approximately thirty nautical miles off the coast of Brazoria County, Texas, SPOT's deepwater export platform also encompasses more than 140 miles of onshore and offshore connected pipelines, and crude processing and buoy infrastructure exclusively servicing the facility. ROA.00188409-11. The deepwater terminal would simultaneously load two Very Large Crude Carriers ("VLCC"), allowing exports of 730-million barrels of oil-per-year for thirty years. These carriers are as long as the Empire state building's height with 71-foot drafts, making them incapable of loading on or near-shore without significant dredging and vessel routing modifications. ROA.00188471; ROA.00188386.

Authorization of this two-million barrel-per-day deepwater export facility could increase the nation's current oil export volumes by as much as two-thirds, ROA.00188383, promoting the massive expansion of crude oil exports and shifting oil consumption abroad. SPOT is owned by Enterprise Products Operating, L.L.C.

---

[4] Louisiana Offshore Oil Port (LOOP), located 18 miles off Louisiana's coast, ROA.00188472, is the only deepwater oil export facility located in U.S. waters, and has a capacity of 1.2 million barrels-per-day – approximately half of SPOT's proposed throughput. ROA.00189105.

(Enterprise), a midstream oil company. *See* ROA.00098607, ROA.00055128, ROA.00098636. SPOT cuts against domestic energy sufficiency and oil market trends that forecast global oil demand falling. SPOT's authorization also contradicts U.S. policies to reduce fossil fuel consumption and is plainly inconsistent with domestic and international polices mandating robust action to mitigate the indisputable and ubiquitous climate crisis. ROA.00050558. SPOT will directly induce massive crude oil production and global consumption for decades, forcing Texas coastal communities, marine ecosystems and endangered wildlife to bear the burden of the Project's damaging externalities. ROA.00157951-53.

## B. SPOT's Immeasurable Harm to Gulf of Mexico Ecosystems, Communities, and the Climate

Residents surrounding the Project are already inundated with industrial pollution and safety hazards, including from the mammoth Dow Chemical complex, the Freeport LNG export terminal, and numerous onshore oil storage and export terminals. *See, e.g.*, ROA.00093878-82. The region's air quality fails to meet National Ambient Air Quality Standards ("NAAQS") for ozone, and EPA recently declared the Houston-Galveston-Brazoria area in "severe" nonattainment for ozone.[5] Individually and cumulatively, SPOT would directly induce massive crude oil

---

[5] EPA, *Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Serious for the 2008 Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 60,926 (Oct. 7, 2022).

exports and production causing additional irreversible harm to public health, the marine environment, and climate. SPOT will generate years of construction impacts, noise, onshore and offshore traffic, air pollution, more frequent and extreme hurricanes, and oil and chemical spills. ROA.00206546; ROA.00157896-97.

SPOT's projected oil spills would extend from Brazoria to Galveston counties and into adjacent coastal waters, affecting both public and private property interests along the shoreline and in deeper waters. ROA.00189016-21. Spills could severely impact local beaches, like Surfside and Bryan Beaches. *Id*. Oil contamination, reminiscent of BP's Deepwater Horizon disaster, would have catastrophic economic impacts on the region's tourism, commercial and recreational fishing, and oyster harvest industries. ROA.00188918. The Project's substantial risk of frequent and significant oil spills threatens imperiled species, including the critically endangered Rice's whale. ROA.00157930-32; ROA.00206552-53. With population estimates numbering less than fifty, this Gulf of Mexico endemic whale risks extinction from the loss of one individual. ROA.00098321; Rice Decl. ¶ 14. The Project's deepwater infrastructure and pipeline, intersecting Surfside Beach, also threaten numerous species of endangered sea turtles that primarily inhabit Gulf waters and depend on this beach for nesting and other essential reproductive activities. ROA.00188720-23.

SPOT would emit significant levels of ozone-producing and hazardous air pollution, exacerbating the "severe" air quality conditions and associated health threats confronting the Houston-Galveston-Brazoria region. ROA.00206564-65. SPOT's construction and operation will directly contribute to climate change, undercutting implementation of U.S. and global emissions reduction policies to avert climate disaster, and exacerbating local climate impacts like stronger storms. MARAD's conservative estimates project SPOT alone will cause emissions of more than 200-million tons of carbon dioxide-equivalent per-year (CO2e/year), ROA.00189109-10, the same as operating more than 80 new coal-fired power plants.[6]

Yet, SPOT is just one of at least four proposed deepwater export terminals proposed off Texas's coast with pending licensing applications before MARAD, two of which would be in waters off Brazoria County. MARAD is evaluating the nearly one-million barrel-per-day GulfLink terminal, which would load VLCCs just seven nautical miles from SPOT. GulfLink would add the same array of new onshore and

---

[6] Depending on crude type originating from Permian Basin or Eagle Ford oil fields, experts estimate SPOT will emit significantly higher greenhouse gas emissions, ranging from 367 to 396-million-tons CO2e/year. *See* ROA.00097724-75.

offshore pipelines and storage terminal capacity as SPOT, multiplying the harmful impacts to coastal Brazoria communities and the region.[7] ROA.00188475.

## C. MARAD's Review of SPOT's Deepwater Port License Application

On January 31, 2019, SPOT Terminal Services LLC submitted an application to MARAD for federal authorizations required to own, construct and operate a deepwater port for the export of oil pursuant to the DWPA. ROA.00035730-31. Nearly four years passed between SPOT's application submission and MARAD's November 21, 2022 Record of Decision ("ROD") to license the facility. ROA.00208533. During that time, MARAD issued three "stop clocks," halting the application review process. ROA.00208546-47; ROA.00208559-61. Each instance centered around SPOT's failure to provide information necessary to complete project review, including a 145-day delay resulting from SPOT's third-party contractor halting work on the Project. ROA.00098928-29, ROA.00039543. The U.S. Coast Guard ("USCG"), working in coordination with MARAD to conduct the Project's required environmental review, 62 Fed. Reg. 11,382 (Mar. 12, 1997), cautioned that termination of the contractor's efforts to provide essential project information and analysis would cause delays preventing application processing

---

[7] Other proposed Gulf Coast deepwater crude oil export facilities with pending applications include: Bluewater (384-million barrels-per-year capacity, sited approximately 15 miles off San Patricio County, Texas); Texas GulfLink (360-million barrels-per-year capacity, sited approximately 30 miles off Brazoria County, Texas); and Blue Marlin (730-million barrels-per-year capacity, sited 99 miles off Cameron Parish, Louisiana). ROA.00189075-76.

within the DWPA's 356-day statutory timeline. ROA.00092043-44. MARAD ultimately resumed project review. In total, MARAD's licensing review extended more than 630 days beyond the mandated timeline.

## II.    Legal Background

### A. Deepwater Port Act

The Deepwater Port Act ("DWPA") of 1974, as amended, establishes a licensing process for ownership, construction, operation, and decommissioning of manmade structures beyond U.S. territorial seas[8] for the import and export of oil and natural gas. The law was initially passed during the 1970s energy crisis and retains an emphasis on securing adequate domestic oil supplies. S. Rep. No. 93-1217, at 5-6 (1974); *See* The Continuing Appropriations Act, 2016, Pub. L. No. 114-53, Div. O, Title I, § 101.

DWPA section 1503(c) confers authority on the Secretary of Transportation through the Maritime Administration ("MARAD"), 68 Fed. Reg. 36,496 (June 18, 2003), to issue deepwater port licenses in a manner that "protect[s] … the marine and coastal environment." 33 U.S.C. § 1501. The Secretary's licensing decision must meet several specified criteria, including a mandatory "determin[ation] that construction and operation of the deepwater port is in the national interest and

---

[8] Waters beyond U.S. territorial waters are those seaward of twelve nautical miles from a coastal state's mean low water mark.

consistent with … national policy goals … including energy sufficiency and environmental quality." 33 U.S.C. § 1503(c)(3); *see Gulf Restoration Network,* 452 F.3d at 373 (establishing Secretary's duty to determine deepwater port is "good for" the national interest in "energy sufficiency").

Further, the deepwater port must be "constructed and operated using best available technology [] to prevent or minimize adverse impact on the marine environment" occurring as a consequence of port development. 33 U.S.C. §§ 1501, 1503(c)(5). To this end, the DWPA explicitly requires environmental review that is consistent with NEPA and includes evaluation of the project's effects on the marine environment, human health and welfare. *See* 33 U.S.C. §1505(a). In coordination with MARAD's licensing review, the U.S. Coast Guard ("USCG") must prepare an Environmental Impact Statement ("EIS"), pursuant to NEPA, and any supplemental review deemed necessary to ensure adequate consideration and analysis of the project's impacts on the environment. 33 U.S.C. § 1504(f), (i).

Valid DWPA and NEPA review must be timely to accurately weigh the costs and benefits of a massive long-term export facility in light of the present set of contextual circumstances and to compare them to other reasonable alternatives. 40 C.F.R. § 1502.14 (NEPA requirements described *infra*); 33 U.S.C. § 1504; 33 C.F.R. §§ 148.283, 148.107. The DWPA establishes a mandatory timeframe of less than one year for MARAD to conduct application review and issue its decision to approve

or deny the license. 33 U.S.C. §§ 1504, 1505; 33 C.F.R. § 148.276(a); S. Rep. No.

93-1217, at 4-5 (1974). A licensing determination must ensure the Project would

advance energy sufficiency, environmental quality, and that the Project applicant

can meet financial responsibility and regulatory requirements. 33 U.S.C. § 1503(c).

### B. National Environmental Policy Act

NEPA is this country's "basic national charter for protection of the

environment." 40 C.F.R. § 1500.1;[9] *see* 42 U.S.C. § 4331 et seq. "Intended to reduce

or eliminate environmental damage," NEPA secures protections through exacting

procedural requirements which place environmental impacts at the forefront of

agency decision-making. 42 U.S.C. §§ 4321, 4331(a)–(b); *Dep't of Transp. v. Pub.*

*Citizen,* 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321); *Coliseum Square*

*Ass'n, Inc. v. Jackson*, 465 F.3d at 223. The procedural requirements of NEPA are

"action-forcing," requiring agencies to carefully "consider[] detailed information

concerning significant environmental impacts" before committing to a decision.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA

review also ensures full and effective public participation in decisionmaking. 42

---

[9] Federal agencies comply with CEQ regulations in implementing NEPA. *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 224 (5th Cir. 2006). CEQ revised these regulations twice prior to the publication of the final EIS. *See, e.g.*, 85 Fed. Reg 43,304 (July 16, 2020). As the FEIS provides, these amendments do not apply to SPOT's NEPA review, which began before the changes in March 2019. ROA.00188373; 84 Fed. Reg. 8,401 (Mar. 7, 2019). *See also* 85 Fed. Reg. at 43,373, 43,340 (new regulations "apply to any NEPA processes begun after September 14, 2020").

U.S.C. § 4332(2)(C); *Robertson*, 490 U.S. at 333. The environmental consequences of a project must be sufficiently detailed to allow the public to understand its impacts. *See Gulf Restoration Network.*, 452 F.3d at 367; *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (agency NEPA obligations are more than a technicality, providing important requirements serving the public and agency before major federal actions occur.).

Federal agencies must prepare a "detailed" Environmental Impact Statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332 (2)(C). This process "forces the agency to take a 'hard look' at the environmental consequences of its actions, including alternatives to its proposed course," and "ensures that these environmental consequences, and the agency's consideration of them, are disclosed to the public." *Sierra Club v. FERC*, 867 F.3d at 1367 (citations omitted). The agency must perform this duty using high-quality, accurate scientific information that ensures the scientific integrity of its analyses. 40 C.F.R. §§ 1500.1(b), 1502.24; *see Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (hard look requirement prohibits agency from relying on incorrect assumptions or data) (citing 40 C.F.R. 1500.1(b))). NEPA also requires an agency to show its work, including "methodologies used and . . . make explicit reference . . . to the scientific and other sources relied upon for conclusions." 40 C.F.R. § 1502.24.

NEPA's required analysis of an action's direct, indirect and cumulative environmental effects must encompass all reasonably foreseeable effects that may result later in time, *see* 40 C.F.R. §§ 1502.16(a)-(b), 1508.7, 1508.8, as well as those with catastrophic consequences, even if their probability of occurrence is low. 40 C.F.R. § 1502.22(b)(4). The analysis also must include evaluation of "reasonable alternatives" to the proposed action, including the alternative of taking no action. 40 C.F.R. § 1502.1; 40 C.F.R. § 1502.14. This informs decisionmakers and the public of options that must be considered to avoid or minimize adverse impacts or enhance the quality of the human environment. *See Sierra Club v. FERC,* 827 F.3d 36, 45 (D.C. Cir. 2016) (considering options that entail less environmental damage, may persuade agency to alter its proposal).

If information relevant to the Project's reasonably foreseeable adverse impacts is incomplete or unavailable, an agency must summarize the relevant credible scientific evidence and attempt to evaluate such impacts based on theoretical approaches or methods generally accepted in the scientific community. 40 C.F.R. § 1502.22(b)(1).

## SUMMARY OF THE ARGUMENT

MARAD's decision to license the two-million barrel-per-day SPOT deepwater crude export terminal, which could increase current U.S. oil exports

13

volumes by two-thirds and induce decades of additional oil production, violates the DWPA and NEPA on several grounds. First, the decision violates NEPA's "hard look" requirement by failing to analyze the terminal's potentially devastating oil spill impacts. *Gulf Restoration Network*, 452 F.3d at 367. It omitted assessment of oil spill risk of a range of foreseeable spill sizes from most sources along the Project's 140-mile array of onshore and offshore infrastructure. The FEIS narrowed its review to a single 2,200-barrel spill solely from the deepwater platform, ignoring record evidence of the range of other possible spills and locations, including higher frequency, smaller spills, as well as high consequence worst-case discharge events of more than 600,000 barrels, like that analyzed by USCG's third-party consultant. 40 C.F.R. § 1502.22(b)(4). The FEIS itself provides evidence of such spills in its safety assessment and MARAD even examines a range of foreseeable spill scenarios for other similar projects. Yet SPOT's impact analysis arbitrarily omits probable spill occurrences.

Moreover, the FEIS fails to evaluate oil spill impacts on species and habitat. Providing no analysis of various spill factors available in the record, the FEIS provides a mere blanket generalization that "the effects of a spill would vary" and "would be direct or indirect, adverse, short-term or long-term, and minor to major, depending on [] size …and exposure …" Despite record evidence of devastating, irreparable impacts that oil spills, like the Deepwater Horizon disaster, have on

marine ecosystems and species, the FEIS omits detailed explanations of possible direct, indirect or cumulative spill impacts, including on federally protected species. There is no discussion of impacts on endangered and threatened sea turtle species that inhabit Gulf waters and depend on surrounding beaches, directly impacted by SPOT's pipeline. Nor does the FEIS provide analysis of spill or other noise or vessel traffic impacts directly caused by SPOT on the critically endangered Rice's whale, which has an estimated population of less than 50 exclusively inhabiting Gulf waters. Further discounting possible species' impact, the FEIS ignores new evidence of the whale's known occurrences within SPOT's impact zone.

The FEIS also fails to take a hard look at SPOT's direct, indirect and cumulative air quality impacts. 40 C.F.R. §§ 1502.16(a)-(b), 1508.7, 1508.8(a)-(b). Specifically, it omits analysis of the Project's significant contributions to the region's existing ozone pollution problems by failing to accurately quantify or disclose the total ozone pollution from SPOT's numerous onshore and offshore infrastructure components. Nor did it analyze how the Project's ozone pollution, both individually and cumulatively with other nearby projects like GulfLink, would impact the health of frontline community residents already suffering from respiratory illness and other ailments caused by the region's unhealthy air quality. The FEIS fails to provide information about the harms of significantly increasing ozone pollution in an area recently downgraded to "severe" non-attainment for

federal ozone standards, and fails to support its conclusions that SPOT's air quality impacts would be "minor."

MARAD's deficient alternatives analysis also violates NEPA. MARAD is required to look at a range of feasible and reasonable alternatives to ensure decisionmakers and the public are fully informed of the Project's impacts relative to alternative courses of action. 40 C.F.R. § 1502.14. Other than reviewing the possible relocation of various project components, the FEIS only considers the "preferred" construction and operation of a thirty-year, maximum capacity two-million barrel-per-day export terminal. In doing so, the FEIS fails to review a smaller-sized project as an alternative that could meet the basic purpose and need for the project at lesser environmental impact. *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 492 F.2d 1123, 1135 (5th Cir. 1974); *see Western Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013). This is particularly in error, because MARAD does not support a need for SPOT's maximum-level capacity, and ignores the series of industry forecasts in the record that global oil demand will decline during the Project's life. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020).

The FEIS also reaches the erroneous and unsubstantiated conclusion that the "no action" alternative, 40 C.F.R. § 1502.14(d), would have the same or worse impacts than the Project as proposed. MARAD accomplishes this by improperly assuming that by taking no action, the Project's harms would still occur at existing

or future ports. *See N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 599-600, 603 (4th Cir. 2012). MARAD also ignores expert evidence that SPOT's enormous addition of export capacity would induce new production for export that would not otherwise occur. As a result of these errors, the FEIS failed to account for SPOT's immeasurable harm to the marine environment, frontline communities and climate.

MARAD's licensing decision violates the DWPA's non-discretionary requirement to complete licensing review within 356 days. See 33 U.S.C. §§ 1504, 1505. MARAD's review extended well beyond this statutory timeline — by more than 630 days — because SPOT failed to diligently respond to agency requests for information necessary for license review and statutory determinations regarding national interest. MARAD even cautioned SPOT that its non-responsiveness would lead to licensing violations. Yet, for nearly four years, the agency continued to unlawfully extend review of SPOT's application, instead of denying it when the statutory timeline lapsed.

MARAD failed to satisfy explicit DWPA licensing criteria, 33 U.S.C. § 1503(c)(3), by omitting determination of whether allowing SPOT's massive new export capacity would advance "energy sufficiency." MARAD's decision to license SPOT, which could lead to exporting nearly 18 percent of domestically produced oil and lock-in decades of additional export contracts, contravenes the congressional

goal of ensuring adequate and necessary domestic oil supplies. MARAD's failure to determine or provide any discussion of whether exporting a massive portion of American oil reserves would be good for domestic energy sufficiency and provide assurances that future energy needs would be met is plain error.

These violations render MARAD's decision to license SPOT invalid. The Record of Decision should thus be vacated and remanded for further review.

# STANDARD OF REVIEW

The Court's Review of MARAD's Record of Decision and underlying EIS for licensing SPOT, is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. § 500 *et seq*. A reviewing court "shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A); *see Sierra Club v. Glickman*, 67 F.3d 90, 96 (5th Cir. 1995). A decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Deference is due only when the agency can "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 894 F.3d 692, 697 (5th Cir. 2018).

A Court is authorized "to reverse an agency's action" if it "fail[s] to give a reasonable explanation for how it reached its decision." *Texas Off. of Pub. Util. Couns. v. F.C.C.*, 183 F.3d 393, 410 (5th Cir. 1999); *see* 5 U.S.C. § 706(2)(A) (1994); *see also Harris v. United States,* 19 F.3d 1090 (5th Cir. 1994).

# ARGUMENT

## I.    Petitioners Have Standing

Petitioners are membership organizations with standing to bring this case. An organization has standing to bring an action on behalf of its members when: (1) its members have standing in their own right; (2) the interests which the organization seeks to protect in the lawsuit are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires members' individual participation in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000).

Petitioners satisfy all three requirements. Regarding the second criteria, Petitioner groups are all nonprofit organizations with environmental missions. Fabish Decl. ¶ 2; Hinojosa Decl. ¶ 5; Oldham Decl.  ¶¶ 9-14; Page Decl. ¶¶ 3-7; Robinson Decl. ¶¶ 3-4; Schneider Decl. ¶¶ 3-4. Petitioners seek to safeguard their members' interests in protecting the environment, including wildlife, air and water quality. Petitioners also satisfy the third criteria because the Court's determination whether MARAD's decision to license SPOT violates applicable law does not require individual participation of Petitioners' members. *See also Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *UAW v. Brock*, 477 U.S. 274,

287-88 (1986) (associational standing satisfied where statutory requirements do not require evaluation of "unique facts" personal to union members).

On the first requirement, members have standing to sue in their own right if they have suffered "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical…." *See Laidlaw*, 528 at 180-81. These injuries must be "fairly traceable to the challenged action of the defendant; and … it is likely, as opposed to merely speculative, that the [injuries] will be redressed by a favorable decision." *Id.*

Petitioners' members have suffered injury-in-fact. MARAD's decision to license SPOT's construction and operation, in excess of the statutory timeline, and concluding that the Project is in the national interest and that MARAD has satisfied NEPA's requirements, directly harms Petitioners' members' concrete interests. Petitioners' members live and recreate in and near areas that will be impacted by the Project, including Surfside beach through which SPOT's pipeline will cross when entering Gulf waters. Page Decl. ¶ 9, 13; Harris Decl. ¶ 8; Oldham Decl. ¶ 30. Petitioners' members regularly use the beach and nearby areas for kayaking, swimming, fishing, birdwatching, and other outdoor recreational activities. Fabish Decl. ¶ 8; Oldham Decl. ¶ 35; Page Decl. ¶ 13.

Noise and air pollution during construction and operation will impact the local environment, ROA.00188878-85; ROA.00188849-54, further diminishing Petitioners' members' quality of life and enjoyment of the area for decades. For instance, members are concerned about SPOT's air pollution emissions that will exacerbate existing impaired air quality and cause adverse health impacts. Harris Decl. ¶ 11; Oldham Decl. ¶¶ 37-44; Robinson Decl. ¶¶ 18-25. SPOT's air pollution emissions will reduce members' use and enjoyment of Surfside beach and the surrounding areas. Oldham Decl. ¶ 35. Project emissions cause visual impairments, from brown, cloudy haze, hindering wildlife identification and diminishing enjoyment of birdwatching and photography activities. Fabish Decl. ¶ 6. Members are also concerned that SPOT will adversely impact their property values and the local tourist economy. Harris Decl. ¶ 14; Page Decl. ¶ 17; Robinson Decl. ¶ 28.

Petitioners' members have concrete interests in numerous species that SPOT will impact, including the critically endangered Rice's whale and threatened and endangered sea turtles. Page Decl. ¶ 15; Rice Decl. ¶ 25; Steinhaus Decl. ¶ 17. An oil spill from SPOT, and impacts from increased vessel traffic, will directly harm sea turtles, and could cause extinction level harm to the Rice's whale, which numbers less than 50 individuals. Rice Decl. ¶ 25; Steinhaus Decl. ¶ 14. Newly published studies documenting Rice's whale occurrences near SPOT demonstrate that Project impacts will further aggravate members' scientific and career interests. Rice Decl. ¶

22

30. The scientific and professional interests of Petitioners' members will suffer significant, direct harm as a result of species' injury. Rice Decl. ¶ 31; Steinhaus Decl. ¶ 18.

MARAD's extensive delays in reviewing SPOT's application further impact Petitioners' members, who, for several years, engaged in SPOT's public participation process. Schneider Decl. ¶ 5; Robinson Decl. ¶¶ 22-23. During the more than 630 days that the Project application inexplicably remained pending, circumstances surrounding the Project changed, including new proposals and permitting of several additional projects in the Gulf region, further burdening members' quality of life. Jones Decl. ¶ 20.c. Recently published climate change research demonstrates the increasing harms on members' communities and livelihoods from continued fossil fuel dependence that SPOT would directly induce. Harris Decl. ¶ 19.  Members have been unable to ascertain SPOT's true impacts as a result of these unaccounted for changed circumstances. Harris Decl. ¶ 19.

Petitioners' members' injuries would be redressed by vacating MARAD's decision to license SPOT, compelling more thorough environmental impact analyses and correcting the flawed assumptions upon which MARAD's licensing decision relied.  A revised analysis could lead to improved mitigation and/or license denial

of SPOT's license that would prevent the above injuries from occurring. *Save Our Cmty. v. E.P.A.*, 971 F.2d 1155, 1161 (5th Cir. 1992).

## II.    SPOT's FEIS Grossly Underestimates the Project's Irreversible Impacts

MARAD's review of SPOT's impacts is insufficient for several reasons. It failed to take a sufficiently hard look at a range of probable oil spills and analyze harm to species and habitat. MARAD also failed to evaluate the direct and cumulative effects of added ozone pollution in this air quality-impaired region. The FEIS further failed to analyze a feasible, smaller capacity alternative that would achieve the project's goals with reduced consequence, as well as consider the true impacts of a baseline, no-action alternative.

### A.  The EIS Fails to Take a Hard Look at the Project's Significant Risks and Impacts to the Environment and Communities

#### 1.  The Flawed Oil Spill Risk and Impact Analysis

Under NEPA's "hard look" requirement, MARAD must analyze the magnitude, frequency and impacts of foreseeable oil spills resulting from SPOT's expansive infrastructure to transfer and export two-million barrels-per-day of oil, during its construction and thirty-year operation. *See* 40 C.F.R. §§ 1502.16(a)-(b), 1508.8(b). However, the FEIS omits analysis of a range of probable spill sizes and locations, including a worst-case discharge occurrence during the Project's lifetime. These fundamental flaws render the FEIS invalid. *See Gulf Restoration Network*,

452 F.3d at 367 (court's EIS review considers whether the agency objectively took a hard look at the proposed action's environmental consequences)

### i.    The FEIS Fails to Assess Spills Likely to Occur Throughout SPOT's Lifetime

MARAD purports to meet its "hard look" obligation by only considering a fixed-size, short-duration oil spill scenario from a single source point. Despite the propensity of oil pipelines to spill,[10] the FEIS ignores the full scope of probable oil spill locations and sizes expected to occur throughout SPOT's infrastructure network and over its thirty-year operation.  The FEIS only considers "most likely" oil spill models involving a one-hour release of 2,200 barrels from the deepwater platform differing by crude type only. ROA.00188985-86. The FEIS disregards the possibility of other spill sources along the more than 140-miles of pipeline, loading and processing infrastructure exclusively servicing SPOT—including points closer to shore, on land, and in communities. The FEIS also fails to provide any analysis of the frequency of likely spills over thirty years.

Notably, the FEIS wholly ignores record submissions analyzing the probability of a range of other oil spill scenarios. Statistical risk expert Susan Lubetkin uses federal Bureau of Ocean Energy Management (BOEM) spill frequency calculations for offshore pipelines, and estimates over 500 spills during

---

[10] SPOT's parent company Enterprise has a known history of egregious non-compliance leading to spills and safety violations. ROA.00050555-56.

SPOT's thirty-year operation, including twenty large spills greater than 1,000 barrels. This represents only a subset of probable spills because it does not account for the likelihood of onshore spills, buoy station spills, or those resulting from vessel collisions.[11] Similarly, record evidence prepared by USCG's consultant Environmental Resources Management provides readily available information and tools to assess a worst-case spill, but the FEIS does not conduct that risk analysis. *See* ROA.00191673-82.

Notably, MARAD has completed a more comprehensive spill analysis for the similarly proposed Texas GulfLink deepwater export terminal. GulfLink's draft EIS evaluates the risk of larger spill size scenarios, including worst-case discharge occurrences, ranging from 147,331 to 582,451 barrels from various source points, including pipeline ruptures at multiple offshore locations and from a VLCC connected to the deepwater port. SAR.00276166-69.[12] It also considers factors related to specific effects such as the degree of direct exposure and bioaccumulation within marine organisms, and considers some impacts to species not considered in SPOT's FEIS, such as birds, benthic resources, plankton and other marine

---

[11] MARAD failed to respond to Petitioners' repeated concerns about these omissions, and to the record report and modeling by environmental risk and statistical expert Dr. Susan C. Lubetkin. *See* ROA.00050761-801; *see* ROA.00157915-16. In each round of supplemental review, MARAD progressively minimized spill probabilities without evidence to substantiate the statistical changes.
[12] Texas GulfLink Draft EIS supplemented to the record by stipulation of the parties on May 8, 2023. Hereafter, cites to this document are labeled SAR.00275949 to SAR.00276708.

communities. SAR.00276170; SAR.00276219; SAR.00276242; SAR.00276255. Clearly, MARAD is capable of conducting a spill risk analysis that reflects a range of foreseeable larger spills from the Project's expansive oil transport infrastructure. Indeed, highly variable, probable spill scenarios would cause a range of serious impacts to the Gulf environment that must be analyzed as part of a valid NEPA analysis. 40 C.F.R. § 1502.22(b)(4). MARAD's failure to complete such analysis for SPOT, which has a capacity double that of GulfLink, is thus arbitrary and capricious.

### ii.    MARAD Failed to Consider Impacts on Species and Habitat from "Most Likely" Spills

The FEIS wholly omits analysis of impacts likely to result from any of SPOT's spill scenarios, including from the 2,200-barrel spills it modeled. *See, e.g.,* ROA.00188624-25; ROA.00188682-83. Specifically, there is no evaluation of impacts to wildlife and habitat, or to different types of marine ecosystems. Nor does it review the efficacy of possible mitigation measures that could avoid or reduce environmental harm. *See O'Reilly v. U.S. Army Corps of Engineers,* 477 F.3d 225, 228 (5th Cir. 2007) (requiring explanation of how measures would mitigate effects to less-than-significant).

The FEIS punts evaluation of direct harm to the nineteen non-endangered marine mammals and thirty-six federally threatened or endangered onshore and offshore species it identified could be impacted by SPOT. ROA.00023633;

ROA.00023688-98. Instead, it generalizes, "the effects of a spill would vary based on the volume of oil released and the time of year of that release. Impacts on [species] would be direct or indirect, adverse, short-term or long-term, and minor to major, depending on the size of the spill and the level of exposure to the release." ROA.00188626; ROA.00188686; ROA.00188723; ROA.00188734. Oddly, the FEIS's safety analysis provides highly relevant exposure trajectories based on crude type for likely onshore and offshore spills that could directly inform evaluation of spill impacts, but the FEIS inexplicably fails to integrate that information into the required impact analyses. ROA.00188985-86; *see also* ROA.00188589 (separate report on spill impacts to limited communities, e.g., salt marshes, seagrasses).

Notably, the FEIS recognizes the high toxicity of polycyclic aromatic hydrocarbons (PAHs) to air, water and sediment released by oil spills, ROA.00023664-65, and calculates maximum PAH dose and exposure in the water column from a 2,200-barrel spill. But the FEIS makes no qualitative or quantitative assessment of PAH harms to marine species in the Project area. ROA.00023664. Without more specific analysis of harm from PAHs, the FEIS fails to meaningfully assess oil spill impacts on marine mammals and other species. In particular, the FEIS fails to adequately analyze impacts that could lead to the extinction of one of the most endangered mammals on Earth, the Rice's whale.

28

Further, the FEIS lacks consideration of other important documentation informing the extent of harm that could result from spills. Impact studies from the Deepwater Horizon disaster provide relevant data on the magnitude of harm to Gulf species. The disaster impacted 48 percent of Rice's whale habitat and caused an estimated 22 percent population loss. *See* Rice Declaration ¶ 13; ROA.00054294-96. Spills of that scale cause severe illness and death in marine mammals by coating their baleen and causing them to breathe and swallow oil. Reproductive impacts from oil spill exposure further hinder species recovery. ROA.00054294-96. Additionally, long-lasting chemical dispersants used for oil spill response can be toxic to Rice's whales and other marine mammals. ROA.00054294.

MARAD's failure to assess anticipated oil spill impacts on wildlife in connection with any spill scenario contravenes NEPA's requirement to take a hard look at environmental impacts. *Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32, 49-51 (D.C. Cir. 2018). At bottom, the FEIS provides only vague conclusions but no analysis whatsoever, and MARAD was prohibited from reaching a decision before conducting the necessary review. 33 U.S.C. § 1504(i)(3); 40 C.F.R. § 1502.5. MARAD's lack of specificity on the type of species and habitat impacts that would result from the purported "most likely" spill, or any other probable spill scenario, and its failure to consider numerous available spill output and environmental factors, renders the FEIS invalid. ROA.00188586; 42 U.S.C. § 4332(2)(C).

29

### iii. The EIS Fails to Assess Impacts of a "Worst Case" Discharge

The FEIS omits the required analysis of a projected "worst-case" oil spill discharge ("WCD")[13] of approximately 687,272 barrels. ROA.00191721. 40 C.F.R. §§ 1500.1(b), 1502.24. Agencies must analyze "'reasonably foreseeable' [significant adverse effects] includ[ing] impacts which have catastrophic consequences, even if their probability of occurrence is low." 40 C.F.R. § 1502.22(b)(4). Notably, the CEQ's recommendations explicitly direct analysis of low probability catastrophic spills for oil and gas development activities on the Outer Continental Shelf.[14] Accordingly, the record must apply existing data projecting a maximum possible spill to a worst-case discharge impact analysis, 40 C.F.R. §§ 1500.1(b), 1502.24, but that did not occur. *See Sierra Club v. Sigler*, 695 F.2d 957, 968-75 (5th Cir. 1983) (EIS invalid for omitting worst-case oil spill analysis);[15] *see Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-68 (9th Cir.

---

[13] The FEIS uses "worst case discharge" and "worst credible discharge" interchangeably. For purposes of required NEPA review, that distinction is not relevant. ROA.00188596-97; ROA.00188989; ROA.00189000.

[14] CEQ, Report Regarding the Minerals Management Service's National Environmental Policy Act Policies, Practices, and Procedures as They Relate to Outer Continental Shelf Oil and Gas Exploration and Development 26 (Aug. 16, 2010), *available at* https://obamawhitehouse.archives.gov/sites/default/files/microsites/ceq/20100816-ceq-mms-ocs-nepa.pdf.

[15] Although NEPA regulations no longer use the term "worst case analysis," they do require evaluation of "reasonably foreseeable significant adverse effects… even if their probability of occurrence is low." 40 C.F.R. 1502.22(b)(4).

2005) (Corps required to analyze effects of increased tanker traffic and oil spills risks for dock extension); Here, there is highly relevant scientific information available within the record to complete the required analysis for spills.

The FEIS documents that a worst-case spill is a reasonably foreseeable consequence of SPOT's thirty-year operation, transporting, loading, and exporting two-million barrels-per-day of crude long distances through land and water.[16] That discussion, which is part of a separate safety risk analysis,[17] projects a WCD of 687,602 barrels from a subsea pipeline rupture, impacting over 400,000 meters of Gulf surface waters and coating the entire shoreline between Port Aransas and Port Arthur. ROA.00191721, ROA.00191729. However, this projection and other record information about the elevated risk of pipeline punctures near anchorage zones are absent from the FEIS's environmental impacts analysis. ROA.00188997. All that exists in SPOT's FEIS is a mere generalization that a WCD could adversely affect endangered corals, ROA.00188727, and "may cover larger areas and thus impact more resources," and that "[t]he underlying effects of an oil spill would be the same, but would differ in magnitude." ROA.00188638. There is simply no explanation of the extent of impacts caused by a WCD from a subsea pipeline puncture or other possible sources.

---

[16] ROA.00188997-98; *see also* ROA.00191711.
[17] ROA.00189012.

The record demonstrates however, that a worst-credible discharge analysis is possible when evaluating the Project's environmental impacts. In the environmental effects section of the GulfLink DEIS, MARAD evaluates a range or worst-credible discharges from various points along the facility's infrastructure network. SAR.00276166; SAR.00276170; SAR.00276242; SAR.00276255.

The FEIS's inexplicable failure to apply record data projecting a possible worst-case discharge to an environmental impacts analysis is arbitrary and capricious. ROA.00188997-98; *see Sigler*, F.2d at 968-75; *see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1049 (D.C. Cir. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022) (citing *Sigler,* rejecting argument that Corps was excused from relying on worst-case discharge analysis because NEPA does not explicitly require it, especially given the existence of WCD data in the record). This omission and others described above foreclosed evaluation of the true scope of oil spill harm caused by SPOT and thus violate NEPA.

## 2. SPOT Presents Extinction-Level Risk to Protected Gulf Species from a Range of Unevaluated Project Threats

MARAD failed to consider new information that would likely intensify impacts of oil spills, noise, and vessel traffic on endangered species like the Rice's whale. ROA.00206554-8. The FEIS also did not properly analyze the cumulative

impacts to species from other projects in the area. As explained *infra*, these omissions prevent decisionmakers from understanding SPOT's full scope of impacts and violate NEPA's "hard look" requirement. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 368 (1989).

> i.    *The EIS did not Accurately Consider the Rice's Whale's Range, which Precluded Understanding of SPOT's True Impacts*

The Rice's whale (*Balaenoptera ricei*) is the only resident baleen whale to regularly occur in the Gulf of Mexico. Rice Decl. ¶ 11; ROA.00054292; ROA.00055308. This highly imperiled cetacean has one of the smallest populations in the world, with only 34 to 50 individuals remaining. ROA.00055308. The whale is vulnerable to many stressors posed by SPOT, including vessel traffic, noise, and the increased risk of spills. ROA.00054295. Whales tend to spend significant time near the water's surface, rendering them more vulnerable to vessel strike mortality. ROA.00055308. However, the FEIS concludes that the risk of a ship strike from SPOT is "low" because the whales "appear to be restricted to an area near Florida." ROA.00026162. Similarly, scientific studies demonstrate that human-caused noise, like vessel noise, causes injury to the whales, including habitat degradation, reduced listening space and masking of biologically important sounds. ROA.00206760-

00206777.[18] But, MARAD dismisses potential noise pollution impacts from SPOT based on assumptions that the species' range is limited. ROA.00026166.

MARAD's conclusion that Rice's whales are "unlikely to be found in the action area," ROA.00023691, ignores recent evidence of the Rice's whale's Gulf-wide range. ROA.00206555. A 2022 scientific study, using long-term passive acoustic recordings of the species, documents that the "whales persistently occur over a broader range in the GOM than previously understood," such as the Western Gulf of Mexico including waters off the coast of Texas. ROA.00206760; *see also* NOAA Tech Memo.

This study, "[i]n combination with a 2017 sighting of a genetically identified Rice's whale at the shelf break off Corpus Christi, Texas . . . provide evidence for the persistent occurrence of some Rice's whales over a broader distribution in the GOM than previously understood[.]". ROA.00206776. Notably, NOAA Fisheries already considers Gulf of Mexico waters outside the Eastern Gulf to be part of the Rice's whale's historic range, *see* ROA.00054294, and this new data suggests whales can still be found in the area. The 2022 study further concludes that "[t]he presence of whales in the western GOM suggests they may have an increased risk

---

[18] *See also* Patricia E. Rosel et al., *NOAA Tech Memo: Status Review of Bryde's whales (Balaenoptera edeni) in the Gulf of Mexico under the Endangered Species Act*, https://repository.library.noaa.gov/view/noaa/14180.

of interaction with potentially harmful human activities." ROA.00206776. Yet, MARAD failed to take this new information into account in evaluating SPOT's impacts, and assumed whales will not be present.

MARAD violated NEPA by failing to evaluate this significant new information about the Rice's whale population and range that directly contradicts the information MARAD relied upon in reaching a licensing determination. ROA.00023691. Importantly, MARAD was not absolved of its independent NEPA duty to analyze this highly relevant information, when, just days before the ROD issued, the National Marine Fisheries Service published its Biological Opinion mentioning the studies. ROA.00054294; ROA.00206760; 40 C.F.R. § 1502.9(d). The agencies had a duty to prepare a supplemental EIS analyzing the new information because they were aware of the recently published studies prior to issuing the ROD. ROA.00206554-57; 40 C.F.R. § 1502.9(d) (agencies must prepare supplemental analysis for a pending Federal action if "significant new circumstances or information" exist that is "relevant to environmental concerns and bearing on the proposed action or its impacts."). MARAD was made aware of this new information in Petitioners' comments on the FEIS. ROA.00206554-57.

By "entirely fail[ing] to consider" significant new evidence regarding the critically endangered Rice's whale's current and historic range, the FEIS's analysis of species impacts is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n.*, 463 U.S.

35

at 43. This omission is particularly concerning given that human-caused death of even one whale could be catastrophic to the species' survival, and SPOT presents stressors to which the Rice's whale is highly vulnerable. ROA.00098321; *see* Rice Decl. ¶ 23.

> ii. *The FEIS Omits Analysis of Cumulative Effects on Protected Species*

NEPA also requires an agency to consider the proposed action's cumulative effects. 42 U.S.C. § 4332(2)(i); 40 C.F.R. §1508.8. Cumulative effects are defined as "impacts on the environment which results from the incremental impact of the action when added to other past, present, and *reasonably foreseeable future actions.*" 40 C.F.R. § 1508.7 (emphasis added). But MARAD failed to consider SPOT's cumulative impacts on the Rice's whale and other species, in conjunction with other similar projects and industrial Gulf activities. *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 234-35 (5th Cir. 2007) (*citing Vieux Carre Prop. Owners Residents, & Assocs., Inc. v. Pierce*, 719 F.2d 1272, 1277 (5th Cir. 1983) (analysis must consider "[c]losely related and proposed or reasonably foreseeable actions that are related by timing or geography.")); *see Fritiofson v. Alexander*, 772 F.2d 1225, 1245-47 (5th Cir. 1985), abrogated on other grounds by *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992) (NEPA review invalidated for failing to evaluate cumulative impacts of "past, present, proposed and future" actions that "may affect the same area"); *and see Gulf Restoration Network*, 452 F.3d at 369-72

(proposed projects with published draft EISs are reasonably foreseeable actions required for cumulative effects analysis).

The Gulf's highly industrialized environment has substantially modified Rice's whale habitat with thousands of oil and gas platforms and underwater pipelines. ROA.00054295. Nonetheless, MARAD failed to consider the cumulative effects of other projects like the proposed Texas GulfLink project, sited seven miles from SPOT and boasting half the export capacity. That project lists the Rice's whale, Kemp's Ridley and Loggerhead sea turtles as species it would potentially impact. ROA.00208788-809. As discussed *supra*, MARAD conducted a more comprehensive spill range and risk analysis for GulfLink that MARAD should have considered to evaluate SPOT's cumulative effects. But the agency overlooked this critical analysis entirely. Additionally, existing Outer Continental Shelf oil and gas drilling activity near SPOT threatens the Rice's whale, ROA.00054295, and must be analyzed in combination with SPOT and other surrounding projects.

In sum, failure to articulate the cumulative impacts of nearby existing activities and proposed projects, especially where available information to complete this critical analysis exists, is arbitrary and capricious and violates NEPA. *Fritiofson*, 772 F.2d at 1245-47 (cumulative impacts must identify "impacts or expected impacts from other actions" and "overall," "accumulate[d]" impact). 40 C.F.R. §§ 1500.1(b), 1502.24.

### 3.  MARAD Violated NEPA by Failing to Take a Hard Look at SPOT's Ozone Pollution

MARAD failed to take a hard look at the direct, indirect, and cumulative impacts of SPOT's ozone pollution on the region's already unhealthy air quality. In particular, MARAD's air quality analysis violated NEPA because it failed to adequately calculate and disclose the impacts of ozone pollution emitted by SPOT alone, and in combination with other projects. Without this information, MARAD's conclusions about SPOT's air quality impacts are incomplete and based on erroneous assumptions, and are thus arbitrary and capricious. These failures pose serious threats to public health, as ozone pollution can cause or exacerbate respiratory harm from asthma and COPD, and cardiovascular harm from heart attacks, strokes, and heart disease. *See* ROA.00206563.

> i.  *The FEIS Fails to Evaluate SPOT's Ozone Impacts in a Region with Existing Unhealthy Air Quality*

The Houston-Galveston-Brazoria County region is in "nonattainment" for federal ozone National Ambient Air Quality Standards ("NAAQS"), meaning air pollution exceeds levels EPA deems safe for human health. *See* ROA.00023830. MARAD correctly concludes SPOT's offshore area also must be treated as nonattainment because the status of the offshore locations is based on the attainment status of the nearest adjacent onshore location. *See* ROA.00023338, ROA.00023835. EPA downgraded this region to "severe" nonattainment just before

MARAD issued its Record of Decision to license SPOT, yet MARAD never acknowledged this downgrade in its review.[19] To satisfy NEPA, MARAD needed to calculate and disclose SPOT's ozone pollution and evaluate the health and environmental impacts of this pollution, including whether the additional pollution will contribute to NAAQS ozone violations in these onshore and offshore areas classified as "severe" nonattainment. 40 C.F.R. §§ 1502.16(a)-(c), 1508.7, 1508.8; *cf. Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1045–46 (10th Cir. 2023) (BLM took a "hard look" at ozone pollution when calculating project's direct and cumulative maximum ozone level increases and determining that increases would not cause regional NAAQS exceedances).

The FEIS's cursory analysis of offshore ozone impacts states that an EPA assessment tool was used to estimate ozone levels based on SPOT's ozone precursor emissions,[20] and the results "show that the total air quality impacts would be less than … the ozone SIL." ROA.00023843. The conclusion that the *total air quality impacts* for SPOT's offshore emissions would be less than the ozone significant impact level ("SIL") is false. The ozone SIL, a non-binding screening level

---

[19] EPA, 87 Fed. Reg. 60,926 (Oct. 7, 2022). Petitioner Citizens for Clean Air and Clean Water in Brazoria County notified MARAD of the absence of any discussion of the impacts of the pending redesignation on the Project in its comments on SPOT's FEIS. ROA.00206497.

[20] Ozone is a secondary pollutant, which means it is formed from reactions in the atmosphere between ozone precursors, such as volatile organic compounds and nitrogen oxides, which are directly emitted from projects like SPOT. *See* ROA.00023843; ROA.00240489.

established by EPA to help streamline air permitting, is 1 part per billion ("ppb").[21]
Based on SPOT's own data in an appendix to its Deepwater Port Application,
Petitioners calculated that SPOT's total offshore operating emissions from both its
terminal and mobile source emissions could result in a *1.8 ppb increase* in ozone,
almost *double* the SIL. ROA.00206564.[22]

No calculation or disclosure of this substantial increase in ozone levels exists
in the FEIS or elsewhere in the record. The FEIS does not evaluate what health and
environmental harms a 1.8 ppb increase in ozone levels from SPOT's offshore
components alone could have in an area that already exceeds the health-based
NAAQS, particularly for sensitive populations or environmental justice
communities near SPOT. *See* ROA.00093878-82, ROA.00206566-67. Moreover,
the FEIS fails to calculate or evaluate SPOT's ozone pollution impacts from both its
offshore and onshore components combined. *See* ROA.00206563.

---

[21] EPA, *Memorandum: Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, at 15 (April 17, 2018), *available at* https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf. The SILs come from a non-binding EPA memorandum related to Clean Air Act permitting as a tool for permitting authorities to use on a case-by-case basis where justified, and have nothing to do with whether emissions are significant from a public health or NEPA standpoint. *See id.* at 1-4; *United States v. Ameren Mo.*, 421 F. Supp. 3d 729, 817 (E.D. Mo. 2019) ("[T]he SILs do not establish a level below which there is no risk of harm from a facility's pollution.").

[22] SPOT's Appendix only includes a table with an analysis based on EPA's rough assessment tool, called Modeled Emission Rate for Precursor ("MERP"), that estimates whether SPOT's offshore emissions will increase ozone more than a 5 ppb threshold, not the 1 ppb SIL. ROA.00034681. In comments to MARAD, Petitioners calculated based on this table that the predicted increase in ozone from the project's offshore emissions alone would be 36.19% x 5 ppb = 1.8095 ppb. ROA.00206564.

MARAD's air quality analysis failed to take a hard look at SPOT's ozone pollution impacts because it relied on inaccurate and incomplete information and did not provide information to allow the public to "understand and consider" the harms from significantly increasing ozone pollution in an area that already violates federal air quality standards. This action violates NEPA. 40 C.F.R. §§ 1502.16(a)-(c), 1502.24; *Gulf Restoration Network,* 452 F.3d at 367; *cf. Dine Citizens Against Ruining Our Env't*, 59 F.4th at 1045–46. MARAD's analysis and ultimate conclusions that none of the emissions from the Project would exceed the NAAQS and that SPOT's air quality impacts would be minor, ROA.00023347, 00023845, were thus arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

> ii.  *MARAD Failed to Consider the Cumulative Impact of SPOT's Ozone Pollution Combined with Pollution from Nearby Projects*

MARAD also failed to evaluate SPOT's ozone pollution impacts in combination with ozone pollution from other proposed or permitted projects in the area, particularly the proposed GulfLink terminal, sited in the same Houston-Galveston-Brazoria ozone nonattainment region as SPOT. SAR.00276442.

The FEIS includes a table listing air emissions from other offshore VLCC and Liquified Natural Gas ("LNG") export terminals proposed along the Texas Coast, including GulfLink. ROA.00024085. The table includes the amounts of each Project's ozone precursor emissions, but omits the estimated ozone pollution levels

the projects would add to the area. ROA.00024085. Thus, MARAD failed to include both the "expected impacts from these other actions" and the "overall impact" of cumulative ozone pollution from these projects, which is particularly important given the region's existing severe nonattainment status for federal ozone standards. *See Fritiofson*, 772 F.2d at 1245-47. These omissions thwart public and decisionmaker understanding of SPOT's cumulative air quality and public health impacts.

## B. MARAD's Alternatives Analysis is Flawed

MARAD made two crucial errors in its alternatives analysis. It failed to consider the alternative of a smaller-capacity project, and to properly evaluate the statutorily-required, "no-action" alternative. Both NEPA violations frustrated public review and obscured SPOT's significant environmental harm.

Comparing alternatives is at the "heart" of the EIS, because it "sharply defin[es] the issues and provid[es] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. Agencies must undertake "intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 492 F.2d 1123, 1135 (5th Cir. 1974); *see* 42 U.S.C. § 4332(C)(2)(iii), (E). Thus, before taking action, agencies must "rigorously explore and objectively evaluate all reasonable

alternatives." 40 C.F.R. § 1502.14; *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175, 177 (5th Cir. 2000). In "rigorously" assessing alternatives, 40 C.F.R. § 1502.14, agencies must, "to the fullest extent possible," engage in "reasonable forecasting" to explore their potential environmental effects. *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (cleaned up). NEPA also requires the agency to analyze a no-action alternative. 40 C.F.R. § 1502.14.

### 1. The Alternatives Analysis Unlawfully Excludes Consideration of a Reduced-Capacity Option

MARAD arbitrarily and unlawfully failed to analyze a smaller-capacity project. *See* ROA.00023451-56. Considering "all reasonable alternatives," means reviewing "'feasible' alternatives that are 'reasonably related to the project's purpose." *League of Wilderness Def. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). This alternative would achieve the goal of building sufficient new deepwater oil-export capacity, ROA.00023362, but reduce crude quantities the facility would handle, correspondingly reducing ozone air pollution, spill risk and climate pollution, *infra* Section II.A. *See EDF*, 492 F.2d at 1135. MARAD instead only reviewed action scenarios in which the Project would operate at the maximum capacity preferred by SPOT—two-million barrels-per-day—differing some Project components' location and design. ROA.00188470; ROA.00188946-66; ROA.00208594. However, NEPA's comparative approach

requires consideration of options the applicant may neither "like," find "desirable," or be "capable of carrying out." ROA.00216026 (CEQ, Memo. to Agencies: Forty Most Asked Questions Concerning CEQ's NEPA Regs., 46 Fed. Reg. 18,026, 18,027 (Mar. 1981)); *see also New Mexico ex rel. Richardson v. Bureau of Land Management,* 565 F.3d 683, 708 (10th Circuit 2009); *Union Neighbors United, Inc. v. Jewell,* 831 F.3d 564, 575–76 (D.C. Cir. 2016) (rejecting alternatives analysis for omitting economically feasible alternative that would take fewer endangered bats). This process includes considering alternatives that only partially meet the proposal's goals. *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975); *see EDF*, 492 F.2d at 1135; *see also* 33 U.S.C. § 1503(e)(1) (requiring MARAD to "prescribe [license] conditions" necessary to carry out DWPA goals).

Here, Petitioners repeatedly offered the alternative of a smaller-capacity project in their comments, ROA.00157908-11; ROA.00206547-49; ROA.00188470-71, but the agency dismissed it without review. *See* ROA.00023451-56. Analogously, in *Western Watersheds Project v. Abbey,* 719 F.3d 1035 (9th Cir. 2013), the court found the agency erred by considering only alternatives allowing the maximum-proposed level of livestock grazing on federal lands, varying only mitigative conditions. *Id.* at 1051. The court held that the agency had a duty under NEPA to review the consequences of the reasonable

44

alternative of permitting some amount of less grazing. *Id.* at 1052. MARAD had an obligation to explore this same reasonable but unexamined, reduced-capacity alternative.

MARAD instead made the legally irrelevant, and incorrect, assumption that all of SPOT's capacity is necessary. ROA.00188383-86. Nowhere does the record explain why a new two-million barrel-per-day, maximum capacity facility is needed. *See, e.g.*, ROA.00098939 (echoing numerous public comments, U.S. Army Corps of Engineers noting draft EIS fails to justify this assumption); *see Westlands Water Dist. v. U.S. Dep't of Interior,* 376 F.3d 853, 868 (9th Cir. 2004) (agency must consider feasible alternatives that reasonably relate to the project's purpose). On the contrary, the record supports the strong likelihood that SPOT's full capacity will be unnecessary. In its analysis, the FEIS ignores the abundant, independent market forecasts predicting a "decline" in "future demand for oil" beginning around the time SPOT would start operating in 2024, and dropping significantly throughout the Project's three-decade operation. *See* ROA.00189111 (citing International Energy Agency projections); ROA.00188382-83 (listing similarly-concluding reports);[23] ROA.00206657-83

---

[23] ROA.00257136-38; ROA.00257188; ROA.00257196; ROA.00257201 (International Energy Agency, *Net-Zero by 2050: A Roadmap for the Global Energy Sector*, concluding to meet 2050 net-zero climate target, "oil demand never returns to its 2019 peak," and must fall nearly 75 percent from 2020 levels by 2050); ROA.00158491 (Stockholm Envt'l Institute, UNEP, et al., *The*

(McKinsey and Company's 2022 Global Energy Perspectives projecting peak global oil demand between 2024 and 2027, with likely rapid decline after 2030). But in its alternatives analysis, the FEIS arbitrarily and capriciously ignores "reasonable forecast[s]," *Del. Riverkeeper*, 753 F.3d at 1310, assuming sustained demand for all of SPOT's capacity, on top of existing and proposed new ports. *See* ROA.00023452-56.

The FEIS instead arbitrarily relies on a 2021 U.S. Energy Information Administration (EIA) model that does not purport to forecast future energy market conditions, ignoring in its analysis the numerous forecasts the agency had available. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 735 (invalidating agency failure to reasonably forecast the likely oil market changes under the no-action alternative to drilling). The EIA model shows oil production will reach and remain at record highs until 2048, which MARAD uses to argue there may be long-term global demand for all of SPOT's capacity. ROA.00023451. But rather than purporting to be a forecast, the EIA characterizes its model instead as a "baseline" from which to compare forecasts, holding constant all existing energy sector laws and regulations into the future,

---

*Production Gap Report: 2020 Special Report*, concluding that to achieve climate target, world's oil production must decrease by approximately 4 percent per year between 2020 and 2030); ROA.00255895 (describing Dallas Federal Reserve Bank survey showing majority of Texas industry executives believe U.S. oil production has already peaked); ROA.00263348-49 (U.S. Long-Term Climate Strategy, showing need for rapid shift to zero-emission vehicles).

including those that are set to expire or undergo amendments to curtail fossil-fuel

dependence. ROA.00263506. Relying on the model alone for predictive purposes

produces "the error of assuming near-constant fossil-fuel demand over the long-

term," ROA.00206889, and is arbitrary and capricious.

Moreover, even if MARAD could support its claim that SPOT's full

capacity would be needed, it would not absolve MARAD from its NEPA duty

to explore the reasonable alternative of approving less capacity, to reduce

environmental risk and consequence. *See NRDC*, 524 F.2d at 93; *EDF*, 492 F.2d

at 1135. The agency had no excuse for failing to evaluate a smaller-capacity

alternative that would, among other reduced impacts, produce less ship traffic,

less air pollution, less oil spill risk, and less greenhouse gas emissions than the

chosen alternative. And the error frustrated NEPA's core purpose of providing

decisionmakers and the public with a basis to compare the Project's harms and

benefits against reasonable alternative courses of action. 40 C.F.R. § 1502.14;

*Sierra Club v. FERC,* 827 F.3d 36, 45 (D.C. Cir. 2016). The FEIS violates NEPA

and is arbitrary and capricious.

### 2.  The FEIS's Flawed Evaluation of the No Action Alternative

The FEIS's conclusion that taking no action would result in the same or worse

impacts to the environment as approving the nation's largest oil export facility was

arbitrary and capricious. ROA.00023450-51. The agency states that without SPOT,

either: federal agencies would approve other identical ports with similar impacts; or somehow existing ports would export the same volumes of oil as SPOT, just less efficiently, worsening some impacts. *Id.* The evidence belies MARAD's assumptions. And lacking any evidentiary support for its claims, MARAD violates NEPA. *See id.*

The no-action alternative analysis must be "informed and meaningful," and fully account for the relative benefits to the environment from rejecting a proposed project. 40 C.F.R. § 1502.14; *Ctr. for Biological Diversity v. Bernhardt,* 982 F.3d at 734-35; *see* ROA.00216026 (no-action alternative "provides a benchmark" against which decisionmakers meaningfully compare environmental effects of action alternatives). And it is "meaningless if it assumes the existence of the very plan being proposed." Mandelkar et al., NEPA Law and Litig. § 10:33 (2d ed. 2022) (citing *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1037–38 (9th Cir. 2008)). Courts have invalidated NEPA review where agencies assume the project's existence or miscalculate the "no build" baseline. *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 599-600, 603 (4th Cir. 2012).

To the extent MARAD assumes it would approve another similar new oil export terminal in SPOT's absence, it violates NEPA's command forbidding agencies from assuming that Project harms will occur under the no-action course. *See id.* And, to the extent MARAD assumes the no-action alternative would mean

48

existing ports would export the same amount of oil as with SPOT, at greater impact, MARAD errs again by contradicting basic economic principles and record evidence.

The record shows that existing Gulf coast ports are physically constrained from exporting increasing volumes of oil, with no evidence they can accommodate the sheer volume of ship traffic necessary to massively expand export capacity through the existing reverse-lightering system.[24] ROA.00188470-71. For example, an EIA report concludes that because existing ports have "lower economies of scale," due to bottlenecks and inherent inefficiencies, they require higher international selling prices to earn a profit, as compared to deepwater ports. ROA.00217277. A University of Houston study stressed that reverse-lightering is responsible for current "congestion and scheduling conflicts," making it a significant "cost center" and a "crucial determinant" hindering export to Asia. ROA.00263032-33, 39. And, a Columbia University report underscored that Gulf export constraints could cause oil producers to "face severe price discounts ... impact[ing] profitability and ultimately constrain[ing] incremental increases in oil production." ROA.00232111.

MARAD ignores economic principles highlighted in the record demonstrating that SPOT would make exports cheaper and more plentiful, inducing

---

[24] Reverse-lightering involves smaller vessels filling with oil near-shore and shuttling to VLCCs anchored in deepwater to transfer oil, a process that can take several days to weeks.

greater production for export and causing greater environmental harm. Petitioners'
expert report, by Peter Erickson of the Stockholm Environmental Institute,
explains that building new VLCC deepwater terminals would lift export
constraints on upstream oil producers, lowering their costs and increasing the
share of U.S. oil reserves available to export. ROA.00158674-80. Based on
Erickson's analysis, SPOT could induce an additional 600,000 to two-million
barrels-per-day of new domestic oil production for export that, in its absence,
likely would not occur. *See* ROA.00158679; ROA.00157910-11; *see also*
ROA.00232111; ROA.00263039 (University of Houston report concluding near-
term production rate growth depends on pipeline infrastructure availability to
evacuate crude as well as Gulf Coast port export capacities). Likewise, Enterprise
executives tout that SPOT would "change the flow patterns for crude exports."
ROA.00206962.

The FEIS's error—in simply ignoring this and other expert analyses that
provide the "reasonable forecasting" required for a proper alternatives
comparison—eerily matches NEPA reviews that circuit courts have thrown out.
*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 735, 740; *see*
ROA.00188382-83; *see also Mid States Coal. For Progressive v. Surface
Transp. Bd.,* 345 F.3d 520, 549-50 (8th Cir. 2003) ("illogical" not to infer that
constructing coal train project, making coal more readily available and cheaper,

would increase demand, consumption and attendant environmental impacts; agency must examine these reasonably foreseeable effects before approving the project). In a closely analogous case, *WildEarth Guardians v. Bureau of Land Management ("WEG")*, the Tenth Circuit invalidated an EIS for coal leases, where the agency concluded the no-action alternative would result in leasing elsewhere, with the same amount of future coal burned. 870 F.3d 1222, 1227-28 (10th Cir. 2017). The court emphatically rejected this logic, specifying "the blanket assertion that coal would be substituted from other sources, unsupported by hard data, does not provide 'information sufficient to permit a reasoned choice' between the preferred alternative and no-action alternative." *Id.* at 1235; *see also Center for Biological Diversity v. U.S. Dep't of Interior ("CBD")*, 623 F.3d 633, 642–43 (9th Cir. 2010) (invalidating EIS for equating the result of mining under different regulatory regimes to conclude that impacts would remain the same if mining activity moved off federal land to private land).

As CEQ warns, "[a]gencies should not simply assume that if the federal action does not take place, another action will perfectly substitute for it," as this "typically contradicts basic economic principles of supply and demand." CEQ, Interim Guidance on Consideration of Greenhouse Gases and Climate Change, 88 Fed. Reg. 1,196, 1,205 (Jan. 9, 2023). The answer is to undertake modeling to gauge the effects. *Id.* Likewise, MARAD failed to offer support for conflating the action and

no-action scenarios, or the idea that ports could accommodate the same volume of oil without SPOT. ROA.00157908-11; ROA.00206547-49; ROA.00188470-71.

The whole point of an alternatives analysis is to disclose and consider "what if" there was no maximum-capacity deepwater export facility and all its connecting oil transport and processing infrastructure operating for the next three decades. Assuming that other speculative export expansions will occur and importing the other actions' effects into the no-action baseline, renders the alternatives comparison meaningless, defeating NEPA's purpose. *CBD*, 623 F.3d at 645-646; *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012); 40 C.F.R. § 1502.14(a). By failing to acknowledge SPOT's potential direct influence on oil production and exports, the FEIS avoided analysis of undeniable impacts relative to the baseline, including significant increases in ozone-forming air pollution and climate-disrupting greenhouse gas emissions, increased onshore and offshore oil and chemical spills, and irreparable marring of Texas coastal communities, shorelines, and marine ecosystems from miles of new pipeline and processing infrastructure exclusively serving the SPOT terminal. ROA.00050575-647; ROA.00157915-41, ROA.00157949-53; ROA.00097709-21; ROA.00206545-46. With such glaring omissions, MARAD's decision was neither "fully informed" nor "well-considered." *See WEG,* 870 F.3d at 1227, 37; *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C.

Cir. 2006) (quoting *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988)). The FEIS is arbitrary and capricious and violates NEPA.

## III.   MARAD'S Licensing Decision Violated Deepwater Port Act Mandates

### A. MARAD Failed to Meet Explicit Statutory Timelines for Licensing Review

MARAD unlawfully exceeded the DWPA's mandatory, 356-day timeline for application review by hundreds of days. The DWPA and its implementing regulations set explicit timeframes by which MARAD and the applicant must comply. *See* 33 U.S.C. §§ 1504, 1505. The statute imposes these "strict timelines for action on a license application, which, if closely observed, can lead to action in just under 1 year," assuming the applicant diligently provides the detailed information required for a complete application. 33 C.F.R. § 148.276(a); *see* 33 C.F.R. § 148.105(z) (requiring applicant to include complete analysis of environmental impacts sufficient to meet NEPA). Here, SPOT failed to diligently respond to agency requests, and MARAD failed to complete the review timely. Therefore, under the plain language of the DWPA, MARAD had an obligation to deny SPOT's application after the statutory time limit expired. 33 U.S.C. § 1504; 33 C.F.R. §§ 148.107, 148.283.

While the law gives DOT discretion in its ultimate licensing decision, Congress used the mandatory signifier, "shall," in setting the firm application-review timeline of approximately one year. *See* 33 U.S.C. § 1504 (c),(g),(i)(1); 33 C.F.R. § 148.276(a); *compared with* 33 U.S.C. § 1503(c)(2) ("The Secretary *may* issue a license [if] . . . he determines that the applicant can and will comply with applicable laws, regulations, and license conditions," and the project is consistent with "energy sufficiency" and "environmental quality" goals … ) (emphasis added)). This inclusion is no accident, as the law's drafters intended that "the procedural requirements for consideration of applications and issuance or denial of a license cover a maximum period of 356 days." S. Rep. No. 93-217, at 4 (1974).

Accordingly, Section 1504 computes the governing timeline for taking action on deepwater port export terminals. The 356-day timeline begins on the date the application is filed; thereafter, instructing MARAD to publish notice of the completed application within 26 days; to complete all public hearings within 240 days of the notice date; and issue a final licensing decision no later than 90 days from the final public hearing date. 33 U.S.C. § 1504 (c), (g), (i)(1); S. Rep. No. 93-217, at 4-5 (1974). The DWPA provides a "stop clock" mechanism, permitting MARAD to pause the regulatory timeline when it requests additional information from the applicant necessary for licensing review. 33 C.F.R. §§ 148.276; 148.107; *see* 33 U.S.C. § 1504 (c)(1).

MARAD was certainly aware of its obligation to complete a timely review. The agency published a proposed 356-day timeline for SPOT's application review on its website.[25] ROA.00101575. Additionally, MARAD acknowledged the importance of the statutorily-required timeline when it issued several "stop clock" notifications, and MARAD references the mandatory clock throughout the ROD. ROA.00039425; ROA.00039543; ROA.0010202654; ROA.00042327; ROA.00098928; ROA.00101488; ROA.00208546-48; ROA.002088552-53; ROA.002088558-61.

However, MARAD arbitrarily and unlawfully let the "clock" expire while keeping SPOT's application alive, failing to meet the DWPA requirements. Specifically, the Secretary:

> (1) failed to approve or deny the application in 356 days after the application was filed. 33 U.S.C. § 1504(i); 33 C.F.R. § 148.276(a), (c); *see also* S. Rep. No. 93-217, at 5 (1974); and

> (2) failed to conclude all public hearings within 240 days after notice of the application.[26] 33 U.S.C. § 1504(g); 33 C.F.R. § 148.276(b); S. Rep. No. 93-217, at 5 (1974).

---

[25]  MARAD's latest DWPA Timeline for the Project, available at: https://www.spotnepaprocess.com/content/english/05_Deepwater%20Act%20National%20Environmental%20Policy%20Act%20Timeline_03.pdf. The Court can take judicial notice of the government website for SPOT, as MARAD declined to supplement the record with the document.

[26] ROA.00208546.

MARAD unlawfully issued its ultimate licensing decision more than 630 days after the DWPA deadline. ROA.002088559-62. During this period, MARAD stopped the statutory clock three separate times, deeming the application incomplete. 33 C.F.R. § 148.283(b); ROA.00039425; ROA.00039543; ROA.0010202654; ROA.00042327; ROA.00098928; ROA.00101488; ROA.00208546-48; ROA.002088552-53; ROA.002088558-61. SPOT failed to respond to MARAD's requests for necessary information to complete application review, and, in April 2020, SPOT's environmental consultant suspended work on the Project. ROA.00092043. The Federal review team could not complete its scheduled tasks and halted its licensing review. ROA.00092043-44. The Coast Guard documented this concern and warned SPOT of the "likelihood that [the] application will not be processed within the [DWPA] statutory timeframe" due to SPOT's failure to provide requested information. ROA.00092043.

Even subtracting the 395 days that the application review was under valid "stop clocks," the Project's 356-day statutory timeline expired long before the ROD issued. ROA.002088559-62. Additionally, MARAD did not hold the final public hearing on the project within 240 days of publishing the application notice. 33 U.S.C. § 1504(i)(4). ROA.002088559-62. The law makes a running, "strict" clock the default; the burden is on the agency to justify stopping it. *See* 33 C.F.R. §§ 148.276; 148.107; 33 U.S.C. § 1504 (c)(1). Here, despite issuing stop clock notices

and citing to the "regulatory clock" in the ROD, MARAD arbitrarily, capriciously, and unlawfully continued to extend review for a project applicant ill-prepared for licensing and environmental review instead of denying the application. *See* 33 U.S.C. § 1504; 33 C.F.R. §§ 148.105(z), 148.107, 148.283.

It is undisputed that SPOT's application was not processed within the 356-day statutory timeframe, and the application should not have moved forward beyond that point. *See* 33 C.F.R. § 148.283 (application process stopped before approval or denial when deemed incomplete and failure of applicant to respond to information request). The Secretary's approval of SPOT's application without adherence to the explicit timeline violates the plain language of the "procedure required by law" and is "in excess of [the agency's] statutory jurisdiction," and thus DOT's conditional licensing of SPOT is invalid and must be set aside. *See* 33 U.S.C. §§ 1503-05; 5 U.S.C. § 706(2).

## B. MARAD Failed to Determine Whether Allowing SPOT's Massive New Export Capacity Would Advance "Energy Sufficiency"

MARAD failed its Congressional duty to "determine" if licensing SPOT would be "good for" the national interest in "energy sufficiency." *See Gulf*

*Restoration Network*, 452 F.3d at 373; 33 U.S.C. § 1503(c)(3); ROA.00208577-79.[27]

It is "familiar" administrative law that an agency must address statutory licensing criteria, supporting its conclusions with record evidence. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S.Ct. 361, 371 (2018); ROA.00208568 (acknowledging it would be "plain error" to fail to do so). Energy sufficiency is a *raison d'être* for the DWPA, enacted during the 1970s energy crisis. *See* DWPA of 1974, Pub. Law No. 93-627 (1975); *see* 33 U.S.C. § 1501(a)(5), (6) (promoting "importing" oil). And Congress remains concerned about the volume and destination of U.S. oil exports. *See* H.R. Res. 22, 118th Cong. (Jan. 12, 2023) (prohibiting export of oil to China from Strategic Petroleum Reserve, enacted by 331-97 vote).

MARAD's failure to make an energy sufficiency determination is even more wrongful because the record shows the Project would not advance this congressional goal. *See Mex. Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956 (5th Cir. 2023) (explaining agency must articulate rational connection between facts and decision). "Sufficiency," while undefined in the DWPA, commonly means ensuring a supply that is "[a]dequate . . . [and] necessary for a  given purpose," here for the nation's future energy needs at a reasonable cost. *See* SUFFICIENT, Black's Law

---

[27] In addition, MARAD failed to "determine" whether licensing SPOT would be consistent with preserving "environmental quality," one of the other explicit licensing decision criteria, as we explain above. *See* 33 U.S.C. § 1503(c). The ROD provides a few short paragraphs discussing national interest with no discussion of how the licensing decision preserves environmental quality. ROA.00208577-78.

Dictionary (11th ed. 2019). In contrast with ensuring "adequate" and "necessary" domestic oil supplies, SPOT's annual capacity would alone export 18 percent of all oil produced in the United States in one year, ROA.00023363, which is more than is produced yearly in the U.S. Gulf of Mexico. ROA.00050551. SPOT forecasts Asia as the destination for "nearly all" additional exports. ROA.0002330. And it would do this for at least 30 years. MARAD never discusses, let alone "determines," whether it would be good for domestic energy sufficiency to export such a massive portion of remaining American oil reserves. *See* ROA.00208577-79. Nor does it do so in the context of other concurrently proposed deepwater oil export facilities that would lock in decades of additional export contracts. Individually and together with other projects, SPOT likely poses a detriment to domestic "energy sufficiency."

Indeed, an industry analysis found that adding SPOT's stated export capacity would "rob[] market share" from some domestic refineries for the same oil barrels. ROA.00055131. And historically, increasing exports has not advanced national energy sufficiency.  Since the advent of widespread American crude-oil exports in 2016, the U.S. Government Accountability Office found that domestic crude oil prices have increased relative to the international price, while the nation continued to import about the same amount of oil as before. ROA.00256078. Most of the newly induced domestic oil production went to export instead. *See* ROA.00256078-80; ROA.00158676 (Erickson report, explaining "nearly one-to-one" relationship

between production growth and exports). In the face of this evidence, the agency might fasten its litigation hopes on the lone (and incorrect) assertion in the ROD that the facility would not impact global oil prices.[28] ROA.00208578. But even if assumed true about *prices*, this flimsy claim does not address energy *sufficiency*: the adequacy of the nation's energy reserves over time.

MARAD is not entitled to duck the question of energy sufficiency. Because MARAD failed to resolve this concern in its decision, and failed to address the environmental quality harms from the Project, *see* 33 U.S.C. § 1503(c)(3), that decision is arbitrary and capricious and invalid as a matter of law.

# CONCLUSION

For the foregoing reasons, Petitioners request this Court vacate the Secretary's Record of Decision to license the SPOT Project and remand it to the agency.

---

[28] The record fails to support this claim and ignores both Petitioners' expert report and other research, describing that by lowering export costs, the Project would incentivize U.S. companies to export significantly more oil than they do currently, directly altering the global price of oil. *See* ROA.00158674-80; ROA.00263032-33, 39.

Respectfully submitted,

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org
*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

Erin Gaines (TX24093462)
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org
*Counsel for Petitioner*
*Texas Campaign for the Environment*

Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
adinn@lonestarlegal.org
*Counsel for Petitioner*
*Citizens for Clean Air and Water in*
*Brazoria County*

Lauren Parker (DC1670885)
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org
*Counsel for Petitioner*
*Center for Biological Diversity*

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2023, I electronically filed the foregoing Initial Brief of Petitioners with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org

*Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify

that this brief complies with:

1) the type-volume limitations of Rule 32(a)(7) because it contains

   12,991 words, excluding the parts of the brief exempted by

   Rule 32(f); and

2) the typeface and type style requirements of Rule 32(a)(5)-(6)

   because it has been prepared in a proportionally spaced

   typeface (14-point) using Microsoft Word (the same program

   used to calculate the word count).

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org

*Counsel for Petitioners*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I further hereby certify that in the foregoing brief filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by Fifth Circuit Rule 25.2.13 have been made, and (2) the electronic submission is an exact copy of the paper document.

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org

*Counsel for Petitioners*