May 10, 2023

**Via CM/ECF**
Lyle W. Cayce, Clerk of Court
United States Court of Appeals, Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408

**RE:  Notice of Submission of Standing Declarations –** *Citizens for Clean Air et al. v. Department of* **Transportation, et al., No. 23-60027 (Petition for Review of Agency Action– On Petition for Review from Maritime Administration, MARAD-2019-0011)**

Dear Mr. Cayce,

  Petitioners Citizens for Clean Air & Clean Water in Brazoria County; Texas Campaign for the Environment; Center for Biological Diversity; Turtle Island Restoration Network; and Sierra Club hereby submit as attachments to this letter the standing declarations referenced in its initial brief. Petitioners submits these declarations in order to satisfy their burden to "prove each element of standing with specific facts supported by affidavit." *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 831 F.3d 961, 966 (8th Cir. 2016); *see also ACORN v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).

      Respectfully submitted,

      /s/ Devorah Ancel
      Devorah Ancel (TX24111073)
      P.O. Box 4998
      Austin, TX 78765
      Telephone: (303) 449-5595
      Fax: (303) 449-6520
      devorah.ancel@sierraclub.org

      *Counsel for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2023, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will send notification of said filing to the attorneys of the record who have consented to electronic service.

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
Fax: (303) 449-6520
devorah.ancel@sierraclub.org

## <u>TABLE OF CONTENTS</u>

**Declarant**

Zachary Fabish…………………………………………………………….. 001

Pamela Harris……………………………………………...……………… 006

Rebekah Hinojosa……………………………………….………………… 014

Gwendolyn Jones……………………………………...………………… 019

Melanie Oldham……………………………………...…………………… 029

Sue Page………………………………………...………………………… 045

Aaron Rice……………………………………….………………………... 053

Donna Robinson……………………………...…………………………… 083

Miyoko Sakashita………………………………………………………….. 096

Robin Schneider……………………………………………………………  104

Joanie Steinhaus……………………………….…………………………..  107

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CITIZENS FOR CLEAN AIR, et al.,

    Petitioners,

    v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Respondents.

Case No. 23-60027

## DECLARATION OF ZACHARY FABISH

Pursuant to 28 U.S.C. 1746, I, Zachary Fabish, hereby declare as follows:

1.    I am over the age of eighteen and competent to make this declaration. The statements made herein are based upon my personal knowledge and experience.

2.    I have been a member of the Center for Biological Diversity ("the Center") for one year. The Center works to secure a future for all species through science, law, and creative media, with a focus on protecting the lands, waters and climate that species need to survive.

3.    Since becoming a member, I routinely receive information from the Center about action alerts, events, and details about endangered species and how the

Center is working to protect those species. I rely upon the Center to
represent my interests in a variety of forums, including legal action.

4.  I have been an employee and member of the Sierra Club since 2010.  The
Sierra Club works to, among other things, promote the responsible use of the
earth's ecosystems and resources and to protect and restore the quality of the
natural and human environment. As part of my job, I am aware of the
harmful impacts that pollution—particularly air pollution—has on public
health and the environment.

5.  Through both the Sierra Club and the Center I am a huge advocate for the
protection of wildlife, human health, and natural resources through the
preservation of the environment and biodiversity. I rely on these
organizations to represent my interests in maintaining the natural
environment and resources, including wildlife and air quality.

6.  I currently reside in Webster, Texas which is very close (31 miles, or around
a 34-minute drive) to Brazoria County, Texas and Galveston, Texas.

7.  I truly enjoy the recreational opportunities and aesthetic beauty afforded to
me by living near the coast of Texas. One of the pastimes that I value the
most in this area is birdwatching and wildlife photography; I spend a lot of
time outside in the area photographing wildlife, like birds and other local
species.  However, decreased air quality in my area makes it more difficult

to see animals at a distance. Poor air quality creates a brown or cloudy-like haze making it more difficult to see and identify wildlife, let alone to get a good picture.

8.    My love for wildlife photography has led me to seek out different species to view, enjoy, and photograph. I hope to see and photograph nesting turtles one day, and I am concerned that due to threats to their continued viability that may not be possible.

9.    I visit the Brazoria County Natural Wildlife Preserve a few times a year to enjoy the natural environment, walk, birdwatch, observe the wildlife, and take photos. My last visit was Spring 2022 and my wife and I plan to return for our next visit this Spring.

10.    My wife and I are avid runners but due to things like high ozone levels and air pollution in general we alter our preferred running schedules and plans because of increased concern about impacts of air pollution on our health. We avoid going outside during high ozone days and check air quality indexes frequently, canceling planned runs on days with poor air quality.  As a result, air pollution often forces us to alter our plans, and limits our outdoor activity. Our enjoyment of the natural environment is considerably diminished when we have to avoid outdoor activities, like running, because of air pollution impacts.

11. Additionally, I visit Galveston beach several times a year. It's nearby and a wonderful place to swim and run on the beach. I get significant enjoyment from swimming and running outdoors in nature at Galveston beach. I have also tried to kayak but the weather was too windy; I plan to try again when the weather cooperates. I also plan to run in a marathon in the area and visit at least once or twice this Spring. I get much enjoyment from recreating in this area, enjoying the natural beauty of the environment and observing wildlife.

12. I've observed that the Gulf coast is comprised of great ecological richness but smothered by the industrial oil complex. It is my opinion that the oil industrial complex is largely to blame for the decreased air quality in my area and the areas I recreate, such as Galveston beach and other parts of the Gulf Coast. The addition of a new deepwater port would further decrease air quality in these areas, making it more difficult for me to participate in the activities that I enjoy, such as wildlife photography and observation, and running.

13. From Galveston beach I can see some of the offshore oil platforms, which makes me increasingly concerned about the water quality. Seeing this manmade fossil fuel infrastructure diminishes my enjoyment of this beautiful natural area. Additionally, I live in an area where my family must

constantly worry about the threat of hurricanes and how that could adversely impact our community, a concern that is only increasing with climate change.

14.     If the Sea Port Oil Terminal is denied, that would alleviate some of my significant concerns about diminishing air quality caused by oil and gas operations in the Gulf, and the weather events that occur as a result of climate change. Additionally, denial of this project decreases the likelihood of oil spills that can eliminate my ability to enjoy Galveston beach and the wildlife that inhabit it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this April 27, 2023 in Webster, Texas.

Zachary Fabish
Member, Center for Biological
Diversity
Member, Sierra Club

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CITIZENS FOR CLEAN AIR, et al.,

    Petitioners,

    v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Respondents.

Case No. 23-60027

## DECLARATION OF PAMELA HARRIS

Pursuant to 28 U.S.C.§ 1746, I, Pamela Harris, hereby declare as follows:

1. My name is Pamela Harris. I am of legal age and competent to give this declaration, and all matters in this declaration are based on my own personal knowledge unless otherwise specified.

2. I live in Surfside Beach, Brazoria County, Texas. I have lived there for two years.

3. I am a member of the Sierra Club and have been for several months. I joined Sierra Club prior to the commencement of this lawsuit because of my concerns about the SPOT VLCC project and other oil and gas infrastructure that is proposed in the region. Sierra Club is a nationwide environmental membership

1

organization with a chapter in Texas. Its mission is dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.

4.    I joined the Sierra Club because I am very concerned about the environmental consequences and community health impacts that the massive build out of oil and gas export infrastructure will bring to my community, especially the SPOT VLCC project. Brazoria County and communities along the Gulf of Mexico are experiencing significant build out of export facilities and refineries, and are causing pollution and environmental harm. The Sierra Club advocates to protect my interests and address my concerns about these projects' impacts to my health, livelihood and community.

5.    I am also a member of Citizens for Clean Air & Clean Water in Brazoria County ("CCACW"). I joined CCACW because of their engagement on the SPOT Project over the last several years and because of my concerns over the Project's adverse impacts to my home, livelihood and the character of the Surfside community. I regularly attended meetings hosted by the organization on the SPOT Project before joining the organization.

6.    I have engaged in the public participation opportunities throughout SPOT's licensing process. I have also frequently engaged with my community about the project through social media posts and at virtual and in-person meetings.

7.    I have consistently participated in my individual capacity as a concerned citizen and impacted landowner, preparing comments regarding SPOT's Deepwater Port License Application and signing on to comments prepared by the various organizations that I am a member of. I submitted written comments via www.regulations.gov (Docket No. MARAD-2019-0011) on August 25, 2022, and on September 12, 2022. ROA.00193333; ROA.00207289.

8.  The SPOT pipeline will be constructed roughly one mile from my home, where the pipeline hits Surfside Beach before it heads out to the Gulf of Mexico and traverses the seabed several miles to the connected deepwater port. The pipeline will pass between residential properties, as shown in the image below that I submitted with my public submission in the MARAD docket for this project on August 25, 2022.



9.  I am concerned about how the SPOT project will affect me in just about every regard. I travel by the site very often, and frequently use the beach that will be

directly impacted by the pipeline crossing and the associated risk of explosions and oil spills from pumping and transporting millions of barrels of crude oil daily through miles of pipeline and connected infrastructure.

10.  Prior to the SPOT project proposal, I had no plans to move. However, because of the risks to my health, safety, and the environment, I have considered leaving Surfside.

11.  I am also concerned that construction and operation of the SPOT Project will increase air pollution in the region and that its contribution to the cumulative impacts of the surrounding industry will negatively affect my health, the health of the environment and the health of my community. We already have frequent air quality alerts and are told to stay indoors due to poor air quality. I am concerned that the SPOT project onshore and offshore components will exacerbate the already impaired air quality, which will increase health risks in my community.

12.  I am also concerned about the siting of this facility, as it will have a direct impact on habitat for migratory birds and threatened and endangered sea turtles. The destruction of habitat will likely impact the number of migratory birds that visit the region, as well as disturb nesting sites for sea turtles. This same destruction will also reduce nesting habitat for ground-nesting birds as well, which poses an ecological threat. The onshore infrastructure for this project is located near a

wildlife refuge, and an area well known for birdwatching. I worry that a spill from the project will result in death for these species and result in long-term ecological damage. As a birdwatcher and someone who enjoys seeing turtles nearby, as well as someone who fishes in the area, the threats to these species and the surrounding ecosystems are very worrisome to me and impacts my enjoyment of the area.

13. In addition to being at the frontline of the project's impacts from oil spills and explosion risk, flooding and drought made worse by climate change and wetland destruction are major concerns that pose a threat to our home. This area is inherently exposed to hurricanes. With fewer wetlands to buffer us from storms, we are more exposed than other similarly situated coastal areas. I have lived through a hurricane since moving to Surfside, and rebuilding was extremely difficult even without the addition of an environmental disaster, such as a spill or explosion. Such a disaster could result from the impacts of a hurricane-magnitude storm on SPOT's pipeline or other oil transport and processing infrastructure. The existing natural coastal protections must be protected rather than destroyed for a project like SPOT that will only exacerbate climate change.

14. As a property owner and a professional realtor, I am very concerned about the impact the SPOT project will have on the industries and community of Surfside. This project will devalue properties throughout the entire city, which will affect

real estate sales and the attractiveness of beachfront property in Surfside as a residence, investment property, or vacation rental. My own home in Surfside will suffer from this devaluation as well.

15. Additionally, the community relies on tourism. Most people in Surfside are either retired or in the service industry that supports tourism. People from all over Texas visit our beautiful beaches, and I am worried that people will no longer visit the region due to the construction and operational impacts from this project.

16. Finally, our bay is home to thousands of fish and shrimp that fisherman make their livelihood on. If there is a spill from the SPOT project, the impacts could devastate the fishing and shrimping industries. As a fisher myself, the loss of this industry would be a huge blow to my enjoyment of Surfside.

17. The fossil fuel industry has already had adverse impacts on my community, and I worry that SPOT will worsen these impacts. Industry has already severely changed the character of and encroached on the nearby Quintana Beach, forcing many residents to move away. I worry that the same impacts will happen to my property, my way of life, and the community of Surfside.

18. Engagement with the public about SPOT by federal agencies, the project applicant, and local government has been severely flawed. These entities failed to provide adequate information to my community about the project and its

components, thereby hiding the true impacts of SPOT on public health, coastal and marine ecosystems and species. All of this was done for the financial gain of those who will not experience the impacts firsthand.

19. Since the SPOT project was originally proposed, numerous other oil and gas infrastructure projects have been proposed that will also impact my community. SPOT's failure to meet its statutory timeline has forced me and my community to live with the uncertainty of whether this massive polluting project will be built through Surfside and in the Gulf of Mexico, despite the significant new information that has come out since SPOT's original proposal, such as new climate studies, new projects, and new dangers to species.

20. This lawsuit challenges many of the same issues that I have been concerned about since SPOT was initially proposed several years ago. A favorable ruling would help protect my interests and alleviate my deep concerns about the project's risks and threats to myself and my community.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 9, 2023.

Pamela Harris
Member, Sierra Club and Citizens for Clean Air and Clean Water

8

013

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

CITIZENS FOR CLEAN AIR, et al.,

    Petitioners,

      v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Respondents.

Case No. 23-60027

## **<u>DECLARATION OF REBEKAH HINOJOSA</u>**

Pursuant to 28 U.S.C. 1746, I, Rebekah Hinojosa, declare as follows:

1.     I am of legal age and am competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated. I give this declaration for use in Sierra Club's challenge to the proposed SPOT deepwater port project.

2.     I am a resident of Brownsville, Texas.

3.     I am a Senior Campaign Representative of the Sierra Club's Beyond Dirty Fuels Campaign, a position I have held for about two (2) years. In this capacity, I lead our fight to slow and halt our nation's reliance on fossil fuels that is contributing to the climate crisis and devastating frontline

communities along Texas's Gulf Coast, including in the Surfside and Freeport region.

4.   The Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. Sierra Club has approximately 800,000 members nationwide in each of the 50 states, including over 24,000 members in Texas and over 2,900 in Louisiana. Sierra Club and its members are dedicated to exploring, enjoying, and protecting the wild places of the earth.

5.   The Sierra Club is a nationwide non-profit environmental membership organization whose purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. This includes things like land, air, and the protection of threatened and endangered species and their habitat.

6.   Sierra Club's membership includes persons who live or recreate near the SPOT deepwater port project and throughout the Coastal Bend region of Texas. Its membership includes persons adversely impacted by the Maritime Administration's decision to license the SPOT project.

7.    I am also a member of the Sierra Club and have been a member since 2014. As a member, I rely on the Club to represent my interests in protecting the environment, including the communities and species that rely on a healthy and safe environment to live and recreate.

8.    The Sierra Club's Dirty Fuels Campaign is dedicated to averting the worst impacts of the climate crisis through slowing or stopping the expansion of fossil fuel production and infrastructure and protecting the environment and communities from the environmental impacts of these projects. Part of this program involves opposing the construction and operation of new oil export terminals and associated infrastructure, such as pipelines. We have three Campaign Representatives, a Campaign Manager, two organizers, and other staff who work on these issues. We work with Sierra Club members and volunteers to organize rallies, disseminate information, attend public meetings, submit comments to state and federal permitting agencies, and more. The Sierra Club, through the work of its Dirty Fuels Campaign, also brings lawsuits concerning oil and gas export terminals where appropriate.

9.    The Sierra Club has a longstanding campaign advocating for protection of the Gulf of Mexico and coastal communities against environmental damage from oil and gas export infrastructure. The Sierra Club and its members have actively participated in the administrative processes and decision-making of

the SPOT deepwater port project. This includes regularly commenting during agency deepwater port licensing public comment opportunities for this project. For example, the Sierra Club submitted extensive comments on the various EIS comment opportunities on the SPOT project, including comments on the draft environmental impact statement, supplemental draft environmental impact statement, and final environmental impact statement.

10. In my role as Senior Campaign Representative, I coordinated with community groups to submit over 17,500 public comments on the draft environmental impact statement, over 100 public comments on the supplemental draft environmental impact statement, and over 3,000 public comments on the final environmental impact statement.

11. The Sierra Club has an ongoing interest in protecting the environment and communities impacted by Respondent's decision to issue a new deepwater port license in the Gulf of Mexico. Sierra Club members live near the project and recreate in the Gulf of Mexico and on the beaches directly impacted by the project, from noise and air pollution, risk of oil spills, and impacts to species. Sierra Club members have scientific and research interests in the ecosystems and species directly impacted by SPOT, including the critically endangered Rice's whale, which is endemic to Gulf waters and numbers less than 50 individuals.

12.    The Sierra Club and its members also are harmed by the increased greenhouse gas emissions caused by deepwater port construction and operation. Greenhouse gas emissions harm our members' interests by, for example, causing sea level rise that is destroying the beaches our members visit to recreate and observe wildlife, such as nesting endangered sea turtles.

13.    I believe that a favorable decision in this case, vacatur of the project's licensing decision, and further environmental review by the agencies would redress harm to Sierra Club's members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 10, 2023 in Brownsville, Texas.


_Rebekah Hinojosa_
Rebekah Hinojosa
Senior Campaign Representative,
Member Sierra Club

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

CITIZENS FOR CLEAN AIR, et al.,

    Petitioners,

      v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Respondents.

Case No. 23-60027

## DECLARATION OF GWENDOLYN JONES

Pursuant to 28 U.S.C.§ 1746, I, Gwendolyn Jones, hereby declare as follows:

1. My name is Gwendolyn Jones. I am over 18 years of age.

2. The information in this declaration is based on my personal knowledge, and the facts herein stated are true and correct.

3. I am a Resident of Angleton and Brazoria County, Texas.

4. I have been a resident of Brazoria County for my entire life.

5. I was born and raised in Freeport, Texas. I consider Freeport my hometown. I still own property in Freeport.

6. While I was growing up, I lived in my family home with my parents in the East End of Freeport at 507 E. 5th Street while they were still living. I raised

1

my children in that home while I was taking care of my parents who had health issues. I now own this property. The house was torn down by the City of Freeport, and I could not secure a permit to rebuild the home.

7.    After my family's home was torn down, I purchased other property in Freeport and continued to live in the Freeport area until 2019. Some of that property was taken by eminent domain by Port Freeport. However, I also still own additional property in Freeport today.

8.    Since 2019, I have lived at 126 Coleman Dr., Angleton, TX 77515, which is a house that I built there.

9.    I have worked at BASF's plant in Freeport for many years, and I have maintained employment in Freeport or other nearby communities working for the chemical industry for most of my life.

10.    Beginning in 2021, I began working with a local environmental advocacy organization, Citizens for Clean Air & Water in Brazoria County ("CCACW") d/b/a Clean Air and Water: Better Brazoria ("Better Brazoria"). I have attended multiple meetings of the organization and traveled as a spokesperson for the organization to Washington D.C. in 2022.

11.    By attending these public meetings and participating with Better Brazoria, I began to understand the cumulative effects of the multiple fossil fuel facilities that are in the Freeport and the Brazoria County area.

12. Firsthand, I have observed and experienced the negative health consequences that the pollution from these facilities has had on the community's health, including my own father. My father worked at Stafford Chemicals and cleaned out the inside of trucks. The exposures from his work environment led to his health issues later in life.

13. Further, as a child, I suffered from respiratory issues, as did my mother. Our house in the East End was located near Port Freeport and a sulfur plant.

14. These experiences make me aware of the potential risks associated with these types of exposures.

15. Additionally, I have been a member of the Sierra Club since January 12, 2023. Sierra Club is a nationwide environmental membership organization with a chapter in Texas. Its mission is dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.

16. Additionally, I have been a member of Texas Campaign for the Environment since November 2021.

17. As a member of these organizations, I have attended rallies as well as public meetings and have volunteered to get signatures for petitions that challenge many of the fossil fuel projects in Brazoria County.

18. I have also engaged in the notice and comment process for SPOT regarding its Deepwater Port License Application.

19. I have submitted timely written comments regarding SPOT's Deepwater Port License Application via www.regulations.gov (Docket No. MARAD-2019-0011) on November 24, 2021 and December 12, 2021. ROA.00112646, ROA.00160423.

20. Specifically, my written comments raised a number of issues concerning the SPOT facility, including the following:

    a. Based on the public disclosures about the oil spill risks from SPOT, I expressed reasonable concerns that an oil spill either during construction or related to SPOT's operations would have significant impacts on endangered species and their critical habitat in Brazoria County.

    b. The projected release of harmful chemicals to the air. These pollutants could cause further respiratory issues to the residents of Brazoria County as well as severe damage to the liver, kidney, and central nervous system.

4

c.    When operating, the onshore and offshore facilities associated with SPOT will be releasing cancer-causing emissions, at a time when Brazoria County is already overburdened with such pollution. The residents of Brazoria County have significantly higher rates of cancer than the national average. These cumulative impacts given the existing industry in the area are of ongoing concern.

21.   SPOT threatens my interest in clean water in Brazoria County.

22.   I currently live less than seven miles from the proposed pipeline through Angleton.

23.   I am concerned that leaks from the pipeline or a catastrophic failure will result in water pollution that will impact the use of my property.

24.   I am also concerned with loss of property value in the event of leaks or disaster along the pipeline that could contaminate or impact my property negatively depending on their severity.

25.   I have health concerns related to air pollution from SPOT.

26.   I am aware that the increased ship traffic associated with the construction of the SPOT pipeline and the additional ship traffic from VLCC's due to SPOT's operations, will emit numerous pollutants, including nitrogen oxides, particulate matter, and volatile organic compounds into the ambient air.

5

27.   I am aware that nitrogen oxides can harm the respiratory system and aggravate respiratory diseases. I also know that long term exposure to nitrogen oxides can cause asthma and increase susceptibility to respiratory infections.

28.   I am aware of the negative effects particulate matter can have on the respiratory and cardiovascular systems. These effects include increased instances of lung disease, aggravated asthma, reduced lung functionality, irritation to the airways resulting in coughing and difficulty breathing, as well as increased risk of heart attack and irregular heartbeat.

29.   I am aware that exposure to volatile organic compounds can harm health in many ways, including such symptoms as eye, nose, and throat irritation, headaches, nausea, dizziness, and damage to organs.

30.   I am aware that SPOT will add even more harmful ozone pollution to our region which already is failing to meet federal air quality standards. The Houston-Galveston-Brazoria region is already not meeting federal ozone air quality standards and was recently downgraded to severe non-attainment for ozone. I am aware that ozone pollution can harm health in many ways, including respiratory harms like asthma and COPD, as well as cardiovascular harms like heart attacks, strokes, and heart disease, among other impacts.

31. I am aware that Freeport is already considered a cancer cluster, with the estimated excess lifetime cancer risk from industrial sources being about 22 times the levels deemed acceptable by the EPA.

32. I am concerned that emissions from the construction and operation of the SPOT facility will contribute to local air quality issues which will affect my health and the use of my residence.

33. I have lived in and around Freeport for my entire life. I have many close friends that live in the area as well. My friends and I would be impacted by the worsened air quality from SPOT, potential water and soil contamination, and the risk of worse harm if there is a catastrophic failure along the pipeline, at the on-shore storage facility or at the off-shore terminal.

34. I am concerned for my health and the health of my close friends that live throughout Brazoria County as a result of the increased risk to the environment posed by SPOT.

35. I have concerns regarding cumulative impacts of pollution and climate change on the community.

36. I am aware that fossil fuel facilities such as SPOT have added to concentrations of greenhouse gases in the atmosphere, and that this increased concentration is causing impacts on the planet's climate, such as warmer seawater, rising sea levels and increased erosion.

37. Freeport is a socio-economically disadvantaged community. As a result, Freeport is not able to mitigate the risks of increasingly powerful storms – a result of climate change, which is driven by fossil fuel facilities like SPOT.

38. The construction and utilization of SPOT will mean warmer seas and stronger hurricanes, thereby threatening my home with greater risk of catastrophic flooding damage.

39. I am aware that increased erosion of Surfside Beach has led to severe loss of land.

40. Every year after Christmas I bring my tree to Surfside beach for a "Dunes Day" community event to help reinforce the sand dunes with recycled and repurposed Christmas trees. I plan to continue this tradition of visiting Surfside beach as long as conditions allow for this.

41. However, I am concerned that in a matter of years there won't be a beach anymore because of fossil fuel facilities such as SPOT. As a result, my community and I would experience significantly less enjoyment of the surrounding scenery and lose a valuable community activity and congregation area.

42. I have concerns about the impacts of SPOT on my recreational interests.

43. During the summer months, I often go to the many beaches in the area including Surfside Beach and Bryan Beach.

44.    I often go to nearby parks.

45.    When the weather is good, I frequently attend barbeques in Angleton, Freeport, and Surfside Beach.

46.    Each summer, I typically recreate outside whether on the beach or at a local barbeque approximately once per week.

47.    I plan to continue these activities and regular visits to beaches and parks into the future. But if SPOT is allowed to construct and operate, my use and enjoyment of these areas will be harmed. I may visit these areas less frequently or not at all if the areas become degraded due to oil spills, air pollution, construction impacts, and other harms.

48.    I am concerned that the beaches that I frequent will be harmed by the increased presence of petrol products in the water as a result of leaks and spills from the SPOT terminal and its pipeline network. This will make my trips to the beach much less frequent and enjoyable.

49.    I am concerned that the new visual, noise, traffic, and air pollution impacts from the construction of the pipeline and onshore and offshore terminals will harm my enjoyment of these activities like going to the beach and attending barbeques.

50.    I am concerned that the increased air pollution from SPOT will make outdoor recreation in the area much less safe, and therefore reduce my enjoyment of

these activities. If air quality gets worse, I may be forced to stop engaging in these activities all together.

51. I am already afraid just going to the grocery store when the air quality is bad. If the pollution gets much worse, I'm not sure how I will manage my daily chores, much less, get any enjoyment from the outdoors where I live.

52. A favorable outcome of the lawsuit brought by Better Brazoria would lead to a denial of the SPOT permit or appropriate mitigation efforts which would prevent the harms I am concerned about.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___**3rd**___ day of May, 2023.

*Gwendolyn Jones*
Gwendolyn Jones
Member, Citizens for Clean Air and Clean Water in Brazoria County d/b/a Clean Air and Water: Better Brazoria

Member, Sierra Club

Member,
Texas Campaign for the Environment

10

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

CITIZENS FOR CLEAN AIR, et al.,

    Petitioners,

      v.                                                   Case No. 23-60027

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Respondents.

**<u>DECLARATION OF MELANIE OLDHAM</u>**

Pursuant to 28 U.S.C.§ 1746, I, Melanie Oldham, hereby declare as follows:

1.    My name is Melanie Oldham. I am over 18 years of age.

2.    The information in this declaration is based on my personal knowledge, and the facts stated herein are true and correct.

3.    I am a resident of Freeport, Texas.

4.    I currently reside at 922 W. 5th St., Freeport, Texas 77541.

5.    I have been a resident of Freeport for over 10 years.

6.    I have been a resident of Brazoria County for over 40 years.

7.    My home is located less than six miles from the proposed onshore pipeline associated with the deepwater port applied for by SPOT Terminal Services, LLC ("SPOT").

1

8.   I am concerned about physical and monetary damage to my home and property in the event of a disaster along the pipeline or at the onshore tank storage facility associated with the SPOT project in Oyster Creek ("Oyster Creek Terminal"). My residence is approximately 11 miles from the Oyster Creek Terminal.

9.   I am involved in a number of different local environmental advocacy groups. In 2014, I founded Citizens for Clean Air & Clean Water in Brazoria County. I have also been a Sierra Club member for 8 years. I have been a member of Texas Campaign for the Environment since 2021.

10.   Citizens for Clean Air & Clean Water in Brazoria County ("CCACW") is a nonprofit organization incorporated under the laws of the State of Texas. As of January 2023, the organization does business under the name of Clean Air and Water:  Better Brazoria ("Better Brazoria").

11.   I have served as the Chair of Better Brazoria since its inception in 2014.

12.   The organization was specifically formed to educate Freeport residents about environmental issues and to advocate for solutions to protect and improve air and water quality.

13.   Better Brazoria distributes information to the public and holds public meetings to raise environmental issues that impact residents of Freeport and the surrounding areas in Brazoria County.

14. For example, Better Brazoria regularly holds community meetings to raise awareness about potentially harmful air and water pollution events in Freeport. I have regularly hosted and attended these membership meetings or specially called meetings by Better Brazoria about certain projects like SPOT.

15. As part of its advocacy work, Better Brazoria regularly communicates with the Texas Commission on Environmental Quality ("TCEQ") and other state and local governmental entities to keep abreast of the latest developments in the area and to engage with the public participation component of environmental permitting by submitting comments and hearing requests on air and water quality permits impacting Brazoria County, Texas with the goal of encouraging pollution control and reduction for the surrounding industry.

16. In addition to being the Chair and a member of Better Brazoria, I also serve on the Board of Directors of Better Brazoria as a director.

17. Since early 2020, Better Brazoria has been engaged in advocacy on the SPOT Project. I have participated in various events organized by Better Brazoria to bring awareness to the SPOT Project. In the last three years, I recall attending meetings or events related to the SPOT Project organized by Better Brazoria and other advocacy groups.

18. From 2020 to 2022, I authorized the filing of written comments (cited below) on behalf of the organization, then identified CCACW, on the SPOT Project by the organization's legal counsel, Lone Star Legal Aid.

19. As a representative of Better Brazoria and as an individual resident of Freeport, I further participated in the following public meetings regarding the SPOT Project and provided oral comments on the SPOT project as part of the Administrative Record: (1) February 26, 2020 Public Meeting on the DEIS in Lake Jackson (in person); (2) November 16, 2021 Public Meeting on the SDEIS (virtual); and (3) August 23, 2022 Final Hearing on SPOT Project (virtual).

20. On May 28, 2020, CCACW submitted written comments on the SPOT Draft Environmental Impact Statement ("DEIS") via www.regulations.gov (Docket No. MARAD 2019-0011). ROA.00093877. These comments reflected the concerns of the community of Freeport, which is an environmental justice community, because of the impacts the proposed project would have on Freeport residents and other members of the CCACW. In addition to raising concerns about the statutory timelines in the Deepwater Port Act of 1974 ("DWPA"), CCACW comments complained that the DEIS was not compliant with the National Environmental Policy Act ("NEPA") in that it failed to:

   a.   Address potential impacts on local drinking water;

b.    Fully address the potential for oil spills and their impacts;

c.    Address the cumulative impacts of the facility on an already heavy burdened environmental justice community;

d.    Fully consider local opposition to the siting of the facility;

e.    Address the impacts of spills and leaks to local beaches including Bryan Beach and Surfside Beach.

f.    Address concerns about lax regulation among existing deepwater ports;

g.    Adequately address air quality impacts from the project;

h.    Address compliance with the Texas Coastal Management Program; and

i.    Address the abandonment of current pipelines as well as the legality and costs associated with such abandonment.

21.    On November 7, 2021, CCACW submitted written comments on the SPOT Draft General Conformity Determination via www.regulations.gov (Docket No. MARAD 2019-0011). ROA.00112273. These comments addressed concerns of the organization about the projected air pollution associated with the SPOT Project and the onshore impacts of local air quality for Freeport residents.

22.    On December 8, 2021, CCACW submitted a request for extension on the public comment period on the SPOT SDEIS via www.regulations.gov (Docket No. MARAD 2019-0011), ROA.00117200, because of the

5

government's failure to make copies of the SDEIS available at the Freeport public library from October 29, 2021 to December 7, 2021 (39 days out of the 45-day noticed public comment period). I also personally alerted MARAD and the U.S. Coast Guard to the absence of the SDEIS at the public library.

23.    On December 13, 2021, CCACW submitted written comments on the SPOT Supplemental Draft Environmental Impact Statement ("SDEIS") via www.regulations.gov (Docket No. MARAD 2019-0011). ROA.00120166. In addition to highlighting that the statutory deadlines under the DWPA for approval of the SPOT Project had expired, CCACW argued that the SDEIS suffered from procedural deficiencies, such as its lack of availability at public libraries and the startling lack of outreach in the local community, especially in areas of limited English proficiency. Furthermore, CCACW raised similar substantive complaints to those raised against the DEIS.

24.    On September 12, 2022, CCACW submitted written comments on the SPOT Final Environmental Impact Statement ("FEIS") via www.regulations.gov (Docket No. MARAD 2019-0011). ROA.00206480. One of our group's main concerns in commenting on the DEIS, SDEIS and the FEIS is that MARAD as part of the Department of Transportation had failed to comply with the deadlines stated in the Deepwater Port Act. We specifically cited the agency to its requirements to conduct the final public hearing on the project within

240 days of the Notice of Application and the Secretary of the Department of Transportation had to approve or reject the project within 356 days of the Notice of Application. None of these deadlines were complied with for the SPOT Project. Moreover, MARAD and the other agencies failed to address these regulatory timeline comments in responding to our written comments on the DEIS, SDEIS, and FEIS, but the U.S. Department of Transportation cited these regulatory timelines in its record of decision.

25.    In addition to highlighting that the statutory deadlines under the DWPA for approval of the SPOT Project had expired, these comments raised additional concerns that the FEIS failed to consider:

a.    That there is a significant likelihood that National Ambient Air Quality Standards ("NAAQS") are about to be adjusted for Brazoria County, resulting in a reduced pollution threshold to obtain Title V Operating Permits. Once this change occurs, the facility will be unable to meet those more stringent standards.

b.    The impacts of climate change on the feasibility of and necessity for SPOT.

c.    The location of the tank farm is situated directly in the 100-year floodplain, making spills and leaks significantly more likely than discussed.

7

d.    The effect of a potential spill on the tourism-based economy of the local area.

e.    Impacts on traffic and road maintenance due to the increased use of local roads resulting from construction of the pipeline.

26.    In my capacity as the Chair of Better Brazoria and an active member, I administer the group's Facebook page and comment frequently on important hearings and other opportunities to engage with the community and regulators on the SPOT Project. For example, on behalf of Better Brazoria, I shared information about our regular membership meetings, which frequently discussed the SPOT Project and held a meeting specifically focused on SPOT on August 19, 2022 via Zoom before the Final Hearing.

27.    As part of the environmental review process on the SPOT Project, in addition to my contribution to the comments submitted on behalf of Better Brazoria through its legal counsel, I also submitted comments on behalf of myself as a resident of Freeport on the SPOT Project's environmental impact statements through regulations.gov.

28.    On November 14, 2021, I submitted a timely comment regarding SPOT's Deepwater Port License Application. ROA.00112592. Specifically, my November 14th comments raised a number of issues about the proposed SPOT facilities, including the following:

a. An oil spill – which could result from SPOT's operations – would have significant impacts on endangered species and their critical habitat in Brazoria County.

b. The release of harmful chemicals to the air can cause respiratory issues as well as severe damage to the liver, kidney, and central nervous system.

c. The facility will be releasing cancer causing emissions in Brazoria County, which is already overburdened with pollution, such that residents of the county have significantly higher rates of cancer than the national average.

29. On December 12, 2021 I submitted another timely comment regarding SPOT's license application. ROA.00120162. The substance of my December 12th comment raised additional issues such as:

a. Notice that Brazoria County is already considered to be a serious non-attainment area for numerous pollutants, and that SPOT will contribute ozone, nitrogen oxide, and volatile organic compounds, which could further harm air quality.

b. Freeport is an environmental justice community that is approximately 65% Hispanic and predominantly low-income. Completion of SPOT would thwart national efforts to combat environmental injustice.

9

30.    I am concerned that SPOT's potential air and water pollution from its onshore and offshore facilities will harm recreational areas in the vicinity of the pipeline as well as along the coastline. These areas include Bryan Beach and Surfside, where I often go to recreate (see images below).



*Aerial Photo of Bryan Beach*



*Location of Pipeline through Surfside Beach*

31.     I typically go to either Bryan Beach or Surfside Beach approximately three to four times per month for walking, hiking, fishing, and bird watching. I intend to continue these recreational activities unless increased air and water pollution from the SPOT project negatively impacts my ability to do so.

32.     My daughter, Kaitlin, also fishes near Surfside Beach.

33.     I participate in beach cleanups and efforts to restore the dunes at the aforementioned beaches.

34.     I also fish at Oyster Creek Municipal Park, less than a mile from the proposed SPOT pipeline in Oyster Creek (see images below).



35. I am concerned that a leaking pipeline (either onshore or offshore) or an oil spill in the Gulf originating from SPOT's facilities will result in serious harm to the fish and bird populations in the areas that I frequently recreate, thereby reducing my enjoyment of these activities.

36. I am concerned that my daughter and I will no longer be able to enjoy fishing in these local areas because of the risk of contamination in the fish as a result of additional petrol pollution due to the construction and operations of the SPOT facility in the immediate area.

37. I am also concerned that the beaches that I frequent in the area will be harmed by the increased presence of petrol products in the water, making walking and hiking less enjoyable, and restoration of the dunes pointless.

38. I am concerned that the new visual, noise, traffic, and air pollution impacts from the construction of the pipeline and onshore and offshore terminals will harm my enjoyment of recreational activities like walking and bird watching on the beaches that I frequent.

39. I plan to continue my regular visits to Bryan and Surfside Beach to fish and to participate in beach cleanups in the future. But if SPOT is allowed to be constructed and operate, my use and enjoyment of these areas will be harmed. I may visit these areas less frequently or not at all if the areas become degraded due to oil spills and construction impacts.

40. I have health concerns related to air and water pollution from SPOT.

41. I have worked in healthcare for 38 years and have become familiar with the health effects associated with air and water pollution.

42. I am aware that the onshore and offshore construction of SPOT and the additional VLCC ship traffic that comes with it, will emit numerous pollutants, including nitrogen oxides, particulate matter, and volatile organic compounds into the ambient air.

43. I am aware that nitrogen oxides can harm the respiratory system and aggravate respiratory diseases. I also know that long term exposure to nitrogen oxides can cause asthma and increase susceptibility to respiratory infections.

44. I am aware of the negative effects particulate matter can have on the respiratory and cardiovascular systems. These effects include increased instances of lung disease, aggravated asthma, reduced lung functionality, irritation to the airways resulting in coughing and difficulty breathing, as well as increased risk of heart attack and irregular heartbeat.

45. I am aware that exposure to volatile organic compounds can harm health in many ways, including things such as eye, nose, and throat irritation, headaches, nausea, dizziness, and damage to organs.

46. I am aware that ozone pollution is not emitted directly from a project like SPOT but is formed in the atmosphere from precursor pollutants, such as

13

nitrogen oxides and volatile organic compounds. I am aware that the Houston-Galveston-Brazoria region is in non-attainment for the federal ozone air quality standard and was recently downgraded to severe non-attainment for ozone. This means that SPOT will add even more harmful ozone pollution to our region which already is failing to meet federal air quality standards. I am aware that ozone pollution can harm health in many ways, including respiratory harms like asthma and COPD, as well as cardiovascular harms like heart attacks, strokes, and heart disease, among other impacts.

47. I am concerned that these air pollutants and other harmful air pollution that will be emitted from the SPOT facility will exacerbate local air quality issues which will affect my health, the health of my family members, and the use of my residence.

48. I have raised twins, both of which have been diagnosed with asthma – likely a result of the existing pollution.

49. My daughter also lives in Freeport. I am concerned for her continued health, as she has just moved to the area in the past year.

50. I have concerns regarding cumulative impacts of pollution and climate change.

51. Freeport is an environmental justice community. Its ability to resist the cumulative impacts of additional pollution and damage from increasingly

14

powerful storms – a result of climate change, which is driven by fossil fuel facilities like SPOT – is limited and already stretched beyond its capabilities.

52. Harm to the community of Freeport is a harm to myself considering that I would experience significantly less enjoyment of my life and property without my community.

53. I am aware that SPOT will contribute significantly to greenhouse gas emissions. These emissions will worsen global climate change.

54. The construction and operation of SPOT will increase levels of oil production and consumption, and associated greenhouse gas emissions for decades to come. This increased fossil fuel development would almost certainly not occur if SPOT were not built. Therefore, the construction and operation of SPOT leads to warmer seawater and stronger hurricanes along the Gulf Coast near Freeport, thereby threatening my home, property, and community with greater risk of catastrophic flooding damage.

55. SPOT will only amplify fear of hurricanes and other climate disasters and environmental injustices within Freeport, taking a silent tax on my well-being and the well-being of my fellow community members.

56. A favorable outcome in the lawsuit brought by Better Brazoria would protect my interests by stopping the SPOT project from going forward. If SPOT's construction and operation is stopped the increased risk of harm to my health,

the health of my family and community, as well as the risk of harm to our recreational and property interests will be prevented.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _____5_____ day of May, 2023.

Melanie Oldham
Founder Chair, Director and Member, Citizens for Clean Air and Clean Water in Brazoria County d/b/a Clean Air and Water: Better Brazoria

Member, Sierra Club

Member, Texas Campaign for the Environment

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CITIZENS FOR CLEAN AIR, et
al.,

    Petitioners,

     v.

Case No. 23-60027

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Respondents.

## DECLARATION OF SUE PAGE

Pursuant to 28 U.S.C. 1746, I, Sue Page, hereby declare as follows

1.   My name is Sue Page. I am of legal age and competent to give this declaration, and all matters in this declaration are based on my own personal knowledge unless otherwise specified.

2.   I live in Surfside Beach, Brazoria County, Texas. I have lived there for two years.

3.   I am a member of the Sierra Club and have been for several months. I joined Sierra Club while participating in the public engagement process for the licensing of SPOT VLCC, because my concerns about the project and other oil and gas infrastructure proposed in the region are aligned with the organization's advocacy.

1

4. Sierra Club is a nationwide environmental membership organization with a chapter in Texas, the Lone Star Chapter. Its mission is dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.

5. I joined the Sierra Club because I believe our world and my community is worth protecting. The Sierra Club has taken an active stance in defending my home and the health of my community in Brazoria County from the risks and threats posed by this fossil fuel development. I appreciate the Sierra Club's work because it will take all of us working together to prevent disasters and activities which are harmful to the flora and fauna, not only in Brazoria County, but throughout the world.

6. I am also a member of Citizens for Clean Air & Clean Water in Brazoria County ("CCACW"). I joined CCACW because of their engagement on the SPOT Project over the last several years, and because of my concerns over the Project's adverse impacts to my home, livelihood and the character of the Surfside community.

2

046

7. I am also a member of Texas Campaign for the Environment ("TCE"). I joined TCE in December 2021. TCE is a 501(c)(3) non-profit membership corporation organized under the laws of the State of Texas dedicated to informing and mobilizing Texans to protect their health, their communities, and the environment. TCE works to promote strict enforcement of anti-pollution laws designed to stop or clean up air, water, and waste pollution.

8. As part of its mission, TCE regularly engages its members and the public to enhance awareness of and encourage robust public participation in permitting processes for fossil fuel facilities impacting the Gulf Coast and other regions of Texas to reduce environmental and health harms. TCE supports the creation of new jobs in renewable energy and energy efficiency sectors.

9. I am also a member of several environmental protection and conservation organizations, including the National Audubon Society, Save Our Beach Association, Defenders of Wildlife, and The Nature Conservancy.

10. My home is about a mile from SPOT's proposed pipeline route where it will cross through Surfside beach and enter into the Gulf of Mexico., The pipeline will transport crude oil from production sites in inland Texas to the offshore loading terminal. This area is where we've created our dream home, and we enjoy every aspect of living near and recreating on the Gulf's shores and waters. However, I am very concerned that the SPOT project will compromise

3

047

the quality of our community and the surrounding area. We frequently have family and friends who visit us who will also be negatively impacted by this project.

11. I submitted comments on the SPOT Deepwater Port License Application on December 6, 2021, December 11, 2021, and August 30, 2022, via www.regulations.gov (Docket No. MARAD 2019-0011). ROA.00117131, ROA.00118147, ROA.00197151. In these comments, I raised my serious concerns regarding this project's risks, including the risk to endangered species of sea turtles and birds; the release of chemicals harmful to human health like VOC's; the risk of exacerbating the already higher than average cancer rates in the area; and many more legitimate concerns.

12. I am very worried about how construction and operation of this project will impact me. It has the potential to impact almost every aspect of my day-to-day life. There is only one roadway along the island where we live. That means access to our home will be continuously interrupted during construction while crossing the proposed pipeline area every time we enter and exit our home and travel within our community.

13. The SPOT project will prevent me from enjoying my home and community as much as I used to, due to the nagging feeling of our health and safety being

4

048

compromised from air and water pollution that will inevitably result from the onshore and offshore facility and connected pipeline and other infrastructure.

14. I use the Gulf regularly for swimming, surfing, kayaking, and other water activities such as fishing. Our grandchildren play on the beach and in the water. I go fishing on average two times a month, kayak monthly, and paddle board when the weather and conditions allow. On average, I swim in the Gulf four times a week from April to October. I also walk or run on the beach daily, even during inclement weather. Every time I am on the beach, I pick up trash. I enjoy my time recreating outdoors, as it is a peaceful place to relax and appreciate the world, and to remember our right and responsibility to care for it. I intend to continue to engage in these activities with the same frequency for the foreseeable future, as long as I can continue to enjoy the quality of the beach and waters.

15. The noise from the construction and then the subsequent structures will diminish our tranquility. I feel like our community is being treated like the "guinea pig" as there is little, if any, precedent for such a massive deepwater oil export facility in Gulf waters; the companies will be learning how to make this massive network of connected oil infrastructure work as they proceed. This does not bode well for my community given the track record of ongoing

5

and massive spills from oil and gas infrastructure development throughout the Gulf.

16. Additionally, the air quality in Brazoria County is already poor, and this project will only worsen the pollution problem, threatening my health and the health of my community.

17. I am also worried about how the SPOT project will impact the many species that live and rely on habitat in the region. I am a turtle patroller who helps locate and protect the critically endangered Kemp's Ridley turtle, which nest on the beach in Surfside. An oil spill would harm the many fish, birds, and turtles that live in the region. Additionally, the increased lighting will disrupt bird migration patterns.

18. I am also concerned about the safety impacts that the SPOT project will cause. The massive quantity of crude oil that will flow through the pipeline into the Gulf is distressing to me. It is highly probable that a leak or spill will result from SPOT and cause toxic chemicals to contaminate the water and air, with insufficient capacity to manage an incident or disaster. We are a small community with a number of industrial facilities already existing in the area. Our lives and properties are already at risk with limited first responder and warning system resources. Additional facilities like SPOT will only exacerbate these dangers. The length and extent of SPOT's proposed offshore

6

pipeline and deepwater port loading infrastructure will make it very difficult to detect the occurrence of a leak or spill disaster. Significant and irreversible harm could occur before a spill is even discovered. There have been spills and explosions from other projects in the area, and I worry SPOT will cause the same devastating problems.

19. I am very concerned about the impact the SPOT project will have on the local economy and community of Surfside. This project will devalue properties throughout the entire city. The community relies on tourism. Most of the neighbors on my street rent their homes to visitors during the warmer months. They use these rental properties for income as well as personal enjoyment. This income source and the aesthetics that bring people to the area will only decline with the construction and operation of SPOT.

20. In addition to SPOT, there is another similar deepwater export facility proposed nearby in the Gulf of Mexico called GulfLink, which would similarly affect my home and surrounding community. Brazoria County is already overburdened by industrial projects, such as the nearby Freeport LNG project which had an explosion last year. The lights of the many industrial facilities brightly illuminate the area, and the sirens and noises from facility incidents and drills disrupt the tranquility of our community.

7

051

21. Prior to the two deepwater port proposals, I had no plans to move. However, because of the risks to my health, safety, and the environment they pose, I have considered moving away from Surfside. Our community simply cannot take the burden of even one more fossil fuel industrial facility.

22. This lawsuit challenges many of the same issues that I have been concerned about since SPOT was initially proposed several years ago. A favorable ruling could help protect my interests and alleviate my deep concerns about the project's risks and threats to myself and my community.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on April 28, 2023.

Sue Page
Member, Sierra Club, Citizens for Clean Air and Clean Water, Texas Campaign for the Environment, National Audubon Society, Save Our Beach Association, Defenders of Wildlife, and The Nature Conservancy.

8

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| CITIZENS FOR CLEAN AIR, et al.,<br>Petitioners,<br>v.<br>U.S. DEPARTMENT OF<br>TRANSPORTATION, et al.,<br>Respondents. | Case No. 23-60027 |

## <u>DECLARATION OF AARON N. RICE, PH.D</u>

Pursuant to 28 U.S.C. 1746, I, Aaron N. Rice, Ph.D., declare the following:

1.  I am of legal age and am competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated.

2.  I have been a member of the Sierra Club since January 13, 2023. The Sierra Club is a nationwide non-profit environmental membership organization whose purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. This includes engaging in efforts to conserve land, air, and water resources, and to protect threatened and endangered species such as

the Rice's whale[1] and other marine mammals and their habitat. The Sierra

Club's mission and vision align with my personal and professional values.

3. The Sierra Club's mission protects my personal, scientific and professional

interests in species and habitat protection, described in detail below. The

efforts of the Sierra Club to advance environmental and species protection

supports and enhances my ability to maintain a livelihood and continue my

career pursuits as a marine ecologist working to promote sustainable ocean

practices and understand the behaviors of imperiled marine species and their

response to anthropogenic threats such as climate change and the

proliferation of fossil fuel infrastructure off our nation's shorelines

throughout the Outer Continental Shelf. One reason that I am a member of

the Sierra Club is because the organization is able to advocate for my values

in ways that I would be directly limited from doing as a university scientist.

The Sierra Club's work helps to ensure species are afforded necessary

protections to facilitate the survival and recovery of threatened and

endangered marine mammal species. These protections allow me to continue

my work contributing to the scientific understanding of these species into the

future.

---

[1] There is no connection between my name and the species' common name. The Rice's whale was named after marine mammal scientist Dale W. Rice, who first documented the species in the Gulf of Mexico in the 1960s.

## <u>Education and Experience</u>

4. I am a research scientist in the K. Lisa Yang Center for Conservation Bioacoustics (formerly the Bioacoustics Research Program) at Cornell University. The Center is one of the world's preeminent research institutions in the field of marine and terrestrial bioacoustics, the study of sound in the natural world. Since 2017, I have also served as a faculty fellow at Cornell's Atkinson Center for Sustainability, which supports multidisciplinary research and collaboration on topics related to environmental sustainability. I am also a graduate field faculty member at Cornell University's Graduate Field of Natural Resources and the Environment, and Affiliate Research Faculty in the Department of Public and Ecosystem Health in Cornell's College of Veterinary Medicine. I am also a courtesy faculty member at Oregon State University's Environmental Sciences Graduate Program and at the University of South Alabama's Biology Department. A copy of my curriculum vitae is attached to this declaration for reference.

5. I hold a B.S. in biology from Davidson College (2000), an M.A. in marine biology from Boston University (2002), and an M.S. and Ph.D. in Organismal Biology and Anatomy from the University of Chicago (2004, 2006). I completed my postdoctoral training in the Department of

Neurobiology and Behavior (2007-2009) and the Bioacoustics Research

Program (2009) at Cornell University.

6. My career has been centered on marine bioacoustics, and I have extensive

research experience on marine mammals and anthropogenic sound, with

expertise on the interaction between marine mammals and offshore energy

development – both renewable and fossil fuel energy development. In my

capacity as a university scientist and a member of the bioacoustics research

community, I have collaborated on research projects and/or provided input

to various federal agencies with an interest in marine bioacoustics, including

the National Oceanic and Atmospheric Administration (NOAA), Bureau of

Ocean Energy Management (BOEM), U.S. Army Corps of Engineers, U.S.

Navy, Marine Mammal Commission, and National Park Service; agencies

for the states of Maryland, Maine, Virginia, and New York; industry groups;

and conservation organizations. I have served as a grant review panelist for

the U.S. National Academy of Sciences, the U.S. National Science

Foundation, the Gulf of Mexico Research Initiative, and the North Pacific

Research Board. I am an editor for the peer-reviewed journal, *Endangered*

*Species Research*. In 2014, I received the Partners in Conservation Award

from the Department of the Interior for my work on the acoustic ecology of

fishes and whales along the Atlantic coast. I am a member of the Marine

Mammal Subcommittee for the Regional Wildlife Science Collaborative for Offshore Wind (http://rwsc.org), which seeks to understand and minimize impacts to marine mammals from offshore wind development.

7. I regularly lecture on bioacoustics, marine mammal ecology and anthropogenic impacts from energy development at the undergraduate and graduate levels at the universities with which I am affiliated. I have expertise about the propagation of biological, environmental, and anthropogenic sound in the marine environment, and how marine mammals produce, perceive, and respond to sound; and I regularly teach about these topics.

8. During the Deepwater Horizon Oil Spill Natural Resource Damage Assessment, I served as Co-Principal Investigator for a large acoustic monitoring project to understand the ecology and possible oil spill impacts to Rice's whales and sperm whales in the Gulf of Mexico, as well as the broader ambient and anthropogenic noise levels throughout the region (Rice et al. 2014a, Rice et al. 2014b, Estabrook et al. 2016, Morano et al. 2020). Since 2009, my research has focused on the use of passive acoustic monitoring to understand the behavior, occurrence, and larger ecological of marine mammals.  While most of my work has focused on the U.S. Atlantic and Gulf of Mexico, I have investigated marine mammals in other regions around the world, such as Ireland, Africa, Canada, and South America. I use

the detection of species-specific vocalizations to infer temporal and spatial patterns of cetacean behavior and ecology, evaluate changes in their acoustic habitat, and how they may be impacted by anthropogenic noise. Because of my Lab's expertise in investigating marine mammals (then under the directorship of Dr. Christopher W. Clark in 2010 during the Deepwater Horizon), we were approached by NOAA and BP, to apply passive acoustic monitoring to investigate possible impacts of Deepwater Horizon to offshore cetacean species, which were relatively understudied at the time.  The significant data gaps around Rice's whales piqued my interest, and I have followed the study of the species since then. I have been intrigued by the irony that the Rice's whale is one of only seven baleen whale species in the U.S. Atlantic Exclusive Economic Zone (EEZ), and scientifically, we know extremely little about it.

### Rice's Whale Background

9. The Rice's whale (*Balaenoptera ricei*) is the only baleen whale to regularly occur in the Gulf of Mexico (Rosel et al. 2021, Corkeron et al. 2022, Rosel et al. 2022). While it is the only resident baleen whale exclusively inhabiting this region, the number of individuals in the species is extremely low, with approximately 34 to 50 individuals (NMFS 2020, Hayes et al. 2021, Rosel et al. 2021). The Rice's whale is one of the cetacean species with the fewest

number of individuals remaining in the world. The species was only recently

designated a distinct species based on morphological and genetic evidence

(Rosel et al. 2021). Before this designation, the Rice's whale was recognized

as a genetically distinct subpopulation of the Western North Atlantic

Bryde's whale (*Balaenoptera edeni*) found only in the Northern Gulf of

Mexico (Rosel and Wilcox 2014). The subspecies was listed as endangered

under the Endangered Species Act, and has remained federally protected as

such even after elevation to a distinct species (NMFS 2019, 2021). For the

purposes of this summary, information on the species is described under the

identifier of Rice's whales, but all references to the Gulf of Mexico Bryde's

whale are applicable to Rice's whales, such as in the most recent NOAA

stock assessment reports (Hayes et al. 2021). There are still critical data gaps

on the life history and ecology of the species–such as population status and

trends, foraging behaviors, habitat features, reproductive ecology, current

and historical temporal and spatial distribution–that limit the implementation

of an effective recovery plan for the species (NMFS 2020) and render the

species potentially vulnerable to human activities.

10. Historically, the species received little research attention compared to other

baleen whales in U.S. federal waters, but the Deepwater Horizon oil spill

created new scientific interest and management concern for the Rice's

whale. The Deepwater Horizon Natural Resources Damage Assessment
(https://www.doi.gov/deepwaterhorizon/nrda) focused on assessing oil spill
impacts to the population, but the lack of extensive previous data on the
species constrained the ability to infer impacts. As a result of this renewed
scientific and management mandate from NMFS and NOAA, in 2014, I
helped lead and develop a study and report providing results from one of the
first passive acoustic recordings of the population, (Rice et al. 2014a). This
study facilitated the use of passive acoustic monitoring to provide more
information on the behavior, ecology, and distribution of the population
(Širović et al. 2014, Hodge et al. 2015). Although the behavioral context in
which these calls are produced is unclear, their frequency range of
approximately 80-150 Hz is similar to other baleen whale calls (Rice et al.
2014a, Širović et al. 2014).

11. Beginning in February 2010, there was an officially declared Unusual
Mortality Event (UME) for cetaceans in the Gulf of Mexico (Hayes et al.
2021), which both preceded and coincided with the Deepwater Horizon oil
spill in April 2010 (Litz et al. 2014). The possible population impacts from
the UME and Deepwater Horizon to the Rice's whale was not included in
stock assessments until 2012 (Waring et al. 2012, 2013). The cetacean UME
in the Gulf of Mexico ended July 31, 2014, and two stranded Rice's whales

in 2012 were attributed to the UME (Hayes et al. 2018). Additionally, studies reveal that the Deepwater Horizon oil spill may have caused the loss of approximately 22 percent of the Rice's whale population.  In 2016, NMFS filed its petition for the Gulf of Mexico stock of Bryde's whales to be listed as endangered (Hayes et al. 2017); the stock was officially listed as an endangered species in 2019 (50 CFR 224; NMFS 2019).

12. In 2011, Rice's whales were designated as a "Strategic Stock" for management purposes under the Marine Mammal Protection Act (Table 1), because the species' average annual mortality and injury from human influences was greater than the established level of biological removal (Waring et al. 2012). A Strategic Stock designation recognizes the vulnerable or imperiled status of a whale population within U.S. waters and requires annual assessments and a mandate for aggregating new information as it becomes available. However, this Strategic Stock designation is further influenced by the extremely low population size; with such a small population size, even a small number of mortalities represents an immense threat to the species' viability. Before the Strategic Stock designation, Rice's whales were only assessed every 3–5 years, which minimized the awareness of how data gaps impair effective management of the species.

13. Despite changes in the reported numbers of the estimated population size of Rice's whales in marine mammal stock assessment reports (Table 1), there are no statistically significant differences between survey years (Garrison et al. 2020), and it is unclear whether the population is actually stable or declining (Hayes et al. 2021). The stock assessment cautions that there are insufficient data for estimating population trends, and are not sufficient to indicate an increase in population size. NMFS has not yet issued a formal recovery plan for the Rice's whale, but has created an initial recovery draft plan for the protection and restoration of the species (NMFS 2020), and convened workshops to further develop this recovery plan (NOAA Fisheries 2021).

**Table 1.** Population estimates of Rice's whale (formerly Northern Gulf of Mexico Bryde's whales) reported in NOAA marine mammal stock assessment reports. The "estimated minimum number of individuals" is the most conservative estimate of population size and based on the best available scientific information on the population's abundance, whereas the "best estimate number" is the statistically most likely number of individuals in the population (see Hayes et al. 2021).

| NOAA Stock Assessment Year | Estimated Minimum Number of Individuals ($N_{min}$) | Average or Best Estimate Number of Individuals ($N_{best}$ or $N_{average}$) | NOAA Stock Designation | Reference |
|---|---|---|---|---|
| 1995 | 17 | 35 | Not strategic | Blaylock et al. 1995 |
| 2003 | 25 | 40 | Not strategic | Waring et al. 2004 |
| 2005 | 25 | 40 | Not strategic | Waring et al. 2005 |
| 2008 | 5 | 15 | Not strategic | Waring et al. 2009 |
| 2011 | 5 | 15 | Strategic | Waring et al. 2012 |
| 2012 | 16 | 33 | Strategic | Waring et al. 2013 |
| 2016 | 16 | 33 | Review for ESA Listing | Hayes et al. 2017 |
| 2017 | 16 | 33 | Endangered | Hayes et al. 2018 |
| 2020 | 34 | 51 | Endangered | Hayes et al. 2021 |

14. The most recent NOAA stock assessment report for Rice's whales lists the potential biological removal (PBR) of Rice's whale individuals without impacting the population's viability as 0.1 (Hayes et al. 2021). The PBR estimate represents the maximum number of animals (excluding natural mortality) that can be removed from the population that still allows for the population to reach a sustainable goal

(https://www.fisheries.noaa.gov/laws-and-policies/glossary-marine-mammal-protection-act#potential-biological-removal-(pbr)-level). For Rice's whales, a PBR of 0.1 indicates that only one Rice's whale can die from non-natural causes per decade in order for the species to reach a sustainable population.

15. Based on ship-based surveys in 2009, NMFS designated a "core area" (also referred to as a Biologically Important Area, or BIA) for Rice's whales in the northeast Gulf of Mexico along the West Florida Shelf (Waring et al. 2013, LaBrecque et al. 2015) (Figure 1). A BIA designation is not equivalent to a species' habitat or range (Ferguson et al. 2015). A BIA does not provide legal protections for the species and is not intended to represent all important areas for consideration in planning processes; instead, it is a recommendation for future protections (LaBrecque et al. 2015). For a small, resident population like the Rice's whale, a BIA may encompass all or most of the population's entire known range, or it may only represent a high-density area within a larger known range (Ferguson et al. 2015). To maintain their utility, all BIAs should be re-evaluated and revised, if necessary, as new information becomes available (LaBrecque et al. 2015). Even at the time of the Rice's whale "core area" designation, there had been observations of Rice's whales outside the core area west of Florida in the

Gulf of Mexico (Waring et al. 2004). For instance, in the 2001 SEFSC spring vessel surveys, there was a single observation of a Rice's whale west of Florida and outside of the core area due south of the Texas/Louisiana Border between the 100- and 1000-meter isobaths (Waring et al. 2004, LaBrecque et al. 2015).

16. Since the core area designation, additional acoustic and ship-based surveys (e.g., Rice et al. 2014a, Rice et al. 2014b, Širović et al. 2014, Hodge et al. 2015b, Soldevilla et al. 2017, Garrison et al. 2020) have documented Rice's whales outside of the northeast Gulf of Mexico. The Rosel et al. (2021) study also aggregated historical records of stranded Rice's whales or other unidentified baleen whales in the Central and Western Gulf of Mexico. The distribution pattern of the strandings along the Mississippi and Louisiana coast suggest that given the clockwise circulation of the loop current in the Gulf of Mexico, it is unlikely that the stranded Rice's whales passively drifted from the "core area" to these coastlines. And most recently, Soldevilla et al. (2022a) reported thousands of Rice's whale acoustic detections in the central and western Gulf of Mexico, with 2,000 calls detected just at the Western Flower Garden site during a 10-month period. While 2,000 calls in the western Gulf are less than the 66,000 concurrently recorded in DeSoto Canyon, they still occur with high enough frequency,

suggesting that these are not rare or isolated occurrences. The estimated 20 km acoustic detection range of these sensors in the western Gulf preclude the possibility that calls detected on these units were produced in the eastern Gulf. Additionally, Soldevilla et al. reported a relatively recent Rice's whale sighting offshore of Corpus Christi, Texas (Soldevilla et al. 2022a), further corroborating evidence that Rice's whales occur in the western Gulf of Mexico.

17. The data collected since NMFS designated the Rice's whale "core area" suggest that the species' range extends beyond the "core area" far into the central and western Gulf (Figure 1). The depth range of Rice's whale observations inhabiting waters predominantly between 100-400 meters has been used as suitable habitat for modeling their distribution throughout the Gulf of Mexico (Roberts et al. 2016).



**Figure 1.** Map of the Gulf of Mexico the Rice's whale "Core Area" (as identified by NMFS) is indicated in red in the northeast Gulf of Mexico (https://www.fisheries.noaa.gov/resource/map/ rices-whale-core-distribution-area-map-gis-data). Rice's whale sightings (black stars, data from OBIS SEAMAP) and historical stranded animals (yellow stars; data from Rosel et al. 2021). Passive acoustic instrumentation on which Rice's whale vocalizations were detected in a 2016- 2017 survey are indicated by orange triangles, along with the estimated acoustic detection range indicated in light orange (data from Soldevilla et al. 2022a). Green circles indicate location of permitted or proposed Deepwater Ports.

**Threats to Rice's Whale Survival and Recovery**

18. Rice's whales are at chronic and/or acute risk of injury and death from shipping traffic, oil spills, increases in noise, and other human activities combined with changing oceanographic conditions within the Gulf of

Mexico.

19. Rice's whales are particularly susceptible to vessel strikes. The probability of ship strikes to marine species is influenced by the amount of vessel traffic in an area, the size and speed of transiting vessels, the overlap between key habitats and shipping lanes, and the animal's diving behavior and time spent near the surface (Soldevilla et al. 2017). Compared to other endangered cetaceans of the Gulf of Mexico, the Rice's whale is a shallower water baleen species known to reside closer to the surface, particularly at night, when visibility for shippers is low. Results from a tagged Rice's whale individual shows that it spent 70 percent of its time within 15 meters of the surface, suggesting a vulnerability to ship strikes. Indeed, the Rice's Whale Recovery Workshop identified vessel strikes as one of the greatest threats to Rice's whales (NOAA Fisheries 2021). Although cetacean fatalities from vessel strikes are often difficult to document, particularly in the Gulf of Mexico, there has been at least one documented ship strike fatality of a Rice's whale (Soldevilla et al. 2017).

20. Vessel noise is another likely major stressor to the Rice's whale. Marine mammals in general suffer major impairments to their fitness and survival due to vessel noise (National Research Council 2003, 2005, Hatch et al. 2008, Jensen et al. 2009, Gervaise et al. 2012, Hatch et al. 2012b, Culloch

et al. 2016, Cholewiak et al. 2018, Putland et al. 2018). The noise
generated from passing vessels directly overlaps with the higher-sensitivity
frequency range of what baleen whales are predicted to hear, and overlaps
with the frequency range where most baleen whale vocalizations occur.
Consequently, vessel noise may mask whale vocalizations (Clark et al.
2009, Erbe et al. 2016) and significantly decrease the distance over which
whales can communicate with each other (Hatch et al. 2012a, Cholewiak et
al. 2018). A study of New Zealand Bryde's whales, for instance,
demonstrated a >95 percent decrease in communication range as a function
of passing vessel noise (Putland et al. 2018). Such a decrease in
communication range may have detrimental consequences to the long-term
fitness for the species because they rely on acoustic communication to
mediate long distance social and reproductive interactions. Bryde's whales
are the closely related sister species to Rice's whales (Rosel et al. 2021),
and a good proxy for how Rice's whales might respond to vessel noise.
Additionally, noise produced from offshore project-related construction
activities, such as pile driving, presents similar risks to marine mammals
and their ability to communicate and conduct essential activities that can
potentially affect species' fitness. These noise sources also may directly
impact the Rice's whale in the Gulf of Mexico.

21. Oil spills also have been identified as an extensive threat to Rice's whales (NOAA Fisheries 2021). The Deepwater Horizon oil spill was estimated to have caused the loss of up to 22 percent of the species' population size (Hayes et al. 2018). While the exact mechanism of injury is not clear, during an oil spill, Rice's whales may ingest oil when feeding or breath in aerosolized oil particles. The long-term consequences of acute and chronic exposure to oil for cetaceans is unclear; however, studies of oil exposure in other animal models indicate a variety of deleterious physiological effects (Geraci 1990). With the extensive oil and gas activity in the Gulf of Mexico, including oil and gas export infrastructure and shipping which appear to be on the rise, the potential risk of future oil spills cannot be disregarded.

22. The possibility of Rice's whale extinction is not merely hypothetical given the concurrent range of threats facing the species within the Gulf region. Loss or injury of even one Rice's whale as a result of the human-caused activities described here could have deleterious effects on the species as a whole, which numbers only 34 – 50 individuals exclusively inhabiting the Gulf's heavily developed waters. Based on our understanding of the possibility of impacts to whales from these activities and their associated noise levels, combined with the best available population data described

herein, suggests a non-negligible probability of potential impacts to Rice's whales.

## **SPOT VLCC Oil Export Terminal Impacts**

23. I have serious concerns about the SPOT VLCC deepwater oil export project, for which the Maritime Administration (MARAD) recently issued a decision to license its construction and 30-year operation.  The SPOT project presents the full range of serious risks (described above) to the highly imperiled Rice's whale, including a very real and significant risk of oil spills and leaks that could result from underwater pipeline ruptures and crude carriers. Given the project's massive two-million barrel-per-day capacity, significant quantities of crude oil could spill in a single incident or over time through several frequent smaller spills and leaks, spreading crude oil throughout the species' known range, leading to ingestion and inhalation of crude oil and related chemicals. Since the 2010 Deepwater Horizon disaster, there have been numerous oil spills in Gulf waters (https://incidentnews.noaa.gov/browse/date) demonstrating that oil spills are not uncommon occurrences caused by oil and gas industry activities. Even without SPOT, the existing and continued oil contamination of Gulf waters compromises habitat conditions for the Rice's whale.

24. The project will also bring additional vessel traffic to the region, posing a risk of vessel strikes causing injury and even death. Project related construction as well as ongoing vessel traffic will emit constant noise, disturbing whale habitat that disrupts critical sound-reliant behaviors necessary for species survival and recovery. Vessel activity and related noise occupy or destroy important whale feeding and breeding areas, can displace whales from their habitat, and can disrupt species' navigation, its ability to find prey, avoid predators and communicate with other conspecific individuals.

25. The new information on the Rice's whale sightings in the Western Gulf of Mexico illustrates that species' occurrences are much closer to the proposed project action area than previously thought. These sightings, combined with information about the significant time the Rice's whale spends near the surface, demonstrate the elevated risk and likelihood of significant adverse effects to the species that could result from the SPOT project, including injury or loss of one or more whales.

26. The risks and threats to the Rice's whale borne by the SPOT project will compound the existing threats of oil spills, vessel strikes and noise caused by the shipping industry, existing and proposed onshore and offshore fossil fuel export terminals, and the offshore fossil fuel extraction industry which

regularly conducts seismic and drilling activities throughout the central and western Gulf of Mexico. These existing threats already compromise Rice's whale habitat and the species' capacity for survival throughout its range. SPOT's construction and operation will only exacerbate these problems.

27. SPOT's numerous risks and threats to the marine environment from oil and chemical spills, noise stressors, vessel strikes and general habitat deterioration and destruction will likely also cause adverse impacts to other marine protected species occurring within the project's impacted area and its shipping transit routes. Other impacted species include sperm whales, dolphins and several species of threatened and endangered sea turtles.

28. Sierra Club submitted a request for a supplemental EIS for the SPOT project to MARAD and U.S. Coast Guard on October 28, 2022, as well as a request to the National Marine Fisheries Service to reinitiate Section 7 Endangered Species Act consultation on that same date, due to changes in the species status and new scientific information about Rice's whale occurrences in the western and central Gulf of Mexico that demonstrate the species' broad range, in an area of possible impact by the SPOT project. These letters drew from the expert report I prepared for the organization analyzing the impacts of Gulf of Mexico fossil fuel export infrastructure development on the Rice's whale and other marine species. Specifically, the

letters to the agencies discuss the project's operational noise and vessel impacts which directly draw from my report's analysis.

29. I have reviewed MARAD, U.S. Coast Guard's (USCG) and National Marine Fisheries Service's (NMFS) analyses and Record of Decision for the SPOT project, with a focus on the sections discussing impacts to marine species. Unfortunately, the agencies make many flawed assumptions about the project's impacts to species, and in particular on the Rice's whale, leading to conclusions that drastically downplay project risks and the adverse impacts that will likely result from the project. Specifically, SPOT's Final Environmental Impact Statement (FEIS) and Biological Opinion (BiOP) assume that Rice's whales do not inhabit the Western or Central Gulf of Mexico and are confined to NMFS's identified "core area" in the northeastern Gulf of Mexico. These documents rely on density and distribution models from Roberts et al. (2016) for Rice's whales in the Gulf. However, these models are based on an extremely low number of historical visual sightings of individuals, and likely underestimate number and distribution of Rice's whales. As stated above, while the majority of Rice's whales are found within NMFS's identified "core area," recent passive acoustic surveys for Rice's whales (Soldevilla et al. 2022a, Soldevilla et al. 2022b) demonstrate there is an expanded geographical

distribution of Rice's whales in the Western and Central Gulf of Mexico. The agencies did not consider this recent information in combination with the species' current imperiled status and the significant risks the SPOT project poses to it. This omission warrants re-evaluation of SPOT's direct, indirect and cumulative threats to the species. Given my knowledge and expertise on the impacts of threats to this critically endangered species presented by the SPOT project and the significance of known occurrences within the project's impacted area, it is my opinion that there is a strong likelihood that the Rice's whale species could be irreparably harmed by SPOT.

30. Impacts to the critically endangered Rice's whale and other marine mammals caused by the SPOT project will directly threaten my professional and career interests, as well as my personal enjoyment of the species. The authorization and licensing of the project's construction and operation, and the likely impacts to the Rice's whale that would ensue, including the possibility of species extinction, threaten my ability to conduct research and further develop my understanding of the species, and its critical use of noise for survival. As previously mentioned, my work on the Rice's whale began after the Deepwater Horizon spill, when in 2014 I helped lead and develop a study and report providing results from one of

the first passive acoustic recordings of the population, and served as Co-

Principal Investigator for a large acoustic monitoring project to understand

the ecology and possible oil spill impacts to Rice's whales (and sperm

whales) in the Gulf of Mexico as well as associated noise levels in the

region. Additionally, since 2021, I have prepared multiple reports analyzing

impacts to the species from oil and gas leasing and export infrastructure.

An oil spill from the SPOT project could have significant repercussions to

the resilience and long-term survival of the Rice's whale, which could

result in jeopardy to the species.  The development of SPOT and further

human impacts to the Rice's whale would undercut my research in the

region and my contributions to the scientific community. In sum,

MARAD's licensing decision directly threatens the work to which I have

devoted my career and livelihood.

31. Sierra Club's comment submissions to the SPOT docket addressing the

project's risks and harms to the Rice's whale and other marine species of the

Gulf[2] directly protect my scientific and professional interests. Sierra Club's

---

[2] Sierra Club et al., Comments on SPOT Terminal, LLC, National Environmental Policy Act Draft
Environmental Impact Statement, Docket No. MARAD-2019-0011, Comment ID: MARAD-2019-0011-0121, https://www.regulations.gov/comment/MARAD-2019-0011-0121; Sierra Club et al., Comments onSPOT Terminal, LLC, National Environmental Policy Act Supplemental Draft Environmental Impact
Statement, Docket No. MARAD-2019-0011, Comment ID: MARAD-2019-0011-5005,

efforts help to ensure the species' long-term survival, allowing me to continue my research and contributions to the scientific understanding of the species and its capacity for recovery.

32. I understand that Sierra Club now brings this litigation to challenge MARAD's licensing decision based on the flawed assumptions the agency made about the project's impacts on marine species, including the Rice's whale, as well as other environmental impacts posed by the project that would affect imperiled species of the Gulf. A favorable decision in the case could overturn the agency's licensing decision and require more thorough analysis of the project's impacts that could result in project denial, or implementing less damaging project alternatives and/or species mitigation. A favorable decision would directly protect my professional and scientific interests and prevent harm to my career and livelihood.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of May, 2023 in Ithaca, New York.

_____

Aaron Rice, Ph.D

---

https://www.regulations.gov/comment/MARAD-2019-0011-5005; Sierra Club et al., Comments on SPOT Terminal, LLC, National Environmental Policy Act Final Environmental Impact Statement, Docket No.: MARAD-2019-0011, Comment ID: MARAD-2019-0011-7786, https://www.regulations.gov/comment/MARAD-2019-0011-7786.

## Literature Cited

Blaylock, R. A., J. W. Hain, L. J. Hansen, D. L. Palka, G. T. Waring, K. D. Bisack, M. Bravington, S. P. Northridge, J. M. Quintal, B. Rubenstein, A. S. Williams. 1995. *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments*. NOAA Technical Memorandum NMFS-SEFSC-363. Southeast Fisheries Science Center, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Miami, FL. Available at: https://repository.library.noaa.gov/view/noaa/9168.

Cholewiak, D., C. W. Clark, D. Ponirakis, A. Frankel, L. T. Hatch, D. Risch, J. E. Stanistreet, M. Thompson, E. Vu, S. M. Van Parijs. 2018. Communicating amidst the noise: modeling the aggregate influence of ambient and vessel noise on baleen whale communication space in a national marine sanctuary. *Endangered Species Research* 36:59-75.

Clark, C. W., W. T. Ellison, B. L. Southall, L. Hatch, S. M. Van Parijs, A. Frankel, D. Ponirakis. 2009. Acoustic masking in marine ecosystems: intuitions, analysis, and implication. *Marine Ecology Progress Series* 395:201-222.

Corkeron, P., J. Roman, F. Kershaw, M. S. Leslie, S. D. Kraus, D. Sutaria. 2022. *Balaenoptera ricei* is also the Gulf of Mexico whale. *Marine Mammal Science* 38:847-849.

Culloch, R. M., P. Anderwald, A. Brandecker, D. Haberlin, B. McGovern, R. Pinfield, F. Visser, M. Jessopp, M. Cronin. 2016. Effect of construction-related activities and vessel traffic on marine mammals. *Marine Ecology Progress Series* 549:231-242.

Erbe, C., C. Reichmuth, K. Cunningham, K. Lucke, R. Dooling. 2016. Communication masking in marine mammals: A review and research strategy. *Marine Pollution Bulletin* 103:15- 38.

Estabrook, B. J., D. Ponirakis, C. W. Clark, A. N. Rice. 2016. Widespread spatial and temporal extent of anthropogenic noise across the Northeastern Gulf of Mexico shelf ecosystem. *Endangered Species Research* 30:267-282.

Ferguson, M. C., C. Curtice, J. Harrison, S. M. Van Parijs. 2015. Biologically Important Areas for cetaceans within US waters - Overview and rationale. *Aquatic Mammals* 41:2-16.

Garrison, L. P., J. Ortega-Ortiz, G. Rappucci. 2020. *Abundance of Marine Mammals in Waters of the U.S. Gulf of Mexico During the Summers of 2017 and 2018*. PRD Contribution: #PRD-2020-07. NOAA Southeast

Fisheries Science Center, Protected Resources and Biodiversity Division, Miami, FL.

Geraci, J. R. 1990. Physiologic and toxic effects on cetaceans. Pages 167-197 in *Sea Mammals and Oil: Confronting the Risks* (J. R. Geraci, and D. J. St. Aubin, eds.). Academic Press, San Diego.

Gervaise, C., Y. Simard, N. Roy, B. Kinda, N. Ménard. 2012. Shipping noise in whale habitat: Characteristics, sources, budget, and impact on belugas in Saguenay--St. Lawrence Marine Park hub. *Journal of the Acoustical Society of America* 132:76-89.

Hatch, L., C. Clark, R. Merrick, S. Van Parijs, D. Ponirakis, K. Schwehr, M. Thompson, D. Wiley. 2008. Characterizing the relative contributions of large vessels to total ocean noise fields: a case study using the Gerry E. Studds Stellwagen Bank National Marine Sanctuary. *Environmental Management* 42:735-752.

Hatch, L. T., C. W. Clark, S. M. Van Parijs, A. S. Frankel, D. W. Ponirakis. 2012a. Quantifying loss of acoustic communication space for right whales in and around a U.S. National Marine Sanctuary. *Conservation Biology* 26:983-994.

Hatch, L. T., C. W. Clark, S. M. Van Parijs, A. S. Frankel, D. W. Ponirakis. 2012b. Quantifying loss of acoustic communication space for right whales in and around a U.S. national marine sanctuary. *Conservation Biology* 26:983–994.

Hayes, S. A., E. Josephson, K. Maze-Foley, P. E. Rosel (eds) 2017. *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments – 2016*. NOAA Technical Memorandoum NMFS-NE-241. National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Northeast Fisheries Science Center, Woods Hole, MA.

Hayes, S. A., E. Josephson, K. Maze-Foley, P. E. Rosel (eds) 2018. *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments - 2017 (second edition)*. NOAA Technical Memorandum NMFS NE-245. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service Northeast Fisheries Science Center., Woods Hole, MA.

Hayes, S. A., E. Josephson, K. Maze-Foley, P. E. Rosel, J. Turek (eds) 2021. *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments - 2020*. NOAA Technical Memorandum NMFS-NE-271. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service Northeast Fisheries Science Center, Woods Hole, MA.

Hodge, K. B., J. T. Tielens, A. N. Rice. 2015. Acoustic monitoring of Bryde's whales (*Balaenoptera edeni*) in the northern Gulf of Mexico. *Journal of the Acoustical Society of America* 137:2220.

Jensen, F. H., L. Bejder, M. Wahlberg, N. Aguilar Soto, M. Johnson, P. T. Madsen. 2009. Vessel noise effects on delphinid communication. *Marine Ecology Progress Series* 395:161-175.

LaBrecque, E., C. Curtice, J. Harrison, S. M. Van Parijs, P. N. Halpin. 2015. Biologically Important Areas for cetaceans within US Waters - Gulf of Mexico region. *Aquatic Mammals* 41:30-38.

Litz, J. A., M. A. Baran, S. R. Bowen-Stevens, R. H. Carmichael, K. M. Colegrove, L. P. Garrison, S. E. Fire, E. M. Fougeres, R. Hardy, S. Holmes. 2014. Review of historical unusual mortality events (UMEs) in the Gulf of Mexico (1990-2009): Providing context for the multi-year northern Gulf of Mexico cetacean UME declared in 2010. *Diseases of aquatic organisms* 112:161-175.

Morano, J. L., J. T. Tielens, C. A. Muirhead, B. J. Estabrook, P. J. Sullivan, P. J. Dugan, C. W. Clark, A. N. Rice. 2020. Seasonal movements of Gulf of Mexico sperm whales following the Deepwater Horizon oil spill and the limitations of impact assessments. *Marine Pollution Bulletin* 161:111627.

National Marine Fisheries Service (NMFS). 2019. Endangered and threatened wildlife and plants; Endangered status of the Gulf of Mexico Bryde's whale. *Federal Register* 84:15446-15488.

National Marine Fisheries Service (NMFS). 2020. *Recovery Outline: Rice's Whale*. National Marine Fisheries Service, Office of Protected Resources, Silver Spring, MD. Available at: https://www.fisheries.noaa.gov/resource/document/rices-whale-recovery-outline.

National Marine Fisheries Service (NMFS). 2021. Endangered and threatened wildlife and plants; Technical corrections for the Bryde's whale (Gulf of Mexico subspecies) *Federal Register* 86:47022-47024.

National Research Council. 2003. *Ocean Noise and Marine Mammals*. National Academy Press, Washington, DC.

National Research Council. 2005. *Marine Mammal Populations and Ocean Noise: Determining when Ocean Noise Causes Biologically Significant Effects*. National Academy Press, Washington, DC.

NOAA Fisheries. 2021. *Rice's Whale Recovery Planning Workshop. Workshop Summary, October – November 2021*. NOAA Fisheries, Southeast Regional Office, Miami, FL. Available at: https://media.fisheries.noaa.gov/2022-

04/RIWH_WorkshopSummary_Oct- Nov2021_FinalDraft_Public-Version_508%20Compliant.pdf.

Putland, R. L., N. D. Merchant, A. Farcas, C. A. Radford. 2018. Vessel noise cuts down communication space for vocalizing fish and marine mammals. *Global Change Biology* 24:1708-1721.

Rice, A. N., K. J. Palmer, C. A. Muirhead, J. T. Tielens, C. W. Clark. 2014a. Potential Bryde's whale (*Balaenoptera edeni*) calls recorded in the Northern Gulf of Mexico. *Journal of the Acoustical Society of America* 135:3066-3076.

Rice, A. N., J. T. Tielens, J. L. Morano, B. J. Estabrook, Y. Shiu, C. M. Popescu, K. J. Palmer,
C. Muirhead, M. S. Pitzrick, C. W. Clark. 2014b. *Passive Acoustic Monitoring of Marine Mammals in the Northern Gulf of Mexico: June 2010 – March 2012*. BRP Technical Report 14-07, submitted to BP Production and Exploration, Inc. and the National Oceanic and Atmospheric Administration. Cornell Lab of Ornithology, Cornell University, Ithaca, NY.

Roberts, J. J., B. D. Best, L. Mannocci, E. Fujioka, P. N. Halpin, D. L. Palka, L. P. Garrison, K.
D. Mullin, T. V. N. Cole, C. B. Khan, W. A. McLellan, D. A. Pabst, G. G. Lockhart. 2016. Habitat-based cetacean density models for the U.S. Atlantic and Gulf of Mexico. *Scientific Reports* 6:22615.

Rosel, P. E., L. A. Wilcox. 2014. Genetic evidence reveals a unique lineage of Bryde's whales in the northern Gulf of Mexico. *Endangered Species Research* 25:19-34.

Rosel, P. E., L. A. Wilcox, T. K. Yamada, K. D. Mullin. 2021. A new species of baleen whale (*Balaenoptera*) from the Gulf of Mexico, with a review of its geographic distribution. *Marine Mammal Science* 37:577-610.

Rosel, P. E., L. Engleby, L. P. Garrison, J. A. Litz, K. D. Mullin, M. S. Soldevilla, M. Srinivasan, L. A. Wilcox, T. Yamada, B. J. Zoodsma. 2022. Response to Corkeron et al. "*Balaenoptera ricei* is also the Gulf of Mexico whale". *Marine Mammal Science* 38:850- 851.

Širović, A., H. R. Bassett, S. C. Johnson, S. M. Wiggins, J. A. Hildebrand. 2014. Bryde's whale
calls recorded in the Gulf of Mexico. *Marine Mammal Science* 30:399-409.

Soldevilla, M. S., J. A. Hildebrand, K. E. Frasier, L. A. Dias, A. Martinez, K. D. Mullin, P. E. Rosel, L. P. Garrison. 2017. Spatial distribution and dive behavior of Gulf of Mexico Bryde's whales: potential risk of

vessel strikes and fisheries interactions. *Endangered Species Research* 32:533-550.

Soldevilla, M. S., A. J. Debich, L. P. Garrison, J. A. Hildebrand, S. M. Wiggins. 2022a. Rice's whales in the northwestern Gulf of Mexico: call variation and occurrence beyond the known core habitat. *Endangered Species Research* 48:155-174.

Soldevilla, M. S., K. Ternus, A. Cook, J. A. Hildebrand, K. E. Frasier, A. Martinez, L. P. Garrison. 2022b. Acoustic localization, validation, and characterization of Rice's whale calls. *Journal of the Acoustical Society of America* 151:4264-4278.

Waring, G. T., R. M. Pace, J. M. Quintal, C. P. Fairfield, K. Maze-Foley (eds) 2004. *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments – 2003*. NOAA Technical Memorandum NMFS-NE-182. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Northeast Fisheries Science Center, Woods Hole, MA.

Waring, G. T., E. Josephson, K. Maze-Foley, P. E. Rosel (eds) 2012. *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments – 2011*. NOAA Technical Memorandum NMFS-NE-221. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Northeast Fisheries Science Center, Woods Hole, MA.

Waring, G. T., E. Josephson, K. Maze-Foley, P. E. Rosel (eds) 2013. *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments – 2012*. NOAA Technical Memorandum NMFS-NE-223. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Northeast Fisheries Science Center, Woods Hole, MA.

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

CITIZENS FOR CLEAN AIR, et al.,

    Petitioners,

       v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Respondents.

Case No. 23-60027

## DECLARATION OF DONNA ROBINSON

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.    My name is Donna Robinson. I am over 18 years of age.

2.    The information in this declaration is based on my personal knowledge, and the facts herein stated are true and correct.

3.    I am a Resident of the Village of Surfside Beach, Texas

4.    For the past 25 years, I have lived in the Village of Surfside Beach or Surfside, Beach, Texas.  Locals also refer to our city as "Surfside."

5.    My current residence is located at 507 Bluewater Highway, Surfside Beach, TX 77541.

6.      Surfside is a very quaint, lovely, community with lovely people that live here. I like living in Surfside because it is beautiful.

7.      My home is a waterfront property on Surfside Beach. Because of ongoing erosion in the area, the beach now starts at my driveway.

8.       I enjoy going to Surfside Beach and moved to this area to live near the water. At my home on Surfside Beach, I personally enjoy bird watching, swimming, walking on the beach, sunbathing, and gardening around my beachfront property. I appreciate the biodiversity of the area and its marine wildlife, including the turtles, sharks, whales, dolphins, and birds.

9.      My home is located approximately one mile away from the onshore pipeline proposed by SPOT Terminal Services, LLC ("SPOT") where it hits Surfside Beach before it heads out to the Gulf of Mexico and the related deepwater port. The map below shows the relative location between my home and the pipeline outfall onshore.



10.     The onshore pipeline plans for this project have it cutting through a residential neighborhood near mine. I have many friends living in this area and visit there weekly (if not daily) and plan to continue visiting as long as I continue to live in Surfside. However, a disaster along the pipeline could impact my activities in the area.

11.     I am a property owner dependent on income from the tourist industry visiting Surfside Beach.

12.     In addition to my residence as a home, I also operate a small vacation home rental business by renting out my beachfront property. My rental business includes this single residential, rental property in Surfside that is located on the beach.

13.     Because of its proximity to a sandy beach on the Gulf of Mexico, Surfside is a popular tourist destination in Brazoria County and the Greater Houston area.

Surfside Beach publicizes our area as a tourist destination for the many attractions and water-based activities that it offers.

14. At my rental property, I host people from all over Texas who come to the area for recreational activities offered near Surfside Beach, such as swimming, fishing, sunbathing, beach combing, bird watching, and walking. Surfside appeals to recreational athletes, sun worshipers and nature lovers.

15. Since I am retired, I depend on the additional income from my vacation home rental business to supplement my income.

16. I regularly participate with Citizens for Clean Air & Clean Water in Brazoria County on environmental issues.

17. I became a member of Citizens for Clean Air & Clean Water in Brazoria County ("CCACW") in 2021 after being connected with this group because of their engagement on the SPOT Project since 2019 and my concerns over the Project's adverse impacts to my home, livelihood and the character of the Surfside community. I regularly attended meetings hosted by the organization on the SPOT Project before joining the organization.

18. I have engaged in the Public Participation Process on SPOT.

19. Since 2019, I have been the administrator of the STOP SPOT Facebook page and have been very engaged on the SPOT Project because of the potential impacts on my home and other property interests described above.

4

20. I am also a frequent poster on the Facebook page for CCACW. My posts often inform members of events going on in the local area, such as community meetings, public hearings, and issues at nearby facilities like the reopening of Gladieux Metals Recycling and the explosion at Freeport LNG in 2022.

21. With respect to SPOT, I helped publicize information through Facebook about community meetings about the SPOT Project and the virtual meeting hosted on the Final Environmental Impact Statement ("FEIS") for the SPOT Project.

22. Moreover, I have consistently participated in my individual capacity as a concerned citizen, preparing multiple comments regarding SPOT's Deepwater Port License Application beginning in March of 2020. I submitted my written comments via www.regulations.gov (Docket No. MARAD-2019-0011).

23. Specifically, in 2020, I submitted written comments on March 11 and 22. ROA.00045030, and ROA.00050551. In 2021, I submitted separate written comments on November 1, 4, 5, and 9, and submitted another comment on December 9. ROA.00107304, ROA.00108375, ROA.00111511, ROA.00112537, ROA.00117973.

24. The following paragraphs summarize my concerns about the SPOT Project reflected in my public written comments submitted to MARAD as part of the environmental review process:

a. A spill or leak from SPOT or its pipelines would ruin Surfside's tourism economy. This issue will impact me directly because of my property interests in my vacation rental home in the area and my economic interests from operating this small business.

b. A spill or leak would harm animal populations such as turtles, sharks, dolphins, redfish, shrimp, and brown and white pelicans, as well as the fragile dune ecosystem on Surfside's beaches.

c. Industrial activities on-shore, whether from the construction or operation of the pipeline and the tank storage facility at the Oyster Creek Terminal, have the potential to cause surface water pollution, air pollution, and have the propensity to disrupt sites sacred to the local inhabitants.

d. Given the violation history of SPOT's ultimate parent company, Enterprise Products Partners L.P., and the violations of others in the fossil fuel industry (such as the disaster at the Deepwater Horizon), closer scrutiny must be given to the applications of petrol companies operating in the Gulf of Mexico.

e. I also raised concerns about the effects that SPOT could have on the ecosystem surrounding Surfside. There are three wildlife refuges in

Brazoria County and multiple endangered species are known to live there.

f.    The comment further drew attention to the disproportionate burden of pollution that Surfside already is exposed to, when compared with other communities around the country. The burden is particularly clear with respect to Brazoria County's higher rates of cancer.

g.    With respect to the Draft General Conformity Determination, I expressed concerns that the SPOT air permits were improperly segmented between on-shore and off-shore portions when they should have been considered as a single source. If the application had been done correctly; it would have been found in violation of the local National Ambient Air Quality Standards ("NAAQS") as well as Texas's State Implementation Plan ("SIP").

h.    With respect to the Supplemental Draft Environmental Impact Statement ("SDEIS") for the SPOT Project, I raised concerns about the failure to assess the cumulative impacts of the upstream and downstream effects associated with the operation of SPOT. Another point of criticism related to the minimal outreach efforts made in the local community, particularly in the non-English speaking parts of Surfside.

7

25.   I am aware that CCACW has filed an appeal of the record of decision relating to SPOT and hope that this lawsuit will address the concerns I have raised about the deficient environmental review of the SPOT Project.

26.   I am concerned about the impacts of SPOT on my property and economic interests.

27.   My home is located approximately one mile from the SPOT pipeline and is directly adjacent to the beach, so any harm to the ocean water ends up directly on my doorstep. One of my main fears is another spill like Deepwater Horizon, during which 210 million gallons of crude oil spilled into the Gulf of Mexico, killing marine life and blackening shorelines.

28.   I am concerned about the harm that a potential spill or leak could have on the value of my home and consequently my vacation home rental business. Any harm to my home, as well as to the surrounding beaches, would have direct economic impacts on my business.

29.   A potential spill or leak as projected in the FEIS could have long-term impacts on my neighborhood, my community, and the ability to utilize this area for residential and recreational uses. Surfside must maintain its reputation as a tourist destination.

30.   I am aware that part of SPOT's construction will require drilling on the seafloor to lay the pipeline.  Because I live nearby the area where the pipeline

will be installed onshore and immediately offshore, I am concerned there will be disruptions to the use and enjoyment of my property during the construction and laying of the pipeline. The construction noise, activity and light along the pipeline route is likely to interfere with the use and enjoyment of my property as a residence or its value as a rental property.

31.   Already, the ships and barges generate noticeable noise and vibrations, the drilling from the construction will make this significantly worse.

32.   This construction will affect my property in multiple ways. The ships will create significant noise and light pollution that will affect my enjoyment of my property as well as the income that I will earn from renting my home as a vacation destination.

33.   I am aware that SPOT will contribute significantly to greenhouse gas emissions from the production and consumption of oil it will export for several decades. These emissions will worsen global climate change.

34.   I am aware that climate change has already contributed to rising sea levels and the erosion of beaches in the Surfside area. When I first moved into my home, the beach was approximately a quarter mile from my driveway. Today, there are high tides that reach all the way to my driveway. Many other homes in the area have had to be relocated as the beach has continued to erode in this area.

9

35.    I am aware that climate change has led to warmer water in the Gulf of Mexico, thereby making storms such as Hurricanes Ike, Harvey, and Nicholas more severe and more frequent.

36.    The erosion of the beach as well as the frequency and severity of storms in the area, all of which is a result of climate change, have made me question how much longer it will be safe to remain at my home in Surfside. SPOT and the oil production and consumption it will induce will only worsen these conditions.

37.    I am concerned that SPOT will impact my recreational interests.

38.    I frequently go swimming at the beach near my home. I go for walks on the beach and sunbathe. I tend to my outside garden. I also hike and birdwatch in the surrounding area, particularly at the Surfside Bird and Butterfly Trail.

39.    I partake in these recreational activities almost every day.

40.    If contamination to the soil and/or water occurred as a result of a spill or other release during the construction or operation of SPOT and its associated pipeline, I would get significantly less satisfaction out of the activities. Or, I may be forced to stop engaging in some of these activities depending on the severity of impacts.

41.    I am concerned about the impacts of SPOT on my health.

42.   I am aware that the increased ship traffic associated with the construction of the SPOT pipeline and the additional ship traffic from VLCCs due to SPOT's operations, will emit numerous pollutants, including oxides, particulate matter, and volatile organic compounds into the ambient air.

43.   I am aware that nitrogen oxides can harm the respiratory system and aggravate respiratory diseases. I also know that long term exposure to nitrogen oxides can cause asthma and increase susceptibility to respiratory infections.

44.   I am aware that exposure to volatile organic compounds can harm health in many ways, including things such as eye, nose, and throat irritation, headaches, nausea, dizziness, and damage to organs.

45.   I am concerned that emissions from the SPOT facility will contribute to local air quality issues which will affect my health and the use of my residence.

46.   I am mentally exhausted from having to constantly worry about the effects of air and water pollution on my physical health.

47.   SPOT will likely impact monthly, local community events that I participate in with my friends.

48.   Every month the Surfside community sponsors some activity that involves the outdoors. These activities include historical society events, group hikes, and marathons. I participate in these events approximately once or twice per month, often as the official photographer. I plan to participate in these events

just as frequently in the future unless the events become less frequent due to the effects of SPOT's construction and operation.

49.   I am concerned that leaks from the pipeline as well as additional air emissions from the SPOT terminal and additional ship traffic will have a negative impact on these community events.

50.   I am concerned for the health and well-being of my many friends and neighbors in the Surfside community. I am especially concerned for those that live on the beach, like I do, and those that live closer to the pipeline.

51.   I am aware that Surfside is home to many other fossil fuel facilities and chemical plants.

52.   I am aware that the parent company of SPOT Terminal Services LLC, Enterprise Products Operating, LLC, has a track record of pipeline leaks.

53.   I am concerned about the compounding effect of the various air and water pollutants that would result from SPOT on top of existing pollution sources, that would directly impact Surfside.

54.   I am concerned that a catastrophic failure at the SPOT pipeline could have dramatic ripple effects on surrounding, connected infrastructure that could lead to widespread devastation for the area. Specifically, a large oil spill would have long-term impacts on water quality, recreational activities, tourism,

fishing, and other beach-related activities that would impact my use and enjoyment of my beachfront property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___5___ day of May, 2023.

Donna Robinson
Member, Citizens for Clean Air and
Clean Water in Brazoria County d/b/a
Clean Air and Water: Better Brazoria

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| CITIZENS FOR CLEAN AIR, et al., | |
| Petitioners, | |
| v. | Case No. 23-60027 |
| U.S. DEPARTMENT OF TRANSPORTATION, et al., | |
| Respondents. | |

## DECLARATION OF MIYOKO SAKASHITA

Pursuant to 28 U.S.C. 1746, I, Miyoko Sakashita, declare as follows:

1.    I am a resident of Oakland, California.

2.    I am the director of the Center for Biological Diversity's Oceans Program. I have personal knowledge of the facts and statements contained herein and, if called as a witness, could and would competently testify to them.

3.    The Center for Biological Diversity (the "Center") is a non-profit, membership organization with more than 84,333 members and offices in various states, including thousands of members in the Gulf of Mexico region and hundreds in Texas.

4.    The Center is founded in the belief that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.

Combining conservation biology with litigation, policy advocacy, and strategic vision, the Center is working to secure a future for animals and plants hovering on the brink of extinction, the habitat they need to survive, and by extension, for the physical health and spiritual welfare of generations to come.

5.  I am also a member of the Center and have been a member since 2005. As a member, I rely on the Center to represent my interests in conserving native species and their habitats. I support its efforts to secure a future for all species, great or small, and to prevent development, pollution, and climate change from driving species extinct.

6.  Many of the species we work to protect rely on a stable climate to survive and ultimately achieve recovery. To that end, the Center has longstanding programs and campaigns to address climate change and greenhouse gas emissions through the Center's Climate Law Institute, public lands program, oceans program, and endangered species program.

7.  In my role as director of the Center's Ocean Program, I oversee all aspects of the Center's work relating to ocean conservation, including offshore energy development and ecosystem impacts.

8.  The Center's Ocean Program focuses on the protection of marine species and their ocean habitats, including significant efforts to ensure the conservation of wildlife in the Gulf of Mexico. The Center has undertaken numerous actions

to conserve species affected by offshore oil and gas activities including sperm whales, right whales, Gulf of Mexico whales (or Rice's whales), loggerhead, leatherback, and Kemp's ridley sea turtles, and migratory birds.

9.   The Center has a longstanding campaign advocating for protection of the Gulf of Mexico against environmental damage from oil and gas drilling; and it monitors governmental oversight of offshore oil and gas activities. The Center and its members have actively participated in the administrative processes and decision-making of offshore oil and gas leasing and the development of deepwater ports in the Gulf of Mexico. This includes regularly commenting on agency decisions involving offshore oil and gas activities in the Gulf of Mexico and draft environmental impact statements ("EIS") purporting to analyze the impacts of oil and gas activities in the area. For example, the Center submitted extensive comments on the various drafts of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program as well as comments on the Bureau of Ocean Energy Management's ("BOEM") draft programmatic EIS on the Five-Year Program; its draft programmatic EIS on the Outer Continental Shelf Oil and Gas Leases in the Gulf of Mexico from 2017–2022; its draft supplemental EIS for Lease Sale 247 in the Gulf of Mexico; scoping comments on a supplemental EIS for Lease Sales 250 and

251 in the Gulf of Mexico; and comments on the supplemental EIS for Lease Sale 250.

10.   Additionally, the Center has participated via public comment on the deepwater port licensing processes conducted by the Maritime Administration for oil and gas projects in the Gulf of Mexico on and offshore including New Fortress Energy Louisiana FLNG LLC, Texas GulfLink LLC, Bluewater Texas Terminals LLC, and West Delta LNG LLC.

11.   The Center and 289 organizations also recently submitted a petition to the Maritime Administration requesting that all deepwater port licenses are rejected because they are contrary to the national interest.

12.   The Center works to protect imperiled species and their habitat impacted by offshore energy development, to protect public health, and to attain clean water, a safe climate, and a healthy web of life. One of the Ocean Program's top priorities is the full implementation of existing environmental laws to reduce impacts to endangered species and fragile ecosystems. We also aim to address climate change and help spur the transition from a fossil fuel dependent society to a clean energy future.

13.   The Center's members and staff use the Gulf of Mexico for wildlife observation, research, nature photography, aesthetic enjoyment, recreational, educational, and other activities. Some of the Center's members seek out and

enjoy opportunities to observe wildlife such as sea turtles, including on their nesting beaches, birds, sperm whales, Rice's whales and other marine mammals in the Gulf of Mexico. The Center's members have also spent time recreating in and near the Gulf of Mexico and have interests in the water quality, air quality, and health of the Gulf ecosystem. The Center's members depend on the Center to protect those interests.

14.     The Center has an ongoing interest in protecting the imperiled species impacted by Defendants' decision to issue a new deepwater port license in the Gulf of Mexico. For example: the Center has worked to secure protections for sea turtles, Rice's and sperm whales. I personally work on many campaigns for the Center seeking protection for species affected by offshore oil development, and I rely upon the Center to represent my interests in protecting these endangered species and their habitat.

15.     The Center and some of its members also will be harmed by the impacts of oil spills on Gulf marine life. Oil is toxic to sea turtles, birds, fish, and other wildlife that encounter or ingest it. Oil pollutes the environment and can impair important spawning grounds and nesting habitat. Oil spills can and occur from offshore drilling and onshore pipelines.

16.     The Center and some of its members are also harmed by the noise pollution that will be generated by oil and gas activities, including increased vessel

traffic and seismic exploration. The Center and some of its members know, for example, that seismic surveys can displace sperm whales, critically endangered Rice's whales and other marine mammals from their preferred habitat and disrupts feeding, breeding, nursing, communication, navigation, and other behaviors essential to their survival. Seismic survey activities that displace, deafen, and injure whales in the Gulf of Mexico diminishes the enjoyment of these animals and the Gulf environment for the Center and its members. The noise from increased vessel traffic can also displace or otherwise harm Rice's whales and other marine mammals and increases the risk of death or injury of these whales and sea turtles from vessel strikes.

17.   The Center and its members are also harmed by the increased greenhouse gas emissions caused by deepwater port construction and operation. A myriad of scientific evidence demonstrates that the onshore infrastructure and offshore impacts associated with the operation of deepwater ports cause increased greenhouse gas emissions and that the reduction of oil and gas activities means less of these emissions. Greenhouse gas emissions harm our members' interests by, for example, exacerbating the sea level rise that is destroying the beaches and sea turtle nesting habitat some of our members visit to recreate and observe sea turtles.

18.   The interests of the Center and our members are thus directly harmed by the Defendant's failure to deny the deepwater port application for Sea Port Oil Terminal and comply with the environmental laws at issue in this case. I believe that if the Defendants had followed the laws correctly, the agencies would have more fully disclosed and analyzed the impacts to air quality, water quality, sensitive species, and other resources and would have either included measures to reduce these impacts or would have decided not to approve the license application at all.

19.   I believe that a favorable decision finding that Defendants failed to comply with the laws at issue, vacating Defendants' decision, and requiring the agencies to conduct additional environmental review before moving forward with any approval of deepwater port licenses would redress the injuries I have described.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 1, 2023 in Oakland, California.

Miyoko Sakashita
Oceans Program Director, Member
Center for Biological Diversity

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CITIZENS FOR CLEAN AIR, et al.,

Petitioners,

v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

Respondents.

Case No. 23-60027

## DECLARATION OF ROBIN SCHNEIDER

Pursuant to 28 U.S.C. 1746, I, Robin Schneider, hereby declare as follows:

1.    My name is Robin Schneider. I live in Austin, Texas.

2.    I am the Executive Director of Texas Campaign for the Environment
      ("TCE"), based in the Austin office. I have worked for TCE since 1998 and
      have held the position of Executive Director since 2000.

3.    TCE is a 501(c)(3) non-profit membership corporation organized under the
      laws of the State of Texas dedicated to informing and mobilizing Texans to
      protect their health, their communities, and the environment. TCE works to
      promote strict enforcement of anti-pollution laws designed to stop or clean
      up air, water, and waste pollution. TCE has approximately 20,000 Texas

members, including members living in the Brazoria County region of the

proposed SPOT project.

4.    As part of its mission, TCE regularly engages its members and the public to

enhance awareness of and encourage robust public participation in

permitting processes for fossil fuel facilities impacting the Gulf Coast and

other regions of Texas to reduce environmental and health harms. TCE

supports the creation of new jobs in renewable energy and energy efficiency

sectors.

5.    Since 2020, TCE, on behalf of its members, has been engaged in advocacy

to educate the public about SPOT and several other proposed deepwater port

oil export terminals. TCE has filed comments, provided public testimony in

opposition to SPOT, done door to door canvassing, participated in local

educational events, and sent action alerts to our supporters to take action.

For example, TCE was a signatory to the following comments to the U.S.

Maritime Administration and U.S. Coast Guard about SPOT:

    a.    "Comments on SPOT Terminal, LLC, National Environmental Policy
Act Draft Environmental Impact Statement, Docket No. MARAD-
2019-0011" submitted on March 23, 2020 by Sierra Club,
Earthjustice, Center for Biological Diversity et al.

    b.    "Comments on SPOT Terminal, LLC, National Environmental Policy
Act Supplemental Draft Environmental Impact Statement, Docket No.
MARAD-2019-0011" submitted on December 13, 2021 by Sierra
Club, Earthjustice, Center for Biological Diversity et al

c.      "Comments on SPOT Terminal, LLC, National Environmental Policy Act Final Environmental Impact Statement, Docket No. MARAD-2019-0011" submitted on September 12, 2022 by Sierra Club, Earthjustice, Center for Biological Diversity et al

6.    TCE maintains a membership list for the organization. In connection with this case, I have reviewed the membership list. I can confirm that based on the most recent information available, the following individuals are members of TCE:

a.      **Melanie Oldham** has been an active member of TCE since November 2021.

b.      **Gwen Jones** has been an active member of TCE since November 2021.

c.      **Sue Page** has been an active member of TCE since December 2021.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of May, 2023.

Robin Schneider
Executive Director,
Texas Campaign for the Environment

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

CITIZENS FOR CLEAN AIR, et al.,
Petitioners,
v.
U.S. DEPARTMENT OF
TRANSPORTATION, et al.,
Respondents.

Case No. 23-60027

## <u>DECLARATION OF JOANIE STEINHAUS</u>

Pursuant to 28 U.S.C. 1746, I, Joanie Steinhaus declare as follows:

1.   My name is Joanie Steinhaus, and I am over 18 years old. The information in this declaration is based on my personal experience and my review of publicly available information.

2.   My primary residence for the past ten years is in Galveston, Texas.

3.   I am the Gulf Program Director for Turtle Island Restoration Network ("TIRN"), which is a non-profit organization founded in 1989 and is dedicated to protecting and conserving marine wildlife. TIRN's principal place of business is Olema, CA with a satellite office in Galveston, TX. TIRN has over 12,264 supporters located in the Gulf of Mexico and over 150,000 members and supporters across the United States and the entire world. TIRN represents its members' interests and concerns regarding the protection, conservation, and preservation of the Gulf's marine ecosystems, and the protection of endangered, threatened, and vulnerable marine species.

4.   With our members, volunteers, interns and staff, TIRN engages in multiple activities to protect, advocate, educate and enhance the scientific knowledge

1

107

of marine species, including threatened and endangered species. As a staff member, I rely on TIRN to represent my interests in conserving and protecting species in their native habitat and fully support my organization's mission of protecting the ocean and marine wildlife from extinction.

5.    I have worked for Turtle Island Restoration Network since May 2013 as the Gulf Program Director. Through my work with TIRN, my background, training and education, I began and continue to be involved in marine and terrestrial species protection and habitat conservation. For example, I have coordinated volunteer sea turtle nest patrols on the upper Texas coast, from the Bolivar Peninsula to the Freeport jetty, for eight years, and I have responded to sea turtle tracks or nesting sea turtles to excavate the eggs to be moved to a protected incubation site. I manage all programs and projects for our conservation work in the Gulf, and this includes building ecological understanding and coordination of conservation actions through public education, involvement, and outreach. My work has a strong connection to marine wildlife found in the Gulf including reduction of bycatch in fisheries with both commercial and recreational anglers, vessel strikes, and recovery of lost fishing gear. In addition, we work to raise awareness of marine life, migratory swim-ways, breeding behaviors, and critical habitat. We began and sponsor the sea turtle hotline for the upper Texas coast to promote reporting, responding, recovering, and rehabilitation of sea turtles, and identification of sea turtle nest locations.

6.    Additionally, I live in Galveston within nine blocks of the Gulf of Mexico and enjoy the view of the ocean and wildlife in many of my recreational pursuits. I frequently ride my bike along the city's seawall, walk the seawall, and swim in the Gulf in various areas along the 30 plus miles of beachfront access to the Gulf. I also am an avid stand-up paddle boarder, and with my

husband, we own a small motorized boat. I spend most weekends from March through November on the water in the Gulf or bays in either a non-motorized or motorized watercraft. I frequently see dolphin and fish, and at times I have seen sharks, manta rays, and threatened and endangered sea turtles while on the water. I am a certified scuba diver and I have enjoyed hundreds of dives, including in the Gulf of Mexico, to see marine wildlife.

7.  I plan to continue to bike, walk, paddle, boat and observe the Gulf's native wildlife daily, weekly and throughout the year as these pursuits are part of mine and my husband's way of life living near the Gulf waters. Being on the water builds my connection to the marine environment and offers me the opportunity to disconnect from the electronic world that surrounds us. I have always appreciated the ocean and marine wildlife and I am intensely dedicated to its preservation.

8.  In my personal life, I am already impacted by the oil and gas activities that occur in the Gulf of Mexico. The continued vessel traffic in the Gulf, while I am walking the beach, paddle boarding, or touring in my boat is not aesthetically pleasing and deters from my personal enjoyment of the Gulf of Mexico. If the wind is blowing from the south, I can hear the engine of the vessels as they are anchored offshore. The entire horizon may be lined with vessel traffic and their lights may be seen at night on the horizon. Approval of the SPOT oil export facility further threatens my way of life and community. For example, the significant risk of onshore and offshore oil and chemical spills would diminish my enjoyment and disrupt my ability to engage in these daily recreational activities that depend on health Gulf waters and ecosystems.

9.  The approval of the SPOT oil export project also will jeopardize the existence of the Gulf's fishing community, whose livelihood depends on a

healthy marine ecosystem. Recreational fishing is a cornerstone of the coastal Texas economy, generating 16,000 jobs and 2 billion dollars in sales. The Gulf is one of the most important commercial fisheries in the United States, accounting for 18% of the weight and 16% of the United States commercial fish landings value. Portions of the offshore pipelines and the SPOT Deepwater port would be located within three Marine Protected Areas; Reef Fish Stressed Area, Reef Fish Longline and Buoy Gear Restricted Area, and the Texas Shrimp Closure. The Flower Garden Banks National Marine Sanctuary is approximately 40 nautical miles to the southeast of the SPOT Deepwater Port.

10. The construction and operation of the SPOT project will jeopardize the existence of vital habitats. In addition to the above-mentioned three Marine Protected Areas through which the project would cut, SPOT's operations are adjacent to multiple protected wildlife areas including the Brazoria Wildlife Refuge, Justin Hurst Wildlife Management Area, San Bernard National Wildlife Refuge, and the Columbia Bottomlands Important Bird Area. Components of the project are also located within the Central Flyway, one of the four major migratory routes for birds in North America.

11. There are 27 federally protected species within the area that SPOT would impact. These species include the West Indian Manatee, Rice's Whale, Sperm Whale, Whitetip Shark, Giant Manta Rays, and various coral species. The Project will also cause direct harm to every species of sea turtle that resides in the Gulf of Mexico, including the Green sea turtle, Hawksbill, Kemp's ridley, Leatherback, and Loggerhead.

12. The pipeline and offshore terminal will cut through designated Loggerhead critical habitat for Sargassum foraging. The project will eradicate critical Kemp's ridley habitat, with over half the species' nests located in the Upper

Texas Coast encompassed within coastline that could be affected by impacts, such as oil spills, from the SPOT project. To facilitate survival and recovery, preserving every single nest is crucial.

13.   The Gulf's ecosystem can't sustain another catastrophic oil spill and is reeling from the ramifications of the Deepwater Horizon Oil tragedy. The 2010 oil spill was responsible for the death of trillions of larval fish and invertebrates ranging across hundreds of different species, billions of shellfish, and between 56,100 and 102,400 birds. Federally listed sea turtles suffered greatly. In total, their populations plummeted between 4,900 to 7,600 for large juvenile and adult sea turtles, about 55,000 to 160,000 for small juvenile sea turtles, and injured approximately 35,000 hatchling sea turtles. Studies indicate that these species continue to die today due to the ongoing impacts of the Deepwater Horizon Oil spill.

14.   I have personally witnessed firsthand the impact of an oil spill and in 2014, I viewed the impacts to our beaches and the Gulf from the Texas City Y oil spill. The beaches were closed to the public and crews were on the beach wearing protective suits and gloves trying to remove the oil. Numerous agencies responded and a command center was established. Wildlife agencies and non-profits responded to numerous reports of oiled birds and dolphins. The beach was empty of any human activity and all recreational activity was not allowed in this area. Over 160 miles of the Texas shoreline between Galveston and Matagorda received 168,000 gallons of oil. In Galveston, the beaches closest to the spill had large booms and skimmer vessels attempting to contain the oil. I could see and smell the oil on our beaches, lagoon, and the rocks.

15.   In May 2016, I attended a Regional Preparedness Training workshop addressing the environmental analysis for an oil response impacting the

Flower Garden Banks National Marine Sanctuary. This was a National Oceanic and Atmospheric Administration (NOAA) workshop to address how a response would be handled if oil reached the sanctuary. At the workshop, I learned that oil is transported by wind and currents, and even small-scale currents will tear oil apart and spread the oil into a patchy distribution over a larger area. These small droplets of oil stay in the water column and in turbulent environments, they may stay in underwater areas forever. There are numerous methods to respond to an oil spill in a closed inlet; physical herding with high pressure hoses, manual removal like scrubbing, vacuuming, sediment removal, and skimming to name a few. How would an oil response be handled more than 30 miles offshore to protect habitat, marine life, and the natural resources found in a marine sanctuary if the SPOT deepwater port or underwater pipeline were to suffer a rupture? In-situ burning, dispersant use, and berms and barriers were discussed as options, but the eco-toxicity and sublethal efforts would take years to determine and years to restore these natural resources. The risk is too high to coral and marine life and could lead to anemia, immune disfunctions, issues with reproduction, and other abnormalities in marine wildlife. I was shocked and saddened to learn mammals exposed to oil are susceptible to increased mortality, failed reproduction, and it could take decades for species to recover. Although I learned a great deal about oil impacts to species and ecologically significant ecosystems firsthand and at that workshop, I was troubled to find that federal agency review of oil spills resulting from SPOT failed to apply this, and other readily known information about how oil pollution would affect protected species and habitat in any specific way.

16. Wildlife in the Gulf is and will continue to be significantly harmed, injured, or killed every day by the ongoing operations of oil and gas activities like the

SPOT crude oil export project. I am genuinely concerned about the survival and recovery of shark, fish, marine mammals, sea turtles, and sea birds in the Gulf of Mexico. Construction and operation of the SPOT project would increase the likelihood of injury to the five species of endangered and threatened sea turtles found in this area, which I work to protect. Based on the known impacts of past spills like Deepwater Horizon, harm to sea turtles would almost certainly include numerous strandings and decreased numbers of turtles nesting on beaches.

17. The continued existence of marine animals in the wild enhances my quality of life, and allows me to pursue my professional goal of promoting recovery of species in the Gulf of Mexico. I gain significant professional, recreational, and aesthetic benefits from these animals and the healthy marine environment they require for their existence. The construction and operation of the SPOT project would indeed diminish my professional, recreational and aesthetic enjoyment of the Texas coast.

18. This lawsuit challenges many of the same issues that I have been concerned about since SPOT was initially proposed several years ago. A favorable ruling would help protect my interests and alleviate my deep concerns about the project's risks and threats to myself, my community, and the species of the Gulf of Mexico.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of May, 2023.

Joanie Steinhaus
Gulf Program Director
Turtle Island Restoration
Network