No. 23-60027

_____

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY;
TEXAS CAMPAIGN FOR THE ENVIRONMENT; CENTER FOR
BIOLOGICAL DIVERSITY; TURTLE ISLAND RESTORATION NETWORK;
SIERRA CLUB,
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; PETE
BUTTIGIEG, in his official capacity as Secretary of the U.S. Department of
Transportation; UNITED STATES COAST GUARD, an agency of the U.S.
Department of Homeland Security; RICHARD V. TIMME; UNITED STATES
MARITIME ADMINISTRATION, an agency of the U.S. Department of
Transportation; ANN PHILLIPS, in her official capacity as Administrator of the
U.S. Maritime Administration, LINDA L. FAGAN, in her official capacity as
Commandant of the U.S. Coast Guard,
*Respondents*.

_____

On Petition for Review of an Order of the Maritime Administration

_____

**BRIEF FOR RESPONDENTS**

_____

Of Counsel:

JOHN E. PUTNAM
*General Counsel*
PAUL M. GEIER
*Assistant General Counsel*
ERIN D. HENDRIXSON
*Senior Trial Attorney*
U.S. Dept. of Transportation

GABRIEL CHAVEZ
*Acting Chief Counsel*
AINSLEY Q. PARRISH
*Attorney Advisor*
Maritime Administration

LT PEYTON COLEMAN
*Attorney*
U.S. Coast Guard

TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
EZEKIEL A. PETERSON
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

No. 23-60027
*Citizens for Clean Air & Clean Water in Brazoria County, et al.*
*v.*
*U.S. Department of Transportation, et al.*

Under Circuit Rule 28.2.1, Respondents are governmental parties that need not furnish a certificate of interested persons.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

## STATEMENT REGARDING ORAL ARGUMENT

Respondents believe that oral argument would be both appropriate and helpful to the Court in ensuring full consideration of the issues in the parties' briefs.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES ...................................................................vi

GLOSSARY .................................................................................. xii

INTRODUCTION ..............................................................................1

STATEMENT OF JURISDICTION.............................................................2

STATEMENT OF THE ISSUES...............................................................2

PERTINENT STATUTES AND REGULATIONS ...........................................3

STATEMENT OF THE CASE .................................................................3

       A.     Statutory and regulatory background ...........................................3

           1.     The National Environmental Policy Act....................................3

           2.     The Deepwater Port Act.....................................................5

       B.     Factual background .........................................................7

           1.     The proposed SPOT deepwater port .........................................7

           2.     The agencies' environmental-review process...........................8

           3.     The SPOT license application Record of Decision .................11

SUMMARY OF ARGUMENT ................................................................12

STANDARD OF REVIEW ...................................................................15

ARGUMENT ..................................................................................16

I.     The agencies complied with NEPA...........................................16

A.    The agencies took the requisite hard look at the Project's environmental impacts. ........................................................17

    1.    The agencies analyzed the risk and impacts of a potential oil spill.......................................................17

        a.    The agencies analyzed the risk of an oil spill from the Project. ............................................17

        b.    The agencies considered a potential oil spill's impact on species and habitat. ............................21

        c.    The agencies performed a thorough analysis of the worst-case oil spill................................23

    2.    The agencies took a hard look at the Project's effect on protected Gulf species................................26

        a.    The agencies analyzed potential effects on the Rice's whale................................................26

        b.    The agencies examined the Project's cumulative effects on protected species. ......................30

    3.    The agencies took a hard look at the Project's potential ozone pollution...........................................32

        a.    The agencies determined that the Project would not worsen regional ozone pollution. .................32

        b.    The agencies considered the Port's cumulative impact on ozone pollution. .........................37

B.    The agencies' analysis of project alternatives complied with NEPA. .......................................................38

    1.    The agencies were not required to analyze Petitioners' preferred alternative under NEPA.........................38

    2.    The agencies properly evaluated the no-action alternative...............................................................44

II.    MARAD complied with the Deepwater Port Act. ........................................49

     A.    As to the timelines in the Deepwater Port Act, Plaintiffs fall outside the zone of interests protected by the Act, and MARAD complied with the Act when it approved the license application after extending the review timelines. ...................49

          1.    Petitioners do not fall within the zone of interests protected by Section 5 of the Deepwater Port Act. .................50

          2.    MARAD was not required to deny the application after the review timeline elapsed. ...........................................52

     B.    MARAD reasonably determined that the Port is in the national interest and consistent with national energy-sufficiency goals....................................................................................55

CONCLUSION ....................................................................................................58

CERTIFICATE OF COMPLIANCE........................................................................59

CERTIFICATE OF DIGITAL SUBMISSION ......................................................60

CERTIFICATE OF SERVICE .............................................................................61

# TABLE OF AUTHORITIES

## Cases

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
715 F.2d 897 (5th Cir. 1983) ..................................................................15, 55

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ........................................................41

*City of Shoreacres v. Waterworth*,
420 F.3d 440 (5th Cir. 2005) ..........................................................41

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ..........................................................45

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004)..................................................................24, 39

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022)..........................................................44

*Gulf Restoration Network v. U.S. Dep't of Transp.*,
452 F.3d 362 (5th Cir. 2006) ...................................... 3, 5, 15, 23, 26, 31, 44

*Harris v. United States*,
19 F.3d 1090 (5th Cir. 1994) ..........................................................16

*Harrison Cty. v. U.S. Army Corps of Eng'rs*,
63 F.4th 458 (5th Cir. 2023) ..........................................................27

*La. Wildlife Fed'n, Inc. v. York*,
761 F.2d 1044 (5th Cir. 1985) ........................................................41

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..................................................................50, 51

*Louisiana v. Verity*,
853 F.2d 322 (5th Cir. 1988) ..........................................................16

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)....................................................................42

*Meliezer v. Resolution Tr. Co.*,
952 F.2d 879 (5th Cir. 1992) ......................................................52

*Miss. River Basin All. v. Westphal*,
230 F.3d 170 (5th Cir. 2000) ...................................................5, 23

*Mont. Wilderness Ass'n v. Connell*,
725 F.3d 988 (9th Cir. 2013) .......................................................24

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
677 F.3d 596 (4th Cir. 2012) .......................................................46

*No Mid-Currituck Bridge-Concerned Citizens v. N.C. Dep't of Transp.*,
60 F.4th 794 (4th Cir. 2023) ........................................................46

*Robertson v. Methow Valley Citizens Counsel*,
490 U.S. 332 (1989)......................................................................3

*Russello v. United States*,
464 U.S. 16 (1983).......................................................................53

*Sabine River Auth. v. U.S. Dep't of Interior*,
951 F.2d 669 (5th Cir. 1992) ...................................................4, 51

*Shrimpers & Fisherman of the RGV v. U.S. Army Corps of Eng'rs*,
56 F.4th 992 (5th Cir. 2023) ...................................................39, 40

*Sierra Club v. Envtl. Prot. Agency*,
705 F.3d 458 (D.C. Cir. 2013).....................................................36

*Sierra Club v. Sigler*,
695 F.2d 957 (5th Cir. 1983) ...................................................23, 24

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) .......................................................58

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993)..........................................................................52

*United States v. Johnson*,
    632 F.3d 912 (5th Cir. 2011) ................................................24, 25

*United States v. Wong Kim Bo*,
    472 F.2d 720 (5th Cir. 1972) ........................................................53

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
    870 F.3d 1222 (10th Cir. 2017) .............................................46, 47

*Young v. Gen. Servs. Admin.*,
    99 F. Supp. 2d 59 (D.D.C. 2000)
    *aff'd*, 11 F. App'x 3 (D.C. Cir. 2000)..........................................44

## Statutes and Court Rules

Administrative Procedure Act
    5 U.S.C. § 706(2)(A) ....................................................................16

Endangered Species Act
    16 U.S.C. § 1536(a)(2) ................................................................10

Deepwater Port Act
    33 U.S.C. § 1502(9)(A) ..................................................................5

    33 U.S.C. § 1503(a) ........................................................................5

    33 U.S.C. § 1503(b)........................................................................5

    33 U.S.C. § 1503(c)(1)-(9) .............................................................6

    33 U.S.C. § 1503(c)(2) ...................................................................6

    33 U.S.C. § 1503(c)(3) ..............................................................6, 55

    33 U.S.C. § 1503(c)(5) ...................................................................6

    33 U.S.C. § 1503(c)(6) ...................................................................7

33 U.S.C. § 1503(c)(7) ...................................................................6

33 U.S.C. § 1503(c)(8) ...................................................................7

33 U.S.C. § 1504 ....................................................................51, 52

33 U.S.C. § 1504(c)(1) ...........................................................50, 53

33 U.S.C. § 1504(c)(2) ...................................................................6

33 U.S.C. § 1504(g) ................................................................50, 53

33 U.S.C. § 1504(i)(1) ............................................................50, 53

33 U.S.C § 1508(b)(1) ..................................................................53

33 U.S.C. § 1516 ...................................................................2, 52

National Environmental Policy Act
    42 U.S.C. § 4332(2)(C) ............................................................4

    42 U.S.C. § 4332(2)(C)(ii) .....................................................30

42 U.S.C. § 6212a(b) .....................................................................57

Clean Air Act
    42 U.S.C. § 7506(c)(1) ...........................................................33

## Federal Regulations and Federal Register Notices

33 C.F.R. § 148.3(a) .......................................................................5

33 C.F.R. § 148.105 .......................................................................6

33 C.F.R. § 148.107 .....................................................................54

33 C.F.R. § 148.276 .....................................................................52

33 C.F.R. § 148.283 .....................................................................54

40 C.F.R. § 51.166(k) ...................................................................36

40 C.F.R. § 93.153 .......................................................................33

40 C.F.R. § 93.153(b)(1) ..............................................................34

40 C.F.R. § 1502.1 .........................................................................4

40 C.F.R. § 1502.9(c)(1) .........................................................27, 29

40 C.F.R. § 1502.9(d)(1) ..............................................................27

40 C.F.R. § 1502.10 ......................................................................24

40 C.F.R. § 1502.13 .......................................................................4

40 C.F.R. § 1502.14 .......................................................................4

40 C.F.R. § 1502.14(a) .............................................................38, 44

40 C.F.R. § 1502.14(d) .................................................................44

40 C.F.R. § 1502.16 .......................................................................4

40 C.F.R. § 1508.7 ........................................................................30

40 C.F.R. § 1508.8(c) ...................................................................30

49 C.F.R. § 1.93(h)(1) ....................................................................5

49 C.F.R. § 1.93(h)(2) ....................................................................5

*Forty Most Asked Questions Concerning CEQ's National
    Environmental Policy Act Regulations*,
    46 Fed. Reg. 18,026 (Mar. 23, 1981) ....................................44

85 Fed. Reg. 43,304 (July 16, 2020)..............................................4

87 Fed. Reg. 23,453 (May 20, 2022) .............................................4

87 Fed. Reg. 60,926 (Oct. 7, 2022)..............................................35

*National Environmental Policy Act Guidance on Consideration of*
    *Greenhouse Gases and Climate Change*,
    88 Fed. Reg. 1,196 (Jan. 9, 2023) ................................................................46

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| MARAD | Maritime Administration |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| $NO_X$ | Nitrogen Oxides |
| PAH | Polycyclic Aromatic Hydrocarbon |
| SDEIS | Supplemental Draft Environmental Impact Statement. |
| VOC | Volatile Organic Compound |

**INTRODUCTION**

Petitioners challenge the Maritime Administration's (MARAD's) conditional Record of Decision (ROD) and the corresponding Final Environmental Impact Statement (FEIS) prepared by the U.S. Coast Guard in coordination with MARAD for an application to construct and operate a deepwater port (the Port or the Project) in the Gulf of Mexico. Before MARAD issued the ROD approving the application, the agencies conducted years of environmental analysis, consulted other federal agencies, and conducted public outreach to ensure they had thoroughly assessed the Project's environmental impacts. The agencies made their analysis available to the public, culminating in a 4,498-page FEIS and ROD approving the license application.

Petitioners challenge that decision under the National Environmental Policy Act (NEPA), the Deepwater Port Act of 1974, and the Administrative Procedure Act (APA). Though Petitioners disagree with MARAD's decision to approve the license application, they do not show that the agencies violated any legal requirement. At every step of the environmental-review process, the agencies took a hard look at the environmental impacts of approving the license. The agencies disclosed those impacts in the FEIS, where they directly addressed the concerns that Petitioners now raise. And MARAD made specific findings in the ROD

addressing why the Project was in the national interest. The agencies complied with NEPA, the Deepwater Port Act, and the APA. The petition should be denied.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to review the petition under the Deepwater Port Act, which provides that any person "adversely affected or aggrieved by the Secretary [of Transportation]'s decision to issue . . . a license [to construct and operate a deepwater port] may, not later than 60 days after a decision is made, seek judicial review of such decision in the United States Court of Appeals for the circuit within which the nearest adjacent coastal State is located." 33 U.S.C. § 1516. Here, MARAD issued the ROD approving the license application on November 21, 2022, and Petitioners timely filed their petition for review on January 19, 2023. The nearest adjacent coastal State to the proposed deepwater port is Texas, so this Court has jurisdiction to review the petition. MAR.208544.

## STATEMENT OF THE ISSUES

1.    As to NEPA:

    a.    Whether the agencies took a hard look at the proposed Project's: (1) potential oil-spill risk; (2) impact on protected species; and (3) potential ozone pollution.

b.    Whether the agencies (1) considered reasonable alternatives to the Project including a reduced-capacity alternative and (2) considered reasonable future development when analyzing the no-action alternative.

2.    Whether Petitioners fall sufficiently within the zone of interests protected by the Deepwater Port Act's statutory timeline to challenge MARAD's compliance with the statutory timeline for review of a Deepwater Port Act license application, and if so, whether MARAD complied with the Deepwater Port Act when it made specific and reasonable findings that the proposed Port was in the national interest and consistent with national policy goals, including energy sufficiency.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are in the addenda to the opening brief and this brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

### 1.    The National Environmental Policy Act

NEPA is a procedural statute that does not mandate substantive results but requires agencies to consider environmental impacts. *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 350 (1989). When reviewing the adequacy of an EIS, the Court is "mindful that NEPA guarantees a process, not a certain result." *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 367 (5th Cir.

2006) (*Gulf Restoration*). Even if a federal project would adversely affect the environment, NEPA does not prohibit it; the statute "simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992).

Under NEPA, if a project involves a "major Federal action" that would "significantly affect[] the quality of the human environment," an agency must prepare a detailed Environmental Impact Statement (EIS) analyzing the environmental effects of the action. 42 U.S.C. § 4332(2)(C). An EIS must provide a "full and fair discussion of significant environmental impacts" and discuss the purpose and need of the proposed action; reasonable alternatives to the proposed action; and the environmental impacts of the alternatives, including those of the proposed action. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14, 1502.16 (2019).[1]

In reviewing an EIS, this Court considers three key factors: (1) whether the agency has taken a good-faith, objective hard look at the environmental consequences of a proposed action; (2) whether the EIS provides enough detail to allow those who did not participate in its preparation to understand and consider

---

[1] The Council on Environmental Quality twice recently amended its NEPA regulations. 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (May 20, 2022). Because the agencies in this case began their NEPA process before these amendments' effective dates, they applied the pre-2020 version of the NEPA regulations, which this brief cites.

the environmental effects of the action; and (3) whether the EIS explains alternatives to the proposed action sufficient to permit a reasoned choice among different courses of action. *Gulf Restoration*, 452 F.3d at 367 (quoting *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000)). The Court reviews an EIS under the rule of reason and "must not substitute its judgment for that of the agency." *Miss. River Basin All.*, 230 F.3d at 175 (cleaned up). Because the analysis in an EIS requires a "high level of technical expertise," courts defer to the informed discretion of federal agencies. *Id.*

### 2.     The Deepwater Port Act

A deepwater port is a structure located in open ocean that is used as a port or terminal for the transportation of oil or natural gas. 33 U.S.C. § 1502(9)(A). Under the Deepwater Port Act, no one may own, construct, or operate a deepwater port without a license from the Secretary of Transportation. *Id.* § 1503(a), (b).

The Secretaries of Transportation and Homeland Security have delegated this licensing authority to MARAD, an operating agency of the U.S. Department of Transportation. 49 C.F.R. § 1.93(h)(1). The Secretary of Transportation has further delegated the authority to process deepwater port license applications to MARAD and the Coast Guard in coordination with each other. *Id.* § 1.93(h)(2); 33 C.F.R. § 148.3(a). Here, the Coast Guard, in coordination with MARAD, prepared the EIS

for the Project, and MARAD alone issued the ROD. This brief refers to MARAD and the Coast Guard collectively as "the agencies."

Under the Deepwater Port Act, license applicants must provide the agencies with financial, technical, and other information. 33 U.S.C. § 1504(c)(2); 33 C.F.R. § 148.105. MARAD, as the agency that issues the license, must determine that an applicant meets nine conditions before it approves an application to construct and operate a deepwater port. 33 U.S.C. § 1503(c)(1)–(9). Among those conditions, MARAD must determine: that the applicant will comply with applicable laws, regulations, and license conditions; that the construction and operation of the deepwater port will be in the national interest and consistent with national policy goals and objectives, including energy sufficiency and environmental quality; and that the applicant has demonstrated that the port will be constructed and operated using best available technology, so as to minimize adverse impact on the environment. *Id.* § 1503(c)(2), (3), (5).

The application process also requires consultation with other government agencies. MARAD must consult with the Secretary of the Army, the Secretary of State, and the Secretary of Defense. *Id.* § 1503(c)(7). A license cannot be issued if, within 45 days of the last public hearing on the application, the Administrator of the Environmental Protection Agency (EPA) informs MARAD that the deepwater port "will not conform" with the Clean Air Act; the Federal Water Pollution

Control Act; or the Marine Protection, Research and Sanctuaries Act. *Id.*

§ 1503(c)(6). Additionally, a license cannot be issued until the governor of the

adjacent coastal State "approves, or is presumed to approve, issuance of the

license." *Id.* § 1503(c)(8).

### B.    Factual background

#### 1.    The proposed SPOT deepwater port

To ensure adequate domestic energy supplies during the 1973 oil crisis,

Congress prohibited the export of domestically produced crude oil. Congress then

repealed the crude-oil export ban in 2015. MAR.208534–35. In recent years,

domestic production of crude oil has steadily increased, and domestic consumption

has fallen, increasing interest in the development of offshore deepwater ports for

exporting crude oil. MAR.208535.

The ships that transport crude oil are often too large to use at shore-side

ports. MAR.23366. Thus, without a deepwater port, these ships are typically

loaded using ship-to-ship transfers, a process known as reverse lightering, in which

smaller ships are loaded at shore-side facilities and travel to deeper waters to

transfer the oil to the large carriers. *Id.* This process generates greenhouse gases,

volatile organic compounds (VOCs), and hazardous air pollutant emissions.

MAR.208578.

SPOT Terminal Services LLC (SPOT) is a wholly owned subsidiary of

Enterprise Products Operating LLC and seeks to construct a deepwater port off the

coast of Texas. MAR.208536. The SPOT Deepwater Port (the Port or the Project)

is designed for the transportation of domestically produced crude oil for export to

the global market. *Id.* The Project's purpose is to transport and export excess

domestic crude oil supplies to the global market with reduced use of ship-to-ship

transfers. MAR.23450.

### 2.    The agencies' environmental-review process

The agencies thoroughly evaluated the Project's environmental effects. The

agencies complied with multiple federal environmental laws, including NEPA, the

Deepwater Port Act, the Clean Air Act, and the Endangered Species Act. An

overview of that process follows.

In January 2019, SPOT applied for a license under the Deepwater Port Act

to own, construct, and operate the Port. MAR.187783–84. Two months later,

MARAD published a Notice of Application in the Federal Register. MAR.263591–

93. The agencies also began the environmental-review process for the license

application, publishing a notice of intent to prepare an EIS, a notice of a public

meeting and open house to discuss the license application, and a request for public

comments on the license application. MAR.263610–13. The agencies held an

informational open house and public scoping meeting in March 2019 and accepted

written comments on the license application for 30 days. MAR.39435–516.

MARAD published a notice of availability of the Draft EIS (DEIS) for the

SPOT license application in February 2020. MAR.263594–96. MARAD also

announced a public meeting on the DEIS and opened a 45-day public comment

period, consistent with NEPA, to receive formal comments. *Id.* The public

comment period was to end on March 23, 2020, but was extended to May 31

because of the COVID-19 public-health emergency. MAR.263597–98. The

agencies received 37,408 comments on the DEIS and responded to all substantive

comments. MAR.189493–90334.

Based on the comments on the DEIS, MARAD determined that the public

notice and opportunities for comment did not include sufficient outreach and

notification to people with limited English proficiency. MAR.263599–601. So in

October 2021, MARAD published a notice in the Federal Register announcing the

SPOT Supplemental Draft EIS (SDEIS), with an additional 45-day public review

and comment period. *Id.* The Executive Summary of the SDEIS, among other vital

documents, was translated to Spanish and Vietnamese to ensure meaningful public

engagement from people with limited English proficiency that lived in the affected

area of the Project. MAR.208551.

In November 2021, the agencies held a public meeting on the SDEIS. MAR.187891–8249. The agencies also accepted written public comments on the SDEIS. MAR.190363–788.

In July 2022, MARAD published a notice of availability of the SPOT FEIS and a notice of a final virtual public hearing, which occurred in August 2022. MAR.263604–06. In October 2022, the Deputy Regional Administrator of the EPA informed MARAD that EPA recommended approval of SPOT's license application pursuant to EPA's authority under the Clean Air Act, the Clean Water Act, and the Marine Protection, Research and Sanctuaries Act. MAR.207462–63.

During their environmental review, the agencies complied with the Clean Air Act. In October 2021, the agencies published a determination that the Project would not further degrade regional air quality. MAR.263602–03. The determination also confirmed that the Project's potential air emissions would conform with the Texas state air quality plan. MAR.263603. That determination was subject to a 30-day public notice and comment period. *Id.*

The agencies also complied with the Endangered Species Act. Under that Act, agencies must ensure that their actions are not likely to jeopardize the continued existence of any endangered species. 16 U.S.C. § 1536(a)(2). MARAD consulted the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (NMFS). In April 2020, the Fish and Wildlife Service issued a letter

concurring with the agencies' determination that the Project is not likely to adversely affect ten endangered and threatened species. MAR.102707–12. In September 2021, the Fish and Wildlife Service issued a letter concurring that the Project is not likely to adversely affect two other species. MAR.103078–82. And in November 2022, the agencies concluded formal consultation with NMFS when that agency issued a final Biological Opinion. MAR.208271–513. The Biological Opinion concluded that the Project was not likely to adversely affect Rice's whales and endangered corals; was likely to adversely affect, but not likely to jeopardize the continued existence of, eight marine species; and was not likely to result in the destruction or adverse modification of designated critical habitat for loggerhead sea turtles. MAR.208272.

### 3.    The SPOT license application Record of Decision

In November 2022, MARAD issued a Record of Decision (ROD) approving SPOT's license application. MAR.208528–621. MARAD found that SPOT had satisfied the nine licensing conditions imposed by the Deepwater Port Act. MAR.208568–616. Relevant here, MARAD found that the construction and operation of the Port was in the national interest because it would benefit employment, economic growth, and domestic energy infrastructure resilience. MAR.208616–17. MARAD also found that the Project would have a minimal impact on the availability and cost of crude oil in the domestic market and that the

Project would provide a more efficient, less environmentally harmful way to export crude oil. *Id.*

In January 2023, Petitioners filed this petition for review challenging the ROD under NEPA and the Deepwater Port Act.

## SUMMARY OF ARGUMENT

1.     The agencies complied with NEPA when they took a hard look at the Project's environmental impacts, appropriately analyzed alternatives to the Project, and fully disclosed their analysis and conclusions in the FEIS. The agencies did not act arbitrarily or capriciously. Petitioners' arguments to the contrary ignore the record.

a.     First, the agencies analyzed the risk of an oil spill from the proposed Project. They modeled spills of several different sizes and explained the results of that modeling in the FEIS. The agencies modeled spills ranging from 17.5 to 687,602 barrels and calculated the probability of different-sized spills. They analyzed both potential onshore and offshore oil spills from the Project. And they analyzed the specific environmental impacts that an oil spill could have on wildlife, freshwater fisheries, benthic resources, plankton, marine mammals, marine fisheries, and threatened and endangered species. The agencies also took a hard look at the potential impact of a worst-case oil spill of 687,602 barrels, modeling a worst-case spill under three scenarios.

12

Next, the agencies took a hard look at the Project's potential effects on protected Gulf species. The agencies determined that the Project was not likely to adversely affect the endangered Rice's whale—the same conclusion reached by NMFS in its final Biological Opinion. The agencies also took a hard look at the Project's cumulative impacts on protected marine species, carefully identifying actions that overlap temporally or geographically with the Project and analyzing the cumulative impacts of these actions on protected species.

Finally, the agencies took a hard look at the Project's effect on regional air quality, and specifically the Project's ozone emissions. Adhering to EPA guidance, the agencies calculated the Project's ozone emissions by modeling its emission of ozone precursors, nitrogen oxides ($NO_x$) and VOCs. The agencies, with concurrence from the Texas Commission on Environmental Quality, published a determination that the Project was not likely to cause or contribute to any new air-quality standard violations, increase the frequency or severity of any existing ozone-standard violation, or delay the timely attainment of any ozone standard. EPA had the opportunity to review and comment on the FEIS and raised no concerns with the air-quality analysis.

b.    The agencies also complied with NEPA when they analyzed reasonable project alternatives in the FEIS. Petitioners fault the agencies for not considering their specific preferred alternative of a reduced-capacity port, but they

13

did not sufficiently raise this specific alternative in their comments to the agencies. And even if they had presented a specific alternative, the agencies considered—but reasonably rejected—a reduced-capacity alternative that would have used other infrastructure to attempt to meet the objectives of the Project. Nothing more was required under NEPA.

The agencies also appropriately analyzed the baseline no-action alternative. The agencies' no-action alternative considered reasonably foreseeable development if a project were not constructed, as required by NEPA. The data and the agencies' analysis reasonably demonstrated that crude-oil exports would increase even if the Port were not constructed. Thus, the no-action alternative provided an appropriate baseline from which to measure the Project's environmental effects, consistent with NEPA.

2.    The agencies also complied with the Deepwater Port Act, and again did not act arbitrarily or capriciously.

a.    At the threshold, Petitioners have not shown that their purported injury from an extended review process falls within the zone of interests that statutory-timeline provision in the Deepwater Port Act was intended to protect. The review timelines in the Deepwater Port Act were meant to ensure that license applications were processed promptly and were thus intended to benefit project applicants, not groups challenging the project on environmental grounds.

Even if Petitioners can bring this claim, MARAD was not required to deny the license application after the statutory timeline elapsed. The agencies chose to extend the review timeline to receive more information from the applicant and to make accommodations due to the COVID-19 pandemic. Nothing in the Deepwater Port Act commands MARAD to deny a license application once the statutory timeline elapses. As this Court has explained, a statutory deadline is not mandatory unless it both expressly requires an agency or public official to act within a particular time and imposes a consequence for failure to comply. Because the plain text of the Deepwater Port Act does not impose consequences for noncompliance with the statutory timeline, MARAD was not required to reject the license application.

b.      MARAD also complied with the Deepwater Port Act when it determined that the Project is in the national interest and consistent with the goal of national energy sufficiency. MARAD supported these conclusions with specific findings that the Project would have a minimal effect on the availability and cost of crude oil in the United States.

## STANDARD OF REVIEW

This Court reviews agency action under NEPA and the Deepwater Port Act under the deferential standard of the APA. *Gulf Restoration*, 452 F.3d at 368. Under that standard, a reviewing court only overturns agency decisions that are

15

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). The Court reviews the agency's decision "not as a chemist, biologist, or statistician . . . but as a reviewing court exercising [a] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Id.* (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)) "[I]f the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious." *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994) (quoting *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988)). An agency's decision should be upheld "so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Verity*, 853 F.2d at 327.

## ARGUMENT

### I.  The agencies complied with NEPA.

MARAD and the Coast Guard performed a thorough environmental review of the Project that complied with NEPA's requirements to take a hard look at the environmental effects of a proposed action and alternatives and to disclose that analysis to the public. Petitioners show no arbitrary and capricious conduct.

**A.     The agencies took the requisite hard look at the Project's environmental impacts.**

During the environmental review, MARAD and the Coast Guard took a hard look at the Project's environmental impacts. The agencies analyzed the risk of an oil spill, the Project's effect on Gulf species, and the Project's ozone emissions. Contrary to Petitioners' arguments, the agencies complied with NEPA by preparing a good-faith, comprehensive analysis of the Project's environmental consequences.

**1.     The agencies analyzed the risk and impacts of a potential oil spill.**

Petitioners contend that the agencies prepared a flawed analysis of the risk and impacts of a potential oil spill from the Project (Pet'rs' Br. 24–32), but they do not identify any major flaws in that analysis. Rather, the record demonstrates that the agencies closely analyzed the probability and the effects of a potential oil spill.

**a.     The agencies analyzed the risk of an oil spill from the Project.**

Petitioners claim that the agencies only considered a narrow, limited oil-spill risk (Pet'rs' Br. 25), but the record shows that the agencies conducted extensive oil-spill modeling that covered an appropriate range of spill volumes. The FEIS includes two thorough analyses of the Project's oil-spill risk: an oil-spill risk analysis performed by the applicant and an oil-spill risk analysis conducted under the direction of the Coast Guard. MAR.23962.

17

The FEIS's first analysis developed oil-spill probabilities for all Project components and compiled spill risk profiles that express the annual probability of a spill of any given size. *Id.* That analysis also included oil-spill modeling for a 2,200-barrel hypothetical release of three different oil types. MAR.23965. This quantity was based on the Bureau of Ocean Energy Management's EIS for Gulf of Mexico Oil and Gas Lease Sales, which estimated that the most likely size of a spill equal or greater than 1,000 barrels would be 2,200 barrels. *Id.*

The FEIS's second analysis considered spill sizes ranging from 17.5 barrels to 687,602 barrels—a worst-case discharge from the deepwater port. MAR.23983, 24002. That analysis also modeled the trajectory of the worst-case discharge (687,602 barrels) in three scenarios: (1) a release from the proposed deepwater port, (2) a release from the proposed pipeline two miles from the coastline, and (3) a release from a ship moored at the deepwater port because of another vessel striking it. MAR.23992, 23994. This complex modeling accounted for 12 processes that can affect oil dispersion. MAR.23992. And the modeling produced probabilistic results for each scenario that show where the oil may spread. MAR.23994; MAR.23999–4001 (maps showing the potential impact under for each scenario). This modeling allowed the agencies to examine individual worst cases among the range of possible trajectories for each spill scenario. MAR.23994.

Thus, Petitioners are incorrect when they assert that the FEIS "only considers [the] 'most likely' oil spill models involving a one-hour release of 2,200 barrels." Pet'rs' Br. 25. Although the first analysis models a 2,200-barrel spill (under three different conditions), the second analysis modeled a series of "large-scale, credible oil spill scenarios," including "accidental and intentional [ship] cargo tank breaches, riser rupture due to supply vessels colliding on the platform, and subsea pipeline rupture caused by dropped or dragged anchor." MAR.23976. And that analysis did not simply look at the "most likely" spill (*cf.* Pet'rs' Br. 25), but also considered the "worst credible discharge scenario," a spill of 687,602 barrels. MAR.23992.

Nor are Petitioners correct when they claim that the FEIS disregarded the risk of a spill from onshore project components. Pet'rs' Br. 25. The agencies' analysis considered the worst-case discharge for onshore project components such as the new onshore pipelines. MAR.23979 (noting that the worst-case discharge "for the Project onshore components is 600,000 [barrels], which is the capacity of a single tank within a single secondary containment system at the Oyster Creek Terminal"). Petitioners ignore this analysis, and thus have not demonstrated any flaw in it.

Next, Petitioners contend that the agencies should have discussed a report by Susan Lubetkin in the FEIS (Pet'rs' Br. 25–26), but the agencies explained why the

Lubetkin report is inapt in their responses to comments. The report is based on frequency calculations for extractive projects (such as offshore drilling platforms), and the analysis "does not include deepwater ports." MAR.25660.

Finally, Petitioners' comparison of the SPOT FEIS to the Texas GulfLink supplemental draft EIS lacks merit. Pet'rs' Br. 26–27. The GulfLink oil-spill risk analysis does not bind the agencies because spill scenarios are project-specific and conducted on a port-by-port basis. But even if one were to compare the GulfLink EIS to the SPOT FEIS, Petitioners have failed to identify any shortcomings in the SPOT FEIS. They point to the GulfLink EIS's analysis of worst-case discharges and analysis of a spill's effect on wildlife. But like the GulfLink EIS, the SPOT FEIS properly addressed these issues by: (1) evaluating the risk of worst-case discharge occurrences, MAR.23992; (2) modeling oil spills based on discharges from various source points, including from on- and offshore pipeline ruptures and from a ship connected to a deepwater port, MAR.23980, 23994; and (3) considering the effects of the Port and an oil spill on wildlife. MAR.23602–06 (analyzing the effect of a potential oil spill on wildlife species); MAR.23618–19 (benthic resources); MAR.23629–30 (plankton); MAR.23662–66 (marine mammals).

In sum, the agencies took a hard look at the Project's oil-spill risk and thus their findings were not arbitrary and capricious.

**b.**     **The agencies considered a potential oil spill's impact on species and habitat.**

Petitioners incorrectly contend that the FEIS "wholly omits analysis of impacts likely to result from any of [the Project's] spill scenarios" on wildlife species and habitat. Pet'rs' Br. 27–29. The record instead shows that the agencies took a hard look at the effect of a potential oil spill on species and their habitat in the Project area.

Petitioners inaccurately assert that the FEIS includes "no evaluation of impacts to wildlife and habitat, or to different types of marine ecosystems" when it comes to potential oil spills from the Project. Pet'rs' Br. 27. To the contrary, the FEIS *does* discuss the effect of "accidental spills of hazardous materials" on wildlife in the Project area. MAR.23602–06. And the biological assessment, prepared by the agencies and incorporated by reference in the FEIS, also analyzes a potential oil spill's effect to threatened and endangered species including marine mammals, sea turtles, and fish. MAR.26122–24. The agencies evaluated the direct harm from a potential oil spill to marine mammals, threatened species, and endangered species. They recognized that marine mammals exposed to oil could suffer from skin and eye wounds, lung disease, gastrointestinal injury, and other harms. MAR.23655, 26122–23. And they explained that exposure to hazardous oil products could cause sea turtles to develop respiratory, skin, and blood chemistry problems. MAR.26123.

21

Contrary to Petitioners' contention that the agencies did not review the efficacy of mitigation measures (Pet'rs' Br. 27), the agencies analyzed potential mitigation measures and best management practices that could avoid or reduce harm from oil spills for each resource type. MAR.23604 (discussing mitigation to "minimize the impacts of an oil spill" on wildlife); MAR.23608–10 (freshwater fisheries); MAR.23618–19 (benthic resources); MAR.23629–30 (plankton); MAR.23665–66 (nonendangered marine mammals); MAR.23673–86 (marine fisheries); MAR.23713–14 (state-listed threatened and endangered species); MAR.26125 (federally listed threatened and endangered species). And the ROD incorporates mitigation measures outlined in the biological opinion and the FEIS that the applicant must follow to reduce risk from oil spills on marine species. MAR.208591, 208598–601.

Petitioners acknowledge that the agencies explained the high toxicity of polycyclic aromatic hydrocarbons (PAHs) and calculated the amount of PAHs that could be released from an oil spill, but Petitioners incorrectly assert that the FEIS does not make a "qualitative or quantitative assessment of PAH harms to marine species in the Project area." Pet'rs' Br. 28. The agencies analyzed the effects of PAHs on marine species, both qualitatively and quantitatively. *See, e.g.*, MAR.23549; MAR.23618–19 (describing the effects of PAHs on bivalves and

crustaceans); MAR.23664–65 (marine mammals); MAR.26117–18 (threatened and endangered species).

Petitioners' argument that the agencies failed to analyze the potential harms from PAHs on Rice's whales similarly misses the mark. Pet'rs' Br. 29. The agencies explicitly addressed Rice's whales when they discussed the Project's effects on threatened and endangered animals. MAR.23691. The agencies entered formal consultation with NMFS about the Project's effect on Rice's whales, among other species, which resulted in a Biological Opinion from NMFS concluding that the Project was not likely to adversely affect the whale. MAR.208271–513.

In short, the FEIS "in good faith objectively has taken a hard look at" the effects on species and habitat from a potential oil spill from the Port and has provided "detail sufficient to allow those who did not participate in its preparation to understand and consider" those effects. *Gulf Restoration*, 452 F.3d at 367 (quoting *Miss. River Basin All.*, 230 F.3d at 174). It is, therefore, not arbitrary and capricious.

### c.    The agencies performed a thorough analysis of the worst-case oil spill.

The agencies also took a hard look at the potential effects of a worst-case oil spill, and Petitioners' arguments to the contrary (Pet'rs' Br. 30–32) are misplaced. This Court has held that an agency must include some analysis of a worst-case scenario in its NEPA analysis. *See Sierra Club v. Sigler*, 695 F.2d 957, 972–73

(5th Cir. 1983). The agencies did so here in the FEIS's safety and risk analysis contained in Chapter 4 of the document. MAR.23977–4001.

Petitioners concede that the agencies analyzed a worst-case spill in the FEIS. Pet'rs' Br. 31. But they contend that the analysis still violates NEPA because it is in the wrong section of the FEIS—the safety and risk analysis, rather than the environmental impacts analysis. *Id.* Neither NEPA's text, its implementing regulations, nor caselaw require an EIS to adhere so strictly to a formal structure. *See Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013) ("An agency, however, has discretion in deciding how to organize and present information in an EIS."). Rather, the regulations suggest a recommended format for an EIS, but acknowledge that an EIS can be valid so long as it includes the substantive discussion required by the statute. *See* 40 C.F.R. § 1502.10 (2019). The agencies included the worst-case spill analysis in the FEIS, which satisfies NEPA's two purposes of ensuring the agencies carefully considered detailed information about significant environmental impacts and made the information available to the public. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767–68 (2004).

Even if it were error for the agencies to address the worst-case oil spill in the safety and risk analysis, that error would be harmless. An agency's error "is not prejudicial only when it is one that clearly had no bearing on the procedure used or the substance of decision reached." *United States v. Johnson*, 632 F.3d 912, 930

(5th Cir. 2011) (cleaned up). The agencies' decision on how best to organize the FEIS had no effect on whether the agencies took a hard look at the worst-case oil spill risk and disclosed that analysis to the public, which they did.

As for the substance of that analysis, the agencies' oil-spill analysis calculated the worst-case discharge for both onshore and offshore project components. MAR.23979, 83. The agencies evaluated the consequences of the worst-case oil spill scenarios caused by both accidental events (such as ship-to-ship collisions, ships striking the platform, and pipeline ruptures due to dropped or dragged anchors) and intentional threats. MAR.23977. The agencies also simulated the spread of oil across the gulf and predicted the oil slick's path by modeling meteorological conditions such as waves, winds, currents, and solar radiation. MAR.23978. In their discussion of the Project's environmental impacts, the agencies also briefly described the result of the worst-case spill analysis when discussing the potential effects of an oil spill on various species and resources. MAR.23605; MAR.23577–79 (discussing the effects of a worst-case spill on oyster reefs). NEPA does not require a more substantive worst-case oil spill than that.

In reviewing an EIS's environmental analysis, the Court considers whether the agency "in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives" and has provided "detail

sufficient to allow those who did not participate in its preparation to understand
and consider the pertinent environmental influences involve[d]." *Gulf Restoration*,
452 F.3d at 367. The agencies did so here when they modeled the potential effects
of worst-case oil spills under three scenarios and included that analysis in the
FEIS. Thus, the agencies' determinations were not arbitrary and capricious.

## 2. The agencies took a hard look at the Project's effect on protected Gulf species.

The FEIS analyzed the Project's effect on threatened and endangered
species. During the environmental review, the agencies closely examined the
Project's effect on Gulf species, as required by NEPA (Petitioners have not made
any argument based on the Endangered Species Act).

### a. The agencies analyzed potential effects on the Rice's whale.

Petitioners contend that the agencies did not consider a recent study about
the Rice's whale and were required to supplement the FEIS. Pet'rs' Br. 33–36. But
the agencies analyzed the Project's potential effects on the Rice's whale in the
FEIS, concluding that the Project was not likely to adversely affect the whale, and
the study did not require the agencies to supplement the FEIS.

An agency need only issue a supplemental EIS if a major federal action
remains to occur and the agency makes "substantial changes to the proposed action
that are relevant to environmental concerns" or there are "[s]ignificant new

26

circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Harrison Cty. v. U.S. Army Corps of Eng'rs*, 63 F.4th 458, 463 (5th Cir. 2023) (quoting 40 C.F.R. § 1502.9(d)(1) (2020), which is substantively identical to the applicable pre-2020 regulation, 40 C.F.R. § 1502.9(c)(1) (2019)).

Here, supplementation was not warranted because Petitioners point to no significant new circumstances or information that changed the proposed Project's environmental impacts. In the FEIS, the agencies concluded that the Project is not likely to adversely affect the Rice's whale because the whale is unlikely to be found near the Port. MAR.23691. Although the agencies identified the Rice's whale as an endangered species that could occur in the SPOT project area, they explained that the whale is "most commonly observed along the northeastern [Gulf] . . . off the west coast of Florida, far from the Project site." *Id.* But the agencies recognized that, if the whale is present during construction, it "could be affected by temporary changes in water quality and noise" and that the greatest threats to the whale would be from vessel strikes and oil spills, "but the potential of occurrence is low." *Id.*

Petitioners point to a 2022 study to argue that the agencies ignored recent evidence of the Rice's whale's Gulf-wide range, but that study is consistent with the agencies' analysis. The 2022 study found Rice's whales over a broader

27

distribution in the Gulf of Mexico than previously understood, but it also noted that "[i]t remains unknown whether confirmed and potential Rice's whale sightings in the western [Gulf] represent extralimital movements, if there has been a range contraction, . . . or if Rice's whales still occupy this northwestern region in low densities." MAR.206760, 206776. And the study reaffirmed that "there seem to be fewer whales in the western [Gulf] compared to the eastern [Gulf]." MAR.206774. The study does not cast doubt on the FEIS's conclusion that Rice's whales are "unlikely to be found near" the Port site.

Further, the agencies did not "entirely fail to consider" the 2022 study. Pet'rs' Br. 32. To comply with the requirements of the Endangered Species Act, the agencies entered formal consultation with NMFS on the Project's effect on the whale. *Id.* Between the publication of the FEIS and the issuance of the ROD, NMFS finalized its Biological Opinion and reached the same conclusion as the FEIS, concluding that the Project is "not likely to adversely affect [the] Rice's whale." MAR.208272. The Biological Opinion cited the 2022 scientific study referenced by Petitioners, and noted that, although "there is potential for Rice's whales to occur in the western Gulf, . . . their occurrence outside of the known core distribution area [off the west coast of Florida] appears to be quite rare." MAR.208324.

After NMFS finalized the Biological Opinion, MARAD issued its ROD. The ROD discusses the Biological Opinion, which cites the 2022 study. MAR.208591–92. Both the Biological Opinion and the ROD are consistent with the FEIS in concluding that the Port is not likely to adversely affect the Rice's whale because the whales are unlikely to be found near the Port. In the ROD, MARAD acknowledged the potential for Rice's whales to occur in the western Gulf offshore from the proposed Project. *Id.* But MARAD concluded, based on the information contained in the FEIS and Biological Opinion, that "a project-related vessel strike involving Rice's whale is unlikely to occur" because (1) the whale's occurrence outside the known core distribution area is quite rare, (2) the Port would be constructed in shallower water than where the whales live, and (3) ship traffic was unlikely to cross through the whale's core distribution area. *Id.* Thus, the FEIS is consistent with the 2022 scientific study discussing the Rice's whale's range that Petitioners cite. Pet'rs' Br. 34.

Nor were the agencies required to issue a Supplemental EIS after NMFS issued its Biological Opinion discussing the 2022 study, as Petitioners contend. Pet'rs' Br. 35. The NMFS Biological Opinion reached the same conclusion as the FEIS about the Project's effect on Rice's whales, so the study did not present "significant new circumstances or information relevant to environmental concerns and bearing on" the Project. 40 C.F.R. § 1502.9(c)(1) (2019).

In sum, the agencies were not required to issue a supplemental EIS and were not arbitrary and capricious.

> **b.** **The agencies examined the Project's cumulative effects on protected species.**

Petitioners contend that the agencies failed to consider the cumulative impacts of nearby existing activities and proposed projects on the Rice's whale and sea turtles, Pet'rs' Br. 37, but the record demonstrates that the agencies carefully identified activities and projects that could create cumulative impacts and took a hard look at those impacts on Gulf wildlife.

An agency's NEPA analysis must consider the cumulative impacts of a proposed action. 42 U.S.C. § 4332(2)(C)(ii); 40 C.F.R. § 1508.8(c) (2019). Cumulative impacts are impacts on the environment from a project's incremental effects when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7 (2019).

To identify potential cumulative impacts, the agencies collected information on past, present, and reasonably foreseeable future actions that could overlap temporally or geographically with the Port. MAR.24037. The agencies analyzed potential cumulative impacts from other industrial activity in the Gulf of Mexico including other proposed deepwater ports (such as the Texas GulfLink project) and existing oil and gas drilling. MAR.24054–56 (identifying proposed deepwater port

projects that could result in cumulative impacts); MAR.24057 (identifying oil and gas activity that could result in cumulative impacts).

Then, the agencies analyzed how cumulative impacts from these projects would affect biological resources, including marine mammals and sea turtles. MAR.24064–75. The agencies analyzed potential cumulative impacts to marine mammals from activities in the Gulf of Mexico including vessel strikes, underwater noise, entanglement, marine debris, and oil spills. MAR.24064–72. When discussing cumulative impacts on marine mammals from underwater noise, the agencies specifically discussed impacts to the Bryde's whale (the name of the Rice's whale before 2021). MAR.24071. The FEIS also examined potential cumulative impacts to sea turtles—including Kemp's ridley and loggerhead sea turtles—from vessel strikes, underwater noise, entanglement, marine debris, and oil spills. MAR.24072–75.

This Court previously upheld a cumulative-impacts analysis in an EIS for a deepwater port application that was limited to analyzing the cumulative impacts from two ports out of five pending port applications. *Gulf Restoration*, 452 F.3d at 368–70. The cumulative-impacts analysis here, which analyzed the potential cumulative impacts from four potential future deepwater ports and one operational deepwater port, is even broader in scope than the analysis in *Gulf Restoration*. *See* MAR.24054–56. And Petitioners have pointed to no specific shortcoming in the

agencies' cumulative-impacts analysis that shows that the agencies overlooked a specific cumulative impact of industrial activity in the Gulf.

### 3. The agencies took a hard look at the Project's potential ozone pollution.

The agencies carefully analyzed the Project's effect on air quality, including the Project's effect on ozone pollution. As Petitioners acknowledge, ozone is a secondary pollutant, meaning that it is not directly emitted but is formed through photochemical reactions between precursor $NO_X$ and VOCs. Pet'rs' Br. 39 n.20 (citing MAR.23843; MAR.240489). Following EPA guidance, the agencies analyzed the Project's precursor emissions ($NO_X$ and VOCs) to determine whether the Project would result in quantifiable ozone formation. MAR.23843. The agencies complied with NEPA by appropriately calculating and disclosing the Project's ozone precursor emissions and thus did not act arbitrarily or capriciously.

### a. The agencies determined that the Project would not worsen regional ozone pollution.

Petitioners assert that the agencies failed to evaluate the Project's impact on regional ozone pollution (Pet'rs' Br. 38–41), but this argument ignores the fact that the agencies analyzed the Project's effect on ozone levels through an analysis of the Project's ozone precursor emissions, consistent with EPA's guidance. As explained below, the agencies prepared and published a General Conformity Determination analyzing the Project's proposed emissions in relation to the Texas

Clean Air Act State Implementation Plan. The determination concluded that the

Project would not increase the severity of any existing ozone-standard violation in

any area. MAR.27406. The public had notice of that determination and the

opportunity to comment, and the Texas Commission on Environmental Quality

concurred in that determination. And the agencies incorporated the conformity

analysis into the FEIS.

The General Conformity Rule of the Clean Air Act requires federal agencies

to ensure their activities do not cause or contribute to any new air quality standard

violations, increase the frequency or severity of any existing standard violation, or

delay the timely attainment of any standard or interim emission reduction in any

area. MAR.23849; *see also* 42 U.S.C. § 7506(c)(1). When the General Conformity

Rule applies, an agency must issue a "conformity determination" for each pollutant

for which a project's total direct and indirect emissions would equal or exceed de

minimis rates. MAR.23849 (citing 40 C.F.R. § 93.153).

For the Project, the agencies determined that the total annual net emissions

of $NO_X$ from Project *construction* would exceed the regulatory de minimis

threshold rates and thus required a General Conformity Determination, which the

agencies prepared with concurrence from the Texas Commission on Environmental

Quality. MAR.23850; MAR.27395–421. The agencies determined that, after

construction, $NO_X$ and VOC emissions during Port *operation* would be well below

the threshold rates for a conformity determination, so a General Conformity

Determination was not required for operational emissions. MAR.23850.

In the General Conformity Determination, the agencies determined that the

Port will not (1) cause or contribute to any new air-quality standard violations in

any area; (2) increase the frequency or severity of any existing ozone-standard

violation in the area; or (3) delay the timely attainment of any ozone standard,

interim emission reduction, or other milestones in any area. MAR.27400, 27402.

The General Conformity Determination was subject to public notice and a 30-day

public comment period and incorporated by reference in the FEIS. MAR.27400.

Thus, Petitioners are wrong that the agencies failed to take a hard look at the

Port's ozone pollution impacts. Pet'rs' Br. 41. In the General Conformity

Determination, the agencies calculated the Project's potential to increase ozone

pollution through its precursor emissions and determined whether the added

pollution would contribute to the current ozone standard violations in the area, in

accordance with the Clean Air Act. Nothing in the Clean Air Act or NEPA

prohibits agencies from using $NO_X$ and VOC emissions to calculate ozone

formation; indeed, EPA's General Conformity Rule explicitly contemplates that

agencies will use measurements of precursor emissions to calculate a project's

contribution to ozone formation. 40 C.F.R. § 93.153(b)(1) (defining the threshold

emission rates for when a General Conformity Determination for ozone is required in tons/year of VOCs or $NO_X$).

Petitioners note that EPA downgraded the region from "Serious" to "Severe" nonattainment status for ozone just before MARAD issued its ROD, Pet'rs' Br. 38–39, but that determination was made after the agencies issued the FEIS so it could not be included in the FEIS. *See* 87 Fed. Reg. 60,926 (Oct. 7, 2022). Nor did that downgrade trigger any supplemental NEPA analysis, because the agencies had already prepared a General Conformity Determination confirming that the Project would not contribute to air-quality standard violations. In any event, MARAD did address Petitioners' concern about the downgraded air quality after the agencies issued the FEIS. In response to comments on the FEIS relating to health concerns from ozone, MARAD added a condition to the ROD requiring the applicant to monitor its VOC emissions. MAR.208608–09. The ROD also requires the applicant to provide ongoing construction and operation progress reports, which allows MARAD to track the progress of construction activities subject to the General Conformity Determination. MAR.208596.

Petitioners contend that estimated ozone levels (based on an EPA assessment tool to estimate ozone levels through precursor emissions) were above significant impact levels. Pet'rs' Br. 39–40. But Petitioners have inaccurately conflated the agencies' air-quality analysis with the analysis in the applicant's own

35

data. *Cf.* Pet'rs' Br. 40 n.22. The applicant's data estimates the *total* impact of the offshore ozone emissions from the entire project. The agencies' analysis instead followed the Clean Air Act's framework for new source review, which focuses on whether a single stationary source will lead to an increase in a pollutant beyond the "significant impact level." This source-focused analysis determines whether the new source will lead to a significant deterioration in air quality. *See Sierra Club v. Envtl. Prot. Agency*, 705 F.3d 458, 461 (D.C. Cir. 2013) (citing 40 C.F.R. § 51.166(k)). So Petitioners are comparing the applicant's estimate for the total ozone formation from the entire offshore project, including all mobile and stationary sources that will be used during the project, with the agencies' estimate for the ozone formation from the new stationary source. It makes sense that these numbers would be different because the applicant's data included more sources of emissions.

Moreover, the agencies disclosed that adding mobile sources (tanker ships, support vessels, and helicopters) to the analysis nearly triples the total offshore $NO_X$ emissions. MAR.23839. At bottom, the agencies analyzed the Project's ozone formation from two angles. They determined that the offshore estimated ozone formation, when the Project was analyzed as a stationary source, would fall under the 1 part-per-billion significant impact level. MAR.23843. By contrast, the applicants' data—which was also disclosed in the FEIS—demonstrated that the

*total* offshore ozone formation, including mobile sources, would be far below 5 parts-per-billion. MAR.34675–76, 34681. And when EPA reviewed the FEIS, it had no comments on the air-quality analysis. MAR.207307–08.

In sum, the agencies took a hard look at the Project's effect on ozone levels by analyzing the Project's ozone precursor emissions. The agencies disclosed that analysis to the public, and neither EPA nor the Texas Commission on Environmental Quality disagreed with that analysis. Thus, the agencies complied with NEPA.

> **b.**     **The agencies considered the Port's cumulative impact on ozone pollution.**

The agencies also analyzed the Project's cumulative impact on ozone pollution in the region. Petitioners fault the FEIS for not considering the Project's combined ozone emissions from offshore and onshore components, Pet'rs' Br. 57, but the FEIS explains why the agencies chose to separate the analysis. The agencies found that the onshore and offshore construction activities would not result in a cumulative impact because they would be far enough apart geographically. MAR.23838. In addition, most of the offshore construction would occur in a different construction year than the onshore construction. *Id.*

Petitioners acknowledge that the FEIS's discussion of cumulative impacts includes a table listing emissions from SPOT and other crude oil and liquefied natural gas terminals, but they fault that table for not including ozone specifically.

Pet'rs' Br. 41–42 (citing MAR.24085). But, as discussed above, the FEIS analyzes

ozone emissions by modeling ozone precursor emissions, and the table includes

$NO_X$ and VOC emissions for the other projects. MAR.24085. And the FEIS's

discussion of cumulative impacts explicitly covers ozone emissions. MAR.24086.

At bottom, Petitioners identify no deficiencies in the agencies' discussion of the

cumulative impacts on ozone pollution from the Project and nearby projects.

**B.    The agencies' analysis of project alternatives complied with NEPA.**

Under NEPA, an EIS should "[r]igorously explore and objectively evaluate

all reasonable alternatives, and for alternatives which were eliminated from

detailed study, briefly discuss the reasons for their having been eliminated." 40

C.F.R. § 1502.14(a) (2019). Here, the agencies appropriately considered

reasonable alternatives to the Project and properly analyzed the baseline no-action

alternative. Thus, the agencies did not act arbitrarily or capriciously.

**1.    The agencies were not required to analyze Petitioners' preferred alternative under NEPA.**

The agencies prepared a robust alternatives analysis consistent with NEPA's

requirements (MAR.23389–477), and Petitioners do not directly challenge the

alternatives that the agencies studied. Instead, Petitioners point to another

alternative (a reduced-capacity port) that they claim the agencies should have

included. Pet'rs' Br. 43. But the agencies were not required to consider Petitioners'

preferred alternative because Petitioners did not sufficiently raise a specific reduced-capacity alternative in their comments to the agencies. Even if they had raised that alternative, the agencies considered a reduced-capacity alternative and explained why it would not fit the purpose and need of the Project.

First, persons challenging an agency's compliance with NEPA must "structure their participation so that it . . . alerts the agency to the [parties'] position and contentions, in order to allow the agency to give the issue meaningful consideration." *Pub. Citizen*, 541 U.S. at 764 (cleaned up). To challenge an agency's failure to properly consider possible alternatives to the proposed action, a party must identify in its comments a specific alternative beyond what was analyzed and urge the agency to consider that alternative. *Id.*

Likewise, this Court has held that, to challenge an agency's adequate consideration of alternatives, a party must generally "rais[e] the alternative in the comments addressed to the agency." *Shrimpers & Fisherman of the RGV v. U.S. Army Corps of Eng'rs*, 56 F.4th 992, 997–98 (5th Cir. 2023).

Here, Petitioners did not present a specific, reduced-capacity alternative in their comments. Before the agencies published the FEIS, Petitioners only mentioned the idea of a reduced-capacity alternative in one comment, which they do not cite in their opening brief. MAR.50571–72. There, Petitioners questioned the need for the Project's whole capacity and challenged the Project's purpose and

need. *Id.* But they did not request that the agencies consider a specific, reduced-capacity alternative; instead, they argued that the agencies improperly defined the Project's purpose and need by assuming that the Project's full oil-export capacity was necessary. *Id.* So Petitioners' comment was framed as a challenge to the purpose and need of the Project—it did not present a concrete alternative that the agencies had to consider under NEPA.

In their brief, Petitioners cite a comment that they made on the SDEIS, but that comment did not specifically suggest that the agencies consider a reduced-capacity alternative, it only suggested that the agencies had "fail[ed] to genuinely consider the no-action alternative in the SDEIS." MAR.157908–11. Like the petitioners in *Shrimpers*, Petitioners here did not propose their specific alternative in comments addressed to the agencies before the agencies issued the FEIS. Rather, they only raised alternatives that were not "sufficiently similar to Petitioners' [now-]proposed alternative to allow the [agencies] to give the issue meaningful consideration." *Shrimpers*, 56 F.4th at 998.

Even if Petitioners had raised a specific alternative, the agencies considered a reduced-capacity alternative in the FEIS and explained why that alternative would not meet the purpose and need of the Project. MAR.23455. In their alternatives analysis, the agencies considered "system alternatives," which considered "the ability of other existing, planned, or proposed . . . facilities to meet

40

the objectives of the proposed SPOT Project." MAR.23451. This explored using

the proposed Bluewater Terminal to meet SPOT's purpose and need. MAR.23455.

The Bluewater Terminal would load up to 192 very large crude carriers per year,

which is around 52% of SPOT's capacity. *Id.* But the FEIS concluded that "[t]he

proposed export volume for the Bluewater SPM Project would not meet the

volume that would be exported by the Proposed Action without substantial design

modifications and facility additions." *Id.*

When outlining the purpose and need of an application by a third party,

NEPA requires only that the agency "consider alternatives relevant to the

applicant's goals," and the agency is "not to define what those goals should be."

*City of Shoreacres v. Waterworth*, 420 F.3d 440, 450–51 (5th Cir. 2005); *La.*

*Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985) ("Indeed, it

would be bizarre if the [agency] were to ignore the purpose for which the applicant

seeks a permit and to substitute a purpose it deems more suitable."). When passing

NEPA, "Congress did not expect agencies to determine for the applicant what the

goals of the applicant's proposal should be." *Citizens Against Burlington, Inc. v.*

*Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (Thomas, J.).

Here, the agencies explained that the purpose and need of the Project is to

"allow for the export of crude oil from excess production capability from the

United States to meet global demands at competitive prices" and that the Project

would "meet the Applicant's objective to provide a safe, efficient, and reliable facility to allow full capacity loading of a maximum of 365 [very large crude carriers] per year." MAR.23362, 23366. Thus, the agencies properly concluded that the reduced-capacity Bluewater alternative would not meet the purpose and need of the Project. MAR.23455.

Although Petitioners object (Pet'rs' Br. 45–47) to how the agencies analyzed future demand for crude oil when defining the purpose and need of the Project, they fail to show that analysis was arbitrary. In fact, the agencies closely examined future crude-oil demand. When analyzing the global market demands for crude oil to define the purpose and need of the Project, the agencies primarily relied on studies by the U.S. Energy Information Administration and International Energy Agency. MAR.23362, 24091. The agencies explained that, although some analysts believe that oil demand has already peaked, the Energy Information Administration expects crude-oil production to return to pre-pandemic levels by 2025 and remain high through 2048. MAR.23362. The Energy Information Administration also predicted demand will rise, and the U.S. Government Accountability Office reported that the repeal of the crude-oil export ban has resulted in a greater incentive for domestic producers to increase crude oil production. *Id.* Petitioners disagree with this analysis, but "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified

experts." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). When agencies conduct a reasoned evaluation of relevant information, as they did here, their conclusion is not arbitrary and capricious. *Id.* at 385.

Petitioners are also incorrect that the agencies summarily assumed that all the proposed Port's capacity is necessary. Pet'rs' Br. 45. In defining the purpose and need of the Project, the agencies contemplated that the Port would not necessarily operate at maximum capacity. The agencies observed that it was "highly unlikely that the proposed Project would operate at maximum capacity due to downtime for planned and unplanned maintenance, severe weather shutdowns, and market conditions, among other factors." MAR.23363. And the agencies noted that the International Energy Agency "forecasts that world oil demand will peak soon after 2025 and decline by 20 million bpd by 2050" but concluded that "because the world price, and thus global consumption, of oil is independent of U.S. oil export infrastructure, [the Port's] increase in U.S. crude oil [exports] would be expected to largely displace production in other countries."[2] MAR.24091. So the record demonstrates that the agencies contemplated that the Port would not necessarily operate at full capacity and considered (but rejected) alternatives that would operate at too low of a capacity to meet the purpose and

---

[2] The original quote refers to "U.S. crude oil imports," but from the context of the FEIS, it is clear that the quoted language was discussing oil exports. The quotation addresses scrivener's error.

need of the Project. The agencies' alternatives analysis is not arbitrary, capricious, or unlawful.

### 2. The agencies properly evaluated the no-action alternative.

The agencies also appropriately considered the no-action alternative. An EIS must analyze "all reasonable alternatives" to a project, including "the alternative of no action." 40 C.F.R. § 1502.14(a), (d) (2019). The Council on Environmental Quality, which promulgates NEPA's implementing regulations, has explained that when a no-action alternative would "result in predictable actions by others," those consequences should be included in the analysis. *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981). For example, "if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the 'no action' alternative." *Id.* Thus, courts have held that the no-action alternative should discuss reasonably foreseeable development that would result from that alternative. *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 801 (D.C. Cir. 2022); *Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 74 (D.D.C. 2000), *aff'd*, 11 F. App'x 3 (D.C. Cir. 2000).

Under the no-action alternative in the FEIS, the Port would not be constructed. MAR.23450. The agencies explained that, if MARAD were to deny

44

the applicant's license application, oil exports would likely continue because of high international demand and excess domestic production. *Id.* But under the no-action alternative, those oil exports would use shoreside terminals and offshore ship-to-ship transfers. *Id.*

Petitioners assert that the no-action alternative is flawed because it assumes either: (1) federal agencies would approve other identical ports with similar impacts or (2) existing ports would export the same volumes of oil as the proposed Port. Pet'rs' Br. 47–48. But the agencies did not assume in the no-action alternative that MARAD will approve other new oil export terminals; rather, they acknowledged that "[a]s current excess production exceeds the capacity of existing shoreside terminals, a denial of a DWP license could result in expansion or establishment of *onshore* oil terminals in other locations along the Gulf Coast," which are outside of MARAD's licensing authority. MAR.23450 (emphasis added).

It is both permissible and sensible under NEPA for the no-action alternative to discuss reasonably foreseeable onshore development that could result from the agencies' inaction. Indeed, courts have upheld no-action alternatives that accounted for market forces and predicted development outside an agency's control. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020) ("Not drilling at the proposed site may cause global oil supply to fall,

demand to rise, and, as a result, require drilling and oil extraction elsewhere. To capture these indirect downstream emissions, BOEM used a market-simulation model to predict the greenhouse gas emissions for energy sources that would substitute for the oil not produced at Liberty."); *No Mid-Currituck Bridge-Concerned Citizens v. N.C. Dep't of Transp.*, 60 F.4th 794, 805–06 (4th Cir. 2023) ("It's true that the agencies looked to the local land-use plans—reflecting the Outer Banks communities' development expectations—as a starting point to calculate a baseline level of expected development. But the agencies then properly omitted the effects of the bridge in constructing the 'no-build baseline.'"); *cf. N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 602–05 (4th Cir. 2012) (holding that agencies' NEPA analysis was flawed because it did not disclose to the public that the no-action alternative baseline assumed that the action under consideration itself would proceed).[3]

Petitioners err in relying on *WildEarth Guardians v. U.S. Bureau of Land Management*, 870 F.3d 1222, 1234 (10th Cir. 2017). There, the Tenth Circuit

---

[3] Petitioners cite Council on Environmental Quality guidance from January 9, 2023, but this guidance was issued after MARAD issued the ROD in November 2022. Pet'rs' Br. 51. Thus, the agencies did not consider this guidance and the Court should not consider it here. *See National Environmental Policy Act Guidance on Consideration of Greenhouse Gases and Climate Change*, 88 Fed. Reg. 1,196, 1,212 (Jan. 9, 2023) ("CEQ does not expect agencies to apply this guidance to concluded NEPA reviews and actions for which a final EIS or EA has been issued.").

faulted the agency for relying on a "perfect substitution assumption" contradicted by a report from the Energy Information Administration and for failing to distinguish between the action and no action alternatives. *Id.* at 1234–37. The agency made a "blanket assertion that coal would be substituted from other sources, unsupported by hard data" and "provided no information" sufficient to permit a reasoned choice among options. *Id.* at 1235.

Unlike the agency in *WildEarth Guardians*, the agencies here made a reasoned and rational calculation based on the record. Relying on record data and market principles, the agencies concluded that if MARAD were to deny the license application, "it is likely that exports of oil that are already occurring due to international global demand and domestic excess production would continue to use shoreside terminals in combination with offshore ship-to-ship transfers." MAR.23450. Likewise, the agency action in *WildEarth Guardians* would have approved leases for the extraction of coal itself, while the action here does not approve the extraction or production of crude oil but would simply approve a license for a facility to export already-produced crude oil. *Id.*

Here, after analyzing the data, the agencies concluded that the Project would only marginally impact upstream production of crude oil based on slightly reduced transportation costs. MAR.24091. The agencies relied on scientific studies from the Energy Information Administration to bolster their conclusion that crude oil

47

supply available for export will continue to rise, independent of the Project at issue—unlike the agency in *WildEarth Guardians* whose analysis was contradicted by an Energy Information Administration report. MAR.23451. In response to comments, the agencies added a discussion of whether the Project would induce the production of crude oil. MAR.24088. Thus, they did not "simply ignor[e]" the comments addressing the issue, as Petitioners claim. Pet'rs' Br. 50.

Petitioners also point out that the record shows that "existing Gulf coast ports are physically constrained from exporting increasing volumes of oil, with no evidence they can accommodate the sheer volume of ship traffic necessary to massively expand export capacity through the existing reverse-lightering system." Pet'rs' Br. 49. If anything, this supports the agencies' conclusion that denying the applicant's license could lead to the establishment of new onshore oil terminals to expand onshore-port capacity for oil exports. MAR.23450.

Agencies evaluating the no-action alternative should not blind themselves to reasonably foreseeable development that would occur were a project not to proceed. The record demonstrates that the agencies properly defined the no-action alternative and made a rational conclusion that, under that alternative, the excess crude oil in the United States would be exported through means other than the proposed Port. In sum, the alternatives analysis complied with NEPA and was not arbitrary and capricious.

**II.    MARAD complied with the Deepwater Port Act.**

Petitioners bring claims that MARAD violated the Deepwater Port Act by (1) exceeding the Act's statutory timeline, and (2) by failing to determine whether the Port would be consistent with the Nation's energy sufficiency goals. Pet'rs' Br. 53–60. But as for their statutory-timeline claim, Petitioners do not fall within the zone of interests protected by the Act—indeed, they asked the agencies to *extend* the time for review and comment. If anything, the extra time and delay benefitted rather than harmed Petitioners. Even if they could bring that claim, the Deepwater Port Act did not require MARAD to deny SPOT's license application when the statutory timeline was exceeded. Lastly, MARAD reasonably determined that SPOT would be consistent with the Nation's energy sufficiency goals and stated this conclusion in the ROD. MAR.208577; MAR.208620.

**A.    As to the timelines in the Deepwater Port Act, Plaintiffs fall outside the zone of interests protected by the Act, and MARAD complied with the Act when it approved the license application after extending the review timelines.**

Petitioners argue that the agencies violated the Deepwater Port Act's procedures when they exceeded the Act's statutory timeline to review the license application. Pet'rs' Br. 53.

Section 5 of the Deepwater Port Act includes four consecutive timelines for the agencies' review of a license application. First, within 21 days of receiving an application, the agencies must determine whether the application "appears to

contain all of the information required." 33 U.S.C. § 1504(c)(1). Within 5 days of making such a determination, the agencies must publish notice of the application in the Federal Register. *Id.* Then the agencies must conclude all public hearings within 240 days. *Id.* § 1504(g). Lastly, the Secretary "shall approve or deny any application . . . not later than 90 days after the last public hearing on a proposed license." *Id.* § 1504(i)(1). These timelines total 356 days.

MARAD met the 90-day timeline to approve or deny the license, but the agencies exceeded the other three timelines. 23 days passed between when the agencies received the application and when they made the completeness determination, and 11 days passed between when the agencies deemed the application complete and when they published the notice in the Federal Register. MAR.208544. The agencies exceeded the 240-day timeline to conclude public hearings by more than 600 days. MAR.208553. Petitioners do not fall within the zone of interests to challenge the timeline exceedances, and in any event, the Deepwater Port Act did not require MARAD to deny the application because of the extended review.

### 1.    Petitioners do not fall within the zone of interests protected by Section 5 of the Deepwater Port Act.

Plaintiffs have not shown that their purported injury from an extended review process falls within the zone of interests that Section 5 of the Deepwater Port Act was intended to protect. *See Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 129 (2014). The test is "not especially

demanding," so it forecloses suit only when Petitioners' interests are "so

marginally related to or inconsistent with the purposes implicit in the statute," that

"it cannot reasonably be assumed that Congress authorized" them to sue. *Id.* at 130

(cleaned up); *see also Sabine River Auth.*, 951 F.2d at 675 ("The only people who

may sue to enforce a law are the people who belong to the class that the law was

designed to protect.").

The timelines in Section 5 ensure that MARAD promptly approves or denies

an application to operate a deepwater port. 33 U.S.C. § 1504. Applying traditional

tools of statutory interpretation, *Lexmark*, 572 U.S. at 127, the timelines in

Section 5 are for the *applicant*'s benefit to ensure timely decisions; there is no

indication in Section 5 that Congress intended litigants to challenge approval of a

license if the agencies extended their review beyond those deadlines. The extended

review process benefitted Petitioners, it did not harm them. In fact, Petitioners

themselves requested that the agencies extend the public comment period, which

the agencies did. MAR.45062–63 ("In many cases, [the COVID-19 pandemic] has

led to insufficient time for review and comment preparation on the DEIS under the

current deadline."). If anything, the extended review process gave Petitioners'

members even more opportunities to present their comments to the agencies,

conferring a benefit on Petitioners' members. On that score, Petitioners have failed

to show that they are "adversely affected" by the extended timelines. *See* 33 U.S.C. § 1516(B) (Deepwater Port Act's judicial review provision). Thus, Petitioners fall outside the zone of interests protected by Section 5 and cannot challenge the agencies' action under this provision.

### 2. MARAD was not required to deny the application after the review timeline elapsed.

Petitioners contend (Pet'rs' Br. 52) that once 356 days had passed since the license application's submission, MARAD had to deny it, but that requirement is nowhere in the statute*, see* 33 U.S.C. § 1504, or Coast Guard's regulations, 33 C.F.R. § 148.276.

Because the Deepwater Port Act does not specify a "consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993). This Court has similarly held that "a statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and imposes a consequence for failure of compliance." *Meliezer v. Resolution Tr. Co.*, 952 F.2d 879, 883 (5th Cir. 1992). The Deepwater Port Act's plain language imposes no consequences for extending a license-application review past the statutory timeline, so MARAD was not required to deny the license application when the timeline elapsed. *See* 33 U.S.C. § 1504.

By contrast, the Deepwater Port Act does specify consequences for other deadlines. For example, it provides that the governor of an adjacent coastal State is presumed to approve of the application if he fails to "transmit his approval or disapproval to the Secretary not later than 45 days after the last public hearing." 33 U.S.C § 1508(b)(1). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United* States, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). Thus, the Deepwater Port Act's structure suggests that if Congress intended for MARAD to deny an application that was still being reviewed after the timeline elapsed, it would have included a consequence in the statutory text stating so. Congress did not include such language.

Petitioners note that Section 5 states that the agencies "shall" take an action after a specified number of days. 33 U.S.C. § 1504(c)(1), (g), (i)(1). But again, the statute imposes no consequences for the agencies' failure to act by those dates. Petitioners' interpretation also leads to illogical outcomes. Under Petitioners' reading of Section 5, MARAD had to deny the license application just 22 days after SPOT submitted its application, when the agencies had not determined whether the application was complete within 21 days. *See* 33 U.S.C. § 1504(c)(1).

The plain text does not compel this irrational result. Nor do Coast Guard regulations specify any consequence when the agencies exceed the review timeline. 33 C.F.R. §§ 148.107, 148.283. With no language in either the Deepwater Port Act or the Coast Guard implementing regulations requiring MARAD to deny an application if review has taken longer than 356 days, the agencies properly continued their review of SPOT's application.

Petitioners did not object to the agencies' reasons to extend the regulatory timeline, but instead requested extensions of the NEPA review. And the agencies had sound reasons to extend the review timeline. Specifically, MARAD opted to extend the review timeline to conduct more outreach to non-English speakers and to make accommodations related to the COVID-19 pandemic. In a letter to the applicant, the Coast Guard explained that the extended comment period for the DEIS was needed mostly because of the "unforeseen, extensive health and related social distancing impacts of the coronavirus pandemic." MAR.92043–44. On top of extensions caused by the pandemic, the agencies extended their review after a determination that public notification and opportunities for comment "did not include sufficient outreach and notification to Limited English Proficient (LEP) persons." MAR.208549. Thus, the agencies prepared Spanish and Vietnamese translations of Project documents and issued the SDEIS to "ensure meaningful

engagement" of identified non-English speakers located in the affected area of the Project. MAR.208550.

The Deepwater Port Act did not require MARAD to deny SPOT's application when the statutory timeline lapsed. Consistent with the Act's plain language, MARAD reasonably opted to extend the review timeline to make accommodations in response to the COVID-19 pandemic and to conduct more outreach to non-English speakers.

**B.**    **MARAD reasonably determined that the Port is in the national interest and consistent with national energy-sufficiency goals.**

Before issuing a license under the Deepwater Port Act, the Secretary of Transportation must determine that the deepwater port "will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality." 33 U.S.C. § 1503(c)(3). Petitioners claim (Pet'rs' Br. 57–60) that MARAD failed to determine that the Port would be consistent with the nation's energy sufficiency goals, but MARAD made that determination, supported by specific findings.

When reviewing an agency's determination under the APA, the Court "must give due deference to the agency's ability to rely on its own developed expertise." *Avoyelles Sportsmen's League*, 715 F.2d at 904–05. So long as an agency decision was rational and based on consideration of the relevant factors, it should be upheld.

*Id*. MARAD's national-interest determination should be upheld because it is clearly articulated and explained in the ROD. After consulting Department of Transportation economists, MARAD found that the Port's benefits to local growth, national economic growth, and the nation's infrastructure resilience would be in the national interest. MAR.208579. MARAD further noted the Port's minimal impact on the availability and cost of crude oil in the domestic market, which would ensure that the project protected domestic energy sufficiency. *Id.* Additionally, MARAD explained that the Port would be better for the environment and safer than current methods for crude-oil export. *Id.* All these factors led MARAD to conclude that the Port was "in the national interest and consistent with other policy goals, including energy sufficiency and environmental quality." *Id.*

MARAD bolstered its national-interest determination by explaining that the Port's operation was not expected to impact oil prices in the U.S. because "major drivers of oil price movements, such as global oil demand, wars and civil unrest, technological innovation, and government policy are minimally influenced by U.S. exporter decisions and largely independent of U.S. exports." MAR.208578. And in the conclusion to the ROD, MARAD reaffirmed that the Port was "in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency." MAR.208620. That conclusion aligns

with Congress's 2015 repeal of the ban on exporting crude oil. *See* 42 U.S.C. § 6212a(b).

Petitioners' contention that the Port would not ensure "adequate" and "necessary" domestic oil supplies is contradicted by the record. Pet'rs' Br. 58–59. MARAD explained why the Port would satisfy the goal of energy sufficiency: "While a portion of the crude oil produced by the United States is refined domestically for domestic use, the existing refineries in the United States are not anticipated to be able to handle the amount of crude oil projected to be produced in the United States through 2050." MAR.23363. MARAD also explained that future global demand for oil was expected to decline, "regardless of whether deepwater ports for U.S. oil exports are constructed." MAR.24091. In other words, MARAD rationally concluded that domestic supply of crude oil would be unaffected by the Port.

Although Petitioners may disagree with MARAD's determination that the Port is in the national interest and consistent with energy sufficiency policy goals, they are wrong to contend that it failed to make that determination. MARAD made a reasoned national-interest determination that complies with the Deepwater Port Act. The ROD was not arbitrary and capricious.

## CONCLUSION

For these reasons, the petition for review should be denied.[4]

Of Counsel:

JOHN E. PUTNAM
*General Counsel*
PAUL M. GEIER
*Assistant General Counsel*
ERIN D. HENDRIXSON
*Senior Trial Attorney*
U.S. Dept. of Transportation

GABRIEL CHAVEZ
*Acting Chief Counsel*
AINSLEY Q. PARRISH
*Attorney Advisor*
Maritime Administration

LT PEYTON COLEMAN
*Attorney*
U.S. Coast Guard

Respectfully submitted,

s/ *Ezekiel A. Peterson*
TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
EZEKIEL A. PETERSON
*Attorneys*[5]
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

July 10, 2023
90-13-1-16983

---

[4] If the Court grants the petition, it should not vacate the ROD and should instead remand to MARAD for further proceedings. Remand is the appropriate remedy when there is at least a serious possibility that the agency will be able to substantiate its decision. *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). Given the issues raised by Petitioners, MARAD could substantiate its decision on remand.

[5] Emma Ehrlich, a law clerk in the Environment and Natural Resources Division, substantively contributed to this brief.

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,805 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 5th Cir. R. 25.2.13;

(2)    the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and

(3)    the document has been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender Antivirus Version 1.391.4116.0 (updated July 10, 2023), and according to the program is free of viruses.

s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2023, I electronically filed the foregoing

using the court's CM/ECF system, which will notify all registered counsel.


s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON

Counsel for Respondents

**ADDENDUM**

33 U.S.C. § 1503 ................................................................................2a

33 U.S.C. § 1504 ................................................................................4a

# 33 U.S.C. § 1503

*License for ownership, construction, and operation of deepwater port*

**(a) Requirement**

No person may engage in the ownership, construction, or operation of a deepwater port except in accordance with a license issued pursuant to this chapter. No person may transport or otherwise transfer any oil or natural gas between a deepwater port and the United States unless such port has been so licensed and the license is in force.

**(b) Issuance, transfer, amendment, or reinstatement**

The Secretary may—

> (1) on application, issue a license for the ownership, construction, and operation of a deepwater port;
>
> . . .

**(c) Conditions for issuance**

The Secretary may issue a license in accordance with the provisions of this chapter if—

> (1) he determines that the applicant is financially responsible and will meet the requirements of section 2716 of this title[;]
>
> (2) he determines that the applicant can and will comply with applicable laws, regulations, and license conditions;
>
> (3) he determines that the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality;
>
> (4) he determines that the deepwater port will not unreasonably interfere with international navigation or other reasonable uses of the high seas, as defined by treaty, convention, or customary international law;

(5) he determines, in accordance with the environmental review criteria established pursuant to section 1505 of this title, that the applicant has demonstrated that the deepwater port will be constructed and operated using best available technology, so as to prevent or minimize adverse impact on the marine environment;

(6) he has not been informed, within 45 days of the last public hearing on a proposed license for a designated application area, by the Administrator of the Environmental Protection Agency that the deepwater port will not conform with all applicable provisions of the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, or the Marine Protection, Research and Sanctuaries Act, as amended;

(7) he has consulted with the Secretary of the Army, the Secretary of State, and the Secretary of Defense, to determine their views on the adequacy of the application, and its effect on programs within their respective jurisdictions;

(8) the Governor of the adjacent coastal State or States, pursuant to section 1508 of this title, approves, or is presumed to approve, issuance of the license; and

(9) the adjacent coastal State to which the deepwater port is to be directly connected by pipeline has developed, or is making, at the time the application is submitted, reasonable progress, as determined in accordance with section 1508(c) of this title, toward developing, an approved coastal zone management program pursuant to the Coastal Zone Management Act of 1972.

. . .

## 33 U.S.C. § 1504

*Procedure*

. . .

### (c) Plans; submittal to Secretary of Transportation; publication in Federal Register; application contents; exemption

(1) Any person making an application under this chapter shall submit detailed plans to the Secretary. Within 21 days after the receipt of an application, the Secretary shall determine whether the application appears to contain all of the information required by paragraph (2) hereof. If the Secretary determines that such information appears to be contained in the application, the Secretary shall, no later than 5 days after making such a determination, publish notice of the application and a summary of the plans in the Federal Register.

. . .

### (g) Public notice and hearings; evidentiary hearing in the District of Columbia; decision of Secretary based on evidentiary record; consolidation of hearings

A license may be issued only after public notice and public hearings in accordance with this subsection. At least one such public hearing shall be held in each adjacent coastal State. . . . All public hearings on all applications for any designated application area shall be consolidated and shall be concluded not later than 240 days after notice of the initial application has been published pursuant to subsection (c) of this section.

### (i) Application approval; period for determination; priorities; criteria for determination of application best serving national interest

(1) The Secretary shall approve or deny any application for a designated application area submitted pursuant to this chapter not later than 90 days after the last public hearing on a proposed license for that area.

. . .