No. 23-60027

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA COUNTY;
TEXAS CAMPAIGN FOR THE ENVIRONMENT; CENTER FOR BIOLOGICAL
DIVERSITY; TURTLE ISLAND RESTORATION NETWORK; SIERRA CLUB,

*Petitioners*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; PETE BUTTIGIEG,
IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF
TRANSPORTATION; UNITED STATES COAST GUARD, AN AGENCY OF THE
U.S. DEPARTMENT OF HOMELAND SECURITY; RICHARD V. TIMME;
UNITED STATES MARITIME ADMINISTRATION, AN AGENCY OF THE U.S.
DEPARTMENT OF TRANSPORTATION; ANN PHILLIPS, IN HER OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE U.S. MARITIME
ADMINISTRATION; LINDA L. FAGAN, IN HER OFFICIAL CAPACITY AS
COMMANDANT OF THE U.S. COAST GUARD,

*Respondents*

On Petition for Review from Maritime Administration,

MARAD-2019-0011

**REPLY BRIEF OF PETITIONERS**

SUBMITTED BY:

Devorah Ancel (TX24111073)
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org
*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

Erin Gaines (TX24093462)
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org
*Counsel for Petitioner*
*Texas Campaign for the Environment*

Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
adinn@lonestarlegal.org
*Counsel for Petitioner*
*Citizens for Clean Air and Water in*
*Brazoria County*

Lauren Parker (DC1670885)
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org
*Counsel for Petitioner*
*Center for Biological Diversity*

Submitted on: July 31, 2023

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cɪʀ. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Respondents: | Counsel for Respondents: |
|---|---|
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Brian Toth of U.S. Department of Justice Washington, DC |
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Paul Geier of U.S. Department of Transportation Washington, DC |
| Pete Buttigieg, Secretary, U.S. Department of Transportation | Ann Phillips of U.S. Department of Transportation Washington, DC |
| Linda Fagan | Brian Toth of U.S. Department of Justice Washington, DC |
| Linda Fagan | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| Linda Fagan | Linda Fagan of U.S. Coast Guard Washington, DC |
| Linda Fagan | Melissa Bert of Judge Advocate General Washington, DC |
| Ann Phillips | Brian Toth of U.S. Department of Justice Washington, DC |

| | |
|---|---|
| Ann Phillips | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| Ann Phillips | Paul Geier of U.S. Department of Transportation Washington, DC |
| Ann Phillips | Ann Phillips of U.S. Department of Transportation Washington, DC |
| Richard Timme | Richard Timme of U.S. Coast Guard New Orleans, LA |
| Richard Timme | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| United States Coast Guard | Brian Toth of U.S. Department of Justice Washington, DC |
| United States Coast Guard | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| United States Coast Guard | Linda Fagan of U.S. Coast Guard Washington, DC |
| United States Coast Guard | Melissa Bert of Judge Advocate General Washington, DC |
| United States Department of Transportation | Brian Toth of U.S. Department of Justice Washington, DC |
| United States Department of Transportation | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
| United States Department of Transportation | Paul Geier of U.S. Department of Transportation Washington, DC |
| United States Department of Transportation | Ann Phillps of U.S. Department of Transportation Washington, DC |
| United States Maritime Administration | Brian Toth of U.S. Department of Justice Washington, DC |

| United States Maritime Administration | Ezekiel Peterson of U.S. Department of Justice Washington, DC |
|---|---|
| United States Maritime Administration | Paul Geier of U.S. Department of Transportation Washington, DC |
| United States Maritime Administration | Ann Phillps of U.S. Department of Transportation Washington, DC |

| **Petitioners:** | **Counsel for Petitioners:** |
|---|---|
| Center for Biological Diversity | Jason Rylander of Center for Biological Diversity Washington, DC |
| Center for Biological Diversity | Lauren Parker of Center for Biological Diversity Washington, DC |
| Citizens for Clean Air & Clean Water in Brazoria County | Amy Dinn of Lone Star Legal Aid Houston, TX |
| Sierra Club | Rebecca McCreary of Sierra Club Boulder, CO |
| Sierra Club | Devorah Ancel of Sierra Club Austin, TX |
| Texas Campaign for the Environment | Michael Brown of Earthjustice New Orleans, LA |
| Texas Campaign for the Environment | Erin Gaines of Earthjustice Houston, TX |
| Turtle Island Restoration Network | Rebecca McCreary of Sierra Club Boulder, CO |
| Turtle Island Restoration Network | Devorah Ancel of Sierra Club Austin, TX |

| Intervenors: | Counsel for Intervenors: |
|---|---|
| Enterprise Products Operating, L.L.C. | Catherine Stetson of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | James Banks of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | Sean Marotta of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | Patrick Valencia of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | Joanne Rotondi of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | Reedy Swanson of Hogan Lovells US, L.L.P. Washington, DC |
| Enterprise Products Operating, L.L.C. | David Keltner of Kelly, Hart & Hallman, L.L.P. Fort Worth, TX |
| Enterprise Products Operating, L.L.C. | Caitlyn Hubbard of Kelly, Hart & Hallman, L.L.P. Fort Worth, TX |
| Enterprise Products Operating, L.L.C. | Jacob deKeratry of Kelly, Hart & Hallman, L.L.P. Fort Worth, TX |
| Spot Terminal Services, L.L.C. | Catherine Stetson of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | James Banks of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | Sean Marotta of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | Patrick Valencia of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | Joanne Rotondi of Hogan Lovells US, L.L.P. Washington, DC |

| Spot Terminal Services, L.L.C. | Reedy Swanson of Hogan Lovells US, L.L.P. Washington, DC |
| Spot Terminal Services, L.L.C. | David Keltner of Kelly, Hart & Hallman, L.L.P. Fort Worth, TX |
| Spot Terminal Services, L.L.C. | Caitlyn Hubbard of Kelly, Hart & Hallman, L.L.P. Fort Worth, TX |
| Spot Terminal Services, L.L.C. | Jacob deKeratry of Kelly, Hart & Hallman, L.L.P. Fort Worth, TX |

| Other Interested Parties: | Counsel for Interested Parties: |
| --- | --- |
| Enbridge Inc. or its affiliate[1] | |

---

[1] Petitioners' Certificate lists "Enbridge, Inc. or its affiliate," ("Enbridge") because Enbridge's interest meets the broad definition of an "interested party," under Fifth Circuit Rule 28.2.1 (requiring "complete list of all persons . . . financially interested in the outcome of the litigation"). Petitioners based this certification on a string of Enbridge and Enterprise Products Partners L.P. ("Enterprise") SEC filings and independent media, from 2019 to May 2023. *See* Pet. Br. vi n.1. This includes Enbridge's recent 8-K report stating Enbridge has "expansion optionality to include Sea Port Oil Terminal (SPOT) export deliveries." Current Report (Form 8-K, Ex. 99.1), 5 (May 5, 2023), https://www.sec.gov/Archives/edgar/data/895728/000089572823000015/eiex991newsreleasexdocume.htm.

This May 2023 description matches earlier SEC filings and media reports evidencing Enbridge's potential equity participation right in the Project. *See* Pet. Br. vi n.1 (collecting sources). Meanwhile, SPOT relies nonspecifically on a year-old report. *See* SPOT Br. iii (citing Enterprise Products Partners L.P., Annual Report (Form 10-K) (filed Feb. 28, 2023)). That document is merely silent on the question, *see id.*, and says nothing to contradict the mass of authority Petitioners cite, including the most recent Enbridge filing.

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
/s/ Rebecca McCreary
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

/s/ Erin Laurel Gaines
Erin Gaines (TX24093462)
/s/ Mike Brown
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
*Counsel for Petitioner*
*Texas Campaign for the Environment*

/s/ Amy Catherine Dinn
Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
*Counsel for Petitioner*
*Citizens for Clean Air and Water in*
*Brazoria County*

/s/ Lauren Parker
Lauren Parker (DC1670885)
/s/ Jason Rylander
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
*Counsel for Petitioner*
*Center for Biological Diversity*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS............................................................iii

TABLE OF AUTHORITIES.............................................................................xi

GLOSSARY ...............................................................................................xvii

INTRODUCTION ..........................................................................................1

I.    Petitioners Have Standing.......................................................................2

II.    NEPA Hard Look Claims ......................................................................5

    A.    The Flawed Oil Spill Analysis Violates NEPA ...........................................
        .................................................................................................5

        1.  Failure to Consider Oil Spill Sizes and Impacts.........................................5

        2.  Failure to Take a Hard Look at Oil Spill Impacts on Species .....................8

        3.  Impacts to Rice's Whale and Protected Species.........................................8

    B.    MARAD Failed to Analyze SPOT's Total Ozone Impacts
        in an Ozone Nonattainment Area...............................................................11

        1.  MARAD Failed to Evaluate SPOT's Total Offshore Ozone Impacts
            from Stationary and Mobile Sources ........................................................12

        2.  MARAD Failed to Evaluate SPOT's Total Onshore and Offshore
            Ozone Impacts..........................................................................................14

        3.  MARAD Cannot Solely Rely on Ozone Precursors to Fulfill its
            Obligation to Take a "Hard Look" at the Project's Ozone Impacts,
            Both Individually and Cumulatively...........................................................15

        4.  MARAD Fails to Evaluate SPOT's Cumulative Ozone Impacts
            with GulfLink..........................................................................................16

III.    MARAD Failed to Analyze Reduced-Capacity or No-Action
        Alternatives ............................................................................ 17

   A.   Respondents Fail to Compare a Reasonable Smaller-Capacity
        Alternative .............................................................................. 17

   B.   Respondent's Unsubstantiated Claims that Existing Terminal
        Expansion is Inevitable Distorts Assessment of a No-Action
        Alternative .............................................................................. 20

IV.    MARAD Failed to Comply with the Deepwater Port Act ......................... 23

   A.   Petitioners Are "Aggrieved" Parties Because MARAD Failed
        to Meet Strict DWPA Deadlines or Justify its 600-Day Delay ................. 23

   B.   MARAD Violated the DWPA in Failing to Determine Whether
        The Project Advances National "Energy Sufficiency" .............................. 26

V.     Vacatur Is The Standard and Necessary Remedy ........................................ 29

CONCLUSION ...................................................................................... 30

CERTIFICATE OF SERVICE ................................................................. 32

CERTIFICATE OF COMPLIANCE ......................................................... 33

CERTIFICATE OF ELECTRONIC COMPLIANCE ............................... 36

ADDENDUM ........................................................................................ 38

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. Paxton,*
 65 F.4th 204 (5th Cir. 2023)................................................................2

*Alaska Survival v. Surface Transp. Bd.,*
 705 F.3d 1073 (9th Cir. 2013)...........................................................18

*Allied-Signal v. Nuclear Regulatory Comm'n,*
 988 F.2d 146 (D.C. Cir. 1993) .....................................................29, 30

*Ass'n of Data Processing Serv. Orgs. v. Camp,*
 397 U.S. 150 (1970) ..........................................................................23

*Atlantic Sea Island Grp. LLC v. Connaughton,*
 592 F. Supp 2d 1 (D.D.C. 2008) .......................................................24

*Bonds v. Tandy,*
 457 F.3d 409 (5th Cir. 2006).......................................................23, 24

*Cf. Mont. Wilderness Ass'n v. Connell,*
 725 F.3d 988 (9th Cir. 2013)...............................................................7

*Citizens Against Burlington, Inc. v. Busey,*
 938 F.2d 190 (D.C. Cir. 1991) ..........................................................19

*City of Shoreacres v. Waterworth,*
 420 F.3d 449 (5th Cir. 2005)..............................................................18

*Clarke v. Sec. Indus. Ass'n,*
 479 U.S. 388 (1987) ..........................................................................24

*Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior,*
  100 F.3d 837 (10th Cir. 1996)...................................................................5

*Ctr. for Biological Diversity v. Bernhardt,*
  982 F.3d 723 (9th Cir. 2020).............................................................21, 22

*Ctr. for Biological Diversity v. Brennan,*
  571 F. Supp. 2d 1105 (N.D. Cal. 2007) .................................................5

*Data Mktg. P'ship, LP v. Dep't of Labor,*
  45 F.4th 846 (5th Cir. 2022)..............................................................26, 27

*Dine Citizens Against Ruining Our Env't v. Haaland,*
  59 F.4th 1016 (10th Cir. 2023)...............................................................16

*DOT v. Pub. Citizen,*
  541 U.S. 752 (2004) .........................................................................13, 17

*Friends of Buckingham v. State Air Pollution Control Bd.,*
  947 F.3d 68 (4th Cir. 2020).......................................................................4

*Grazing Fields Farm v. Goldschmidt,*
  626 F.2d 1068 (1st Cir. 1980) ..................................................................9

*Gulf Restoration Network v. U.S. DOT,*
  452 F.3d 362 (5th Cir. 2006) ( ...................................................16, 25, 26

*Lexmark Int'l v. Static Control Components,*
  572 U.S. 118 (2014) ...........................................................................23, 24

*Mid States Coal. v. Surface Transp. Bd.,*
  345 F.3d 520 (8th Cir. 2003)...................................................................21

*Miss. River Basin All. v. Westphal,*
   230 F.3d 170 (5th Cir. 2000)...................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
   463 U.S. 29 (1983) ...............................................................................27

*N.C. Wildlife Fed'n v. N.C. DOT,*
   677 F.3d 596 (4th Cir. 2012)................................................................21

*Nat'l Parks & Conservation Ass'n v. BLM,*
   606 F.3d 1058 (9th Cir. 2010)..............................................................13

*No Mid-Currituck Bridge-Concerned Citizens v. N.C. DOT,*
   60 F.4th 794 (4th Cir. 2023).................................................................21

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
   402 F.3d 846 (9th Cir. 2005)...................................................................3

*R.J. Reynolds Vapor Co. v. FDA,*
   65 F.4th 182 (5th Cir. 2023).................................................................16

*S. La. Env't Council, Inc. v. Sand,*
   629 F.2d 1005 (5th Cir. 1980)..............................................................19

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality,*
   968 F.3d 419 (5th Cir. 2020)...................................................................3

*Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs,*
   56 F.4th 992 (5th Cir. 2023).................................................................17

*Sierra Club v. Cedar Point Oil Co. Inc.,*
   73 F.3d 546 (5th Cir. 1996)....................................................................2

*Sierra Club v. EPA,*
  939 F.3d 649 (5th Cir. 2019).................................................................3

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) ..........................................6, 12, 15, 16

*Sierra Club v. Morton,*
  405 U.S. 727 (1972) ......................................................................4

*Sw. Elect. Power Co. v. EPA,*
  920 F.3d 999 (5th Cir. 2019)................................................................29

*Texas Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021)................................................................29

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
  2021 WL 3716769 (D.C. Cir. Aug. 3, 2021) .......................................13

*Wages & White Lion Invs., L.L.C. v. FDA,*
  16 F.4th 1130 (5th Cir. 2021).................................................1, 11, 18, 27

*White Glove Staffing, Inc. v. Methodist Hosps. of Dallas,*
  947 F.3d 301 (5th Cir. 2020)................................................................24

*WildEarth Guardians v. BLM,*
  870 F.3d 1222 (10th Cir. 2017)......................................................21, 22

## STATUTES

33 U.S.C. § 1501................................................................24, 28

33 U.S.C. § 1503........................................................19, 26, 28

xiv

33 U.S.C. § 1504.................................................................24, 25

33 U.S.C. § 1511.....................................................................25

33 U.S.C. § 1513.....................................................................24

33 U.S.C. § 1514.....................................................................26

33 U.S.C. § 1515................................................................24, 26

33 U.S.C. § 1516................................................................23, 26

5 U.S.C. § 706.......................................................................29

## REGULATIONS

33 C.F.R. § 148.107................................................................25

33 C.F.R. § 148.276................................................................25

40 C.F.R. § 1502.10..................................................................7

40 C.F.R. § 1502.14.................................................................23

40 C.F.R. § 1502.16..............................................................6, 13

40 C.F.R. § 1502.22..................................................................7

40 C.F.R. § 1508.7..............................................................10, 13

40 C.F.R. § 1508.8.................................................................13

40 C.F.R. § 1502.9 ............................................................................................8

## FERC ORDERS

Endangered and Threatened Species; Designation of Critical Habitat for the Rice's Whale,
   88 Fed. Reg. 47,453 (Jul. 24, 2023) ....................................................................10

## OTHER AUTHORITIES

Memorandum from Michael Celata to Amanda Lefton (Director, BOEM), Request for Concurrence on Preliminary Wind Energy Areas for the Gulf of Mexico Area Identification Process Pursuant to 30 C.F.R. § 585.211(b) (Jul. 22, 2022) ....................................................................................................................10

Pub. Law No. 112-213, Tit. III, § 312 (Dec. 20, 2012) ...........................................28

Sen. Rep. No. 93-1217 (1974) ..........................................................................25, 26

SUFFICIENT,
   Black's Law Dictionary (11th ed. 2019) ..............................................................26

# GLOSSARY

The following acronyms and abbreviations are used in this brief:

APA .............. Administrative Procedure Act

BiOp ............ Biological Opinion

BOEM ......... Bureau of Ocean Energy Management

DEIS. ........... Draft Environmental Impact Statement

DOT ............. Department of Transportation

DWPA ......... Deepwater Port Act

EIS ............... Environmental Impact Statement

EPA ............. Environmental Protection Agency

FEIS ............. Final Environmental Impact Statement

GOM ............ Gulf of Mexico

MARAD ...... Maritime Administration

NAAQS ....... National Ambient Air Quality Standards

NEPA ........... National Environmental Policy Act

NMFS .......... National Marine Fisheries Service

$NO_x$ .............. Nitrogen Oxides

PAH ............. Polycyclic Aromatic Hydrocarbon

ROD............. Record of Decision

SEC.............. Securities and Exchange Commission

SDEIS .......... Supplemental Draft Environmental Impact Statement

SPOT ........... Sea Port Oil Terminal, LLC

VOC ............. Volatile Organic Compound

WCD ............ Worst-Case Discharge

# INTRODUCTION

MARAD approved SPOT to export 18 percent of the nation's oil production for thirty years, despite absent analysis on critical environmental harms and Congressional licensing requirements the agency must address under NEPA and DWPA. The agency requests deference, evading its legal failings in its brief. This court's review "has serious bite" and it must reverse, where MARAD did not act with well-reasoned support, or ignored aspects of the problem. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).

MARAD must take a hard look at environmental consequences of a worst-case spill, but punted analyzing the problem. For SPOT's large potential ozone impacts to the Houston region, which suffers from legally unhealthy air, MARAD never assessed the risk from the Project's total ozone emissions, or that combined with nearby sources. MARAD also never analyzed the no-action alternative's benefits or a smaller-capacity alternative to the Project, despite NEPA's mandate.

The decision violates the DWPA. MARAD failed to issue a timely decision, or to assess consistency with national energy sufficiency, core tasks Congress assigned the agency.

1

## I.    Petitioners Have Standing

SPOT is wrong on the law and fails to address the facts, including sworn declarations from four Surfside Beach residents living about 1-mile from SPOT's proposed pipeline, who (with further declarants) recreate in the immediate Project area. *See* Doc No. 51. Any of their interests is sufficient for standing to vacate Project approval.

SPOT misrepresents the Article III standard. SPOT's argument (at 13), that Petitioners allege only "possible future injur[ies]," is plain wrong. *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023) (rejecting standing where petitioner's retirement distributions uninfluenced by challenged investments). Unlike *Abdullah*, Petitioners' members' harms are not "entirely independent" of SPOT, *id.* at 209, but directly relate to MARAD's deficient environmental and licensing analysis. Petitioners' member declarations demonstrate that they are not "mere 'bystanders.'" They are in danger of sustaining concrete, direct, actual, or imminent injury resulting from SPOT's construction and operation. *Id*.; *Sierra Club v. Cedar Point Oil Co. Inc.,* 73 F.3d 546, 556 (5th Cir. 1996); s*ee, e.g.,* Jones Decl. ¶ 20.a-c, 24, 26-30 (expressing concerns based on project record disclosures of construction and operational impacts to wildlife, recreation, spills, air emissions impacting respiratory health); Harris Decl. ¶ 14 (project will injure local realtor by devaluing her property

and real estate sales of Surfside beachfront property); Oldham Decl. ¶¶ 35, 37-38, 42-43; Robinson Decl. ¶ 24(g).

Indeed, Petitioners' members are local residents who the FEIS acknowledges "are likely to have a deeper appreciation of the aesthetic character and existing conditions of the coastal area," and thus will be uniquely impacted by SPOT's visual changes to the landscape. MAR.00023789; *see Sierra Club v. EPA,* 939 F.3d 649 (5th Cir. 2019) (member regularly visited parks visibly affected by regional haze had standing). Members also rightly assert their fear of oil spills extremely likely to occur along the pipeline route, with close geographic nexus. *See* MAR.00050761-801 (Lubetkin report estimating 500+ spills, 20 large, along pipeline); MAR.00188999-9022 (FEIS admits pipeline spill "may harm communities, contaminate water source, and destroy sensitive environments and species"; coating "vast areas" offshore); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859–60 (9th Cir. 2005) (finding standing for likely oil-spill risk on similar facts).

Petitioners' standing claims are "supported by citations to specific facts in the record," and identify specific health risks their members expect to suffer, including respiratory harms like asthma from increased ozone pollution in an existing non-attainment region. *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020); *see, e.g.*, Oldham Decl. ¶ 40-47 (detailed health concerns from SPOT's pollutant emissions based on 38-year healthcare

3

career); MAR.00023833, 39 (listing SPOT's offshore and onshore pollutant emissions). Moreover, compliance with federal air quality standards does not eliminate public health harms from air pollution that members will endure, particularly in Freeport's overburdened environmental justice community. MAR.00093878-82; *see Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 86 (4th Cir. 2020) (state environmental justice analysis incomplete when it failed to consider "potential degree of injury to the local population independent of NAAQS").

Attempted mitigation does not eliminate harm. *Contra* SPOT Br. 13. For example, mitigation measures for traffic and pipeline construction along Surfside Beach do not negate harm Petitioners object to from road closures, noise, and impacts to members' use and enjoyment of Surfside beach. *See, e.g.*, MAR.00023785, MAR.00120196; *e.g.,* Jones Decl. ¶ 49; *see Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) (road construction in park lessened visitors' aesthetic interests).

Furthermore, injury to members' scientific and professional interests in sea turtle and whale species' survival is undeniably direct and concrete, not mere "daisy-chain speculation." *Contra* SPOT Br. 16. Courts routinely find standing based on threats to plaintiffs' scientific interests in studying particular animal species. *See, e.g.*, *Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100

4

F.3d 837, 839 (10th Cir. 1996). Project construction and operation would directly and indirectly harm sea turtles onshore and offshore, MAR.23345, directly harming Steinhaus' professional Texas coastal work. Steinhaus Decl. ¶¶ 12, 17. SPOT oil spill risk, vessel traffic, and ongoing noise threatens the existence of the critically endangered Rice's whale. Rice Decl. ¶ 23-24. Recent studies showing Rice's whales inhabit waters in or near the Project area, combined with evidence that injury or loss of even one individual could cause the species' extinction, demonstrate direct and concrete harm to Dr. Rice's scientific interests and professional contributions to protect the species. Rice Decl. ¶¶ 16-17, 25. Bluntly, there would be nothing left to protect. *Id.* MARAD's decision to license SPOT thus risks grave disruption to members' professional and scientific interests, demonstrating standing. Rice Decl. ¶ 30; Steinhaus Decl. ¶ 17. *See Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1121 (N.D. Cal. 2007) (professor's cognizable interest from risk of diminished opportunities for fundamental biological research and ability to pursue profession).

## II.    NEPA Hard Look Claims

### A. The Flawed Oil Spill Analysis Violates NEPA

#### 1. Failure to Consider Oil Spill Sizes and Impacts

The FEIS omits probable spill impacts other than from a one-hour, 2,200-barrel spill at a single source point – the terminal platform. Even there, the FEIS

merely mentions that such spills *could* affect a variety of ecosystems, with no further analysis. Pet. Br. 25; *see, e.g.,* MAR.00188624-25; MAR.00188682-83. Respondents' assertion (DOT Br. 17-26; SPOT Br. 20-29) that MARAD conducted "extensive oil-spill modeling that covered an appropriate range of spill volumes" and took a hard look at spill impacts is misleading. MAR.00188624-25; MAR.00188682-83. MARAD's analysis amounts to "it depends." MAR.00188624 (merely mentioning factors that could influence harm). By all accounts, this fails NEPA's "hard look" test. *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (requiring agency evaluation and public disclosure of environmental consequences).

The record contradicts Respondents' painting of a meaningful worst-case discharge (WCD) analysis. In reality, the FEIS's "analysis" is just to note that a WCD could harm two resource categories—wildlife and oyster reefs—but provides no more detail. The document cross-references other parts of the FEIS that also lack worst-case spill harm assessment. MAR.00023984. SPOT can reference the post-FEIS biological opinion (BiOp) as sufficient WCD harm analysis (at 24) because Endangered Species Act review looks at protected species and habitat only, not the full scope of WCD impacts NEPA requires for all species, ecosystems and the human environment. 40 C.F.R. § 1502.16.

Moreover, Respondent's criticism of data underlying Lubetkin's spill risk analysis is disingenuous. Both MARAD and Lubetkin rely on BOEM's offshore

drilling spill risk assessments, but MARAD limited its review to 1996-2010 data,

neglecting BOEM's most current 2018 Spill Risk Study using 1972-2017 data.

Lubetkin explains the timeframe MARAD relies on is outdated and too short to

characterize the frequency and size of larger spills. MAR.00050776-8;

MAR.00050784. MARAD never justifies its data selection and simply criticizes

Lubetkin for using a more current range of the same data pool.

Contrary to Respondents' contentions (DOT Br. 23-26; SPOT Br. 26),

placement of the WCD in the safety chapter is not a trivial formatting error. *Cf.*

*Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013) (FEIS

permissibly structured around specific subjects, rather than objects). The FEIS splits

analysis of a critical environmental consequence into two distinct sections,

preventing adequate public disclosure of SPOT's full scope of oil spill harms.

Consequently, MARAD failed to apply any WCD modeling in assessing SPOT's

*environmental impacts*, Pet. Br. 30, violating NEPA requirement to assess effects of

highly consequential scenarios. 40 C.F.R. § 1502.22(b)(4).

Indeed, the type of analysis performed for public safety is largely immaterial

to that performed for numerous species and ecosystems impacted by spills. Thus, it

does matter that MARAD buried the WCD model in the public safety appendix. 40

C.F.R. § 1502.10 (requiring compelling reason not to use recommended format).

MARAD provides no compelling reason for separating discussion of environmental

consequences based on oil spill size, especially when discussion of the largest

potential spill is fully contained within a chapter limited to public safety impacts of

design and operational components without explanation of consequential

environmental effects. MAR.23947. At bottom, it was arbitrary for MARAD to sever

the WCD model from analysis of other spills and impacts.

### 2.  Failure to Take a Hard Look at Oil Spill Impacts on Species

The FEIS failed to "take a hard and honest look" at oil spill impacts on

species. *Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32, 50-51 (D.C. Cir.

2018). It makes no qualitative or quantitative assessment of the impacts from harmful

oil compounds—PAHs —in the most likely spill scenarios on marine species in the

Project area, and further diminishes PAH effects on species as non-concerns without

evaluation. SPOT Br. 30; *see also* MAR.23629. Contrary to MARAD's claims (at

23) there is no mention of PAH effects on the endangered Rice's whale in the

protected species section. MAR.23578, 23691. Absent specific analysis, the FEIS

fails to meaningfully assess oil spill impacts on marine mammals and other species.

### 3.  Impacts to Rice's Whale and Protected Species

Contrary to Respondents' contention, a 2022 study revealing the Rice's

whales' broader range warrants a supplemental EIS because it represents "significant

new circumstances or information relevant to environmental concerns [ ] bearing on

[SPOT] or its impacts." 40 C.F.R.§ 1502.9(d)(1). MARAD's consideration of the

study in the post-FEIS BiOp (DOT Br. 27; SPOT Br. 32), and reliance on that BiOp

to determine "unlikely" and "discountable" effects to Rice's whales,

MAR.00208683; *see* MAR.00208592, belies the very tenets of NEPA's public

review and participation process. *Grazing Fields Farm v. Goldschmidt*, 626 F.2d

1068, 1072-74 (1st Cir. 1980) (failure to present post-EIS data and analysis

supporting agency's decision in EIS hampers public comment, "mut[ing] those most

likely to identify problems and criticize decisions"). MARAD needed to present this

highly relevant information within the FEIS. *San Luis & Delta-Mendota Water Auth.*

*v. Salazar, 760 F. Supp. 2d 855, 892 (E.D. Cal. 2010), aff'd in part, rev'd in part sub*

*nom. San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581 (9th Cir. 2014)*

(cannot justify NEPA failures post-hoc based on another agency's future

environmental assessment).

   MARAD's consideration of new information about possible Rice's whale

occurrences near the Project area in the post-FEIS BiOp[2] only, prevented the public

from weighing in on information critical to MARAD's conclusion that a rare

occurrence somehow implies insignificant species harm. Provided the opportunity to

weigh-in on this critical study, Petitioners would have explained and submitted

additional record evidence on the importance of considering the species' newly-

_____

[2] BiOp not subject to public review and comment.

discovered broader range combined with the species' highly imperiled state.

Specifically, experts estimate the species can sustain the loss of only one whale per

decade to avoid extinction. Rice Decl. ¶ 14. Therefore, even a "rare" occurrence

(DOT Br. 28) could result in consequential injury or death of one or more whales

from SPOT's increased vessel traffic, oil spills, and other impacts, leading to species-

level harm. Pet. Br. 36; *see*, e.g., Rice Decl. ¶ 14, 22.[3] Barring public engagement on

such critical information violates NEPA.

For the same reasons, NMFS's BiOp does not satisfy MARAD's NEPA duty

to conduct a cumulative impact analysis in the FEIS. 40 C.F.R. § 1508.7; SPOT Br.

38. Contrary to SPOT's misrepresentation, Petitioners made no claim that the BiOp

contained a "more comprehensive spill analysis." Petitioners cited the oil spills

analysis in the GulfLink EIS as an example of how SPOT's FEIS fails. Pet. Br. 26-

27, 37.

---

[3] The court should take judicial notice of federal actions protecting Rice's whales in
the expanded habitat in light of the new study, further undermining MARAD's
determination. NMFS Proposed Rice's Whale Critical Habitat designation, 88 Fed.
Reg. 47,453 (Jul. 24, 2023) (includes the species' Central and Western Gulf of
Mexico range); NMFS's recommendation and BOEM's acceptance to omit expanded
habitat from Gulf wind leases Memorandum from Michael Celata to Amanda Lefton
(Director, BOEM), Request for Concurrence on Preliminary Wind Energy Areas for
the Gulf of Mexico Area Identification Process Pursuant to 30 C.F.R. § 585.211(b)
(Jul. 22, 2022).

The FEIS's consideration of cumulative impacts to biological resources, including marine mammals and sea turtles, only contained barebones conclusory statements. *Contra* DOT Br. 31; SPOT Br. 36. The FEIS contains no analysis of potential adverse effects of other projects near SPOT. In conclusory fashion, it characterizes vessel strike impacts as "direct, adverse, long-term, and minor to moderate, but could be lethal," and underwater noise impacts as "direct, adverse, long-term, and moderate." MAR.24065, 24071. Without analysis, these hollow statements fail as a cumulative impacts assessment under NEPA. *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1138 (agency conclusory, unsupported suppositions due no deference).

### B. MARAD Failed to Analyze SPOT's Total Ozone Impacts in an Ozone Nonattainment Area

Respondents provide no answer for the main deficiency Petitioners raise regarding the air quality impact analysis. MARAD failed to evaluate SPOT's *total* contribution to increased ozone levels and analyze impacts to the region's existing ozone nonattainment area. Pet. Br. 38-41. MARAD failed to evaluate 1) SPOT's total *offshore* ozone impacts from both vessels ("mobile sources") and the terminal's loading process ("stationary source"), 2) SPOT's total impacts from offshore plus onshore ozone levels, and 3) SPOT's cumulative impacts with another nearby export terminal.

### 1. MARAD Failed to Evaluate SPOT's Total Offshore Ozone Impacts from Stationary and Mobile Sources

MARAD (at 32-36) relies on SPOT's compliance with two Clean Air Act permitting regimes, but these, neither alone nor collectively, determine SPOT's total ozone impact. Furthermore, "the existence of permit requirements overseen by another federal agency or state permitting authority cannot substitute for a proper NEPA analysis." *See Sierra Club v. FERC*, 867 F.3d at 1375.

First, the General Conformity analysis only addresses SPOT's *onshore*[4] ozone-causing emissions, which constitute a small portion of its total ozone-causing emissions. MAR.00023849; *compare* MAR.00023850 (General Conformity analysis: 98.8 tpy NOx and 6.4 tpy VOCs), *with* MAR.00023839 (offshore operation emissions: 748.18 tpy NOx and 1,746.94 tpy VOCs).

Second, SPOT's proposed Clean Air Act permit would cover only one component of offshore emissions – stationary source loading emissions at SPOT's platform. DOT Br. 36. But, SPOT's offshore emissions indisputably include both stationary source emissions and mobile source emissions from vessels. *Id.*; MAR.00023839 (table showing all offshore emissions). Although MARAD acknowledges "adding mobile sources … nearly triples the total offshore NOX

---

[4] Plus 2.6 nautical miles offshore over state waters. MAR.00023849.

emissions," DOT Br. 36, the air permit did not consider, or regulate, vessel emissions. *Id.*; MAR.00023835.

Thus, MARAD's detour into these Clean Air Act regimes reaches a dead end. Ultimately, MARAD concedes no agency analyzed SPOT's *total* offshore ozone impacts. DOT Br. 36 (contrasting same with MARAD's stationary source analysis).[5] This alone renders MARAD's analysis of SPOT's total ozone impacts deficient. 40 C.F.R. §§ 1502.16(a)-(c), 1508.7, 1508.8; *cf. Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 2021 WL 3716769, at *3-4 (D.C. Cir. Aug. 3, 2021) (upholding NEPA analysis for export terminal because it estimated terminal's combined stationary *and* mobile source *ozone* impacts, going beyond Clean Air Act permitting).

Petitioners raised this foundational deficiency with MARAD repeatedly, including on the DEIS, MAR.00050644-47,[6] and MARAD, using SPOT's data,

---

[5] MARAD also mentions it "disclosed" SPOT's estimates of total offshore impacts but fails to (1) cite those numbers in the FEIS and (2) justify or contextualize why impacts are "far below 5 [ppb]." DOT Br. 36-37.

[6] SPOT's issue exhaustion argument (at 40) ignores this fact, and that Petitioners' further comments on SPOT's data were likewise during MARAD's official FEIS comment period. MAR.00206563-65; *see Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1065 (9th Cir. 2010) (holding plaintiffs need only raise issue "with sufficient clarity to allow the decision maker to understand"). Petitioners adequately alerted MARAD to these issues in formal comment periods, *before* MARAD's final decision; the law requires no more. *See id.*; *cf. DOT v. Pub. Citizen,* 541 U.S. 752, 764-65 (2004) (SPOT's case).

could have calculated the emissions itself, as NEPA requires. Petitioners proceeded to do the math in their final comments, which show concerningly high ozone concentrations – 1.8 ppb, which is above the 1 ppb significant impact level ("SIL") MARAD relied on to (inaccurately and arbitrarily) conclude that SPOT's *total* offshore air quality impacts were "less than" the SIL and therefore, "minor." Pet. Br. 39-41. The ROD omits this needed calculation, and fails to explain what health and environmental impacts these additional ozone levels could have in this existing ozone nonattainment area. *Id.* at 41.

### 2. MARAD Failed to Evaluate SPOT's Total Onshore and Offshore Ozone Impacts

NEPA requires that MARAD evaluate the Project's total ozone impacts from its interrelated onshore and offshore components regardless of distance between components (*Contra* SPOT 41). MAR.00023383; 40 C.F.R. §§ 1502.16(a)-(c), 1508.8. Ozone forms in regional air transport, and MARAD justifies no distance limit. *See* MAR.00023830, MAR.00023843; MAR.00206563-65. Even if segmentation were allowed, MARAD still must model onshore and offshore impacts on the nonattainment area separately. MARAD did not.

SPOT's attempt to minimize the Project's ozone impacts by comparing them to speculative reverse lightering emissions assumed in the No-Action Alternative[7] is a red herring. The agency has a duty to take a hard look at SPOT's contribution alone to worsening air quality *before* comparing these impacts to alternatives. *Sierra Club v. FERC*, 867 F.3d at 1374-75 (agency not "excused from making emissions estimates just because the emissions in question might be partially offset by reductions elsewhere").

### 3. MARAD Cannot Solely Rely on Ozone Precursors to Fulfill its Obligation to Take a "Hard Look" at the Project's Ozone Impacts, Both Individually and Cumulatively

SPOT contends that MARAD's analysis of Project ozone precursor emissions alone was sufficient to satisfy NEPA requirement to analyze SPOT's ozone impacts, individually and cumulatively. SPOT Br. 38, 42; *see also* DOT Br. 38 (cumulative impacts). However, MARAD not only acknowledges the existence of an available EPA tool to estimate ozone levels based on project ozone precursor emissions, but actually relied on this tool to estimate part (but not all) of SPOT's offshore ozone impacts and to conclude SPOT complies with federal ozone standards.

---

[7] Any calculations of emissions from reverse lightering depend on unsupported assumptions MARAD made in evaluating the No Action Alternative. *See infra* Section III.B).

MAR.00023843.[8] MARAD must analyze SPOT's reasonably foreseeable total ozone impacts based on this generally accepted method, 40 C.F.R. § 1502.22(b)(1), or explain "why it cannot do so." *Sierra Club v. FERC*, 867 F.3d at 1375.

Moreover, it is fundamental for the public to "understand and consider" the degree to which SPOT would increase *ozone* levels and the impacts that increase would have on health and respiratory harms in this existing nonattainment area; ozone precursor emissions alone do not allow the public to understand these actual impacts. *See Gulf Restoration Network v. U.S. DOT*, 452 F.3d 362, 367 (5th Cir. 2006) (*"GRN"*) (EIS must allow public to understand impacts); *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1045–46 (10th Cir. 2023) (affirming NEPA analysis calculating project's ozone increases and comparison to NAAQS).

### 4. MARAD Fails to Evaluate SPOT's Cumulative Ozone Impacts with GulfLink

SPOT's reliance on distances between its *onshore* facilities and neighboring deepwater ports is a deceiving justification for MARAD's failure to evaluate SPOT's cumulative air pollution. That ignores the proposed 7-nautical-mile distance between SPOT's and GulfLink's *offshore* oil export terminals, MAR.00023455, well within

---

[8] Further, because the FEIS did not rely on ozone precursor emissions to support its analysis and conclusions for SPOT's ozone impacts, Respondents cannot construct a new rationale *post hoc*. *See R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023).

the 31-mile threshold SPOT relies on (at 41-42). Moreover, both terminals are

located offshore of the same ozone nonattainment area, SAR.00276442, yet MARAD

failed to disclose and evaluate the "overall impact" of cumulative ozone pollution

increases from SPOT's and GulfLink's total offshore emissions. MAR.00024085-86;

*see* Pet. Br. 42.

### III.   **MARAD Failed to Analyze Reduced-Capacity or No-Action Alternatives**

#### A. **Respondents Fail to Compare a Reasonable Smaller-Capacity Alternative**

MARAD (at 38-40) attempts to avoid this argument by claiming Petitioners

failed to exhaust a reduced-capacity terminal claim below. But Petitioners raised the

requirement explicitly in comment letters addressing alternatives, MAR.00050571-

72, MAR.00206547, *and*, the action's purpose and need. MAR.00050559-60;

MAR.00157900. This case is unlike those Respondents cite, where petitioners failed

to do so. *See DOT v. Pub. Citizen*, 541 U.S. 752 (2004); *Shrimpers & Fishermen of*

*the RGV v. U.S. Army Corps of Eng'rs*, 56 F.4th 992, 997–98 (5th Cir. 2023).

The problem is Respondents ignored the alternative when raised. NEPA

mandates considering all reasonable alternatives, regardless of the applicant's

"preferred" alternative. Pet. Br. 43-44. Respondents disingenuously argue that no

smaller terminal could satisfy the FEIS's purpose and need. But the FEIS

summarizes purpose and need broadly, as "allow[ing] for the export of crude oil from

excess [U.S.] production." *See* MAR.00023362. SPOT could still achieve that

purpose, just at less than 730-million barrels-per-year. MAR.00023363. Respondents

never stop to explain why 730-million barrels is necessary. In fact, MARAD

concedes the Project may never reach that mark. MAR.00023363; *see also* Pet. Br.

45-47 (citing forecasts showing declining global oil demand).[9] MARAD's refusal to

consider a smaller alternative anyway is arbitrary and capricious.

Moreover, agencies may not constrict the action's purpose such that it

"narrows the agency's consideration of alternatives so that the outcome is

preordained." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084-85 (9th

Cir. 2013). SPOT's argument to license at maximum capacity (at 43-47), contrary to

NEPA, would negate *any* alternative not identical to an applicant's proposed

purpose. Applicants could craft baroquely detailed purpose-and-need statements,

nullifying alternatives with every added condition.

Contrary to SPOT's vain effort (at 43-44) to distinguish Fifth Circuit law,

reviewing a smaller project is consistent with the mandate to explore alternatives

"*relevant* to the applicant's goals," *City of Shoreacres v. Waterworth*, 420 F.3d 449,

451 (5th Cir. 2005) (emphasis added), and that "would reduce environmental harm

---

[9] Respondents do not justify their misplaced reliance on an EIA report that is merely a baseline to judge future market and regulatory shifts. Pet. Br. 45-47. Failure to explain, in the face of contradictory data, is arbitrary and capricious. *See Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1137.

while still achieving" those goals. *S. La. Env't Council, Inc. v. Sand*, 629 F.2d 1005, 1017 (5th Cir. 1980). In *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 177 (5th Cir. 2000), the agency considered the relative habitat impacts of developing petitioners' desired alternative prior to rejecting it. Here, MARAD did not consider a reduced-capacity alternative in the first instance.

While MARAD (at 41) adverts to its discussion of the smaller, proposed Bluewater Terminal as a substitute for SPOT, that merely illustrates our point. MARAD rejected Bluewater outright, with no effects comparison, on the same wrongheaded belief— it lacks SPOT's full volume of export capacity. MAR.00023455.

And to this extent, MARAD neglects to incorporate its DWPA mandate in defining reasonable alternatives. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (agency must consider its statutory authorization to act and congressional directives). Specifically, the DWPA commands MARAD to address environmental, energy, and national-interest factors, with authority to condition licenses, e.g., setting capacity and size limits. 33 U.S.C. § 1503(c); MAR.00208554. MARAD's failure to evaluate SPOT as a smaller terminal in light of these mandates is arbitrary and capricious.

**B. Respondent's Unsubstantiated Claims that Existing Terminal Expansion is Inevitable Distorts Assessment of a No-Action Alternative**

MARAD's no-action discussion ends abruptly at the unsupported claim that in SPOT's absence, others would export similar volumes of oil, using existing or new onshore terminals with offshore ship-to-ship transfers. MAR.00023450-51; MAR.00023451, 00027756; DOT Br. 45. MARAD then dismisses the no-action alternative cursorily, saying environmental harm would be the same or worse, because it would happen anyway. *Id.* Keep in mind, the difference between SPOT and no-action would be colossal. SPOT's volumes equate to 18 percent of total U.S. oil production and 67 percent of current exports. MAR.00024055. Indeed, SPOT's volumes would add export volumes, as its own executives told investors that SPOT would increase the company's overall oil exports without sacrificing volumes at onshore terminals. *See* MAR.00157911, 158736-37.

There is no support for the idea that oil-export volumes from purported onshore replacements could approach SPOT's level. To the contrary, MARAD elsewhere clarifies the Project "will increase profits" for exporting oil compared to no-action by reducing transportation costs. MAR.00024091. No party disputes that exporting a barrel of oil from an onshore terminal is more costly than from a deepwater port, because of the required ship-to-ship transfers. *See* Pet. Br. 49-50 (citing, *e.g.*, MAR.00158674-80 (Erickson report), MAR.00232111). Thus, relying

20

on hypothetical new onshore terminals alone would reduce incentive to export and U.S. export volumes. *See id.* Less oil would leave the country and that would reduce environmental harm and improve energy reserves. *See id.*  But MARAD, exactly like agencies reversed in similar cases described in Petitioners' opening brief, failed to reckon with that undisputed market reality in its no-action alternative. *See, e.g.*, *Mid States Coal. v. Surface Transp. Bd.,* 345 F.3d 520, 549-50 (8th Cir. 2003); *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1227-28 (10th Cir. 2017); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735, 740 (9th Cir. 2020).[10]

Respondents make *our* argument in raising *No Mid-Currituck Bridge-Concerned Citizens v. N.C. DOT*, 60 F.4th 794, 805-06 (4th Cir. 2023). There, the agency did the nuanced analysis MARAD didn't. *Id*. That EIS modeled development and traffic induced with and without a proposed bridge, using the impacted community's land-use plans. *See id*. (finding 16 percent fewer homes and hotels in no-action scenario). In contrast, MARAD offered no case-specific evidence or modeling to support its claims about no-action. MAR.00023451-52.

Likewise, *N.C. Wildlife Fed'n v. N.C. DOT*, 677 F.3d 596, 603 (4th Cir. 2012) serves our argument, not Respondents'. The court vacated an agency decision where

---

[10] Additionally, the record does not support SPOT's assertion (at 50-51) of sufficient global crude demand to justify building and operating other export terminals in future years. *See* MAR.00023364-65; Pet. Br. 45-47.

the no-action alternative assumed the project proposed—similar to what MARAD did here. Notably, the court underscored, "[w]ithout [accurate baseline] data, an agency cannot carefully consider information about significant environment impacts … resulting in an arbitrary and capricious decision." *Id.*

Respondent misrepresents *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736-737 (9th Cir. 2020), which concludes that agencies must account for market forces under a no-action alternative. That court aptly explained: an action increasing world oil supply from the drilling project in question would reduce oil prices, thereby increasing foreign consumption; conversely, taking no action would mean less global supply, leading to reduced global consumption. *Id.* What Respondent omits was that the agency (like MARAD here) overlooked those basic economic principles in evaluating the effects of taking no action, e.g., impacts to greenhouse gas emissions when taking the no-action, reduced-global consumption scenario. *Id.*

The fact that *WildEarth Guardians*, 870 F.3d at 1234 was for a lease to mine coal, rather than a license to export oil, is a distinction without a difference. In both cases, the same basic market principles are at play. Building two-million barrel-per-day additional export capacity for 30 years, like issuing leases for coal extraction, would naturally increase supplies to satisfy export capacity. This result would not occur under a no-action scenario in which avenues for export remain constrained and costly. MARAD's failure to evaluate realistic upstream and downstream effects of

export growth coinciding with SPOT's licensing in comparison to a growth-constrained baseline scenario violates NEPA. 40 C.F.R. § 1502.14.

## IV.    MARAD Failed to Comply with the Deepwater Port Act

### A. Petitioners Are "Aggrieved" Parties Because MARAD Failed to Meet Strict DWPA Deadlines or Justify its 600-Day Delay

Petitioners are within the statutory "zone of interests." The test is "not 'especially demanding'" and only requires an interest "arguably within the zone . . . protected or regulated" by the DWPA. *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153 (1970); *see Lexmark Int'l v. Static Control Components,* 572 U.S. 118, 130 (2014) (explaining "any doubt goes to the plaintiff"); *Bonds v. Tandy,* 457 F.3d 409, 414 (5th Cir. 2006) (holding court liberally construes plaintiff's right to challenge administrative actions). Because Petitioners comprise a class Congress authorized to sue under the DWPA, they meet this test. *See Lexmark,* 572 U.S. at 127-28.

DWPA Section 1516 confers a cause of action encompassing Petitioners' claims for violating statutory deadlines, authorizing "any person . . . aggrieved" to sue. 33 U.S.C. § 1516. An aggrieved person is one who participated in the administrative proceedings and is adversely affected by MARAD's action. *Id.* Petitioners undisputedly participated in SPOT's administrative proceedings, and MARAD's decision more than a year and half beyond the deadline aggrieved them. Pet. Br. 20-24; *see e.g.*, Schneider Decl. ¶ 5; Robinson Decl. ¶ 22-23; Oldham Decl.

¶¶ 17-29. MARAD failed to deny SPOT's incomplete application, as it should have. And in these additional 600-plus days, newly proposed and permitted projects in the region further burdened members' quality of life. Jones Decl. ¶ 20c. The DWPA violation proximately caused these injuries. *White Glove Staffing, Inc. v. Methodist Hosps. of Dallas,* 947 F.3d 301, 308 (5th Cir. 2020) (citing *Lexmark,* 572 U.S. at 129).

Respondents cite no "congressional intent to preclude" review by petitioners, as they must. *See Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399-400 (1987). And while there "need be no indication of congressional purpose to benefit" the plaintiff, *id.*, the DWPA explicitly balances the environmental, public, and coastal states' interests with applicant's. 33 U.S.C. §§ 1501, 1513, 1504(g), 1515; *Atlantic Sea Island Grp. LLC v. Connaughton,* 592 F. Supp 2d 1, 6-7 (D.D.C. 2008). This Court cannot bar this action unless Petitioners' asserted interests are "so marginally related to or inconsistent with the purposes implicit in the statute" that it cannot reasonably assume that Congress authorized this suit. *Lexmark*, 572 U.S. at 130. Section 1516 precludes that assumption. And the availability of an equitable remedy under Section 1515, as SPOT argues without support (at 56), does not foreclose Petitioners' request for judicial review of this administrative act post decision. *Bonds,* 457 F.3d at 414, n.9.

Further, it is incongruous that MARAD can act outside the DWPA's "short, 356-day window" provided by Congress to approve this project. 33 U.S.C. §§ 1504(c)(1), (g), (i)(1); *GRN*, 452 F.3d at 366, 370; *see also* 33 U.S.C. § 1511(a) (empowering the Secretary to terminate a license for noncompliance with DWPA). All public hearings must conclude within 240 days after notice. 33 U.S.C. §§ 1504(g); 33 C.F.R. § 148.276(b); Sen. Rep. No. 93-1217, at 5, 45 (1974). No party disputes MARAD's failure to act or that it let the clock run over 600 days. The record confirms that MARAD delayed the public hearing to fix its failure to issue legally-required notices and expand SPOT's incomplete, deficient application. MAR.00208550; MAR.00092043-44. This delay benefited SPOT, not Petitioners, because MARAD had no choice but to deny the application past the deadlines as Petitioners argued. MAR.00093892-94; MAR.00206061-62; MAR.00120181-83.

Having thrice stopped the regulatory clock for a total of 359 days, MARAD could not justify another stopped clock for these failures. 33 C.F.R. §§ 148.276, 148.107; 33 U.S.C. § 1504(c)(1). When MARAD lacks information to approve a license or justification to stop the clock, it must deny the application. 33 U.S.C. §§ 1504(g), 1504(i)(1). Here, MARAD knowingly let the clock run in violation of the deadline and failed to decide the application. 33 U.S.C. §§ 1504(g), 1504(i)(1). Congress expressly warned against "delaying by months or years a final decision" and intended conformance to the established timetable. Sen. Rep. No. 93-1217 at 7,

40 (1974). This violation is not mere oversight, but directly inconsistent with

Congress's intended strict compliance with the DWPA's terms, requiring vacatur. 33

U.S.C. §§ 1514 (imposing class A misdemeanor penalty for willful violation of

DWPA or any related rule, order or regulation); § 1515(a)(2) (authorizing citizen suit

for non-discretionary acts by Secretary); § 1516 (enabling judicial review).

### B.  MARAD Violated the DWPA in Failing to Determine Whether The Project Advances National "Energy Sufficiency"

MARAD authorized SPOT to export the equivalent of 18 percent of U.S. oil

production, for thirty years. MAR.00023363, 00208528–621. Congress requires the

agency to "determine[]" whether licensing that scheme would be "good for" the

nation's "energy sufficiency." *See GRN*, 452 F.3d at 373; 33 U.S.C. § 1503(c)(3).

But MARAD never analyzed the nation's long-term need for oil, or if national

reserves would be "adequate" to meet that need despite SPOT's drain. *See id.*;

SUFFICIENT, Black's Law Dictionary (11th ed. 2019). MARAD would have had to

do so in "the final agency action itself," the ROD meant to address the licensing

factors. *See Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846, 857–58 (5th Cir.

2022). MARAD never did so, despite saying otherwise now. MAR.00208577–79;

*see* DOT Br. 56, SPOT Br. 58–59 (citing same pages).

MARAD (at 55–57) first argues around its omission by irrelevantly pointing to

*other* factors the ROD briefly mentions, then by constructing an impermissible, *post-*

26

*hoc* argument. First, MARAD (at 56) lists factors mentioned in the ROD such as job impacts, infrastructure, and oil prices. But the ROD never reasons from those claims to determine energy sufficiency. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983); MAR.00208577–79. While those factors may go to economic impact, they do not imply how SPOT's massive exports are consistent with preserving sufficient U.S. oil supply for decades of operation. SPOT (at 58) relies on the section's concluding sentence, which merely deems the entire list of national-interest licensing factors in § 1503(c)(3), including energy sufficiency, satisfied. But MARAD's job was not to do a "conclusory" name-check of energy sufficiency; it was to make a reasoned determination on record evidence. *See Wages & White Lion Invs.*, 16 F.4th at 1137.

Second, MARAD's brief cites a grab-bag of FEIS statements on U.S. refineries, global demand, and Congress's repeal of the crude export ban. *See* DOT Br. 57 (citing MAR.23363, 24091). But the ROD did not address these. *See* MAR.00208577–79. And the FEIS disclaimed making any DWPA determination from these points. MAR.00023361 n.3 (deferring to ROD). Rather, MARAD is invoking them now, *post hoc*, which it cannot. *See R.J. Reynolds Vapor Co.*, 65 F.4th at 189 (court cannot "entertain *post hoc* rationalizations" not relied upon in decision); *Data Mktg.*, 45 F.4th at 856 (holding such argument is "evidence that the action is arbitrary and capricious").

27

Even if the court entertained them, stringing together these statements is not an energy-sufficiency determination. While MARAD cites a FEIS passage claiming U.S. refiners as a whole "cannot *currently* accommodate" more of the crude oil type produced in fracking, that passage also acknowledges that East Coast refineries already handle this oil type, but must import it due to domestic crude's cost. *See* MAR.00023363 (emphasis added). This passage further acknowledges that U.S. refineries "have been modified over time to accommodate" different crude types to respond to market dynamics. *See id*. MARAD next quotes (at 57), independent forecasts that global demand for oil will soon decline. *See* MAR.00024091. We agree: that undermines SPOT's claimed need for the full Project. *See* Section III. But declining global demand does not explain America's needs and whether this oil would better remain domestically. Finally, MARAD claims (at 56–57) authorizing SPOT "aligns" with Congress's decision to lift a prior ban on oil exports. Again, this proves nothing. Congress never altered the DWPA's licensing focus on "energy sufficiency" and encouraging *imports*, 33 U.S.C. §§ 1501, 1503(c), even after amending the law to regulate exports too. *See* Pub. Law No. 112-213, Tit. III, § 312 (Dec. 20, 2012).

MARAD simply failed to determine whether SPOT will be good for national energy sufficiency. The court must vacate the ROD and require MARAD to undertake the requisite energy-sufficiency analysis.

## V.    Vacatur Is The Standard and Necessary Remedy

Respondents are incorrect that the court should remand without vacating the

ROD. Vacatur is the APA's presumptive remedy. *See, e.g., Sw. Elect. Power Co. v.*

*EPA*, 920 F.3d 999, 1022 (5th Cir. 2019); *accord* 5 U.S.C. § 706(2)(A) (directing

courts to "set aside agency action … found to be … not in accordance with law").

Respondents do not surmount the presumption. SPOT relies on *Texas Ass'n of Mfrs.*

*v. Consumer Prod. Safety Comm'n*, 989 F.3d 368 (5th Cir. 2021). But unlike that

case, MARAD would have to do more than supply "added detail" to justify its

decision. And MARAD could easily reach a different outcome. For example,

MARAD could determine that denying the license altogether, or conditioning it at

smaller-capacity, would reduce air, climate and water quality impacts, and be more

consistent with national energy sufficiency; that new information about species-level

harm resulting from injury or loss of a single Rice's whale warrants additional

conditions for vessels and spill prevention; and the list goes on.

The presumptive remedy of vacatur is also appropriate applying *Allied-Signal*

*v. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993). First, these violations

are "serious." *Id*. at 150. Respondents ignore that MARAD's inadequate analysis

undermined its national interest determination under the DWPA in addition to

violating NEPA. Because the errors here stem from a lack of requisite analysis—not

merely MARAD's failure to fully document its decision—MARAD is unlikely to be able to substantiate its decision on remand.

Second, SPOT has not raised any "disruptive consequences" of vacatur to prove that reconsidering the licensing decision would cause harmful delay. *Id.* at 150-51. SPOT has not yet fulfilled the ROD's conditions to receive a license and lacks authority to construct. Accordingly, presumptive vacatur applies.

## CONCLUSION

For the foregoing reasons, Petitioners request the Court vacate the ROD and FEIS, and remand to MARAD.

Respectfully submitted,

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
/s/ Rebecca McCreary
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

/s/ Erin Laurel Gaines
Erin Gaines (TX24093462)
/s/ Mike Brown
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org

*Counsel for Petitioner*
*Texas Campaign for the Environment*

/s/ Amy Catherine Dinn
Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
adinn@lonestarlegal.org

*Counsel for Petitioner
Citizens for Clean Air and Water in
Brazoria County*

/s/ Lauren Parker
Lauren Parker (DC1670885)
/s/ Jason Rylander
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner
Center for Biological Diversity*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2023, I electronically filed the foregoing Reply Brief of Petitioners with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
/s/ Rebecca McCreary
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

/s/ Amy Catherine Dinn
Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
adinn@lonestarlegal.org

*Counsel for Petitioner*
*Citizens for Clean Air and Water in*
*Brazoria County*

/s/ Erin Laurel Gaines
Erin Gaines (TX24093462)
/s/ Mike Brown
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org

*Counsel for Petitioner*
*Texas Campaign for the Environment*

/s/ Lauren Parker
Lauren Parker (DC1670885)
/s/ Jason Rylander
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner*
*Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify

that this brief complies with:

1) the type-volume limitations of Rule 32(a)(7) because it contains

   6,489 words, excluding the parts of the brief exempted by

   Rule 32(f); and

2) the typeface and type style requirements of Rule 32(a)(5)-(6)

   because it has been prepared in a proportionally spaced

   typeface (14-point) using Microsoft Word (the same program

   used to calculate the word count).

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
/s/ Rebecca McCreary
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

/s/ Erin Laurel Gaines
Erin Gaines (TX24093462)
/s/ Mike Brown
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org

*Counsel for Petitioner*
*Texas Campaign for the Environment*

/s/ Amy Catherine Dinn
Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
adinn@lonestarlegal.org

*Counsel for Petitioner*
*Citizens for Clean Air and Water in*
*Brazoria County*

/s/ Lauren Parker
Lauren Parker (DC1670885)
/s/ Jason Rylander
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner*
*Center for Biological Diversity*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I further hereby certify that in the foregoing brief filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by Fifth Circuit Rule 25.2.13 have been made, and (2) the electronic submission is an exact copy of the paper document.

/s/ Devorah Ancel
Devorah Ancel (TX24111073)
/s/ Rebecca McCreary
Rebecca McCreary (CO54097)
P.O. Box 4998
Austin, TX 78765
Telephone: (303) 449-5595
devorah.ancel@sierraclub.org
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners*
*Turtle Island Restoration Network*
*Sierra Club*

/s/ Erin Laurel Gaines
Erin Gaines (TX24093462)
/s/ Mike Brown
Mike Brown (TX24118170)
845 Texas Ave., Suite 200
Houston, Texas 77002
Telephone: (512) 720-5354
egaines@earthjustice.org
mlbrown@earthjustice.org

*Counsel for Petitioner*
*Texas Campaign for the Environment*

/s/ Amy Catherine Dinn
Amy Catherine Dinn
(TX24026801)
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext.
1118
adinn@lonestarlegal.org

*Counsel for Petitioner*
*Citizens for Clean Air and Water in*
*Brazoria County*

/s/ Lauren Parker
Lauren Parker (DC1670885)
/s/ Jason Rylander
Jason Rylander (DC474995)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 868-1008
lparker@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Petitioner*
*Center for Biological Diversity*

# ADDENDUM

## Statutes

33 U.S.C. § 1511....................................................................................................1a

33 U.S.C. § 1513....................................................................................................2a

33 U.S.C. § 1514....................................................................................................4a

33 U.S.C. § 1515....................................................................................................6a

## Regulations

40 C.F.R. § 1502.10...............................................................................................8a

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1511

§ 1511. Suspension or termination of licenses

Currentness

**(a) Proceedings by Attorney General; venue; conditions subsequent**

Whenever a licensee fails to comply with any applicable provision of this chapter, or any applicable rule, regulation, restriction, or condition issued or imposed by the Secretary under the authority of this chapter, the Attorney General, at the request of the Secretary, may file an appropriate action in the United States district court nearest to the location of the proposed or actual deepwater port, as the case may be, or in the district in which the licensee resides or may be found, to--

**(1)** suspend the license; or

**(2)** if such failure is knowing and continues for a period of thirty days after the Secretary mails notification of such failure by registered letter to the licensee at his record post office address, revoke such license.

No proceeding under this subsection is necessary if the license, by its terms, provides for automatic suspension or termination upon the occurrence of a fixed or agreed upon condition, event, or time.

**(b) Public health or safety; danger to environment; completion of proceedings**

If the Secretary determines that immediate suspension of the construction or operation of a deepwater port or any component thereof is necessary to protect public health or safety or to eliminate imminent and substantial danger to the environment, he shall order the licensee to cease or alter such construction or operation pending the completion of a judicial proceeding pursuant to subsection (a) of this section.

**CREDIT(S)**

(Pub.L. 93-627, § 12, Jan. 3, 1975, 88 Stat. 2138.)

33 U.S.C.A. § 1511, 33 USCA § 1511
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1a

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1513

§ 1513. Public access to information

Currentness

**(a) Inspection of copies; reproduction costs; protected information**

Copies of any communication, document, report, or information transmitted between any official of the Federal Government and any person concerning a deepwater port (other than contracts referred to in section 1504(c)(2)(B) of this title) shall be made available to the public for inspection, and shall be available for the purpose of reproduction at a reasonable cost, to the public upon identifiable request, unless such information may not be publicly released under the terms of subsection (b) of this section. Except as provided in subsection (b) of this section, nothing contained in this section shall be construed to require the release of any information of the kind described in subsection (b) of section 552 of Title 5 or which is otherwise protected by law from disclosure to the public.

**(b) Information disclosure prohibition; confidentiality of certain disclosures**

The Secretary shall not disclose information obtained by him under this chapter that concerns or relates to a trade secret, referred to in section 1905 of Title 18, or to a contract referred to in section 1504(c)(2)(B) of this title, except that such information may be disclosed, in a manner which is designed to maintain confidentiality--

**(1)** to other Federal and adjacent coastal State government departments and agencies for official use, upon request;

**(2)** to any committee of Congress having jurisdiction over the subject matter to which the information relates, upon request;

**(3)** to any person in any judicial proceeding, under a court order formulated to preserve such confidentiality without impairing the proceedings; and

**(4)** to the public in order to protect health and safety, after notice and opportunity for comment in writing or for discussion in closed session within fifteen days by the party to which the information pertains (if the delay resulting from such notice and opportunity for comment would not be detrimental to the public health and safety).

**CREDIT(S)**

(Pub.L. 93-627, § 14, Jan. 3, 1975, 88 Stat. 2139.)

33 U.S.C.A. § 1513, 33 USCA § 1513

2a

Current through P.L.118-7. Some statute sections may be more current, see credits for details.

**End of Document**                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

3a

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1514

§ 1514. Remedies

Currentness

**(a) Criminal penalties**

Any person who willfully violates any provision of this chapter or any rule, order, or regulation issued pursuant thereto commits a class A misdemeanor for each day of violation.

**(b) Orders of compliance; Attorney General's civil action; jurisdiction and venue**

**(1)** Whenever on the basis of any information available to him the Secretary finds that any person is in violation of any provision of this chapter or any rule, regulation, order, license, or condition thereof, or other requirements under this chapter, he shall issue an order requiring such person to comply with such provision or requirement, or he shall bring a civil action in accordance with paragraph (3) of this subsection.

**(2)** Any order issued under this subsection shall state with reasonable specificity the nature of the violation and a time for compliance, not to exceed thirty days, which the Secretary determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements.

**(3)** Upon a request by the Secretary, the Attorney General shall commence a civil action for appropriate relief, including a permanent or temporary injunction or a civil penalty not to exceed $25,000 per day of such violation, for any violation for which the Secretary is authorized to issue a compliance order under paragraph (1) of this subsection. Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides, or is doing business, and such court shall have jurisdiction to restrain such violation, require compliance, or impose such penalty.

**(c) Attorney General's action for equitable relief; scope of relief**

Upon a request by the Secretary, the Attorney General shall bring an action in an appropriate district court of the United States for equitable relief to redress a violation by any person of any provision of this chapter, any regulation under this chapter, or any license condition. The district courts of the United States shall have jurisdiction to grant such relief as is necessary or appropriate, including mandatory or prohibitive injunctive relief, interim equitable relief, compensatory damages, and punitive damages.

**(d) Vessels; liability in rem; exempt vessels; consent or privy of owners or bareboat charterers**

Any vessel, except a public vessel engaged in noncommercial activities, used in a violation of this chapter or of any rule or regulation issued pursuant to this chapter, shall be liable in rem for any civil penalty assessed or criminal fine imposed and may

4a

be proceeded against in any district court of the United States having jurisdiction thereof; but no vessel shall be liable unless it shall appear that one or more of the owners, or bareboat charterers, was at the time of the violation, a consenting party or privy to such violation.

## CREDIT(S)

(Pub.L. 93-627, § 15, Jan. 3, 1975, 88 Stat. 2140; Pub.L. 101-380, Title IV, § 4302(m), Aug. 18, 1990, 104 Stat. 539.)

33 U.S.C.A. § 1514, 33 USCA § 1514
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    2

United States Code Annotated
Title 33. Navigation and Navigable Waters (Refs & Annos)
Chapter 29. Deepwater Ports (Refs & Annos)

33 U.S.C.A. § 1515

§ 1515. Citizen civil action

Currentness

**(a) Equitable relief; case or controversy; district court jurisdiction**

Except as provided in subsection (b) of this section, any person may commence a civil action for equitable relief on his own behalf, whenever such action constitutes a case or controversy--

**(1)** against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any provision of this chapter or any condition of a license issued pursuant to this chapter; or

**(2)** against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under this chapter which is not discretionary with the Secretary. Any action brought against the Secretary under this paragraph shall be brought in the district court for the District of Columbia or the district of the appropriate adjacent coastal State.

In suits brought under this chapter, the district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any provision of this chapter or any condition of a license issued pursuant to this chapter, or to order the Secretary to perform such act or duty, as the case may be.

**(b) Notice; intervention of right by person**

No civil action may be commenced--

**(1)** under subsection (a)(1) of this section--

**(A)** prior to 60 days after the plaintiff has given notice of the violation (i) to the Secretary and (ii) to any alleged violator; or

**(B)** if the Secretary or the Attorney General has commenced and is diligently prosecuting a civil or criminal action with respect to such matters in a court of the United States, but in any such action any person may intervene as a matter of right; or

**(2)** under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Secretary.

Notice under this subsection shall be given in such a manner as the Secretary shall prescribe by regulation.

6a

**(c) Intervention of right by Secretary or Attorney General**

In any action under this section, the Secretary or the Attorney General, if not a party, may intervene as a matter of right.

**(d) Costs of litigation; attorney and witness fees**

The Court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party whenever the court determines that such an award is appropriate.

**(e) Statutory or common law rights unaffected**

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement or to seek any other relief.

**CREDIT(S)**

(Pub.L. 93-627, § 16, Jan. 3, 1975, 88 Stat. 2140.)

33 U.S.C.A. § 1515, 33 USCA § 1515
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

7a

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                                    2

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Subchapter A. National Environmental Policy Act Implementing Regulations (Refs & Annos)
        Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.10

§ 1502.10 Recommended format.

Effective: September 14, 2020
Currentness

(a) Agencies shall use a format for environmental impact statements that will encourage good analysis and clear presentation of the alternatives including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication:

(1) Cover.

(2) Summary.

(3) Table of contents.

(4) Purpose of and need for action.

(5) Alternatives including the proposed action (sections 102(2)(C)(iii) and 102(2)(E) of NEPA).

(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA).

(7) Submitted alternatives, information, and analyses.

(8) List of preparers.

(9) Appendices (if any).

(b) If an agency uses a different format, it shall include paragraphs (a)(1) through (8) of this section, as further described in §§ 1502.11 through 1502.19, in any appropriate format.

8a

SOURCE: 85 FR 43357, July 16, 2020; 85 FR 43363, July 16, 2020; 87 FR 23469, April 20, 2022, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

Notes of Decisions (9)

Current through July 28, 2023, 88 FR 49265. Some sections may be more current. See credits for details.

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   2