# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 4, 2024

Lyle W. Cayce
Clerk

———————

No. 23-60027

———————

CITIZENS FOR CLEAN AIR & CLEAN WATER IN BRAZORIA
COUNTY; TEXAS CAMPAIGN FOR THE ENVIRONMENT; CENTER
FOR BIOLOGICAL DIVERSITY; TURTLE ISLAND RESTORATION
NETWORK; SIERRA CLUB,

*Petitioners*,

*versus*

UNITED STATES DEPARTMENT OF TRANSPORTATION; PETE
BUTTIGIEG, *in his official capacity as Secretary of the U.S. Department of
Transportation*; UNITED STATES COAST GUARD, *an agency of the U.S.
Department of Homeland Security*; RICHARD V. TIMME; UNITED
STATES MARITIME ADMINISTRATION, *an agency of the U.S.
Department of Transportation*; ANN PHILLIPS, *in her official capacity as
Administrator of* THE U.S. MARITIME ADMINISTRATION; LINDA L.
FAGAN, *in her official capacity as Commandant of the U.S. Coast Guard*,

*Respondents*.

———————————————

Appeal from the Maritime Administration
Agency No. MARAD-2019-0011

———————————————

Before WIENER, WILLETT, and DOUGLAS, *Circuit Judges*.
DANA M. DOUGLAS, *Circuit Judge*:

    A government agency approved a license to construct and operate a
large deepwater oil facility a few miles from Texas's coast. Several

No. 23-60027

environmental organizations allege that the approval was unreasonable, claiming that the reviewing agency failed to support its decision with a well-reasoned environmental impact analysis. Such a failure, the organizations assert, was in violation of the Deepwater Port Act and the National Environmental Policy Act. The question presented is whether the agency's approval was arbitrary or capricious. We hold that the agency adequately considered the environmental consequences of the facility before approving its deepwater port license and, on those grounds, DENY the petition for review.

I

America's deepwater oil and gas industry was born in the late 1930s when proprietors discovered oil in the Gulf of Mexico's open waters. To access the valuable minerals, workers constructed wooden platforms with timber pilings and floating decks meant to wash away in the event of storms. Diane Austin, et al., MMS 2004-049, History of the Offshore Oil and Gas Industry in Southern Louisiana: Interim Report 72–74 (U.S. Dep't of the Interior, vol. 1 2004). Little did anyone know then that these primitive wooden structures would lay the foundation for the more than 3,000 deepwater oil facilities in operation today. *See Gulf of Mexico Data Atlas: Oil and Gas Structures*, Nat'l Oceanic & Atmospheric Admin., https://www.ncei.noaa.gov/maps/gulf-data-atl as/atlas.htm?plate=Offshore%20Structures (last visited Feb. 4, 2023).

With such an imposing modern infrastructure, it may come as no surprise that the Gulf leads the nation in producing and exporting domestic oil to markets worldwide. That reality nevertheless presents challenges the builders of the first offshore platforms likely never considered. One challenge, for example, is efficiently exporting the roughly 3.9 million barrels of crude oil that move from the region daily. *Petroleum & Other Liquids,*

No. 23-60027

*Annual-Thousand Barrels per Day* (2023), U.S. ENERGY INFO. ADMIN., https://www.eia.gov/dnav/pet/pet_move_exp_dc_R30-Z00_m bblpd_a.htm (last visited Mar. 26, 2024). The most efficient practice today is utilizing large tankers capable of carrying over a million barrels at once. Yet moving these quantities of oil on such large vessels comes with a cost. The weight of the cargo makes the metal tankers weighty, requiring deep waters to support their hull. Practically, that means oil facilities near land cannot load the vessels because the coastal waters are too shallow. To circumvent this issue, the industry employs a "reverse lightering" process where smaller ships ferry oil from coastal ports and transfer their cargo to larger vessels in deeper waters. While reverse lightering addresses the coastal-loading issue, the process has a few setbacks of its own: It multiplies shipping traffic and expenses for oil companies.

The Sea Port Oil Terminal (SPOT or Port) offers a possible alternative. Billed as the largest deepwater terminal of its kind, SPOT would directly load a maximum of 365 very large crude carriers (VLCCs) in deep waters each year. SPOT would operate several miles from the coast of Texas and connect to existing land-based oil facilities through subsea and onshore pipelines. Operating at total capacity, SPOT could store and export 18 percent of total U.S. oil production annually. Such a capability would diminish the need for reverse lightering trips and consequently reduce oil transportation costs.

For all its commercial promise, however, SPOT has drawn significant opposition from Petitioners who constitute local and national environmental organizations. Among their many concerns, Petitioners argue that the project's construction and operation will cause severe and lasting global consequences. Operating SPOT, Petitioners assert, would produce emissions on the Gulf Coast equivalent to "more than 80 new coal-fired power plants." That staggering quantity of harmful pollutants, they say, will

No. 23-60027

not only undercut U.S. and global emission policies but also exacerbate the detrimental effects of climate change. Another worry is that SPOT could increase the likelihood of mass oil spills along miles of Texas coastline. Petitioners believe such disasters would have catastrophic economic impacts throughout the region.

As for ecological effects, Petitioners say the project threatens the Gulf's marine environment. By encouraging shipping traffic, increasing air pollution, discharging hazardous substances, and emitting harmful noise, Petitioners claim that SPOT puts several endangered animals at risk. Of particular concern is the Rice's whale, a non-migratory cetacean that lives in the region's tropical waters. Sadly, scientists believe that no more than fifty Rice's whales remain in the natural world. Petitioners believe that operating the Port will bring these whales closer to extinction.

This appeal is not the first occasion that Petitioners raised these and other concerns about SPOT. For several years, they voiced their criticisms directly to the government agency reviewing SPOT's deepwater port application. Even so, the project is slated to move forward. After conducting hearings, considering numerous public comments, and drafting a thousand-page environmental impact statement, the Government approved SPOT's license for construction and operation.

Continuing to believe that SPOT's dangers far outweigh its benefits, however, Petitioners appealed the licensing decision. They allege that the agency failed to conduct the appropriate level of review in its environmental impact statement and follow relevant statutory provisions during the approval process. To remedy these alleged failures, Petitioners ask us to vacate the agency's decision and remand this case for additional review. We consider Petitioners' challenges below. But before addressing them, we must

No. 23-60027

first ensure that we have jurisdiction to do so. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).

II

The parties disagree about whether Petitioners have standing to challenge the agency's licensing decision. Such a dispute invokes the constitutional limitations rooted in Article III's "case" or "controversy" clause. Satisfying the Article III threshold requires Petitioners to demonstrate their "'personal stake' in the case." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). To do so, at least one plaintiff must point to some concrete injury "'fairly traceable' to the actions of the defendant," which will "likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992)).[1]

Enterprise Products Operating, LLC (Enterprise),[2] one of SPOT's principal designers, argues that Petitioners fail to articulate a cognizable injury.[3] It claims Petitioners offer only their subjective "concerns" without proof that they or anyone else will suffer the harms alleged. Enterprise

---

[1] That Petitioners here constitute organizations adds another level of review to the standing inquiry: They must show "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). Despite this added layer of analysis, however, only the first element is in dispute—that is, whether the organizations here can point to a single member with standing to challenge the Secretary's approval of SPOT's license application.

[2] Enterprise is appearing as Intervenor in this case along with SPOT Terminal Services, LLC, another entity who helped design the Port. Although the parties appeared together on appeal, this ruling refers to both Intervenors as "Enterprise" for clarity.

[3] The Government does not dispute Petitioners' constitutional standing.

stresses that the concerns regarding harmful oil spills, decreased air quality, and danger to threatened species are all speculative, subjective, and purely "hypothetical." Enterprise believes that the same logic extends to Petitioners' fears about decreased property values, damage to the local economy, loud noise from construction, and harmful air emissions from construction equipment. At most, Enterprise asserts, Petitioners have managed to identify "possible future injur[ies]," which "will not suffice" under Article III. *See Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023) (per curiam) (internal quotation marks omitted).

Enterprise's claims are unpersuasive. It is true that SPOT's construction has yet to break ground. And in that sense, it may not appear that Petitioners' alleged injuries are "actual" or "imminent." But "[t]he Supreme Court has expressly held that a 'threatened injury' will satisfy the 'injury in fact' requirement for standing." *Sierra Club Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 556 (5th Cir. 1996) (citing *Valley Forge Christian Coll. V. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)). This principle is an important one for environmental plaintiffs who, like the ones here, challenge "an administrative agency's failure to satisfy a procedural requirement." *Ctr. For Biological Diversity*, 937 F.3d at 542; *see also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."). According to Petitioners, the procedural violation here was the agency's approval of SPOT's deepwater port application without the environmental review required by statute. *See* 33 U.S.C. § 1505. Although that allegation alone is insufficient to prove an injury, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009), Petitioners may nevertheless establish standing if the agency's unlawful action threatens their "concrete interest," *see Shrimpers*

No. 23-60027

*& Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 426 (5th Cir. 2020) (quoting *Lujan*, 504 U.S. at 573 n.8).

The relevant question, then, is whether Petitioners have identified a concrete interest impaired by the agency's inadequate environmental review. They have. Consider the sworn statements of Pamela Harris, a Sierra Club member[4] who owns a home near Surfside Beach in Brazoria County, Texas. SPOT plans to construct a pipeline connecting its offshore terminal to land-based facilities one mile from her property. Harris claims the proposed pipelines will carry increased risks of oil spills, unwanted noise, habitat destruction, and property devaluation. The construction and operation of the pipelines, she claims, would create an aesthetic and physical nuisance, negatively affecting her enjoyment of her property, her recreational activities on Surfside Beach, and her observation of the beach's migratory birds and nesting sea turtles. As the Supreme Court has explained, environmental plaintiffs have a cognizable interest in their "desire to use or observe an animal species, even for purely esthetic purposes." *Lujan*, 504 U.S. at 563. So too "when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

Because Harris says she "plan[s] to make use of the specific sites" where the environmental effects from SPOT would allegedly be felt, she has identified cognizable interests threatened by the project. *See Summers*, 555 U.S. at 499. We are also satisfied that the agency's alleged procedural

---

[4] She is a member of Citizens for Clean Air & Clean Water in Brazoria County and the Sierra Club.

No. 23-60027

violations directly relate to Harris's injuries: The agency approved SPOT's license based on an allegedly deficient environmental review, which, in turn, will lead to the construction of a project causing the injuries claimed above. *See Lujan*, 504 U.S. at 572 n.8. Harris has thus shown that she has standing to challenge the agency's actions.[5] And because only "one" plaintiff needs standing to consider a "petition for review," *Massachusetts*, 549 U.S. at 518, this environmental suit may proceed accordingly, *see Biden*, 143 S. Ct. at 2365. Assured of our jurisdiction, we turn next to the heart of Petitioners' appeal.

### III

To "promote" efficient oil production in ocean waters, the Deepwater Port Act (DPA) establishes procedures for constructing and operating "deepwater ports." *See* 33 U.S.C. § 1501. Deepwater ports, in turn, are "fixed or floating manmade structure[s] . . . located beyond State seaward boundaries . . . that are used or intended for use as a port or terminal for the transportation, storage . . . of oil or natural gas." *Id.* § 1502(9)(A). The DPA grants the Secretary of Transportation authority to issue licenses "for the ownership, construction, and operation" of these structures, *see id.* § 1503; the Secretary delegates that reviewing authority to the Maritime Administration and the United States Coast Guard. 49 C.F.R. §§ 1.93(h)(1)–(h)(2).

---

[5] We are likewise satisfied that standing's traceability and redressability elements are met. As noted, the Secretary's alleged procedural failures resulted in approving SPOT's license without undergoing the legally mandated review process, which, in turn, will lead to the construction of a project, causing Harris's injuries discussed above. *See Ctr. for Biological Diversity*, 937 F.3d at 543. And while an adequate environmental impact statement may not cause SPOT's "license to be withheld or altered," it may at least force the Government to reconsider its decision, which satisfies the redressability element. *Lujan*, 504 U.S. at 572 n.7.

No. 23-60027

Before approving a deepwater port license, the DPA mandates that the Secretary undergo several analyses. One mandated evaluation is considering whether the proposed port would be in the "national interest" and whether it aligns with "national policy goals and objectives" like "national security . . . [and] energy sufficiency." 33 U.S.C. § 1503(c)(3). As relevant here, the Secretary must also analyze the proposed project's effect on "environmental quality." *Id.* To do so, the DPA incorporates procedures outlined in the National Environmental Policy Act (NEPA). *Id.* § 1505.

Recognizing the "profound impact" of human activity on the environment, Congress passed NEPA to "create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). Among its many objectives, a core principle of NEPA is "fulfill[ing] the responsibilities of each generation as trustee of the environment for succeeding generations." *Id.* § 4331(b)(1). Despite these ambitious goals, however, NEPA does not mandate environmentally friendly results; it imposes procedural requirements ensuring that the government considers "the environmental impact of [its] proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 42 U.S.C. § 4332).

As pertinent here, one of these requirements is the drafting of environmental impact statements (EIS). NEPA mandates the creation of an EIS whenever "major Federal actions significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.1. In crafting these reports, the government must collect accurate scientific data and "disseminate information concerning the projects' environmental consequences." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992); *see* 40 C.F.R. §§ 1500.1(b), 1502.24. The review must also, among other evaluations, discuss the purpose and need of the proposed action, address reasonable alternatives, and consider the impacts of those

alternatives. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14, 1502.16. Though demanding, these procedures are in place to ensure the government takes a "hard look" at the effects of its decisions before approving projects that alter our shared environment. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989).

## IV

In this case, Petitioners claim that the reviewing agency failed to take that "hard look" as it crafted the Final Environmental Impact Statement (FEIS) for SPOT. They contend that the FEIS applied a "flawed" alternatives analysis and "grossly underestimate[ed]" SPOT's environmental impacts concerning a host of foreseeable consequences, including oil spills, harmful impacts on animals, catastrophic ruptures, and diminished air quality. Compounding issues further, Petitioners say that the agency failed to follow certain procedures that the DPA mandates—like approval timelines and energy sufficiency considerations. In their briefing, Petitioners ask that we remand this case for the agency to engage in more robust analyses.

## A

We review an EIS under the rule of reason and "must not substitute [our] judgment for that of the agency." *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000) (cleaned up). We apply a highly deferential review standard in these cases because preparing an EIS requires highly technical knowledge. *Id.* As we lack such expertise, we must "defer to the informed discretion of the responsible federal agencies." *Id.* (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)). Agencies, however, are not infallible. And when their decisions are arbitrary or capricious, we have the power to set them aside. *See* 5 U.S.C. § 706. An arbitrary or capricious action is one that relies on improper factors, fails to consider key information,

No. 23-60027

offers a decision that the record does not support, or lacks plausibility. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In applying that standard to an EIS, we are guided by several principles. Most importantly, we consider,

> (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*Westphal*, 230 F.3d at 174 (quoting *Isle of Hope Hist. Ass'n v. U.S. Army Corps of Eng'rs,* 646 F.2d 215, 220 (5th Cir. 1981)). With these guideposts in mind, we address each of Petitioners' challenges in turn.

*Oil Spill Risks*

We begin with oil spill risks. Petitioners first contend that "[t]he FEIS ignores the full scope of probable oil spill locations and sizes expected to occur throughout SPOT's network." Among the omissions, Petitioners argue that the agency never addressed probable spill analyses for several miles of pipelines, loading and processing facilities, and Port components near communities. As Petitioners put it, the agency instead only addressed "likely" oil spill models with limited releases. As for the spills the FEIS did consider, Petitioners assert that the agency failed to evaluate the broad effects to wildlife habitats or marine ecosystems. One prominent oversight, they note, is the FEIS's failure to analyze the harmful compounds in the most likely spills on marine species near SPOT and the effect of those compounds on endangered sea life. On this argument, Petitioners insist that the agency

No. 23-60027

shirked its responsibility and "punt[ed]" direct evaluations in favor of brief and superficial analyses.

We disagree. To start, we note that the FEIS includes two thorough analyses of SPOT's oil spill risks: one performed by the applicant and the other by the Coast Guard. The first analysis considered spillage throughout SPOT's infrastructure. That review also included oil spill modeling for a 2,200-barrel hypothetical release of three different oil types. In the second spill analysis, the Coast Guard analyzed the scope and effects of varying oil spills, ranging from 17.5 to over 600,000 barrels.[6] Using these varying ratios, the agency examined several spill scenarios from SPOT, SPOT's coastal pipelines, and SPOT's possible collision with tankers.

The FEIS also considered oil spill risks to marine species in similar depth. It explains, for instance, that spills could cause severe skin and eye wounds, lung disease, and gastrointestinal injuries to aquatic species. And it discusses explicitly how a large oil spill could affect threatened and endangered marine mammals, sea turtles, and fish. To bolster its analysis, the agency even consulted with the National Marine Fisheries Service, who produced a report that the EIS incorporates by reference. Considering the detail and extent of the analysis in the record, the agency adequately considered the direct and indirect effects of varying spills. In so doing, the agency's review did not violate NEPA.

*Worst-Case Oil Spill*

Petitioners next argue that the agency's analysis of SPOT's worst-case disasters is deficient. They explain that the FEIS fails to examine impacts caused by a catastrophic rupture or the broad effects of worst-case

---

[6] It discussed the possible effects on groundwater, surface water, soil, wetlands, vegetation, habitats, onshore oyster reefs, wildlife, and listed and non-listed species.

scenarios from different points in SPOT's infrastructure. According to Petitioners, the agency should have applied data projecting a maximum possible spill to a worst-case discharge impact analysis. *See* 40 C.F.R. §§ 1500.1(b), 1502.24. But in Petitioners' telling, the FEIS traded those considerations for "mere generalization[s]" insufficient to satisfy the "hard look" standard.

When promulgating EIS regulations in the 1970s, the Council for Environmental Quality (CEQ) required agencies to consider a project's "worst case scenarios" if "certain information relevant to the agency's evaluation of the proposed action is either unavailable or too costly to obtain." *Robertson*, 490 U.S. at 354. In the ensuing decade, however, a new regulation supplanted the "worst case" guidance: The CEQ modified the rule to mandate that federal agencies generally consider "significant adverse impacts" that are "reasonably foreseeable" "even if their probability of occurrence is low." *See* National Environmental Policy Act Regulations, 50 Fed. Reg. 32234-01 (Aug. 9, 1985) (to be codified at 40 C.F.R. pt. 1502); *Robertson*, 490 U.S. at 354. Today, that modification remains largely unchanged. *See* 40 C.F.R. §§ 1502.21(c), (d) (explaining that federal agencies should generally consider "reasonably foreseeable significant adverse impacts . . . even if their probability of occurrence is low.").

Addressing Petitioners' argument therefore requires us to ask whether the agency evaluated SPOT's reasonably foreseeable significant adverse effects. *Id.* Answering that question does not require much heavy lifting. The record shows that the FEIS indeed analyzed potential effects and risks of worst-case oil spills in several situations that the agency considered "reasonably foreseeable." For example, the agency considered SPOT's worst-case discharge for both onshore and offshore components and simulated the resulting oil dispersion across the Gulf. The agency also projected the extent of catastrophic oil slick spread by applying

No. 23-60027

meteorological conditions such as waves, winds, currents, and solar radiation. In weighing the data, the agency acknowledged that the worst-case spill "may harm communities, contaminate the water source, and destroy or damage sensitive breeding grounds and important species." It further referenced a biological assessment that analyzed the largest spill scenario and the collateral impacts on endangered species. Because the FEIS offered an in-depth assessment of such adverse effects, its analysis was neither arbitrary nor capricious.

Perhaps anticipating such a result, Petitioners alternatively argue that the FEIS's worst-case analysis suffers irredeemable formatting flaws. They explain that the agency confined the relevant examination to the FEIS's safety impact portion. In choosing to do so, Petitioners argue that the agency prevented adequate public disclosure of SPOT's worst-case environmental threats. On this argument, Petitioners conclude that the agency's formatting was not only confusing, but grounds for vacating the FEIS.

Stylistic choices within an EIS, however, are not dispositive of whether an agency took a "hard look" at a project's environmental consequences. *See Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013) ("An agency . . . has discretion in deciding how to organize and present information in an EIS."). NEPA does not require that an EIS strictly adhere to a formal structure. Its own regulations say as much: An EIS can be valid so long as it includes the substantive discussion required by its corresponding guidelines. *See* 40 C.F.R. § 1502.10. And because Petitioners here fail to show how the agency's formatting decisions affect "the substance of [the] decision reached," *see United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979)), any challenge to the FEIS's format is meritless.

No. 23-60027

*Impacts on Protected Species*

Petitioners next challenge the FEIS's review of protected species. Of principal concern, Petitioners say the agency failed to supplement the FEIS with new data concerning the habitat of Rice's whales. As mentioned, the Rice's whale is a highly imperiled cetacean with one of the world's smallest whale populations. As the agency crafted the FEIS, it was understood that the Rice's whale was generally confined near Florida's coast. But that understanding was called into question by a recent scientific discovery: After a period of sea acoustic monitoring in the western Gulf, scientists detected Rice's whale vocalizations near the coast of Texas. Scientists outlined these findings in a research article, which was not published until after SPOT's FEIS review. As the FEIS lacks any reference to these new scientific findings, Petitioners urge us to remand this case to the agency for a supplemental evaluation.

We decline to do so. Agencies must indeed supplement their EIS when "significant new circumstances or information" comes to light. 40 C.F.R. §§ 1502.9(c)(1)(i)–(ii). But not all "new" information is "significant." *See Marsh*, 490 U.S. at 373. And when determining what information warrants EIS supplementation, courts generally defer to the agency's well-informed judgment. *Id.* at 377. Here, the agency concluded that the new data on Rice's whales did not require a supplemental EIS. The vocalization study, the agency reasoned, did not alter the FEIS analysis because it already considered possible effects the Port may have on Rice's whales in the region. When addressing SPOT's potential harm to the species, the FEIS concluded that the whale's occurrence near SPOT would be "extremely unlikely" because its core distribution area would still be "in water depths ranging from 100–400 m[eters]" or 328–1312 feet. The agency explained that SPOT will be constructed in 115-foot waters, meaning any encounter with the whale would be "quite rare."

No. 23-60027

At no point did the FEIS say that an encounter with a Rice's whale was impossible; it observed that the whale "could be affected by temporary changes in water quality and noise" and that the greatest threats to the whale would be vessel strikes and oil spills. The agency also conducted a post-EIS Biological Opinion, affirming these conclusions and restating that Rice's whales are "most commonly observed along the northeastern [Gulf] . . . off the west coast of Florida, far from the project site." These findings are uncontroverted by the whale vocalization study. Indeed, the relevant article acknowledged that Rice's whale populations largely remain confined in the northeastern Gulf. *See* Melissa S. Soldevilla et al., *Rice's Whales in the Northwestern Gulf of Mexico: Call Variation and Occurrence Beyond the Known Core Habitat*, 48 Endang. Species Res. 155–174 (2022). For these reasons, the agency reasonably determined that it need not supplement its FEIS,[7] and Petitioners' challenge accordingly fails.

*Air Quality Analysis*

Petitioners also say the FEIS was insufficient because the agency failed to take a "hard look" at SPOT's direct, indirect, and cumulative air quality impacts. They begin by arguing that the FEIS does not evaluate the full extent of the Port's ozone effects. Ozone is a harmful pollutant that is not directly emitted but reacts to other compounds or "ozone precursors" often produced from industrial projects. As it stands, the Port is slated for construction in a "non-attainment" area, meaning ozone pollution in the region exceeds levels the EPA deems safe for human health. As Petitioners note, however, the EPA recently downgraded the region's non-attainment

---

[7] Beyond the Rice's whale, the FEIS also addressed the cumulative impacts of SPOT on other protected Gulf species from vessel strikes, underwater noise, entanglement, marine debris, and oil spills. Perhaps more importantly, it conducted a ten-page threatened and endangered species review. In sum, the agency's review was substantial, and its conclusions were not arbitrary or capricious.

classification from "serious" to "severe" just before the agency approved SPOT's application. Such a downgrade is consequential because it generally requires that agencies undergo added layers of air quality analyses—analyses that Petitioners say are absent from the FEIS. For example, Petitioners assert that the agency should have considered the Port's "cumulative" air quality impacts. But it did not. As Petitioners put it, the agency instead relied on the Port's single stationary source emissions. In doing so, it concluded in the FEIS that SPOT would have minimal effects on the region's air quality standards. But had the agency instead relied on cumulative ozone emissions, Petitioners insist that the agency would have reached a different conclusion.

The Government takes a different view. It maintains that the agency was correct to look at single stationary source emissions data. In so arguing, the Government points to the EPA's own guidance: "If the single-source analysis shows that a proposed source will not have a significant impact on air quality, permitting authorities may generally conclude that there is no need to conduct a cumulative impact analysis to assess whether there will be any violations of the [national ambient air quality standards (NAAQS)] . . . ." *Memorandum: Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, Env't Prot. Agency, https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf (last visited Mar. 24, 2024); 40 C.F.R. § 51.166. Using these guidelines and working alongside state officials, the agency produced a report that analyzed whether SPOT would conform with state and federal air quality standards.[8] The upshot of the report was that constructing the Port would have no

---

[8] The Clean Air Act establishes requirements that ensure that actions approved by federal agencies do not adversely affect a state's ability to meet the NAAQS. 42 U.S.C. § 7506(c)(1).

No. 23-60027

negative impacts on the region's air quality. As a result, the Government says the agency need not engage in further analysis.

We agree and conclude that the agency's air quality review was sufficient and aligned with government regulations. True enough, the EPA downgraded the region's non-attainment rating after the FEIS was issued. But that downgrade did not alter the agency's review because the FEIS determined that SPOT would not increase the severity of any existing ozone-standard violation in any area. The agency even responded to post-EIS concerns about the air quality downgrade and mandated that SPOT meet certain reporting requirements in the agency's record of decision. Beyond SPOT's stationary effects, the FEIS also considered ozone pollutants from mobile sources, such as ships, that would use SPOT. The agency compared these findings against the pollution emitted through current oil export practices, such as reverse lightering. In so comparing, the FEIS concluded that, in the end, SPOT "could result in fewer overall emissions" because it would reduce shipping traffic to and from onshore facilities.[9] We agree with the Government that the change in attainment status, in this case, does not rise to the kind of significant new information that would have required supplementing the FEIS. *See* 40 C.F.R. §§ 1502.9(d)(1)(i)–(ii). On this point, Petitioners' argument fails.

Petitioners' other challenge to the air quality analysis is also without merit. Their remaining concern is that the FEIS never considered the cumulative impacts of ozone pollutants alongside other regional deepwater ports. That omission, Petitioners think, means that the FEIS's conclusions

---

[9] It also referenced a study conducted by SPOT's applicants that considered SPOT's offshore pollutants, which the agency acknowledged "determined that the operational project would remain in compliance with all applicable air quality standards."

No. 23-60027

on air quality are incomplete and based on erroneous assumptions. But that is not so. According to the agency, the FEIS considered impacts from a 31.1-mile radius—a scope of review suggested by EPA regulations. Because the other offshore terminals and SPOT's own onshore components do not fall within a 31.1-mile span, the FEIS omitted a cumulative impact analysis of other facilities. We find that the agency's approach was reasonable. Even if Petitioners might propose another analytical method, "[c]ourts are not in a position to decide the propriety of competing methodologies . . . but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006) (quoting *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)). The record here shows that the agency at least took a "hard look" at the project's effects on air quality. As a result, we need not question the agency's chosen method of analysis. *See Westphal*, 230 F.3d at 175.

*Alternatives Analysis*

Petitioners next fault the FEIS's alternatives analysis. They first suggest that the agency failed to address an alternative smaller-sized project that could meet the primary purpose and need for SPOT with less severe environmental impacts. According to Petitioners, other than reviewing the relocation of specific Port components, the agency's only alternative analyses involved moving oil at SPOT's maximum capacity—that is, two million barrels per day. Without considering anything else, Petitioners contend that the agency's review was arbitrary and capricious.

A core component of an EIS is its discussion of "a reasonable range of alternatives . . . that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii). Agencies must examine these alternatives in a way that "permit[s] a reasoned choice among different courses of action." *Westphal*, 230 F.3d at 174 (quoting *Isle of*

No. 23-60027

*Hope*, 646 F.2d at 220). That said, a party who challenges an agency's failure to consider a specific alternative usually must alert the agency to the proposed alternative, which "[g]enerally . . . means raising the alternative in the comments addressed to the agency." *Shrimpers & Fisherman of RGV v. U.S. Army Corps of Eng'rs*, 56 F.4th 992, 997–98 (5th Cir. 2023). The parties dispute whether Petitioners ever suggested the specific reduced-capacity alternative they now raise on appeal. Even assuming Petitioners did, however, their challenge fails on the merits. This is because agencies need not consider alternatives "at odds with the [p]roject's purpose," *Westphal*, 230 F.3d at 177; NEPA only requires the consideration of "alternatives relevant to the applicant's goals," which the agency may not define. *City of Shoreacres v. Waterworth*, 420 F.3d 440, 450–51 (5th Cir. 2005).

Put another way, the EIS should only identify "alternatives to a project which would reduce environmental harm while still achieving the goals to be accomplished by the proposed action." *S. La. Env't Council, Inc. v. Sand*, 629 F.2d 1005, 1017 (5th Cir. 1980). A primary purpose for SPOT was to "provide a safe, efficient, and reliable facility to allow full capacity loading of a maximum of 365 VLCCs per year." Weighing that objective, the agency examined nearly two dozen alternatives.[10] For instance, it considered expanding existing terminals' capacities. The agency found, however, that a smaller terminal "would not meet the volume that would be exported by the Proposed Action without substantial design modifications and facility additions." In other words, a smaller capacity alternative, like Petitioners suggest, would not meet the specific goals set by the applicant. Though

---

[10] The agency identified an alternative onshore pipeline route, four possible onshore terminal sites, two onshore terminal design options, three possible deepwater port locations, three possible deepwater port design options, various possible control technologies and alternate construction methods, and four options for SPOT's eventual decommissioning.

No. 23-60027

Petitioners may question the wisdom and purpose of SPOT's proposed capacity, they have not shown how the agency's alternatives evaluation was arbitrary or capricious.

Petitioners second challenge to the FEIS's alternatives analysis fares no better. According to Petitioners, the agency failed to analyze the "no action alternative" as NEPA requires. True to its name, this consideration mandates that agencies analyze the consequences if no action is taken on a project. 40 C.F.R. § 1502.14(c). When addressing no action alternatives, courts have held that the FEIS may consider the reasonably foreseeable development that would result if the project did not exist. *See Gulf Restoration Network v. Haaland*, 47 F.4th 795, 801 (D.C. Cir. 2022). In a world without SPOT, Petitioners say, the FEIS assumed that federal agencies would approve other identical ports or that existing ports would export the same volumes of oil as SPOT proposed. But this conclusion, they claim, is untethered to reality. They insist that existing Gulf Coast ports are physically constrained from exporting increasing volumes of oil. To that end, Petitioners aver that those facilities cannot accommodate the volume of shipping traffic necessary to expand export capacity through the existing reverse lightering system.

In SPOT's absence, Petitioners say the agency also overlooked industry forecasts that global oil demand will decline during the project's lifetime. If the Port is built, Petitioners claim that the project will induce new production for export that would not otherwise occur. In fact, Petitioners contend that SPOT will exponentially multiply oil consumption and demand by decreasing transportation costs. Because the agency ignored this apparent reality, Petitioners argue that the no-alternative analysis "frustrated public review" and "obscured" SPOT's significant environmental harm analysis, resulting in an arbitrary and capricious decision.

No. 23-60027

We disagree. The record here demonstrates that the agency reasonably concluded that excess crude oil in the United States would be exported through means other than through the proposed Port. In SPOT's absence, the agency reasoned, "it is likely that exports of oil that are already occurring due to international global demand and domestic excess production would continue to use shoreside terminals in combination with offshore ship-to-ship transfers." And the fact that existing terminals cannot support SPOT's proposed capacity supports the agency's conclusion that more applicants will apply for licenses to meet the unmet need. As for projecting crude oil demand, the agency relied on scientific studies from the Energy Information Administration. Though reasonable minds may disagree with the conclusions reached in those studies, the court's task here is not to ensure that the agency makes the best decision, but only that the decision is informed. *See Robertson*, 490 U.S. at 351. As the FEIS here makes an informed no-action conclusion, it does not violate NEPA standards.

In sum, we hold that the agency took a "hard look at the environmental consequences" of the Port, offered enough detail for the public "to understand and consider the pertinent environmental influences involved," and evaluated alternatives in a way that "permit[s] a reasoned choice among different courses of action." *See Westphal*, 230 F.3d at 174 (quoting *Isle of Hope*, 646 F.2d at 220).

B

Having found that Petitioners' NEPA claims fail, we next turn to their remaining challenges under the DPA. Petitioners first contend that the agency violated the Act by exceeding statutory timelines during SPOT's approval process. The DPA incorporates several deadlines relevant to the review of deepwater port license applications. In total, the statute permits 356 days between when an applicant applies for a license and when the agency issues its final decision. *See* 33 U.S.C. §§ 1504(c)(1), 1504(g), 1504(i)(1).

No. 23-60027

When considering SPOT, the agency exceeded that timeframe by more than 600 days. In consequence, Petitioners say this court should vacate SPOT's approval.

The Government responds that Petitioners lack the statutory authority to stake such a challenge. It claims the timeline provisions were meant to ensure that license applications were processed promptly; they were created to benefit project applicants, the Government says, not groups challenging the project on environmental grounds. We agree. To understand why, start with the Act's citizen suit provision. It allows "[a]ny person . . . who is adversely affected or aggrieved by the Secretary's decision to issue . . . a license" to "seek judicial review" of that "decision in the United States Court of Appeals . . . ." *Id.* § 1516.

Determining whether Petitioners were "adversely affected" by the agency's violation of the deadline turns on whether the injury Petitioners complain of falls within the "zone of interests" the statute in question seeks to protect or regulate. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Bennett*, 520 U.S. at 163. Petitioners here, of course, allege environmental injuries, and the DPA has a broad environmental purpose. *See* 33 U.S.C. § 1501. Still, its citizen suit provision is intended to address *substantive* decisions made by the agency with respect to licenses. *See id.* § 1516. Unfortunately for Petitioners, the DPA's statutory deadlines do not serve a substantive purpose in support of the statute's environmental goals; they are administrative and for the *applicant's* benefit. *See id.* §§ 1504(c)(1), 1504(g), 1504(i)(1). Indeed, it is unclear how Petitioners were "affected or aggrieved by" the agency exceeding the review timeline. *See id.* § 1516. In any case, the DPA does not provide any indication that it would allow litigants to challenge the approval of a license if the agency exceeded its mandated review deadlines. And because "it cannot reasonably be assumed that Congress authorized [Petitioners] to sue" for such a violation, the "legislatively

conferred cause of action" in § 1516 does not "encompass" Petitioners' challenge. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127, 130 (2014) (internal quotation marks omitted).

But the same cannot be said for Petitioners' second DPA claim. According to Petitioners, the agency also failed to determine whether the Port would be consistent with the nation's energy sufficiency goals. Before issuing a license under the DPA, the Secretary of Transportation must conclude that the deepwater port "will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality." 33 U.S.C. § 1503(c)(3). Though the agency here engaged in that inquiry, Petitioners say it did so in "conclusory" fashion without a reasoned determination or record evidence. If true, the agency's failure relates to the grant of the license, and Petitioners' environmental interests are more than "marginally related to . . . the purposes implicit in the statute." *See Lexmark*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). As Petitioners' argument, in this regard, challenges a substantive decision, the DPA grants Petitioners the authority to contest the agency's action. *Id.*

Yet even though Petitioners may have the statutory authority to bring this claim, it nonetheless fails on the merits. When reviewing an agency's determination, we "must give due deference to the agency's ability to rely on its own developed expertise." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976)). So long as an agency's decision was rational and based on consideration of the relevant factors, it should be upheld. Contrary to Petitioners' allegation, the record shows that the agency did engage in an energy sufficiency inquiry before licensing SPOT. Indeed, after consulting with economists from the Department of Transportation, the agency found

No. 23-60027

that the Port would support local and national economic growth. It further found that the project would be "in the national interest and consistent with other policy goals, including energy sufficiency and environmental quality." Even if these conclusions were brief, they were based on consultations with the agency's experts and a detailed review of the record. Given that fact, we cannot say that the agency's determination here was an arbitrary or capricious one. Petitioners' challenge, therefore, cannot serve as a basis to vacate the agency's ultimate decision.

V

After drafting thousands of pages in reports, reviewing lengthy biological studies, and considering hundreds of public comments, the government approved SPOT's deepwater port application. Though Petitioners may disagree with that decision, it was, at the very least, informed. And because NEPA and the DPA require nothing more, Petitioners' petition for review is accordingly DENIED.